In re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION,

Pamela M. Tittle, Thomas O. Padgett, Gary S. Dreadin, Janice Farmer, Linda Bryan, John L. Moore, Betty J. Clark, Shelly Farias, Patrick Campbell, Fanette Perry, Charles Prestwood, Roy Rinard, Steve Lacey, Catherine Stevens, Roger W. Boyce, Wayne M. Stevens, Norman L. and Paula H. Young, Michael L. McCown, and Dan Schultz, on behalf of themselves and a class of persons similarly situated, and on behalf of the Enron Corp. Savings Plan, the Enron Corp. Employee Stock Ownership Plan, and the Enron Corp. Cash Balance Plan, Plaintiffs

v.

Enron Corp., an Oregon Corporation, Enron Corp. Savings Plan Administrative Committee, Enron Employee Stock Ownership Plan Administrative Committee, Cindy K. Olson, Mikie Rath, James S. Preston, Mary K. Joyce, Sheila Knudsen, Rod Hayslett, Paula Rieker, William D. Gathmann, Tod A. Lindholm, Philip Bazelides, James G. Barnhart, Keith Crane, William J. Gulyassy, David Shields, John Does Nos. 1–100, Unknown Fiduciaries of the Enron Corp. Savings Plan or the Esop, the Northern Trust Co., Kenneth L. Lay, Jeffrey Skilling, Andrew S. Fastow, Michael Kopper, Richard Causey, James V. Derrick, Jr., the Estate of J. Clifford Baxter, Mark A. Frevert, Stanley C. Horton, Kenneth Rice, Richard B. Buy, Lou L. Pai, Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Wendy L. Gramm, Robert K. Jaedicke, Charles A. Lemaistre, Joe H. Foy, Joseph M. Hirko, Ken L. Harrison, Mark E. Koenig, Steven J. Kean, Rebecca P. Mark–Jusbasche, Michael S. McConnell, Jeffrey McMahon, J. Mark Metts, Joseph W. Sutton, Arthur Andersen & Co. Worldwide Societe Cooperative, Arthur Andersen LLP, Arthur Andersen United Kingdom, David B. Duncan, Thomas H. Bauer, Debra A. Cash, Roger D. Willard D. Stephen Goddard, Jr., Michael M. Lowther, Gary B. Goolsby, Michael C. Odom, Michael D. Jones, William Swanson, John Stewart, Nancy A. Temple, Donald Dreyfuss, James A. Friedlieb, Joseph F. Berardino, Andersen Does 2 Through 1800 Unknown Partners in Andersen LLP, Merrill Lynch & Co., Inc., J.P. Morgan Chase & Co., Credit Suisse First Boston Corporation, Citigroup, Inc., Salomon Smith Barney Inc., Vinson & Elkins, LLP, Ronald T. Astin, Joseph Dilg, Michael Finch, and Max Hendrick, III, Defendants.

No. MDL 1446.
No. CIV.A.H–01–3913.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 30, 2003.

As Correct Nunc Pro Tunc Oct. 16, 2003.

Lynn Lincoln Sarko, Britt L. Tinglum, Derek W. Loeser, Erin M. Riley, Keller Rohrback LLP, Seattle, WA, Ron Kilgard, Gary A. Gotto, Laurie B. Ashton, Keller Rohrback PLC, Phoenix, AZ, Steve W. Berman, Clyde A. Platt, Jr., Kevin P. Roddy, Karl P. Barth, Andrew M. Volk, Jeniphr A. E. Breckenridge, Christopher A. Jarvis, Hagens & Berman LLP, Seattle, WA, R. Douglas Dalton, Dalton Gotto et al, Phoenix, AZ, James D. Baskin, III, The Baskin Law Firm, Austin, TX, James Eric Wren, III, Williams Squires et al, Waco, TX, Robin L. Harrison, Campbell Harrison et al, Randy J. McClanahan, McClanahan & Clearman, Billy Jack Shepherd, Cruse Scott et al, John G. Emerson, Jr., Emerson Poynter LLP, Thomas E. Bilek, Hoeffner & Bilek LLP, Tom Alan Cunningham, Cunningham Darlow et al, Paul Thomas Warner, Reich & Binstock, Richard Eugene Norman, Douglas & Norman, Bonnie E. Spencer, Spencer and Associates, Roger B. Greenberg, Schwartz Junell et al, William Charles Slusser, Slusser & Frost LLP, Houston, TX, Cary Ira Schacht, Cynthia S. Schiffer, Raymond P. Harris, Jr., Whittenburg Whittenburg et al, Dallas, TX, George Whittenburg, Susan L. Burnette, C. Jared Knight, Karl L. Baumgardner, Whittenburg Whittenburg et al, Amarillo, TX, Gary A. Orseck, Kathryn Schaefer Zecca, Lawrence S. Robbins, Robbins Russell Englert Orseck & Untereiner, LLP, Washington, DC, Amelia Rudolph, Sutherland Asbill et al, Atlanta, GA, Frank W. Morgan, Frank W. Morgan & Asoc, The Woodlands, TX, Andrew M. Schatz, Robert A. Izard, Wayne T. Boulton, Schatz & Nobel PC, Hartford, CT, G. Douglas Jones, Joe R. Whatley, Whatley Drake LLC, Birmingham, AL, Damon Michael Young, Young Pickett et al, Texarkana, TX, Mark Jeffrey Dearman, Dearman & Gerson, Plantation, FL, Joseph H. Weiss, Weiss & Yourman, Tzivia Brody, Stull Stull et al, New York City, Andy Wade Tindel, Provost & Umphrey Law Firm, Tyler, TX, Thomas Walter Umphrey, Provost & Umphrey, Beaumont, TX, for Plaintiffs.

Martin J. Bienenstock, Scott David Lassetter, John B. Strasburger, Weil Gotshal and Manges, Robin C. Gibbs, Gibbs & Bruns, H. Bruce Golden, Golden & Owens LLP, J. Clifford Gunter, III, Bracewell & Patterson, George W. Billy Shepherd, III, Cruse Scott et al, Eric J.R. Nichols, Beck Redden & Secrest, Jack C. Nickens, Nickens Keeton et al, Barry G. Flynn, Attorney at Law, Craig Smyser, Jr., Smyser Kaplan & Veselka, Joseph D. Jamail, II, Jamail and Kolius, Murray J. Fogler, McDade Fogler et al, Linda L. Addison, Fulbright and Jaworski, J. Cal Courtney, Jr., Courtney and Associates, Russell "Rusty" Hardin, Jr., Rusty Hardin and Associates, Edward John O'Neill, Jr., Jason Carrington Norwood, Clements O'Neill et al, Jacalyn D. Scott, Wilshire Scott et al, Richard Warren Mithoff, Jr., Mithoff and Jacks, Lawrence David Finder, Haynes & Boone LLP, Taylor M. Hicks, Jr., Hicks Thomas et al, William Edward Matthews, Gardere Wynne et al, Harvey G. Brown, Jr., Orgain Bell et al, Houston, TX, Anthony C. Epstein, F. Michael Kail, Paul J. Ondrasik, Jr., Steptoe & Johnson LLP, David Clarke, Jr., Keara M. Gordon, Piper Marbury et al, Bruce A. Hiler, Gregory Y Porter, Karen M. Wahle, Kathleen P. Kelly, O'Melveny & Myers, Robert M. Stern, Attorney at Law, Luisa Caro, Michael D. Warden, Sidley Austin et al, Justin S. Antonipillai, Scott B. Schreiber, Arnold & Porter, George A. Borden, John K. Villa, Mary G. Clark, Williams & Connolly LLP, David E. Ross, Mark C. Hansen, Kellogg Huber et al, Amy M. McNamer, Deborah J. Jeffrey, Karen Bell Eisenberg, Norman L. Eisen, Roger E. Zuckerman, Steven M. Salky, Zuckerman Spaeder LLP, Washington, DC, Amy Joseph Pedersen, William F. Martson, Zachary W.L. Wright, Tonkon Torp LLP, Portland, OR, James E. Coleman, Jr., Carrington Coleman et al, Gayle

Anne Boone, Bracewell & Patterson, Charles A. Gall, Rodney Acker, Jenkens & Gilchrist, Dallas, TX, John J. McKetta, III, Graves Dougherty et al, Austin, TX, Christa M. Anderson, Jan Nielsen Little, John W. Keker, Kerker & Van Nest LLP, San Francisco, CA, Richard Bruce Drubel, Jr., Boies Schiller et al, Hanover, NH, Gregory P. Joseph, Attorney at Law, Benard V. Preziosi, Eliot Lauer, Michael J. Moscato, Peter Fleming, Jr., Theresa Ann Foudy, Curtis Mallet–Prevost et al, Catherine E. Palmer, Latham & Watkins, Alyssa A. Qualls, Brad S. Karp, Claudia Hammerman, Jonathan Hurwitz, Margaret E. McGuinness, Mark F. Pomerantz, Michael E. Gertzman, Richard A. Rosen, Robert C. Weisz, Robyn F. Tarnofsky, Todd A. Kipnes, Paul Weiss et al, Bruce D. Angiolillo, Christopher M. Caparelli, David J. Woll, George S. Wang, Jill M. O'Toole, John D. Roesser, Jonathan K. Youngwood, Nihara K. Choudhri, Pieter H.B. Van Tol, Thomas C. Rice, William M. Tong, Simpson Thacher et al, Joseph R. Wallin, Julie Ann North, Karin A. DeMasi, Margaret K. Dooley, Melissa J. Baily, Rachel G. Skaistis, Richard W. Clary, Cravath Swaine et al, James D. Miller, Clifford Chance US LLP, Marshall R. King, Robert F. Serio, Gibson Dunn & Crutcher, New York, NY, Miles N. Ruthberg, Latham & Watkins, Los Angeles, CA, Peter Wald, Latham & Watkins, San Francisco, CA, J. Hoke Peacock, II, Orgain Bell & Tucker, Beaumont, TX, for Defendants.

Donald J. Myers, Douglas K. Spaulding, Michael B. Richman, Reed Smith LLP, Stephen M. Saxon, Groom Law Group CHTD, Washington, DC, for Amicus.

Carolyn S. Schwartz, pro se, US Trustee, New York City, for Trustee.

## MEMORANDUM AND ORDER

HARMON, District Judge.

### *TITTLE* ROADMAP

I. Overview of Causes of Action and Pending Motions ........................... 531

II. Applicable Law ................................................................. 543
 A. ERISA ..................................................................... 543
 1. Fiduciary Liability ................................................. 543
 a. Expansive Definition .......................................... 543
 b. Fiduciary Duties .............................................. 546
 c. "Two–Hat" Doctrine ............................................ 550
 d. Power to Appoint/Remove Plan Fiduciaries ..................... 552
 e. Duty to Disclose ............................................. 555
 f. Personal Liability of Corporate Employees .................... 567
 g. Professional Liability ....................................... 570
 h. Section 404(c) Plans ......................................... 574
 i. Causation .................................................... 579
 2. Co-fiduciary Liability ............................................. 580
 3. Directed Trustee Liability ......................................... 581
 4. Standing and Remedies .............................................. 602
 5. Service on and Liability of the Administrative Committees of the
 Plans as Unincorporated Associations ............................. 614
 B. RICO Amendment ............................................................ 618
 C. Common Law Claims ......................................................... 624
 1. Preemption and the Federal Statutes at Issue ....................... 624
 a. ERISA (Generally) ............................................. 624
 b. SLUSA (Generally) ............................................. 632
 2. ERISA Preemption and Plaintiffs' Common–Law Conspiracy Claim ..... 644
 3. ERISA Preemption and Plaintiffs' Common–Law Negligent Misrepresentation Claim ............................................................. 645

**530**

III. Application of the Law to the Complaint's Allegations ........................ 647
 A. Procedural Objections ............................................. 647
 B. RICO Amendment ............................................... 648
 C. ERISA Breach of Fiduciary and Co–Fiduciary Duty ...................... 652
 1. Count I and Count V ......................................... 653
 2. Count II .................................................. 662
 3. Count III ................................................. 665
 4. Count IV ................................................. 670
 D. Texas Common Law Causes of Action ............................... 679
 1. Count IX: Civil Conspiracy .................................... 679
 2. Count VIII: Negligent Misrepresentation ......................... 682

### RE TITTLE DEFENDANTS' MOTIONS TO DISMISS

The above referenced action is brought on behalf of Enron Corporation ("Enron") employees who were participants in three employee pension benefit plans governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), § 3(2), 29 U.S.C. § 1002(2), specifically the Enron Corporation Savings Plan ("Savings Plan"), the Enron Corporation Employee Stock Ownership Plan ("ESOP"), and the Enron Corporation Cash Balance Plan ("Cash Balance Plan"),[1] and also on behalf of Enron employees who received "phantom stock" as compensation.[2] The first consolidated amended class action com-

---

1. While various parties have submitted copies of the relevant plans and trust agreements, some not the controlling version, the governing versions of all three are available as exhibits A.1–A.5 to the Joint Appendix in Support of Defendants' Motions to Dismiss Amended and Consolidated Complaint (# 271) and as exhibits A–D to *Tittle* Plaintiffs' Appendix for Opposition to Defendants' Motions to Dismiss the First Consolidated and Amended Complaint (# 322).

2. The complaint at 54, ¶ 192 states that the phantom stock was given in lieu of money as wages (or bonuses for work done) and "was not part of any ERISA plan." ERISA governs only employee welfare benefit plans (which provide medical, unemployment, disability, death, vacation, and other benefits) and employee pension benefits plans (which provide retirement income to employees or defers payment of income to employees until termination of covered employment or thereafter), or plans that are a combination of the two. 29 U.S.C. § 1002(1), (2), and (3); *Absher v. Flexi International Software, Inc.*, No. Civ. 3:02CV171 (AHN), 2003 WL 2002778, *6 (D.Conn. April 10, 2003), *citing Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) (Where payments are made not to "provide retirement income" but for some other purpose, ERISA does not apply.); *Hahn v. Nat'l Westminster Bank, N.A.*, 99 F.Supp.2d 275, 278–81 (E.D.N.Y.2000) (citing Department of Labor regulation, 29 C.F.R. § 2510.3–2(c), excluding from the definition of employee benefit plans those that involve payments made to employees as "bonuses for work performed"). In contrast to a pension benefit plan, a bonus plan does not proffer retirement income, but functions for another purpose, such as increased compensation for an incentive or a reward for good work. *Absher*, 2003 WL 2002778 at *6. In the *Tittle* complaint there are no allegations that the phantom stock was designated for retirement income so that it might have constituted an employer "program" that might qualify as an "employee pension benefit" plan under 29 U.S.C. § 1002(2)(A)(i). *See, e.g., Massachusetts v. Morash*, 490 U.S. 107, 118–20, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (payments by an employer out of general company assets as compensation for work, even if deferred, are not employee welfare benefit plans under ERISA); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931–32 (8th Cir.1999) (holding that a phantom stock plan for executive employees to provide incentives and compensation for remaining in their employment "with additional incentives for industry and efficiency," was not a pension plan because redemption of shares was not conditioned upon termination of employment and its purpose was not deferral of income, but was instead a bonus plan exempted from coverage by ERISA). Thus the Court assumes none of the ERISA causes of action is or can be asserted on behalf of the proposed class of the phantom stock recipients.

plaint (instrument # 145) alleges that Defendants are liable for the following violations during a proposed Class Period from January 20, 1998 through December 2, 2001:(1) breach of fiduciary and co-fiduciary duties under ERISA, 29 U.S.C. §§ 1104 and 1105; (2) the commission of or conspiracy to commit unlawful acts or omissions in the conduct of certain enterprises' affairs through a pattern of racketeering activity in a scheme to mislead and defraud Enron employees, shareholders, potential investors, and the securities market in violation of the Racketeer Influenced and Corrupt Organizations Act (civil "RICO"), 18 U.S.C. §§ 1961–1968; and (3) negligence and civil conspiracy under Texas common law.

## I. OVERVIEW OF CAUSES OF ACTION AND PENDING MOTIONS

Defendants fall into five groups: (1) Enron and individual officers and directors of the company; (2) committees, trustees, and individuals that administered the three pension plans; (3) Enron's accountant Arthur Andersen LLP and some of its individual partners and employees (Thomas H. Bauer, Joseph F. Berardino, Debra A. Cash, Donald Dreyfus, James A. Friedlieb, D. Stephen Goddard, Jr., Gary B. Goolsby, Michael D. Jones, Michael M. Lowther, John Stewart, William Swanson, Nancy A. Temple, and Roger D. Willard); (4) Enron's outside law firm Vinson & Elkins L.L.P. and some of its individual partners (Ronald Astin, Joseph Dilg, Michael Finch, and Max Hendrick, III); and (5) five investment banks (J.P. Morgan Chase & Co., Merrill Lynch & Co., Inc., Credit Suisse First Boston, Citigroup, Inc., and Salomon Smith Barney, Inc).

The complaint asserts its causes of action in nine counts: five under ERISA, two under RICO, one under Texas common-law negligence, and the last under Texas common-law civil conspiracy.

 Count I originally asserted a claim on behalf of the Savings Plan and the ESOP[3] against Defendants Enron, the

---

Moreover, phantom stock is not actually stock. It has been defined as
> [a] right ... to receive an award with a value equal to the appreciation of a share of stock from the date that Phantom Stock is cashed out.... Phantom Stock programs are designed to provide executives with cash payments equivalent to amounts they could receive under an actual stock option or similar program.... Phantom programs are based on "phantom" or "hypothetical" shares or units.

*Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1327 (11th Cir.1998)(*quoting Coopers & Lybrand, Executive Summary of Nonqualified Long-term Incentive Plans*, CV01 ALI–ABA 619, 632 (1996)). The *Tittle* complaint fails to state what company issued the stock, but in Plaintiffs' Opposition to Defendants' Motions to Dismiss State Law Claims (# 319 at 19), Plaintiffs represent that at this stage of the litigation they believe the stock does not constitute a "covered security," or a "nationally traded security" or a security issued by a registered investment company under 15 U.S.C. § 77r(b), nor that it constitutes an investment contract of any kind and thus any conduct related to the phantom stock is not actionable under the federal securities laws.

The complaint does assert phantom stock claims under RICO and Texas common law civil conspiracy.

**3.** As explained by the Sixth Circuit Court of Appeals in *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 425 (6th Cir.2002), *cert. denied*, 537 U.S. 1168, 123 S.Ct. 966, 154 L.Ed.2d 908 (2003),

> Under ERISA, a plan that primarily invests in shares of stock of the employer that creates the plan is referred to as an ESOP.... Congress intended ESOPS to function as both "an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership." ... "Because of these dual purposes, ESOPS are not designed to guarantee retirement benefits, and they place employee retirement assets at much greater risk than the typical diversified ERISA plan." [citations omitted]

Enron ERISA Defendants,[4] Kenneth L. Lay,[5] Jeffrey K. Skilling [to be dismissed],[6]

The Fifth Circuit has provided "a thumbnail sketch of basic ESOP mechanics":

> An employer desiring to set up an ESOP will execute a written document to define the terms of the plan and the right of beneficiaries under it. 29 U.S.C. § 1102(a)(1976). The plan document must provide for one or more named fiduciaries "to control and manage the operation and administration of the plan." *Id.,* § 1102(a)(1). A trust will be established to hold the assets of the ESOP. *Id.,* § 1103. The employer may then make tax-deductible contributions to the plan in the form of its own stock or cash. If cash is contributed, the ESOP then purchases stock in the sponsoring company, either from the company itself or from existing shareholders. Unlike other ERISA-covered plans, an ESOP may also borrow in order to invest in the employer's stock. In that event, the employer's cash contributions to the ESOP would be used to retire the debt.

*Donovan v. Cunningham,* 716 F.2d 1455, 1459 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

Furthermore the fiduciary of an ESOP is not relieved of his traditional duties of loyalty, prudence, and care under § 404 of ERISA, 29 U.S.C. § 1104(a), although the fiduciary is not bound by the requirement of diversification of plan assets under § 404(a)(2), 29 U.S.C. § 1104(a)(2), or by the prohibited transaction rules of § 406, 29 U.S.C. § 1106 and § 408, 29 U.S.C. § 1108(e), to be discussed in detail later. *Id.* at 1463–67. Plaintiffs here maintain that they are not alleging that Defendants failed to diversify the ESOP assets, but that in breach of their fiduciary duties to plan participants and beneficiaries, they permitted an imprudent investment in Enron stock when they knew or should have known it was very risky.

The Third Circuit has held that in light of the special nature of an ESOP and the special provisions for it, an ESOP trustee is entitled to a presumption that it acted consistently with ERISA in investing plan assets in the employer's securities unless a showing was made that circumstances have arisen that would make such an investment defeat or impair the original purpose of the trust. *Moench v. Robertson,* 62 F.3d 553, 568–71 (3d Cir.1995), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996). A determination as to whether an ESOP fiduciary breached its fiduciary duty should not be made on a motion to dismiss, but only after discovery develops a factual record. *Id.* (reviewing whether ERISA fiduciary was entitled to presumption on summary judgment; under a showing of circumstances that made such an investment defeat or impair the original purpose of the trust, the trustee was subject to the prudent man rule); *in accord Kuper v. Iovenko,* 66 F.3d 1447, 1459 (6th Cir.1995); *In re Ikon Office Solutions, Inc.,* 86 F.Supp.2d 481, 492 (E.D.Pa.2000) (denying motion to dismiss because "it would be premature to dismiss even a portion of the ERISA complaint without giving plaintiffs an opportunity to overcome the presumption"). *But see Canale v. Yegen,* 782 F.Supp. 963, 967–68 ("the allegation that [an ESOP] Plan administrator has failed to prudently diversify plan assets invested exclusively in the stock of the beneficiaries' employer can state a claim for breach of fiduciary duty under ERISA."), *on reargument,* 789 F.Supp. 147, 154 nn. 4, 5 (D.N.J. 1992) (the relevant fiduciary duty, described in the [earlier] opinion only in terms of the duty to diversify, is better characterized as both the duty to diversify and to discharge her duties with the prudence that a prudent person would use in the conduct of a like enterprise.).

4. The complaint at ¶ 62 states that the term "Enron ERISA Defendants" refers to those Defendants named in ¶¶ 44–61, i.e., the Enron Corp. Savings Plan Administrative Committee ("Administrative Committee"), the Enron Stock Ownership Plan Administrative Committee ("ESOP Administrative Committee"), the Cash Balance Plan Administrative Committee, Cindy Olson, Mikie Rath (since dismissed from this action, # 367), James S. Prentice, Mary K. Joyce, Sheila Knudsen, Rod Hayslett, Paula Rieker, William D. Gathmann (since dismissed from this action, # 363), Tod A. Lindholm, Philip J. Bazelides, James G. Barnhart, Keith Crane, William J. Gulyassy, David Shields, and John Does Nos. 1–100 (at all relevant times members of the Administrative Committees of the Savings Plan, ESOP, and/or the Cash Balance Plan).

Plaintiffs have indicated that they are dismissing without prejudice Counts I–V against Gathmann and Barnhart. # 314 at 11. They are also dismissing without prejudice Defendant the Cash Balance Plan, successor to the Enron Corporation Retirement Plan, which is sued only under Count IV. *Id.* at 10–11.

Richard A. Causey [to be dimsissed],[7] and Arthur Andersen,[8] at a time when Enron, the Enron ERISA Defendants, Lay, and Skilling knew or should have known that Enron stock was an imprudent investment choice, for breaches of their fiduciary and co-fiduciary duties of prudence, care and loyalty under 29 U.S.C. §§ 1104(a)(1)(A)-(D)[9] and 1105, for (1) allowing Savings Plan participants the ability to direct the Plan's fiduciaries to purchase Enron stock for their individual accounts from monies the participants contributed as deductions from their salaries; (2) inducing the participants to direct the fiduciaries to purchase Enron stock for their individual accounts in exchange for funds they contributed to the Plan; (3) causing and allowing the Savings Plan to purchase or accept Enron's matching contributions in the form of Enron stock; (4) imposing and maintaining age restrictions and other restrictions on the participants' ability to direct the Savings Plan fiduciaries to transfer both Savings Plan and ESOP assets out of Enron stock; and (5) inducing the Savings Plan and ESOP participants to direct or allow the fiduciaries of both Plans to maintain investments in Enron stock. Arthur Andersen is charged with breaching its fiduciary duty under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), by participating in the Enron Defendants' breach of fiduciary

---

**5.** The complaint asserts that Lay was Chairman of the Board of Directors of Enron, served as Enron's CEO from 1986–February 2001 and August 2001–January 2002, and was a fiduciary of the Savings Plan, the ESOP, and the Cash Balance Plan. In their Overview Memorandum (# 314) at 11 n. 5, Plaintiffs state they are dismissing their Count I claim against Lay based on "his alleged fraudulent promotion of Enron stock," but not their claim against Lay for breach of his fiduciary duty to monitor the appointment and conduct of the Savings Plan and ESOP Committee Members.

**6.** According to the complaint, Skilling was a director of Enron at all relevant times, was CEO of Enron from February 2001–August 14, 2001, and was a fiduciary of the Savings Plan, the ESOP, and the Cash Balance Plan. In Plaintiffs' Overview Memorandum (# 314) at 11 and n.5, Plaintiffs state they are dismissing their Counts I and II claims against Skilling.

**7.** Causey was Executive Vice–President and Chief Accounting Officer of Enron. He is alleged to have signed each of Enron's Form 10–K's and 10–Q's that were filed with the SEC from 1997–2000. Plaintiffs have indicated they are dismissing without prejudice their claims against Causey under Counts I–IV. # 314 at 11.

**8.** Arthur Andersen L.L.P. is sued in its capacity as auditor of the Savings Plan and in its capacity as the auditor of Enron's financial statements generally.

**9.** Section 404(a) of ERISA, 29 U.S.C. § 1104(a), addressing fiduciary duties and the prudent man standard of care, provides,

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-
(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;
(B) with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.
This provision imposes fiduciary duties that overlap one another, i.e., a duty to diversify the investments of the plan, a duty of loyalty, and a duty of care. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 293–94 (5th Cir.2000).

duties by actively concealing from the Plan fiduciaries and Plan participants the actual financial condition of Enron and the imprudence of investing in Enron stock.

Count II is brought on behalf of the Savings Plan and the ESOP against Defendants Enron, the Enron ERISA Defendants, Lay, Skilling [since dismissed], Causey [since dismissed], and the Northern Trust Company ("Northern Trust"), for breach of their fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A)-(D) and 1105, based on the lockdown (freeze, blackout)[10] of the two Plans, without adequate notice

10. The complaint states that Northern Trust was a trustee and fiduciary of the Savings Plan and the ESOP within the meaning of 29 U.S.C. § 1002(21)(A). According to the complaint, during the lockdown, plan participants were unable to move their investments from one plan investment fund to another despite exigent circumstances that made the blackout imprudent. The complaint asserts that Northern Trust exercised authority and control over the plan assets by imposing the lockdown, which it had the ability to stop or delay, and that by not stopping or delaying that lockdown, Northern Trust breached its fiduciary duties to plan participants.

In its amicus curiae brief (# 446), the SPARK (Society of Professional Administrators and Recordkeepers) Institute insists that Northern Trust filled two distinct roles, one as a directed trustee and one as a recordkeeper, and charges that the Department of Labor in its own amicus curiae brief is trying to conflate the two to make Northern Trust a trustee of the Savings Plan. Id. at 14. SPARK Institute insists that the allegations in the complaint, i.e., that Northern Trust exercised authority and control over the plan by imposing the blackout and not delaying it in breach of its duties to the participants, relate solely to Northern Trust's role as a nonfiduciary, ministerial recordkeeper. Id. at 15. SPARK Institute explains the typical procedure of a lockdown and the trustee's role. # 446 at 8 n. 1. SPARK Institute asserts that "lockdown" is not a term used in the retirement services industry. Instead "conversion" is used to identify the transaction in which a plan transfers administration of the plan from one recordkeeper to another, while a "blackout," which is one part of the conversion process, is a cessation of trading activity relating to the plan investments so that the transfer can occur without mistakes. Id. at 8 n. 1. According to SPARK Institute, during a blackout, generally salary deferrals, employer matching contributions, and monthly payments to retirees are not frozen, but exchanges from one investment option to another, in-service withdrawals, loans, and lump-sum final distributions are. Id. at 8–9. SPARK Institute contends that there is no independent decision to impose a blackout; it is a mandatory part of the complex process of conversion, and the only way to prevent a blackout is to stop the conversion. Id. at 16. Moreover, SPARK Institute maintains that the decision regarding conversion and imposition of a blackout is controlled by the plan sponsor and named fiduciary, not by the recordkeeper. Id. at 9. The plan documents adopted by the plan sponsor establish the rules and procedures governing the plan, including the handling of employer securities, while named fiduciaries give the orders. Id. at 10. Furthermore, the recordkeeping contract generally requires a recordkeeper to cooperate with a plan sponsor and the successor recordkeeper in effecting the conversion, while Department of Labor regulations require that these contracts must be terminable on reasonably short notice. Id. at 8, 17, 18. SPARK Institute argues that the recordkeeper's role is purely ministerial and nonfiduciary (consisting of keeping track of all the individual accounts, the sources of the funds in each and the amounts, employer matching contributions, pre- and post-tax contributions, rollovers from other 401(k) plans, etc., matters largely handled by automated systems), and that conversion activities are conducted exclusively by recordkeepers. Id. at 11–13. See Freimark & Thurston Agency, Inc. v. National City Bank of Dayton, 231 F.Supp.2d 713, 715 (S.D.Ohio 2002) (record keeper charged with delaying a conversion, had no discretion in the transfer and was not a fiduciary).

Plaintiffs charge SPARK Institute with obfuscation because Plaintiffs have not sued the recordkeeper here, but only Northern Trust in what Plaintiffs contend is its role as trustee and fiduciary. They also point out that Northern Trust, itself, has never argued that it was not the proper defendant nor that the functions challenged by Plaintiffs amounted to mere recordkeeping. This Court has previously ruled that Plaintiffs have produced sufficient evidence under seal to raise material

to participants, effectually from October 17, 2001 until November 14, 2001,[11] while the Plans were switched to a new record keeper and trustee,[12] during which time the price of Enron stock fell from $33.84 to $10.00 per share.[13]

In Count III, Plaintiffs, on behalf of the Savings Plan,[14] assert a breach of

issues of fact about the nature of Northern Trust's role.

11. The complaint highlights the significance of the timing of the lockdown by emphasizing the extreme circumstances that Plaintiffs maintain made the lockdown imprudent. On October 16, 2001, Enron made a surprise announcement, stunning Wall Street and triggering the first public investigations, that Enron was taking a $1.2 billion charge against its third quarter results. According to the complaint, stories immediately appeared in the media questioning Enron's financial condition, and many class members complained to Northern Trust and requested or demanded a postponement of the lockdowns. According to the complaint, when Enron asked Northern Trust and Hewitt Associates (the incoming recordkeeper) about the possibility of postponing the lockdowns, both responded that a postponement would be possible. On October 22, 2001 Enron publicly announced that the SEC had opened an informal investigation of Enron's accounting practices. On October 24, 2001 Andrew S. Fastow was forced to relinquish his position as Chief Accounting Officer, which was assumed by Jeff McMahon, who had previously complained about accounting improprieties. Just before midnight on October 25, 2001, Enron sent employees an e-mail stating that it would not delay the lockdown because it would be too inconvenient to do so. The alleged "constructive and/or actual" lockdown of the assets in the Savings Plan and the ESOP occurred between October 17 and 26, 2001. Meanwhile, the price of Enron stock declined during this period until it closed at $11.17 per share on November 5, 2001. The lockdown was lifted on November 14, 2001. The price of Enron stock continued to plunge, closing at $4.11 on November 27, 2001. Enron filed for bankruptcy protection on December 2, 2001.

12. Purportedly from Northern Trust and its recordkeeper, Northern Trust Retirement Consulting, to new trustee Wilmington Trust and new recordkeeper Hewitt Associates.

13. Northern Trust argues that Plaintiffs fundamentally misconstrue the terms of the ESOP (Ex. B to # 243), as opposed to the Savings Plan, and that there was no "lockdown" of the ESOP. See footnotes 3 and 10 of this memorandum and order. Northern Trust contends that unlike the members of the Savings Plan, members of the ESOP do not choose what investments should be made with their contributions; they can only choose to contribute or withdraw funds from the ESOP. Furthermore, under the terms of the ESOP, at any and all times participants were required to submit any request to sell assets held in the ESOP by the twentieth day of the month in which the request was made or they would have to wait until the last day of the next month for the withdrawal to be effective. # 243, Ex. B at XIII–2.

Plaintiffs respond that their claim is not based on the normal business schedule, but on the fact that the exigent circumstances required Northern Trust, pursuant to its overriding fiduciary duty to act prudently and loyally in the best interests of plan participants and beneficiaries at all times, to disrupt that routine procedure to prevent grievous harm to them, and that although it had the ability to stop or delay the lockdown, Northern Trust breached its fiduciary duties in failing to do so.

14. Plaintiffs have indicated that they will seek leave of Court to amend to add the ESOP Plan to Count III based on ESOP plan language requiring Northern Trust to ensure prudent diversification of plan assets. # 316 at 38 n. 19. With respect to ESOPS' purchases of employer securities generally, courts have held that fiduciary duties are met where the decision to purchase is made by or on the recommendation of independent financial and legal advisors after thorough examination of all relevant matters and consideration of the positive and negative effects of such investment to plan participants and beneficiaries. *See, e.g., Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.1982), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Andrade v. Parsons Corp.*, 972 F.2d 1336, 1992 WL 182218 (9th Cir.1992). At least two district courts have determined there is a duty of prudence on new plan fiduciaries to protect existing ESOP assets. *Keach v. U.S. Trust Co.*, 240 F.Supp.2d 840, 844–45 (C.D.Ill.

fiduciary duty in violation of 29 U.S.C. § 1104(a)(1)(D) against Enron, the Enron ERISA Defendants (excluding the ESOP Administrative Committee and the Cash Balance Administrative Committee), Lay, Skilling, Causey [since dismissed], and the Northern Trust Company for their failure to diversify the Savings Plan assets, i.e., to liquidate the Enron stock, in accordance with the terms of the plan, because Defendants knew or should have known that investment in Enron stock was imprudent.

In Count IV Plaintiffs on behalf of Certain Retirement Plan Participants and Beneficiaries assert against Enron, the Enron ERISA Defendants, and the Enron Corp. Cash Balance Plan as Successor to the Enron Corp. Retirement Plan [since dismissed], another claim of breach of fiduciary duty, this time with respect to offsets (reductions) of accrued pension benefits that were based on the artificially inflated price of Enron stock from 1998–2000. The *Enron Corp.* Cash Balance Plan and its predecessor, the Enron Corp. Retirement Plan, constituted a "defined benefit plan" under 29 U.S.C. § 1002(35)[15] and was fully funded by Enron. In essence Plaintiffs allege that until January 1, 1996, the retirement benefits provided to a plan participant of five years or more service were determined by adding different percentages of final average pay multiplied by levels of years of accrued service, and then offset by the annuity value of a portion of that participant's account in the ESOP ("Offset Account") as of certain determination dates, usually the date the benefit payments began or, if earlier, the date(s) of distribution(s) from the Offset Account.

2002); *Neyer, Tiseo & Hindo, Ltd. v. Russell,* 1993 WL 334951, *11 (E.D.Pa.1993), *aff'd,* 37 F.3d 1488 (3d Cir.1994) (Table).

15. There are two broad categories of employee benefit plans: defined benefit plans and defined contributions plans. The S.E.C. in S.E.C. Release No. 33–6188, 1980 WL 29482, at *6–7 (Feb. 1, 1980), succinctly explains the difference:

> A defined benefit plan pays fixed or determinable benefits. The benefits ordinarily are described in a formula which specifies the amount payable in monthly or annual installments to participants who retire at a certain age.
>
> As long as the plan and the employer(s) contributing to the plan remain solvent, and the plan continues to be operated, vested participants will receive the benefits specified. In the event the investment results of the plan do not meet expectations, the employer(s) usually will be required, on the basis of actuarial computations, to make additional contributions to fund the promised benefits. Conversely, if the plan earnings are better than anticipated, the employer(s) may be permitted to make contributions that are less than the projected amounts.
>
> A defined contribution plan does not pay any fixed or determinable benefits. Instead, benefits will vary depending on the amount of plan contributions, the investment success of the plan, and allocations made of benefits forfeited by non-vested participants who terminate employment. Thus the amount of benefits is based, in part, on the earnings generated by the plan.
>
> Both defined benefit and defined contribution plans can provide for employee contributions. In addition, defined contribution plans maintain individual accounts for all participating employees. These accounts reflect each participant's share in the underlying trust assets and are adjusted annually to take into account plan contributions, earnings and forfeitures. In contrast defined benefit plans ordinarily do not maintain individual accounts, except to the extent necessary under the Internal Revenue Code to record benefits attributable to voluntary contributions by employees. [footnotes omitted]

Of the plans at issue here, only the Cash Balance Plan was a defined benefit plan, the others being defined contribution plans. ERISA created the Pension Benefit Guarantee Corporation, which insures minimum pension benefits for defined benefit plans if the employer becomes unable to pay the pension; there is no insurance for the defined contribution plans like the Savings Plan and the ESOP.

Effective January 1, 1996, the Retirement Plan was amended, renamed the Enron Corp. Cash Balance Plan, and the benefit formula was changed from an average pay formula to a cash balance formula, while the offset arrangement between the Plan and the ESOP was to be phased out over the coming five-year period. Under the new plan, a plan participant's accrued benefit under the Cash Balance Plan was based on his employment from 1987–1994 and was offset over the five-year phase-out period by the value of his ESOP stock based on a formula set out in §§ 5.1–5.5 of the Plan. Each January 1st from 1996–2000, the value of one-fifth of the shares of Enron stock credited to each participant's Offset Account was to be calculated based on the stock's market price on that date as reported at closing time on the New York Stock Exchange and was thereafter permanently fixed at that amount. Plaintiffs allege that Defendants knew or should have known that the market price of Enron stock from 1998 to 2000 was artificially inflated and not representative of its true value, and that Defendants breached their fiduciary duty by not computing the component of the offset at its true, much lower value. As a result, participants and beneficiaries who accrued benefits under the Retirement Plan between January 1, 1987 and December 31, 1994 have suffered losses because their retirement benefits would be offset by the inflated market price of one-fifth of the shares of Enron stock in their ESOP Offset Account in 1998, 1999, and 2000.

Count V, brought on behalf of the Savings Plan, the ESOP, and the Cash Balance Plan against Enron and the Compensation Committee Defendants, alleges another breach of fiduciary and co-fiduciary duties under 29 U.S.C. § 1104(a)(1)(A)-(D) and § 1105 relating to their failure to appoint and monitor other plan fiduciaries and their failure to disclose to the investing fiduciaries material information about Enron's true financial condition. Specifically Plaintiffs claim that Defendants breached their fiduciary duties (1) by appointing fiduciaries to manage Plan assets that Defendants knew, or should have known, were not qualified to manage Plan assets loyally and prudently; (2) by failing to monitor adequately the investing fiduciaries investment of these assets; (3) by failing to monitor adequately the Plans' other fiduciaries' implementation of the terms of the Plans, including but not limited to investment of the assets; (4) by failing to disclose to the investing fiduciaries material facts concerning Enron's financial condition that they knew or should have known were material to loyal, prudent investment decisions concerning the use of Enron stock in the Plans and/or with respect to the implementation of the terms of the Plans; (5) by failing to remove fiduciaries who Defendants knew or should have known were not qualified to manage the Plans' assets loyally and prudently; (6) by knowingly participating in the investing fiduciaries' breaches by accepting the benefits of those breaches, both personally and on behalf of Enron; (7) by knowingly undertaking to hide acts and omissions of the fiduciaries that Defendants knew constituted fiduciary breaches; and (8) by failing to remedy those fiduciaries' known breaches.

Count VI asserts RICO violations under section 1962(c), conducting the affairs of a RICO enterprise through a pattern of racketeering activities involving Enron stock, and 1962(d), conspiring to do so, thereby causing injury to Plaintiffs' and proposed Class Members' property.[16]

---

16. Section 1962(c) states,
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

Count VI is brought on behalf of all proposed classes against the "Enron Insider Defendants" (i.e., Kenneth L. Lay, Jeffrey K. Skilling, Andrew S. Fastow,[17] Michael Kopper,[18] Richard A. Causey, James V. Derrick, Jr.[19], the Estate of J. Clifford Baxter,[20] Mark A. Frevert,[21] Stanley C. Horton,[22] Kenneth Rice,[23] Richard B. Buy,[24] Lou L. Pai,[25] Robert A. Belfer, Norman P. Blake, Ronnie C. Chan, John H. Duncan, Wendy L. Gramm, Robert K. Jaedicke, Charles A. LeMaistre, Joe H. Foy,[26] Joseph M. Hirko,[27] Ken L. Harrison,[28]

a pattern of racketeering activity or collection of unlawful debt.

The word, "conduct," means "participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The defendant who directs the enterprise need not have the primary responsibility for directing the enterprise, but must have some role in directing it. *Id.* at 179, 113 S.Ct. 1163. "Operation" of an enterprise can be performed by upper management or by "lower rung participants in the enterprise who are under the direction of the upper management." *Id.* at 184, 113 S.Ct. 1163. The "pattern of racketeering activity" must consist of two or more related predicate acts, which are federal or state crimes, and which amount to or pose a threat of continued criminal activity. *In re MasterCard Intern., Inc.*, 313 F.3d 257, 261–62 (5th Cir.2002). A plaintiff's injury for purposes of § 1962(c) must flow from one of the alleged predicate acts. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

Section 1962(d) provides, "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a),(b), or (c) of this section."

17. Fastow was Chief Financial Officer of Enron at all relevant times.

18. The complaint describes Kopper as a Managing director of Enron's Global Equity Markets Group, "an underling of Fastow," and the person who ran Chewco and JEDI.

19. Derrick was Senior Vice President and General Counsel of Enron before July 1999, when he became Executive Vice President and General Counsel.

20. Baxter was Chairman and Chief Executive Officer of Enron North America Corporation from June 1999–June 2000, Vice Chairman of Enron from October 2000, and Chief Strategy Officer from June 2000 until his death.

21. Frevert is identified as Chairman and Chief Executive Officer of Enron Wholesale Services since June 2000, after serving as Chairman and Chief Executive Officer of Enron Europe from March 1997–June 2000.

22. Horton was Chairman and Chief Executive Officer of Enron Transportation Services at all relevant times.

23. Rice was Chairman and Chief Executive Officer of Enron Capital and Trade ("ECT") - North America from March 1997–June 1999, and Chairman and Chief Executive Officer of Enron Broadband Services, Inc. since June 2000.

24. Buy was Managing Director and Chief Risk Officer of ECT from January 1998–March 1999, Senior Vice President and Chief Risk Officer from March 1999–July 1999, and Executive Vice President and Chief Risk Officer of Enron since July 1999.

25. Pai was Chairman and CEO of Enron Accelerator, after serving as director of Enron Energy Services, and became the Chairman of New Power, one of the vehicles allegedly used by Enron to inflate its earnings and conceal losses through unlawful, labyrinthine transactions.

26. According to the complaint, Robert A. Belfer, Blake, Chan, Duncan, Gramm, Jaedicke, LeMaistre, and Foy were directors of Enron. Blake, Duncan, Jaedicke and LeMaistre were also members of the Compensation and Management Committee of the Enron Board of Directors (collectively, "Compensation Committee Defendants") and allegedly fiduciaries with respect to the Enron Corp. Savings Dlan and the ESOP.

Outside Directors state the proper name of the committee is the Compensation and Management Development Committees, which were charged with "creat[ing] an employee compensation system linked to the enhancement of shareholder value." # 240 at 3 n. 2.

27. Hirko was Chief Executive Officer of Enron Broadband.

Mark E. Koenig,[29] Steven J. Kean,[30] Rebecca P. Mark–Jusbasche,[31] Michael S. McConnell,[32] Jeffrey McMahon,[33] J. Mark Metts,[34] Joseph W. Sutton[35]); the "Accounting Defendants" (Arthur Andersen,[36] David B. Duncan, Thomas H. Bauer, Debra A. Cash, Roger D. Willard, D. Stephen Goddard, Jr., Michael M. Lowther, Gary B. Goolsby, Michael C. Odom, Michael D. Jones, William Swanson, John E. Stewart, Nancy A. Temple, Donald Dreyfuss, James A. Friedlieb, Joseph F. Berardino, and Andersen Does 2 through 1800); the "Attorney Defendants" (Vinson & Elkins, LLP, Ronald T. Astin, Joseph Dilg, Michael P. Finch, and Max Hendrick, III); and the "Investment Banking Defendants" (Merrill Lynch & Co., Inc., J.P. Morgan Chase & Co., Credit Suisse First Boston Corporation, and Citigroup, Inc. and its subsidiaries Citigroup Securities and Salomon Smith Barney).

Count VI identifies the following as RICO enterprises, either legal entities or association-in-fact enterprises: Enron Corporation; an association-in-fact enterprise comprised of the Enron Insider Defendants, the Enron ERISA Defendants, the Accounting Defendants and/or Andersen, the Attorney Defendants, the Investment Banking Defendants, and other investment banks not named as defendants in the complaint (Canadian Imperial Bank of Commerce, Deutsche Bank, Bank America, Lehman Brothers, Barclays Bank, UBS Warburg, First Union Wachovia, Bear Stearns, and Morgan Stanley Dean Witter); the Savings Plan/ESOP/Cash Balance Plan Enterprise (consisting of three separate RICO enterprises, i.e., legal entities); the Enron–Andersen Enterprise (association-in-fact enterprise); the Andersen Enterprise; the LJM1 Enterprise; the LJM2 Enterprise; the Enron–Merrill Lynch Enterprise(s) (association-in-fact enterprise); the Enron–J.P. Morgan Chase–Mahonia Enterprise (association-in-fact enterprise); the Enron–CSFB Enterprise (association-in-fact enterprise); and the Enron–Citigroup Enterprise (association-in-fact enterprise).

According to Count VI, the pattern of racketeering which Defendants allegedly committed, aided and abetted, or conspired to commit was made up of predicate offenses e.g., violations of various federal statutes, including 18 U.S.C. § 664 (embezzlement and conversion of assets of an ERISA employee pension benefit plan),[37] 18 U.S.C. §§ 1341 and 1343 (feder-

---

**28.** Harrison was Chief Executive Officer of Portland General Electric, a subsidiary of Enron, until March 31, 2000, when he became a director of Enron.

**29.** The complaint states that Koenig was Executive Vice President, Investor Relations of Enron at all relevant times.

**30.** Kean was Executive Vice President and Chief of Staff of Enron since 1999.

**31.** The complaint identifies Mark–Jusbasche as a director of Enron until August 2000.

**32.** McConnell was Executive Vice President, Technology during all relevant times.

**33.** McMahon was Chief Financial Officer of Enron Europe from 1994–July 1998, Senior Vice President, Finance and Treasurer from July 1998 to July 1999, and Executive Vice President, Finance and Treasurer of the Company from July 1999.

**34.** Metts was Executive Vice President, Corporate Development.

**35.** Sutton was Vice Chairman of Enron until early 2001.

**36.** Plaintiffs have settled with and dismissed the foreign Arthur Andersen entities.

**37.** A person violates title 18 U.S.C. § 664 if he "embezzles, steals or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, ... or other assets of any ... employee pension plan ..." subject to ERISA. *United States v. Wiseman*, 274 F.3d 1235, 1240 (9th Cir.2001). The elements of the violation are that the defendant (1) embezzled

al mail and wire fraud),[38] 18 U.S.C. § 1512(b)(2) (obstruction of justice [39]), and 18 U.S.C. § 2314 (interstate transportation offenses [40]).

(2) funds (3) from an employee benefit plan with (4) specific intent to deprive the plan of funds. *United States v. Todd*, 108 F.3d 1329, 1330 (11th Cir.1997).

**38.** The elements comprising mail and wire fraud under 18 U.S.C. § 1341 and § 1343 are (1) the defendant's participation in a scheme to defraud, which includes false or fraudulent pretenses, representations or promises; (2) the use of the mails or wire communications to execute the scheme; and (3) specific intent to defraud. *United States v. Bieganowski*, 313 F.3d 264, 275 (5th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1956, 155 L.Ed.2d 851 (2003); *Chris Albritton Const. Co., Inc. v. Pitney Bowes, Inc.*, 304 F.3d 527, 532 (5th Cir. 2002); *United States v. Caldwell*, 302 F.3d 399, 406 (5th Cir.2002); *United States v. Odiodio*, 244 F.3d 398, 402 (5th Cir.2001). The defendant must act knowingly, willfully, and with the specific intent to defraud. *United States v. Richards*, 204 F.3d 177, 207 (5th Cir.2000), *cert. denied sub nom. Braugh v. U.S.*, 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 36 (2000), *overruled on other grounds, U.S. v. Cotton*, 535 U.S. 625, 629, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002).

**39.** Title 18 U.S.C. § 1512(b)(2)(B) states that a person may be fined or imprisoned for obstructing justice if he "knowingly uses intimidation or physical force, threatens or corruptly persuades another person with intent to—(1) cause or induce any person to—(A) withhold testimony, or withhold a record, document or other object, from an official proceeding; [or] (B) alter, destroy, mutilate or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding."

The complaint at ¶ 796 charges defendants with persuading certain individuals to "(i) withhold records, documents and other objects from official proceedings (including, but not limited to, the SEC investigation), and (ii) alter, destroy, mutilate and conceal objects with the intent to impair those objects' integrity or availability for use in such official proceedings."

 Count VII asserts a claim against Enron Insider Defendants, Arthur Andersen, and the Investment Banking Defendants for investing income that was derived from racketeering activities involving

**40.** To prove an offense in violation of 18 U.S.C. § 2314, the government must demonstrate (1) the interstate transportation of (2) goods, merchandise, wares, money or securities valued at $5,000 or more and (3) knowledge by the defendant that such items were stolen, converted, or taken by fraud. *United States v. Onyiego*, 286 F.3d 249, 253 (5th Cir.2002), *cert. denied sub nom. Biegon v. U.S.*, 537 U.S. 910, 123 S.Ct. 254, 154 L.Ed.2d 189 (2002); *United States v. McIntosh*, 280 F.3d 479, 483 (5th Cir.2002), *cert. denied sub nom. Braugh v. U.S.*, 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 36 (2000), *overruled on other grounds, U.S. v. Cotton*, 535 U.S. 625, 629, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). A defendant need not have transported anything himself, but need only have caused the interstate transportation. *McIntosh*, 280 F.3d at 483.

Section 2314 also prohibits interstate transportation of persons in the execution of a scheme to defraud. The elements are (1) the defendant devised a scheme (2) intending to defraud the victim of money or property of a minimum value of $5,000 and (3) the scheme induced the victim to travel in interstate commerce. *United States v. Richards*, 204 F.3d at 206.

The complaint at ¶¶ 281–82 asserts violations of both provisions of § 2314, i.e., that Defendants (1) transmitted or transferred in interstate commerce money taken from the Savings Plan participants' contributions to the Savings Plan and/or investment in stock offered by the Savings Plan and (2) caused Enron employees to travel to Houston to attend meetings on May 18, 1999, July 13, 1999, December 1, 1999, February 28, 2000, and October 3, 2000, and others, conducted by Enron Insiders, at which the employees were assured that their 401(k) plan funds were safely invested and that they should hold their investments in Enron stock. For a violation of § 2314, a defendant must have fraudulent intent. *United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981).

Enron stock in RICO enterprises, under §§ 1962(a)[41] and 1962(d). Among the various alleged enterprises is an Association-in–Fact Enterprise comprised of the Enron Insider Defendants, the Enron ERISA Defendants, the Accounting Defendants and/or Andersen, the Attorney Defendants, the Investment Banking Defendants, and other investment banks (Canadian Imperial Bank of Commerce, Deutsche Bank, Bank America, Lehman Brothers, Barclays Bank, UBS Warburg, First Union Wachovia, Bear Stearns, and Morgan Stanley Dean Witter). Also named are the Enron Enterprise, the Savings Plan/ESOP/Cash Balance Plan Enterprise, the LJM1–LJM2 Enterprise, the Accountant Defendants Enterprise, the Enron–JP Morgan Chase–Mahonia Enterprise, the Enron CSFB Enterprise, the Enron–Citigroup Enterprise, and the TNPC–New Power Enterprise.

Count VIII asserts a Texas common-law claim for negligent misrepresentation on behalf of the participants and beneficiaries of the Savings Plan and the ESOP against the Andersen Defendants based on Andersen's data, audits, and certified financial statements for Enron.

Finally, Count IX alleges on behalf of all proposed classes a civil conspiracy claim against Andersen, the Enron Insider Defendants, the Attorney Defendants, and the Investment Banking Defendants. Specifically Count IX states that these Defendants conspired to conceal Enron's true financial condition and deceive Enron employees into accepting overvalued stock and phantom stock as compensation for their work, into keeping their retirement assets in artificially inflated Enron stock, and into continuing to work at Enron based on a false belief that it was a strong company.

In light of the length of the complaint, which is available to all counsel, and the fact that the *Tittle* action arises from many of the same facts summarized in detail in instrument #1194 in *Newby*, the Court will not here reiterate the facts alleged, but will reference relevant allegations relating to its decisions regarding the following pending motions:

(1) Defendant Michael J. Kopper's motion to dismiss for failure to state claims upon which relief can be granted (instrument #207);

(2) Arthur Andersen LLP and Andersen Individual Defendants' motion to dismiss the complaint (#208);

(3) Defendant Rebecca Mark–Jusbasche's Rule 12(b)(6) motion to dismiss all claims asserted against her (#209);

(4) Defendant Michael C. Odom's motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA (#210);

(5) Defendant Ken L. Harrison's Rule 12(b)(6) motion to dismiss with prejudice all claims against him (#216);

(6) Defendant Lou Pai's motion to dismiss first consolidated and amended complaint (#222);

(7) Defendants Citigroup, Inc. and Salomon Smith Barney, Inc.'s motion to dismiss Plaintiffs' first consolidated and amended complaint (#227);

(8) Defendant J.P. Morgan Chase & Co.'s motion to dismiss Plaintiffs' first

---

**41.** Section 1962(a) provides that a person who has received income from a pattern of racketeering activity cannot invest that income in the acquisition or operation of a RICO enterprise. A plaintiff asserting a claim under this provision must establish (1) the existence of an enterprise, (2) the acquisition of income by the defendant from a pattern of racketeering activity, (3) the use of any part or all of that income in acquiring an interest in or operating the enterprise, and (4) a nexus between the alleged violation (investment of the income received from the pattern of racketeering activity) and the plaintiff's injury. *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir.2000).

consolidated and amended complaint (# 229) and corrected motion to dismiss (# 351);

(9) Defendants Enron Corp. Savings Plan Administrative Committee, the Administrative Committee of the Enron Corp. Cash Balance Plan [since dismissed], and the Administrative Committee of the Enron Employee Stock Ownership Plan (# 231);

(10) Vinson & Elkins Defendants' motion to dismiss (# 232);

(11) Defendant James V. Derrick, Jr.'s motion to dismiss Plaintiffs' first consolidated and amended complaint (# 233);

(12) Defendant Cindy K. Olson's motion to dismiss (# 234);

(13) Defendant Richard A. Causey's motion to dismiss (# 235);

(14) Defendant Credit Suisse First Boston Corporation's motion to dismiss Plaintiffs' first consolidated and amended complaint (# 236);

(15) Defendant Merrill Lynch & Co.'s motion to dismiss Plaintiffs' first consolidated and amended complaint (# 238);

(16) The Outside Director Defendants' motion to dismiss Plaintiffs' first consolidated and amended complaint (# 240);

(17) Defendant the Northern Trust Company's motion to dismiss Counts II and III of Plaintiffs' first consolidated and amended complaint as to the Northern Trust Company (# 241);

(18) Defendant Andrew S. Fastow's motion to dismiss (# 244);

(19) Defendant Joseph W. Sutton's motion to dismiss (# 251);

(20) Defendant Jeffrey K. Skilling's motion to dismiss first consolidated and amended complaint (# 262);

(21) Defendant Kenneth L. Lay's motion to dismiss (# 264);

(22) Motion to dismiss Certain Officer Defendants (collectively, "Officer Defendants," i.e., The Estate of J. Clifford Baxter, Mark A. Frevert, Stanley C. Horton, Kenneth D. Rice, Richard B. Buy, Joseph M. Hirko, Mark E. Koenig, Steven J. Kean, Michael S. McConnell, Jeffrey McMahon, and J. Mark Metts, who are named as Defendants only in the two RICO and the common law conspiracy claims)(# 265);

(23) Motion to dismiss on behalf of Certain Administrative Committee Members (Philip J. Bazelides,[42] James G. Barnhart, Keith Crane, William Gulyassy, Rod Hayslett, Mary K. Joyce,[43] Sheila Knudsen, Tod A. Lindholm, James S. Prentice,[44] Paula Rieker, and David Shields[45])(# 269)[46]; and

**42.** Bazelides is identified as Chairman of the Enron Corp. Savings Plan Administrative Committee ("Administrative Committee") and Vice President in Charge of Employee Benefits through 1998, and thus allegedly a fiduciary of the Savings Plan, the ESOP, and the Cash Balance Plan within the meaning of 29 U.S.C. § 1002(21)(A).

**43.** Joyce was vice-president of Compensation and Benefits for Enron, a member of the Administrative Committee, and allegedly a fiduciary of the Savings Plan within the meaning of 29 U.S.C. § 1002(21)(A). The complaint asserts that in her capacity as a Plan sponsor and as a Plan administrator, she signed the Savings Plan's Internal Revenue Service Form 5500 for the year ending December 31, 1998.

**44.** Prentice, a chemical engineer, was Senior Vice President of Liquids Operations at EOTT Energy (an Enron affiliate), and was Chairman of the Savings Plan Administrative Committee from 1999 until 2002 and a member of the Committee for ten years, and thus a fiduciary of that Plan.

**45.** The complaint states that Barnhart (since dismissed), Crane, Gulyassy, Hayslett, Knudsen, Lindholm, Rieker, and Shields were members of the Administrative Committee, and therefore fiduciaries, of the Savings Plan within the meaning of 29 U.S.C. § 1002(21)(A).

(24) Enron Corp.'s [47] motion to dismiss the first consolidated and amended complaint (# 370).

When a district court reviews a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), it must construe the complaint in favor the plaintiff and take all well-pleaded facts as true. *Kane Enterprises v. MacGREGOR (USA), Inc.*, 322 F.3d 371, 374 (5th Cir.2003), *citing Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir.1986). It may not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id., quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nevertheless, a plaintiff must plead specific facts, not merely conclusory allegations to avoid dismissal. *Id., citing Collins v, Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)("We will thus not accept as true conclusory allegations or unwarranted deductions of fact."). In addition to the complaint, the court may review documents attached to the complaint and documents attached to the motions to dismiss to which the complaint refers and which are central to the plaintiff's claim(s). *Collins*, 224 F.3d at 498–99.

## II. APPLICABLE LAW

The Court hereby incorporates the conclusions of law set forth in its memoranda and orders dealing with the motions to dismiss in *Newby*. After reviewing the briefs and researching the issues raised in *Tittle*, the Court concludes that the following law applies.

## A. ERISA

### 1. Fiduciary Liability

■ The issue of fiduciary status is a mixed question of law and fact. *Reich v. Lancaster*, 55 F.3d 1034, 1044 (5th Cir. 1995).

### a. Expansive Definition of Fiduciary

■ Under ERISA, a person or entity may be deemed a fiduciary either by assumption of the fiduciary obligations (the functional or *de facto* method) or by express designation by the ERISA plan documents.

■ The phrase, "fiduciary with respect to a plan" is defined *de facto* in functional terms of control and authority in § 3(21)(A), 29 U.S.C. § 1002(21)(A):

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan or has any discretionary authority or discretionary responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

"The phrase 'to the extent' indicates that a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority and control." *Som-*

---

46. Originally Defendant Mikie Rath, Enron's benefits manager and a fiduciary of the Savings Plan, the ESOP, and the Cash Balance Plan, joined the motion, but Rath was subsequently dismissed from this suit on July 8, 2002 (# 367) and, as noted, Plaintiffs are dismissing all claims against the Cash Balance Plan without prejudice (# 314 at 10).

47. The bankruptcy court ordered that the automatic stay against Enron Corporation be lifted as of June 21, 2002. Enron is sued under the first five counts, charging breach of fiduciary and co-fiduciary duties in violation of ERISA.

mers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan ("Sommers II"), 883 F.2d 345, 352 (5th Cir.1989). See also Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 18 (1st Cir.1998)("[F]iduciary status is not an all or nothing proposition . . . ."). "Fiduciary status under ERISA is to be construed liberally, consistent with ERISA's policies and objectives," and is defined " 'in functional terms of control and authority over the plan, . . . thus expanding the universe of persons subject to fiduciary duties-and to damages-under § 409(a).' " Arizona State Carpenters Pension Trust Fund v. Citibank (Arizona), 125 F.3d 715, 720 (9th Cir.1997), citing John Hancock Mut. Life Ins. v. Harris Trust & Sav. Bank, 510 U.S. 86, 96, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993), and quoting Mertens v. Hewitt Assoc., 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). "[F]iduciary obligations can apply to managing, advising, and administering an ERISA plan." Pegram v. Herdrich, 530 U.S. 211, 223, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). Nevertheless, " 'a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control.' " Bannistor v. Ullman, 287 F.3d 394, 401 (5th Cir.2002), quoting Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc. ("Sommers I"), 793 F.2d 1456, 1459–60 (5th Cir.1986), cert. denied, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987).[48] "[F]iduciary status is to be determined by looking at the actual authority or power demonstrated, as well as the formal title and duties of the parties at issue [emphasis in original]."

Landry v. Air Line Pilots Ass'n Inter. AFL–CIO, 901 F.2d 404, 418 (5th Cir. 1990), cert. denied, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990).

In recent years several Circuit Courts of Appeals have focused on and contrasted the language used in the two clauses of subsection (i) of § 1002(21)(A), defining a fiduciary as a person who ("exercises any discretionary authority or discretionary control respecting management of such a plan or who exercises any authority or control over the management or disposition of its assets") and highlighted the fact that the word, "discretionary," is used only with regard to the first clause [emphasis added]. From a close reading of the literal language and structure of the provision, they conclude that where the person exercises any authority or control over the management or disposition of the assets of the plan, discretion is not required of a fiduciary. See Board of Trustees of Bricklayers and Allied Craftsmen Local 6 of New Jersey Welfare Fund v. Wettlin Associates, Inc., 237 F.3d 270, 273 (3d Cir.2001), quoting IT Corp. v. General Am. Life Ins. Co., 107 F.3d 1415, 1421 (9th Cir.1997)("any control over disposition of plan money makes the person who has control a fiduciary"), cert. denied, 522 U.S. 1068, 118 S.Ct. 738, 139 L.Ed.2d 675 (1998); FirsTier Bank, N.A. v. Zeller, 16 F.3d 907, 911 (8th Cir.)("Note that this section imposes fiduciary duties only if one exercises discretionary authority or control over plan management, but imposes those duties whenever one deals with plan assets. This distinction is not accidental—

48. See Dept. of Labor, Interpretive Bulletin 75–8, 29 C.F.R. § 2509.75–8, Question D–4 (2000):

Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the

functions described in section 3(21)(A) of the Act.

Federal courts regularly cite to and rely upon Labor Department interpretive bulletins in determining the scope of ERISA liability and fiduciary responsibilities. See, e.g., Varity Corp. v. Howe, 516 U.S. 489, 511–12, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

it reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another."), *cert. denied sub nom. Vercoe v. Firstier Bank, N.A.,* 513 U.S. 871, 115 S.Ct. 194, 130 L.Ed.2d 126 (1994); *Board of Trustees of Western Lake Superior Piping Industry Pension Fund v. American Benefit Adm'rs, Inc.,* 925 F.Supp. 1424, 1429 (D.Minn.1996).[49]

Such a distinction between authority and control over plan management versus over plan assets in requiring discretion only with regard to the former before fiduciary obligations are triggered appears to have roots in the fiduciary's traditional duties. "At common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries" and "the common law trustee's most defining concern historically has been the payment of money in the interest of the beneficiary." *Pegram,* 530 U.S. at 231, 120 S.Ct. 2143. Moreover, " when Congress took up the subject of fiduciary responsibility under ERISA, it concentrated on fiduciaries' financial decisions, focus-

ing on pension plans, the difficulty many retirees faced in getting the payments they expected, and the financial mismanagement that had too often deprived employees of their benefits." *Id.* at 232, 120 S.Ct. 2143, *citing as examples,* S.Rep. No. 93–127, p. 5 (1973); S.Rep. No. 93–383, pp. 17, 95 (1973).

In contrast to the functional definition of fiduciary in § 1002(21)(A), § 402(a)(2) of ERISA, 29 U.S.C. § 1102(a)(2), defines a formally "named fiduciary" as "a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly."

Section 409(a) of ERISA, 29 U.S.C. § 1109(a), provides, "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable." It makes no distinction between the functional definition of a trustee and the

---

**49.** The Fifth Circuit has not expressly addressed the structure of the statute and the verbal "discretion" distinction between control over plan management and control over plan assets. Although the district court in *Tower Loan of Mississippi v. Hospital Benefits, Inc.,* 200 F.Supp.2d 642, 648–49 (S.D.Miss. 2001) concluded that the Fifth Circuit has rejected the rule that control over plan assets, without discretion, makes a plan manager a fiduciary, this Court finds that the judge's determination is improperly imposed on statements by the appellate court that do not focus on the statutory language and structure. The court cites *Reich v. Lancaster,* 55 F.3d 1034, 1047 (5th Cir.1995) in which the Fifth Circuit, *citing American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Society of the United States,* 841 F.2d 658, 663 (5th Cir.1988)("Holden's authority to grant or deny claims, to manage and disburse assets, and to maintain claims files clearly qualifies as discretionary control

of a plan or its assets within the meaning of § 1002(21)(A)."), as holding that "a plan administrator, who possessed authority to grant or deny claims, to manage and disburse fund assets, and to maintain claim files, clearly has discretionary authority respecting management of a plan or its assets within the meaning of § 1002(21)(A) and therefor was an ERISA fiduciary." The Fifth Circuit merely viewed these duties together generally and conclusorily pronounced that they made the administrator a fiduciary; it did not examine the issue of control over plan assets alone and conclude that such control made the administrator a fiduciary, nor did it examine the question of control over plan assets without discretion. In other words, a review of *Reich* and the underlying *American Federation* demonstrates that the Fifth Circuit looked at the authority granted by the contract to the plan administrator as a whole, without separate analysis of each duty.

formal designation of a fiduciary named by the plan documents or by following the procedure in those documents for designating a fiduciary and thus applies to both.

### b. Fiduciary Duties

██ The common law of trusts "offers a 'starting point for analysis of [ERISA] ... [unless] it is inconsistent with the language of the statute, its structure, or its purposes.'" *Harris Trust*, 530 U.S. at 249, 120 S.Ct. 2180, *quoting Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). "[R]ather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility.'" *Varity Corp. v. Howe*, 516 U.S. 489, 496, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), *quoting Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985). Thus a federal common law based on the traditional common law of trusts has developed and is applied to define the powers and duties of ERISA plan fiduciaries, at least in part, with modifications appropriate in light of the unique nature of the statutory employee benefit plans. *See, e.g., Pegram*, 530 U.S. at 224, 120 S.Ct. 2143; *Varity Corp.*, 516 U.S. at 497, 116 S.Ct. 1065 ("We also recognize ... that trust law does not tell the entire story."); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir.2000)("Although ERISA's duties gain definition from the law of trusts, the usefulness of trust law to decide cases brought under ERISA is constrained by the statute's provisions."); *Donovan v. Cunningham*, 716 F.2d 1455, 1464 n. 15 (5th Cir.1983)("ERISA's modifications of existing trust law include imposition of duties upon a broader class of fiduciaries, 29 U.S.C. § 1003(21)(1976), prohibition of exculpatory clauses, *id.* § 1110(a), broad disclosure and reporting requirements, *id.* §§ 1021–31, and nationwide uniformity of rules," and § 406's "detailed list" of *per se* illegal types of transactions), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). For example, the traditional four overlapping fiduciary duties (of loyalty, care, diversification of plan assets, and adherence to plan documents, where prudent), cited in footnote 9 of this memorandum and order and discussed in detail *infra*, are derived from the common law of trusts and are imposed upon ERISA fiduciaries. At the same time, in contrast to the common law of trusts, under ERISA the plan fiduciary may have multiple roles and wear many hats; he may serve as an employer and as a plan fiduciary.[50] The scope of the incorporation of the common law of trusts is not clearly defined, however, and different courts have frequently come to different conclusions about the extent of its application.

██ The most fundamental duty of ERISA plan fiduciaries is a duty of complete loyalty, under 29 U.S.C. § 1104(a)(1)(B), to insure that they discharge their duty "solely in the interests of the participants and beneficiaries," and to "exclude all selfish interest and all consid-

---

50. *See Varity Corp.*, 516 U.S. at 497, 116 S.Ct. 1065: "In some instances, trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purpose require departing from common-law trust requirements." The high court explained that Congress enacted ERISA to provide extra protections for both employers establishing ERISA benefit plans and for plan participants and beneficiaries that the law of trusts lacked. Thus, for example, ERISA permits an employer to serve as a plan administrator under 29 U.S.C. § 1002(1), unlike trust law. *See Varity Corp.*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (allowing employees to sue employer company for breach of fiduciary duty).

eration of the interests of third persons." *Id.* Fiduciaries must discharge their duties with respect to the plan "solely in the interest of the participants and the beneficiaries," i.e., "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Thus among the responsibilities and duties imposed on fiduciaries by ERISA is avoidance of conflicts of interest. *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251–52, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993).

Second, the fiduciary must meet a "prudent man" standard under 29 U.S.C. § 1104(a)(1)(B), to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use" and "with single-minded devotion" to these plan participants and beneficiaries. According to the Department of Labor, 29 C.F.R. § 2550.404a–1(b), these requirements are satisfied if the fiduciary

> (i) Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and
>
> (ii) Has acted accordingly.

"Appropriate consideration" for purposes of this regulation includes but is not limited to

> (i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and
>
> (ii) Consideration of the following factors as they relate to such *portion* of the portfolio:
>
> (A) The composition of the portfolio with regard to diversification;
>
> (B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and
>
> (C) The projected return of the portfolio relative to the funding objectives of the plan.

*Id.* at § 2550.404a–1(b)(2); *Laborers National Pension Fund v. Northern Trust Quantitative Advisors, Inc.* 173 F.3d 313, 317–18 (5th Cir.)(noting that these regulations from the Department of Labor, 29 C.F.R. § 2550.404a–1, generally reflect that a fiduciary with investment duties must act as a prudent investment manager under the modern portfolio theory rather than under the common law of trusts standard which examined each investment with an eye toward its individual riskiness), *cert. denied*, 528 U.S. 967, 120 S.Ct. 406, 145 L.Ed.2d 316 (1999). In 29 C.F.R. § 2509.94–1 Interpretive Bulletin, the Department of Labor observes, "... [B]ecause every investments necessarily causes a plan to forego other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return."

 Regarding this overlapping duty of "care, skill, prudence, and diligence under the circumstances then prevailing

that a prudent man acting in a like capacity and familiar with such matters would use," the Fifth Circuit has stated,

> In determining compliance with ERISA's prudent man standard, courts objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods to investigate, evaluate and structure the investment; acted in a manner as would others familiar with such matters; and exercised independent judgment when making investment decisions. " '[ERISA's] test of prudence . . . is one of conduct, and not a test of the result of performance of the investment. The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed.' " Thus, the appropriate inquiry is "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment [citations omitted]."

*Laborers National Pension Fund v. Northern Trust Quantitative Advisors, Inc.* 173 F.3d at 317. Since the prudence standard focuses on whether the fiduciary utilized appropriate methods to investigate and evaluate the merits of a particular investment, the "appropriate methods" in a particular case depend "on the 'character' and 'aim' of the particular plan and decision at issue and the 'circumstances prevailing' at the time a particular course of action must be investigated and undertaken.' " *Bussian,* 223 F.3d at 299. Furthermore, the standard of the prudent man is an objective standard, and good faith is not a defense to a claim of imprudence. *Reich,* 55 F.3d at 1046; *Donovan v. Cunningham,* 716 F.2d at 1467 ("this is not a search for subjective good faith—a pure heart and an empty head are not enough").

Third, the ERISA fiduciary must diversify the plan's investments to minimize risk of loss unless, under the circumstances, it is clearly prudent not to diversify. 29 U.S.C. § 1104(a)(1)(C). The legislative history offers some guidance about diversifying the assets of an ERISA plan:

> The degree of investment concentration that would violate this requirement to diversify cannot be stated as a fixed percentage, because a fiduciary must consider the facts and circumstances of each case. The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; (7) dates of maturity.

*Metzler v. Graham,* 112 F.3d 207, 208–09 (5th Cir.1997), *citing* H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5084–85 (Conf. Rpt. at 304). The panel further noted, "We think it is entirely appropriate for a fiduciary to consider the time horizon over which the plan will be required to pay out benefits in evaluating the risk of large loss from an investment strategy." *Metzler,* 112 F.3d at 210 n. 6. Moreover, the panel admonished courts, "It is clearly imprudent to evaluate diversification solely in hindsight—plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time." *Id.* at 209.

To prevail on a claim that a fiduciary violated its duty to diversify, a plaintiff must show that the portfolio, on its face, is not diversified. The burden then shifts to the defendant to demonstrate that it was "clearly prudent" not to diversify, the express statutory exception

to the duty to diversify. *Metzler*, 112 F.3d at 209. Factors such as the trustees' "investigation of the purchase, the evaluation of other investment alternatives, and the relative expertise of the trustee ... are relevant to whether there was risk of large loss." *Id.* at 212. Both the plaintiff's evidentiary burden and the defendant's evidentiary burden "must be analyzed from the perspective of what both parties acknowledge as their purpose; to reduce the risk of large loss." *Id.* at 210. "Prudence is evaluated at the time of the investment without the benefit of hindsight." *Metzler*, 112 F.3d at 209.

██ Fourth, the plan fiduciary must follow the documents and instruments governing the plan to the extent that they are consistent with ERISA. 29 U.S.C. § 1104(a)(1)(D). "In case of a conflict, the provisions of the ERISA policies as set forth in the statute and regulations prevail over those of the Fund guidelines." *Laborers Nat. Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d at 322. *In accord, Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985)("[T]rust documents cannot excuse trustees from their duties under ERISA and ... trust documents must generally be construed in light of ERISA's policies ...."); *Donovan v. Cunningham*, 716 F.2d at 1467 ("Though freed by Section 408 from the prohibited transaction rules, ESOP fiduciaries remain subject to the general requirements of Section 404."); *Herman v. NationsBank Trust Co., (Georgia)*, 126 F.3d 1354, 1368 (11th Cir.1997)(fiduciary was "obligated to determine

whether the plan provisions ... were contrary to ERISA" and to fulfill his duties to act prudently and solely in the interests of the plan participants), *cert. denied*, 525 U.S. 816, 119 S.Ct. 54, 142 L.Ed.2d 42 (1998). *See also Moench v. Robertson*, 62 F.3d 553, 567 (3d Cir.1995)(where the plan language "constrains the [fiduciaries'] ability to act in the best interest of the beneficiaries," it is inconsistent with ERISA and with the common law of trusts and must not be followed), *cert. denied*, 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996); *Eaves v. Penn*, 587 F.2d 453, 459 (10th Cir.1978)("While an ESOP fiduciary may be released from certain Per Se violations on investments in employer securities ..., the structure of [ERISA] itself requires that in making an investment decision of whether or not a plan's assets should be invested in employers [*sic*] securities, an ESOP fiduciary, just as fiduciaries of other plans, is governed by the 'solely in the interest' and 'prudence' tests of §§ 404(a)(1)(A) and (B).").[51]

Given that a fiduciary's duties are "the highest known to the law," "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *cited and quoted by Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000). In determining whether a trustee has breached his duties, the court examines both the merits of the challenged transaction(s) and the thoroughness of the fiduciary's investigation into the merits of

---

**51.** Article VII of the ESOP mandates that "the assets of the Plan will at all times be primarily invested [80% or more]" in Enron stock. The Savings Plan at V.16(a) provided that the employer's contributions should be primarily in shares of its own stock. Plaintiffs contend that where the plans mandated

that the plans acquire and retain Enron stock, ERISA requires that fiduciaries investing and managing plan assets must disregard the terms of the plan if following those terms would be disloyal, imprudent or otherwise violate ERISA.

the transaction(s). *Donovan v. Cunningham*, 716 F.2d at 1467.[52]

Unlike the law of conspiracy, "[n]o fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." 29 U.S.C. § 1109(b); *see also Bannistor v. Ullman*, 287 F.3d 394, 405 (5th Cir.2002).

### c. "Two–Hat" Doctrine

■ Unlike the trustee at common law, who must wear only his fiduciary hat when he acts in a manner to affect the beneficiary of the trust, an ERISA trustee may wear many hats, although only one at a time, and may have financial interests that are adverse to the interests of the beneficiaries but in the best interest of the company. *Pegram*, 530 U.S. at 225, 120 S.Ct. 2143; *Bussian*, 223 F.3d at 294–95; *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 412–13 (5th Cir.2003). For example a fiduciary may wear the hat of an employer and fire a beneficiary for reasons not related to the ERISA plan, or the hat of a plan sponsor and modify the terms of a plan to be less generous to the beneficiary. *Pegram*, 530 U.S. at 225, 120 S.Ct. 2143. When making fiduciary decisions, however, a fiduciary may wear only his fiduciary hat. *Id.* Thus instead of defining a fiduciary merely as an administrator of or manager of or advisor to a plan, the statute states that he is a fiduciary only "to the extent that he acts in such a capacity in relation to a plan." *Pegram*, 530 U.S. at 225–26, 120 S.Ct. 2143, *citing* 29 U.S.C. § 1002(21)(A); *Schlumberger*, 338 F.3d at 412–13. Accordingly, when a plaintiff alleges a cause of action for breach of fiduciary duty, the threshold question is whether the defendant was acting as a fiduciary, i.e., performing a fiduciary function, when he performed the action that constitutes the basis of the complaint. *Pegram*, 530 U.S. at 226, 120 S.Ct. 2143; *Schlumberger*, 338 F.3d at 413.

■ For example, under the "two hats" doctrine, adopted by the Supreme Court in *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)(holding that an employer does not act as a fiduciary, but as a settlor[53] in adopting, amending[54] or ter-

---

**52.** Where conflicting interests potentially involving a fiduciary and his duty to act in the best interests of the plan participants and beneficiaries arise, depending on the circumstances of the case and the degree of the conflict, to avoid any taint the fiduciary at minimum might have to perform an " 'intensive and scrupulous independent investigation of [the fiduciary's] options.' " *Bussian*, 223 F.3d at 299. If the fiduciary chooses to obtain an independent expert's help, merely hiring an expert and relying blindly on his advice does not satisfy a conflicted fiduciary's investigative duty or serve as a complete defense to an imprudence charge; the fiduciary must " '(1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances.' " *Id.* at 301, *quoting Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir.1996). The fiduciary needs to consider the expert's reputation and experience, the breadth and thoroughness of the expert's investigation, the material supporting his opinion, and the appropriateness of his methods and assumption. *Id.* Similarly, the fiduciary may not blindly rely on credit ratings or other ratings, but must investigate further. *Id.* Alternatively, in an extreme situation, the fiduciary may be forced to appoint an independent fiduciary. *Bussian*, 223 F.3d at 299.

**53.** The plan sponsor is technically a settlor because it is creator of the trust fund in which the plan assets will be placed.

**54.** *See, e.g., Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) ("in general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties, which consist of such actions as the administration of the plan's assets"); *Lock-*

minating a welfare plan [55]), a plan sponsor may function in a dual capacity as a business employer (settlor or plan sponsor [56]) whose activity is not regulated by ERISA and as a fiduciary of its own established ERISA plan, subject to ERISA. "The ... act of amending ... does not constitute the action of a fiduciary"; "ERISA's fiduciary duty requirement simply is not implicated where [the employer], acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Hughes Aircraft,* 525 U.S. at 444, 119 S.Ct. 755. The law does not require employers to establish employee benefit plans. Congress sought to encourage employers to set up plans voluntarily by offering tax incentives, methods to limit fiduciary liability, means to contain administrative costs, and giving employers flexibility and control over matters such as whether or when to establish an employee benefit plan, how to design a plan, how to amend a plan, when to terminate a plan, all of which are generally viewed as business decisions of a settlor, not of a fiduciary, and thus not subject to fiduciary obligations. *Pegram,* 530 U.S. at 226–27, 120 S.Ct. 2143; *Martinez v. Schlumberger, Ltd.,* 338 F.3d at 429 ("a company does not act in a fiduciary capacity by simply amending a plan" or by adopting, modifying or terminating a plan); *Akers v. Palmer,* 71 F.3d 226, 230 (6th Cir.1995)("a company is only subject to fiduciary restrictions when managing a plan according to its terms, but not when

it decides what those terms are to be"), *cert. denied,* 518 U.S. 1004, 116 S.Ct. 2523, 135 L.Ed.2d 1048 (1996); *Bennett v. Conrail Matched Savings Plan Administrative Committee,* 168 F.3d 671, 679 (3d Cir.)("in amending a plan, the employer is acting as a settlor"; thus "the mere fact that [the employer] amended its plan did not breach any fiduciary duties under ERISA"), *cert. denied,* 528 U.S. 871, 120 S.Ct. 173, 145 L.Ed.2d 146 (1999); *Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois,* 326 F.3d 919, 924 (7th Cir.2003)("[S]ince an employer has no duty to create a pension or welfare plan in the first place, neither does he have a duty to amend it to make it more generous, or a duty not to amend it if the amendment would make it less generous").

With respect to amendment of a plan that has the effect of reducing or eliminating pension benefits, the general rule is that the employer who amends the plan according to the procedures laid out in the plan documents does not breach its fiduciary duty as long as the benefits that are reduced or eliminated had *not accrued or were not vested at the time and the amendment does not otherwise violate ERISA or the plan terms.* *Hines v. Massachusetts Mutual Life Ins. Co.,* 43 F.3d 207, 210 (5th Cir.1995), *citing Izzarelli v. Rexene Prods. Co.,* 24 F.3d 1506, 1524 (5th Cir.1994); *Heinz v. Central Laborers' Pension Fund,* 303 F.3d 802, 804 (7th Cir. 2002)("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an

---

55. The Supreme Court subsequently extended the dual hat doctrine to pension benefit plans in *Lockheed Corp. v. Spink,* 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996).

*heed Corp. v. Spink,* 517 U.S. 882, 891, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) (holding that "the act of amending a pension plan does not trigger ERISA's fiduciary provisions").

56. Title 29 U.S.C. § 1002(16)(B) defines "plan sponsor" as including the employer or employers responsible for establishment of the plan, or an employee organization if it is responsible.

amendment described in section 1082(c)(8) ["substantial business hardship"] or 1441 [terminated multiemployer plans] of this title."), *petition for cert. filed*, No. 02–891, 71 U.S.L.W. 3429 (Dec. 10, 2002).

Section 204(g), as amended 29 U.S.C. § 1054(g), ERISA's anti-cutback provision, provides in relevant part,

> Decrease of accrued benefits through amendment of the plan
>
> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan other than an amendment described in section 1082(c)(8) or 1441 of this title.[57]
>
> (2) For purposes of paragraph (1), a plan amendment which has the effect of—
>
> (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
>
> (B) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

Section 1054(g) statutorily protects against the reduction or elimination of accrued benefits, but not against reduction or elimination of benefits that are expected but not accrued. *Campbell v. BankBoston, N.A.*, 327 F.3d 1, 8–9 (1st Cir.2003); *Board of Trustees of Sheet Metal Workers' Natl. Pension Fund v. C.I.R.*, 318 F.3d 599, 599 (4th Cir.2003). "Accrued benefits" in the defined benefit context are defined as "the individual's accrued benefit determined under the plan," which is "equal to the employee's accumulated contributions." *Campbell*, 327 F.3d at 8, *citing* 29 U.S.C. § 1002(23)(A) and § 1054(c)(2)(B). Section 1002(23) of ERISA provides, The term "accrued benefit means . . . in the case of a defined benefit plan, the individual's ac-

crued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age." Section 411(d)(6) of the Internal Revenue Code, 26 U.S.C. § 411(d)(6), is a parallel provision prohibiting the same conduct, and Treasury Regulation § 1.411(d)–4, A–4(a), promulgated thereunder to "effectuate these 'anti-cutback' principles," provides in relevant part,

> [A pension] plan that permits the employer, either directly or indirectly, through the exercise of discretion, to deny a participant a section 411(d)(6) protected benefit provided under the plan for which the participant is otherwise eligible (but for the employer's exercise of discretion) violates the requirements of section 411(d)(6).

*Perreca v. Gluck*, 295 F.3d 215, 228 (2d Cir.2002), *citing* Treasury Regulation § 1.411(d)–4, A–4. Under Treasury Regulation § 1411(d)–4, A–5, "The term employer includes plan administrator . . . [and] trustee . . . ." *Id.* at 228 n. 10.

### d. Power to Appoint/Remove Plan Fiduciaries

▮ A person or entity that has the power to appoint, retain and/or remove a plan fiduciary from his position has discretionary authority or control over the management or administration of a plan and is a fiduciary to the extent that he or it exercises that power. *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir.1996)("the power . . . to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)")[58]; *Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir. 1988)("Tosco is a fiduciary within the

---

**57.** Neither § 1441 nor § 1342 (addressing termination of a plan by the Pension Benefit Guarantee Corporation through appointment of a trustee) is relevant here.

**58.** In *Coyne & Delany Co. v. Selman*, 98 F.3d at 1464–65, the Fourth Circuit recognized as an exception to the rule that plan sponsors are usually free to amend plans without triggering fiduciary status a situation where the sponsor amends to obtain and exercise the

meaning of ERISA ... because it appoints and removes the members of the administrative committee that administers the pension plan."); *American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc. of the U.S.,* 841 F.2d 658, 665 (5th Cir.1988)("Liability for failure to adequately train and supervise an ERISA fiduciary arises where the person exercising supervisory authority is in a position to appoint or remove plan administrators and monitor their activities."); *Henry v. Frontier Industries, Inc.,* 863 F.2d 886, 1988 WL 132577, *2 (9th Cir.1988)("Largent was a fiduciary of the ESOP by virtue of his power to appoint and retain, and his duty to monitor the member(s) of the Administrative Committee ...."); *Mehling v. New York Life Ins. Co.,* 163 F.Supp.2d 502, 509–10 (E.D.Pa.2001); *Liss v. Smith,* 991 F.Supp. 278, 310, 311 (S.D.N.Y.1998)("It is by now well-established that the power to appoint plan trustees confers fiduciary status"; "[t]he duty to monitor carries with it, of course, the duty to take action upon discovery that the appointed fiduciaries are not performing properly").

In *Leigh v. Engle,* 727 F.2d 113, 133–35 (7th Cir.1984), the Seventh Circuit noted that 29 C.F.R. § 2509.75–5 at FR–3 provides that "a plan instrument which designates the corporation as 'named fiduciary' should provide for designation by the corporation of specified individuals or other persons to carry out specified fiduciary responsibilities under the plan." Furthermore, in *Leigh,* the Seventh Circuit concluded that two corporate officials exercising a duty to appoint fiduciaries had a duty to monitor their appointees' actions:

> As the fiduciaries responsible for selecting and retaining their close business associates as plan administrators, Engle and Libco had a duty to monitor appropriately the administrators' actions. Engle and Libco could not abdicate their duties under ERISA merely through the device of giving their lieutenants primary responsibility for the day to day management of the trust. Engle and Libco were obliged to operate with appropriate prudence and reasonableness in overseeing their appointees' management of the trust.

727 F.2d at 134–35. *See also* ERISA Interpretative Bulletin 75–8, 29 § 2509.75–8(D–4) (members of a board of directors "responsible for the selection and retention of plan fiduciaries" have " 'discretionary authority or discretionary control respecting the management of such plan' and are, therefore, fiduciaries with respect to the plan."); (FR–17 Q & A)("At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.").[59]

---

power to appoint, retain and remove plan fiduciaries.

**59.** Some Defendants have argued that the right to appoint and remove others to serve as fiduciaries by itself does not make one a fiduciary and have cited *In re WorldCom, Inc.,* 263 F.Supp.2d 745 (S.D.N.Y.2003). In that case, the plaintiffs had relied on 29 C.F.R. § 2509.75–78 (FR–17 Q & A) ("At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.") to impose fiduciary duties on three director defendants on WorldCom's Board, who were vested with WorldCom's power as plan administrator and investment fiduciary to appoint and remove individuals to positions. Disagreeing, Judge Cote granted the motions to dismiss filed by these three defendant directors. Defendants highlight Judge Cote's conclusion that the

Some courts have placed restrictions on such liability. For instance, in *Brock v. Self,* 632 F.Supp. 1509, 1523 (W.D.La. 1986), the district court wrote,

> [I]f the Plan instrument itself provided for a procedure whereby a named fiduciary may designate persons who are not named fiduciaries to carry out fiduciary responsibilities, the named fiduciaries might not be liable for the acts or omissions of the Third–Party Defendants. 29 C.F.R. § 2509.75–8, FR–14 (1985). Because the Plan in the case at bar does not provide for any such procedure, however, then any designation of Third–Party Defendants as fiduciaries by Third–Party Plaintiffs will not relieve Third–Party Plaintiffs from responsibility or liability for the acts and omissions of Third–Party Defendants.

plaintiffs' arguments that the directors were ERISA fiduciaries merely because of their power to appoint and remove individuals as plan administrators or investment fiduciaries was "go[ing] too far. It would make any supervisor of an ERISA fiduciary also an ERISA fiduciary." *Id.* at 760.

This Court finds that the facts in the case before Judge Cote can be easily distinguished from those in *Tittle.* Judge Cote began by observing established law that fiduciary status depends not merely on appointment to a fiduciary status or position, but upon the exercise of discretionary authority by that person: "a person is a fiduciary with respect to a plan *to the extent* ... that he exercises any discretionary authority or discretionary control" over the management of the plan or disposition of its assets or administration of the plan. *Id.* at 757, quoting § 3(21)(A) of ERISA. (As this Court has noted, there is a difference of opinion about the need for discretion with respect to managing plan assets, but assets are not at issue in *Worldcom.*) A key factor in *WorldCom,* not present here, was a provision in the ERISA plan: " 'If WorldCom, Inc. does not appoint individuals to carry out the duties of the Administrator or Investment Fiduciary ... then *any officer* of WorldCom, Inc. shall have the authority to carry out, on behalf of WorldCom, Inc. the duties of the Administrator and the Investment Fiduciary.' " *Id.* at 154. In fact WorldCom did not appoint anyone to be the Plan Administrator or Investment Fiduciary, and Judge Cote *inter alia* dismissed claims against three other officers, whom plaintiffs sued because the officers fell within reach of the plan's phrase "any officer ... shall have the authority" to carry out fiduciary duties. Judge Cote concluded that the complaint failed to allege that the three officers were appointed as fiduciaries *and* that they *functioned* as fiduciaries. As for the Director Defendants, the Plaintiffs made two arguments that Director Defendants were fiduciaries because of the exercise of control and authority over management of the plan: (1)they signed or authored a Section 10(a) prospectus that was included in the SEC Form S–8 statements for WorldCom and (2) they had the right to appoint and remove individuals to fill the positions of plan administrator and investment fiduciary. The judge concluded that the first was a nondiscretionary, ministerial act because "SEC filings are documents that directors must execute to comply with corporation's obligations under the federal securities laws." *Id.* at 760. As for the power to appoint and remove fiduciaries, the judge noted that the plaintiffs provided no statutory or decisional support for their contention that this power made them fiduciaries, relied on a "Georgia statute that describes the general powers of a board of directors" and "addresses those circumstances in which a board is wearing its corporate 'hat' and not an ERISA 'hat,' " cited the DOL regulation *supra* that only "gives guidance for those who are already ERISA fiduciaries," and, significantly, "[did] not sufficiently allege that the Director Defendants functioned as ERISA fiduciaries." *Id.* at 760.

Here this Court has cited a number of opinions holding that the exercise of the power to appoint, retain and remove persons for fiduciary positions triggers fiduciary duties to monitor the appointees. Moreover in *WorldCom,* WorldCom did not appoint anyone as a fiduciary and there apparently were no allegations that Director Defendants *functioned* as fiduciaries, i.e., actually appointed persons to or removed persons from such positions. In *Tittle,* on the other hand, Defendants did appoint fiduciaries who, in turn, exercised discretionary authority or control over the plan and allegedly breached their fiduciary duties, while Director Defendants allegedly failed in their duty to monitor those appointed.

*See also Newton v. Van Otterloo,* 756 F.Supp. 1121, 1132 (N.D.Ind.1991)(directors have duties to monitor plan fiduciaries whom they appoint but do not breach duties in the absence of "notice of possible misadventure by their appointees").

### e. Duty to Disclose

Plaintiffs have alleged that Enron fiduciary Defendants, including the Administrative Committee members, Lay, and the Compensation Committee members (Blake, Duncan, Jaedicke and LeMaistre), have breached their duty of loyalty to the plan participants by affirmatively and materially misleading them about Enron's financial condition and performance and its accounting manipulations, while inducing them to hold and purchase additional Enron stock. Plaintiffs have also argued that Defendants charged in Count II (lockdown) and Count IV (Offset formula used by Cash Balance Plan) had a fiduciary duty to disclose Enron's financial condition to plan participants and beneficiaries.

The fiduciary's duty to disclose is an area of developing and controversial law.

Under the common law of trusts, which Congress indicated should apply as a threshold step to define duties of plan fiduciaries under ERISA, generally the trustee's duty to disclose information was triggered by a specific request from a plan participant or beneficiary. According to Restatement (Second) of Trusts § 173 (1959),[60]

> The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents related to the trust.

**60.** In *Harris Trust,* 530 U.S. at 250, 120 S.Ct. 2180, the Supreme Court turned to the Re-

In addition, as embodied in comment d to § 173, are the seeds of the trustee's duty to disclose:

> The trustee is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest. . . .

Although the duty to disclose has its roots in the common law of trusts, courts recently have been expanding a fiduciary's affirmative duty to disclose material information to plan participants under ERISA.

It is well established that a plan administrator acts in a fiduciary capacity when it explains plan benefits, even likely future benefits, to its employees. *See, e.g., Varity Corp.,* 516 U.S. at 502–03, 504–05, 116 S.Ct. 1065; *McCall v. Burlington Northern/Santa Fe Co.,* 237 F.3d 506, 510–11 (5th Cir.2000)("Providing information about likely future plan benefits falls within ERISA's statutory definition of a fiduciary Act."), *cert. denied,* 534 U.S. 822, 122 S.Ct. 57, 151 L.Ed.2d 26 (2001). The Supreme Court has held that § 404(a) of ERISA, 29 U.S.C. § 1104(a)(1)("a fiduciary shall discharge his fiduciary duty with respect to a plan solely in the interest of the participants and beneficiaries"), imposes a duty on a plan fiduciary not to affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan. *See, e.g., Varity Corp. v. Howe,* 516 U.S. 489, 493, 505, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)(holding that an employer which was also an ERISA Plan administrator breached its fiduciary duty of loyalty to the plan beneficiaries when it deceptively induced them to

statement (Second) of Trusts as its source for the common law of trusts.

"switch employers and thereby voluntarily release [the company] from its obligation to provide them benefits"). In *Varity Corp.*, the Supreme Court proclaimed, "To participate knowingly and significantly in deceiving plan beneficiaries in order to save the employer money at the beneficiaries' expense is not to act solely in the interest of the participants and beneficiaries.... [L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA". *Id.* at 506, 116 S.Ct. 1065. *See also Martinez v. Schlumberger, Ltd.*, 338 F.3d at 425 ("When an ERISA plan administrator speaks in its fiduciary capacity concerning a material aspect of the plan, it must speak truthfully"); *McCall v. Burlington Northern/Santa Fe*, 237 F.3d at 510–11; *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 668 (2d Cir.1994)(holding that "when a plan administrator speaks, it must speak truthfully").

In *Varity Corp.* 516 U.S. at 506, 116 S.Ct. 1065, the Supreme Court chose not to "reach the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries." Nevertheless, in that case the Supreme Court found that a plan sponsor, which distributed materials and called a meeting where it persuaded approximately 1,500 employees to transfer, voluntarily, to positions at a new subsidiary by intentionally misrepresenting that the subsidiary was financially stable and the employees' benefits would be secure, was acting in a fiduciary capacity and violated its fiduciary duties. "While it may be true that amending or terminating a plan is beyond the power of a plan administrator—and, therefore, cannot be an act of plan 'management' or 'administration'—it does not follow that making statements about the likely future of the plan is also beyond the scope of plan administration.... [P]lan administrators often have, and commonly exercise, discretionary authority to communicate with beneficiaries about the future of plan benefits." *Varity Corp.*, 516 U.S. at 505, 116 S.Ct. 1065.

Courts have generally agreed that where an ERISA fiduciary makes statements about future benefits that misrepresent present facts, these misrepresentations are material if they would induce a reasonable person to rely on them. *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122–23 (2d Cir.1997); *Mullins v. Pfizer*, 23 F.3d at 669; *Kurz v. Philadelphia Electric Co.*, 994 F.2d 136, 140 (3d Cir.1993), *cert. denied sub nom Philadelphia Electric Co. v. Fischer*, 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 439 (6th Cir.2002)("[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing ... benefits to which she may be entitled."), *cert. denied,* —— U.S. ——, 123 S.Ct. 2077, 155 L.Ed.2d 1062 (2003).

Concern for uninformed and vulnerable plan participants has increasingly led some courts, including the Third Circuit, to conclude that circumstances known to the plan fiduciary can give rise to an expanded affirmative duty to disclose information necessary to protect a participant or beneficiary because that participant or beneficiary "may have no reason to suspect that it should make inquiry into what may appear to be a routine matter." *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc.*, 93 F.3d 1171, 1181 (3d Cir.1996). *See also Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001)("ERISA administrators have a fiduciary obligation 'not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures.' ... Moreover, a fiducia-

ry is at times obligated to affirmatively provide information to the beneficiary ... [including] 'facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection ... [citations omitted].' "); *Bins v. Exxon Co. U.S.A.*, 189 F.3d 929 (1999)("We believe that once an ERISA fiduciary has material information relevant to a plan participant or beneficiary, it must provide that information whether or not it is asked a question."), *on rehearing en banc*, 220 F.3d 1042, 1048–49 (9th Cir.2000)(when a proposed change in retirement benefits becomes sufficiently likely and therefore material, the employer has a duty to provide complete and truthful information); *Schmidt v. Sheet Metal Workers' Nat. Pension Fund*, 128 F.3d 541, 546–47 (7th Cir.1997)("A plan fiduciary may violate its duties ... either by affirmatively misleading plan participants about the operations of a plan, or by remaining silent in circumstances where silence could be misleading."), *cert. denied*, 523 U.S. 1073, 118 S.Ct. 1513, 140 L.Ed.2d 667 (1998).

A number of the Circuit Courts of Appeals have held that after an ERISA participant/beneficiary requests information from his plan's fiduciary, who is informed of that participant/beneficiary's circumstances, the fiduciary has a duty to provide full and accurate information material to the participant/beneficiary's situation, including information about which the participant/beneficiary did not specifically ask. *See, e.g., Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 114 (1st Cir.2002); *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 380–81 (4th Cir.2001); *Bowerman v. Wal–Mart–Stores, Inc.*, 226 F.3d 574, 590 (7th Cir.2000); *Krohn v. Huron Memorial Hosp.*, 173 F.3d 542, 547–48 (6th Cir.1999)("[A] plan administrator has 'an affirmative duty to inform when it knows that silence might be harmful' ...," including full information about short- and long-

term disability benefits when asked about disability benefits generally); *Shea v. Esensten*, 107 F.3d 625, 629 (8th Cir.)("Where an HMO's financial incentives discourage a treating doctor from providing essential health care referrals for conditions covered under the plan benefit structure, the incentives must be disclosed and the failure to do so is a breach of ERISA's fiduciary duties"), *cert. denied*, 522 U.S. 914, 118 S.Ct. 297, 139 L.Ed.2d 229 (1997); *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir.1993); *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir.1992)("A fiduciary must give complete and accurate information in response to participants' questions ...."); *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750 (D.C.Cir.1990)("At the request of a beneficiary (and in some circumstances upon his own initiative), a fiduciary must convey complete and correct material information to a beneficiary.").

Thus some Circuits have concluded that there is an additional affirmative duty, beyond a full and accurate response triggered by a participant/beneficiary's specific question, to disclose material information to plan participants and beneficiaries. The Third Circuit, one of the most aggressive courts in this area, has held, "[I]t is a breach of fiduciary duty for an employer to knowingly make material misleading statements about the stability of a benefits plan." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 480 (3d Cir. 2000), *citing In re Unisys Corp. Retiree Med. Benefits "ERISA" Litig.*, 57 F.3d 1255 (3d Cir.1995), *cert. denied*, 517 U.S. 1103, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996). "[T]he 'duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence

might be harmful.'" *Bixler v. Central Pa. Teamsters Health–Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir.1993), *quoted for that proposition by James v. Pirelli Armstrong Tire Corp.,* 305 F.3d 439, 452 (6th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 2077, 155 L.Ed.2d 1062 (2003), *Watson v. Deaconess Waltham Hosp.,* 298 F.3d at 115,[61] *Shea v. Esensten,* 107 F.3d at 629, and *Bins v. Exxon Co. U.S.A.,* 220 F.3d 1042, 1054 (9th Cir.2000)(*en banc* ). *In accord, Griggs,* 237 F.3d at 381 ("[A]n ERISA fiduciary that knows or should know that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent . . . ."); *Anweiler,* 3 F.3d at 991 ("Fiduciaries must also communicate material facts affecting the interests of beneficiaries. This duty exists when a beneficiary asks fiduciaries for information, and even when he or she does not."). The Third Circuit has asserted that

> an employer or plan administrator fails to discharge its fiduciary duty in the interest of the plan participants and beneficiaries when it provides, on its own initiative, materially false or inaccurate information to employees about the future benefits of a plan. Under these circumstances, it is not necessary that employees ask specific questions about future benefits or that they take the affirmative step of asking questions about the plan to trigger the fiduciary duty.

*James v. Pirelli,* 305 F.3d at 455; *in accord McGrath v. Lockheed Martin Corp.,* 48 Fed.Appx. 543, 555, 2002 WL 31269646, *10 (6th Cir.2002). *See also* Restatement (Second) of Trusts § 173, comment d (1957)(The trustee "is under a duty to

communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows that the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person . . . ."). The Sixth Circuit has additionally held, "A fiduciary breaches his duty by providing plan participants with materially misleading information, 'regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.' . . ." *James v. Pirelli Armstrong Tire Corp.,* 305 F.3d at 449.

■ In comparison, in the very few cases in which the Fifth Circuit has addressed a fiduciary duty to disclose, and then only in narrow circumstances, the Fifth Circuit appears to impose such a duty cautiously. Rather than promulgating broad rules, it approaches the issue case by case, examining the facts and circumstances of each to determine the nature and extent of any duty to disclose that should be imposed. Like many courts, it views the plan administrator as having a fiduciary duty to plan participants as a whole, but not to individual participants with particular problems who do not make a specific request for information. The Fifth Circuit has stated, "[A]bsent a specific participant-initiated inquiry, a plan administrator does not have any fiduciary duty to determine whether confusion about a plan term or condition exists. It is only after the plan administrator does receive an inquiry that it has a fiduciary duty to respond promptly and adequately in a way that is not misleading [footnotes omitted]." *Switzer v. Wal–Mart Stores, Inc.,* 52 F.3d 1294, 1299 (5th Cir.1995)(holding that plan administrator has no duty to give personal-

---

**61.** The First Circuit has imposed two limitations on the concept of an affirmative fiduciary duty to inform ERISA beneficiaries of material facts about their ERISA plan: there must be a particular reason why fiduciary should know that his failure to communicate certain information would be harmful to the beneficiary/participant and a fiduciary does not have to provide unsolicited individual advice, but only advice general to the plan as a whole. 298 F.3d at 114–15.

ized attention to each and every employee, and in particular to inform a plan participant that he was late in remitting his final COBRA premium).

■ Nevertheless, in *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir.1995), *cert. denied*, 516 U.S. 1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996), the panel observed, "Section 404(a) imposes on a fiduciary the duty of undivided loyalty to plan participants and beneficiaries, as well as a duty to exercise care, skill, prudence and diligence. An obvious component of those responsibilities is the duty to disclose material information." In *McDonald*, an appellate court held that § 404(a) required the fiduciary to disclose a change in its rate schedule that caused a prohibitive premium to be set because of the impact such a premium could have on small employers, including the plaintiff. Subsequently, in *Ehlmann v. Kaiser Foundation Health Plan of Texas*, 198 F.3d 552, 556 (5th Cir.2000), *cert. dis-*

*missed*, 530 U.S. 1291, 121 S.Ct. 12, 147 L.Ed.2d 1036 (2000)(holding that ERISA does not impose a fiduciary duty on health maintenance organizations to disclose physician compensation and reimbursement schemes to plan participants),[62] the Fifth Circuit described the imposition of a duty to disclose in *McDonald* as based on the "extreme impact" that the change in rate schedules would have on small employers. The panel observed about *McDonald inter alia*, "Clearly these cases, which adopt a case by case or an *ad hoc* approach, do not warrant the wholesale judicial legislation of a broad duty to disclose that would apply regardless of special circumstance or specific inquiry." *Id.* Thus the Fifth Circuit does recognize that in addition to a specific inquiry from a plan participant, special circumstances with a potentially "extreme impact" on a plan as a whole, where plan participants generally could be materially and negatively affected, might support imposition of such an affirmative duty in a particular case.[63]

---

**62.** The situation in *Ehlmann*, which focused narrowly on "why the text, structure, and legislative history of ERISA do not support the imposition [on health maintenance organizations ("HMOs")] of a broad *duty to disclose physician compensation plans* [emphasis added]," is distinguishable from claims in *Tittle*. In *Ehlmann*, the panel, applying the canon of statutory construction that specific provisions control over general, pointed out that the general fiduciary provision of § 404 does not mention any duty to disclose, but that ERISA has "numerous other provisions detailing an HMO's disclosure duties [and] that these provisions *do not* reference physician reimbursement plans." 198 F.3d at 554. The panel reasoned that because Congress could have included such a requirement among these HMO-specific provisions, the absence of a disclosure requirement regarding physician compensation was probably intentional. *Id.* The appellate court stated, "Where ERISA provides a section specifically dealing with a particular information scheme," a court should not supplement that scheme by reference to another provision in another part of the statute. *Id.*

Here, with respect to the *Tittle* duty-to-disclose claims, there has been no showing of any such related detailed section of provisions in ERISA, so the general duties of § 404 and case law construing them govern.

**63.** As an example of the growing trend to impose and expand a fiduciary duty to disclose where necessary to protect the plan participants, under the two-hat theory, an employer was traditionally seen as not wearing his fiduciary hat when it adopted or changed a plan, because amendment was viewed as a business decision of a settlor to which ERISA's fiduciary duty law did not apply. Nevertheless, some courts have been eroding the protection of the dual hat rule in the context of plan modification by viewing the employer as an administrator-fiduciary and imposing on it fiduciary duties to act solely in the interest of the participants and beneficiaries, including a duty to disclose information about plan changes, either in response to an inquiry or by recognizing an affirmative duty to advise, *even where a change to the plan may not yet have been formally approved.*

A number of the federal appellate courts have adopted, with various modifications, the "serious consideration" test created by the Eleventh Circuit in *Barnes v. Lacy,* 927 F.2d 539, 544 (11th Cir.1991), *cert. denied,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991), to determine whether a fiduciary obligation to disclose to plan participants the existence of or potential changes to an ERISA plan in response to a plan participant's inquiry has been triggered. *See, e.g., Hockett v. Sun Co., Inc.,* 109 F.3d 1515, 1522–25 (10th Cir.1997); *Muse v. Int'l Bus. Machs. Corp.,* 103 F.3d 490, 493–94 (6th Cir.1996), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997); *Wilson v. Southwestern Bell Tel. Co.,* 55 F.3d 399, 405 (8th Cir.1995); *Vartanian v. Monsanto Co. ("Vartanian I"),* 14 F.3d 697, 702 (1st Cir.1994). The test attempts to "balance the tension between an employee's right to information and an employer's need to operate on a day-to-day basis." *Hockett,* 109 F.3d at 1522. Under the test, a fiduciary's obligation to inform plan participants upon request about the existence of an ERISA plan or of potential changes to a plan arises at the point that the creation of a plan or proposed alterations to a plan come under "serious consideration." *Id.* If the breach of fiduciary duty claim is based on a misrepresentation, that misrepresentation had to occur when the plan was under serious consideration. *Id.* Three factors have been used to determine if a plan or changes have come under "serious consideration": (1) following initial steps of gathering information, developing strategies and analyzing options, a specific proposal is prepared; (2) practicalities of putting it into effect are being discussed; (3) and the discussion is by senior officials with the authority to effect the change. *Fischer v. Phila. Elec. Co.,* 96 F.3d 1533, 1539 (3d Cir.1996); *basically in accord, McAuley v. IBM Corp.,* 165 F.3d 1038, 1043–45 (6th Cir.1999); *Hockett,* 109 F.3d at 1523; *Vartanian v. Monsanto Co. ("Vartanian II"),* 131 F.3d 264, 268 (1st Cir.1997).

The Second Circuit considers "serious consideration" as one factor in determining materiality, but not a determinative one; it has adopted "the simple view that when a plan administrator speaks, it must speak truthfully, regardless of how seriously any changes are being considered." *Ballone v. Eastman Kodak Co.,* 109 F.3d 117, 120, 122–24 (2d Cir.1997)(holding that an employer can be liable for misrepresentation regarding a potential future retirement enhancement program even if it was not under serious consideration; the employer's statements about future benefits "are material if they would induce reasonable reliance"). Turning to securities law for guidance on the issue of the materiality of the employer's alleged misrepresentations, the Second Circuit identified the following as some specific factors:

how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes; the special relationship of trust and confidence between the plan fiduciary and beneficiary; whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware taking into consideration the broad trust responsibilities owed by the plan administrator to the employee and the employee's reliance on the plan administrator for truthful information; and the specificity of the assurance. Whereas mere mispredictions are not actionable, false statements about future benefits may be material if couched as a guarantee, especially where, as alleged here, the guarantee is supported by specific statements of fact.

*Id.* at 125 (citations omitted). In *Wayne v. Pacific Bell,* 238 F.3d 1048, 150–51, 155 (9th Cir.2001), *cert. denied,* 534 U.S. 814, 122 S.Ct. 40, 151 L.Ed.2d 13 (2001), the Ninth Circuit adopted the Second Circuit's approach.

Others have rejected the idea of an affirmative duty to disclose potential plan changes absent an inquiry from a plan participant. *See, e.g., Bins v. Exxon Co. U.S.A.,* 220 F.3d at 1048–49 (holding that plan amendment is not plan management or administration, that "an employer's serious consideration of a change to a plan does not, in and of itself, implicate ERISA fiduciary duties," but that "when an employer communicates with its employees about a plan, fiduciary responsibilities come into play"). Nevertheless, the Ninth Circuit en banc indicated that outside of plan modification, it would still find "the existence of other 'affirmative' disclosure duties of an employer-fiduciary." *Id.* at 1053 n. 10, *citing inter alia Barker v. American Mobil Power Corp.,* 64 F.3d 1397, 1403 (9th Cir.1995)("holding that an ERISA fiduciary has a duty to investigate suspicions he has with respect to plan funding and maintenance, and that failing to convey information concerning those suspicions when responding to participants' inquiries can be construed as an affirmative misrepresentation").

In the recently issued *Schlumberger,* 338 F.3d at 416–25, the Fifth Circuit provided a

The *Tittle* Plaintiffs complain not only of general material misrepresentations regarding Enron's financial condition and the inducement to purchase or hold Enron stock, but also of particular employee meetings held in which certain Defendants urged plan participants to continue their employment and purchase or hold Enron stock as part of Defendants' larger scheme to enrich themselves. Indeed, among the "predicate acts" alleged under their RICO claims, as factual support for their interstate transportation of persons and property in order to defraud, Plaintiffs claim that the Enron Insider Defendants, Arthur Andersen Defendants, and some Investment Banking Defendants conspired to induce Enron employees "to travel ... in the execution of the wrongful scheme alleged herein, ... to Houston, Texas, to attend meetings conducted by the Enron Insider Defendants at which ECSP participants were reassured that their 401(k) funds were safely invested and that they should hold and maintain their investments in Enron stock." (Complaint at 281–82,

¶ 796). The facts and holding in *Varity Corp.* have relevance here.

Mindful of Congress' balanced intent in enacting ERISA " 'to offer employees enhanced protection for their benefits, on the one hand, and, on the other, ... not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place,' " in *Schlumberger*, 338 F.3d at 413–16, the Fifth Circuit discussed *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130, in some detail in the context of an employer/administrator/fiduciary's duty to disclose to plan participants future changes to their ERISA plan.

According to the Fifth Circuit, in *Varity Corp.*, former employees of Varity Corporation's subsidiary Massey–Ferguson, Inc. sued Varity, alleging that "Varity Corporation had affirmatively represented to them that their benefits would remain secure if they transferred to a new subsidiary, Massey Combines." *Schlumberger*, 338 F.3d

lengthy and detailed review of the development of the serious consideration test. The Fifth Circuit, citing *Varity Corp.*, opined that when an employer chooses, in its discretion, to communicate about future plan benefits, it does so as an ERISA fiduciary. In speaking it is exercising discretionary authority in administration of the plan, a specifically enumerated fiduciary function under ERISA.... When an ERISA plan administrator speaks in its fiduciary capacity concerning a material aspect of the plan, it must speak truthfully. *Id.* at 424–25. The panel flatly rejected the serious consideration test and concluded,

[W]e cannot agree that misrepresentations are actionable only after the company has seriously considered the plan change. *Varity* does not suggest that the obligation not to misrepresent materializes near the end of a progression, but rather implies that whenever an employer exercises a fiduciary function, it must speak truthfully. Nor do we find a safe harbor for predictions of the future. When an employer speaks to the

future of a plan, employees are justified in concluding that it is backed by the authority of a plan administrator, and should therefore be entitled to trust in those representations.

*Id.* at 425 ("we reject the view that the duty to speak truthfully only arises once the employer begins seriously considering a plan"). Instead the Fifth Circuit adopted "a fact-specific approach akin to that promulgated by the Second Circuit in *Ballone* and followed by the Ninth Circuit in *Wayne*. *Id.* at 428. The overarching question in such an analysis is whether there is a substantial likelihood that a reasonable person in the plaintiffs' position would have considered the information an employer-administrator allegedly misrepresented important in making a decision to retire." *Id.* at 428. It did note that "the more seriously a plan is being considered, the more likely a representation about the plan is material." *Id.* Nevertheless, the Fifth Circuit has held that otherwise an employer has no affirmative duty to disclose that it is considering amending its plan. *Id.*

at 414, *citing Varity*, 516 U.S. at 492–93, 116 S.Ct. 1065. In fact Varity created Massey Combines in order to transfer Massey–Ferguson's money-losing divisions, including its benefit plans, and other debts to Massey Combines with the expectation that Massey Combines would fail. In order to convince the plan beneficiaries to switch to Massey Combines, Varity had a special meeting with the employees and promised that their benefits would remain secure if they transferred, even though Varity knew the result would be quite different. Approximately 1500 employees relied on these promises and made the transfer; Massey Combines went into receivership within a couple of years and those employees lost their benefits. *Id.* at 414, *citing id.* at 494, 116 S.Ct. 1065. Although Varity argued that it was wearing its settlor/employer hat when it urged Massey–Ferguson's employees to switch to Massey Combines, the Supreme Court concluded otherwise and found that when Varity convened the meeting to represent that the transfer would not threaten their benefits, it was acting in its fiduciary capacity as a plan administrator. *Id.* at 415, *citing id.* at 501–02, 116 S.Ct. 1065. The high court opined that " 'Varity was exercising 'discretionary authority' respecting the plan's 'management' or 'administration' when it made these misrepresentations' " and that " '[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose.' " *Id.* at 415, *citing id.* at 498, 502, 116 S.Ct. 1065. Emphasizing that fiduciary duties primarily constrain the exercise of discretionary authority operating beyond duties laid out in the express terms of plan instruments, the Supreme Court emphasized the ERISA

fiduciary's duty of loyalty and concluded that Varity had breached that duty in " 'participat[ing] knowingly and significant by in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense' " and lying to the employee participants. *Id.* at 415–16, *citing id.* at 506, 116 S.Ct. 1065.

Although the facts in *Varity Corp.* are not precisely on point with those in the instant suit, there are sufficient parallels with the *Tittle* Plaintiffs' allegations to state a claim for breach of fiduciary duty in their representations to employees in these meetings.

This Court concludes that in light of the fiduciary's duties of loyalty and of care, skill, prudence, and diligence, the *Tittle* plaintiffs have stated a claim generally for breach of a fiduciary duty to disclose based on material information in various ERISA counts, implied or express; they have asserted that Defendants breached their fiduciary duty regarding Enron's alleged fraudulent accounting, concealment of its deceitful business practices and of the company's precarious, swiftly deteriorating financial condition, and Defendants' alleged representations knowingly intended to induce the plan participants' continued participation in pension plans' purchase and holding of Enron stock, which were known or should have been known to plan fiduciaries. They have alleged with supporting facts that disclosure was essential to protect the interests (retirement assets) of plan participants and beneficiaries from the threat of substantial depletion. Plaintiffs have specifically alleged that Lay, Olson, the Compensation Committee, the Enron ERISA Defendants, and Enron breached their fiduciary duty under ERISA by failing to disclose information about Enron's dangerous financial condition that they knew or should have known [64] to plan participants, the Administrative Committee, or plan counsel, while

64. According to the complaint, not only did Sherron Watkins inform both Lay and Olson

personally about what she saw as dangerous

these Defendants were individually selling large amounts of their own Enron holdings.

Certain Committee and Outside Directors ("Compensation Committee") Defendants [65] have argued that if these Defendants met their duty of loyalty by selectively disclosing only to the plan participants non-public information about material accounting irregularities and financial improprieties, so that the participants could make an informed decision not to purchase additional shares or to sell their currently held shares of Enron stock before the market and the public found out and the price plunged, Defendants would be violating insider trading laws under the federal securities laws.[66]

accounting irregularities that might result in catastrophe for the company, but Olson purportedly learned that Fastow wanted to fire Watkins for her disclosures and ordered that Watkins' computer be seized. Despite her fiduciary duties, Olson did nothing. Plaintiffs' Memorandum in Opposition, # 315 at 38, quotes Judge Cardoza in *Globe Woolen Co. v. Utica Gas and Electric Co.*, 224 N.Y. 483, 488–89, 121 N.E. 378, 380 (1918): "The trustee is free to stand aloof, while others act, if all is equitable and fair. He cannot rid himself of the duty to warn and denounce, if there is improvidence or oppression, either apparent on the surface, or lurking beneath the surface, but visible to his practiced eye."

Furthermore among the red flags, Plaintiffs assert that had the fiduciaries cared to investigate, as was their fiduciary duty, regulatory filings would have revealed that Enron was in deep trouble. *See, e.g.*, "Enron Short Seller Spotted Trouble Ahead of the Crowd," *The Wall Street Journal*, November 6, 2001 (detailing how one analyst had discovered from a careful review of Enron's regulatory filings that Enron was a "hedge fund in disguise" whose stock price would ultimately tumble). # 315 at 37. Administrative Committee members owe "the highest duty known in the law." *Bierwirth*, 680 F.2d at 272. Plaintiffs scoff at Defendants' contention that they are "no different" from Plaintiffs and are also "victims" of the scheme like the defrauded shareholders, employees, and the market; Plaintiffs insist Defendants are not like Plaintiffs because Defendants had, but failed to discharge, their duties as Plan fiduciaries loyally and prudently.

In their Memorandum in Opposition, # 315 at 39–40, referencing a memorandum from Defendant Max Hendrick, III of Vinson & Elkins following his August 29, 2001 interview of Defendant Paula Rieker, Plaintiffs state that they have recently learned that Rieker, who was Enron's Managing Director

of Investor Relations, learned as early as 1999 of issues relating to Fastow's conflicted role in the LJM partnerships, Whitewing, and other related party transactions that were utilized to hide Enron's actual financial condition. The memorandum also reflects that Rieker, through Vinson & Elkins' investigation, learned of Watkins' allegations of specific accounting improprieties involving Raptor and other related party transactions and thus by the end of August 2001 knew of Watkins' allegations, like Olson and Lay. Plaintiffs have also learned that Defendant Lindholm, an Enron Accounting executive, signed off on the "LJM Approval Sheet" that approved Enron's participation in transactions involving LJM1 and LJM2, entities used to defraud investors about Enron's precarious and illicit financial practices. The complaint charges these fiduciaries generally with failure to discharge their fiduciary duties to participants; while the new, specific allegations are not currently included in the consolidated complaint, as in *Newby*, in the interests of justice, this Court will permit *Tittle* Plaintiffs to replead to include them.

65. "Certain Committee Defendants" are the members of the Administrative Committees for Enron pension plans: Philip J. Bazelides, Keith Crane, Rod Hayslett, Mary K. Joyce, Shiela Knudsen, Tod A. Lindholm, James S. Prentice, Paula Rieker, and David Shields. As noted previously, the four Outside Directors against whom Plaintiffs assert ERISA claims are Blake, Duncan, Jaedicke and LeMaistre, all members of the Compensation and Management Development Committee of the Enron Board of Directors.

66. As will be discussed in greater detail later, under 29 U.S.C. § 1104(c), where a plan allows participants to control and manage their plan assets and meets certain requirements that qualify it as a " § 404(c) plan," the

Rule 10b–5, 17 C.F.R. § 240.10b–5, requires that a corporate insider, because he owes a fiduciary duty to shareholders, either disclose material non-public information publicly or abstain from trading his own shares for personal gain. *See, e.g., Chiarella v. United States,* 445 U.S. 222, 226–29, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). *See, generally,* # 1269 at 8–12 in *Newby,* H–01–3624. Furthermore, if a plan fiduciary were to tell plan participants of Enron's actual financial condition so they could sell at a high price based on this nonpublic information, he would also be violating insider trading laws and he, the plan participants as "tippees," and the Administrative Committee might be found liable of securities law violations. *See* 15 U.S.C. § 78u–1(a)(1)(B)(imposing civil penalties for insider trading against a person who directly or indirectly controlled a person who sold a security while in possession of such material, nonpublic information or violated the law in communicating such information) & (b)(1)(A)(imposing controlling person liability where the "controlling person knew or recklessly disregarded the fact that such controlled person was likely to engage in the act or acts constituting the violation and failed to take appropriate steps to prevent such act or acts before they occurred").

As authority for their argument, these Defendants cite two unpublished opinions, *Hull v. Policy Management Systems Corp.,* No. CIV.A.3:00–778–17, 2001 WL 1836286 (D.S.C. Feb. 9, 2001), and *In re McKesson HBOC, Inc. ERISA Litigation,* No. C00–2003RMW, 2002 WL 31431588, *6 (N.D.Cal. Sept. 30, 2002). In *Hull* the court *inter alia* dismissed a claim against corporate-defendant administrative committee members for failing to provide correct, adverse information about the actual value of the corporation and failing to act on it and sell the stock in the trust fund to protect the interests of the plan participants. The district court opined that the plaintiffs' standard of care for the corporation's stock was illegal and impractical because it

would put the Committee in the untenable position of choosing one of the three unacceptable (and in some instances illegal) courses of action; (1) obtain "inside" information and then make stock purchase and retention decisions based on this "inside" information; (2) make the disclosures of "inside" information itself before acting on the discovered information, overstepping its role and, in any case, likely causing the stock price to drop; or (3) breach its fiduciary duty by not obtaining and acting on "inside" information.

2001 WL 1836286, at *9. In the same vein, in *In re McKesson* the district court concluded, "Fiduciaries are not obligated to violate the securities laws in order to satis-

directing participant will not be deemed a fiduciary and neither the participant nor the trustee/plan administrator would be liable for any loss that results from the plan participant's exercise of that control over the assets in his individual account. The statute is regulated by 29 C.F.R. § 2550.404c–1; subsection (c)(2) of the regulation provides that a participant's control of his investment decisions does not meet the requisite element of independence to qualify as a § 404(c) plan if a "plan fiduciary has concealed material nonpublic facts regarding the investment from the participant," unless disclosure would violate federal or state law that is not preempted by ERISA, such as the securities laws. As will be discussed subsequently, Plaintiffs have raised material issues of fact as to whether the Savings Plan would qualify as a § 404(c) plan. But assuming for this purpose that it does, and that the alleged material nondisclosure by Defendants were true, the issue is whether disclosure of the alleged material, non-public facts by Defendants about Enron's business practices and accounting fraud would necessarily violate insider trading laws under § 10b and Rule 10b–5. If so, Defendants would not be liable.

fy their fiduciary duties." 2002 WL 31431588 at *6. The district court opined, moreover, that had there been public disclosure by ERISA Enron fiduciaries in an efficient market, there would have been a swift adjustment in market price and the plan participants would have been unable to sell the stock at artificially high prices so the court dismissed claims against a number of defendants under Rule 12(b)(6). See instruments # 504 and 513 in *Tittle*.

First, the Court notes that the holding in *McKesson*, that ERISA fiduciaries must comply with the prohibition on selective disclosure under the securities laws for the fiduciaries' or their beneficiaries' personal gain, is limited to ESOP plans, which by their nature are generally excepted from the duty to diversify, and on its face does not apply to 401(k) plans. Second, and more significant, the Court finds that the *McKesson* court's rationale is misguided for the following reasons.

Defendants' argument that despite the duty of loyalty, a fiduciary should make no disclosure to the plan participants, because under the securities laws he cannot selectively disclose nonpublic information, translates in essence into an argument that the fiduciary should both breach his duty under ERISA and, in violation of the securities laws, become part of the alleged fraudulent scheme to conceal Enron's financial condition to the continuing detriment of current and prospective Enron shareholders, which include his plan's participants. This Court does not believe that Congress, ERISA or the federal securities statutes sanction such conduct or such a solution, i.e., violating all the statutes and conning the public. As a matter of public policy, the statutes should be interpreted to require that persons *follow* the laws, not undermine them. They should be construed not to cancel out the disclosure obligations under both statutes or to mandate concealment, which would only serve to make the harm more widespread; the statutes should be construed to require, as they do, disclosure by Enron officials and plan fiduciaries of Enron's concealed, material financial status to the investing public generally, including plan participants, whether "impractical" or not, because continued silence and deceit would only encourage the alleged fraud and increase the extent of injury.

At the same time, a fiduciary's duty of loyalty should also not be construed to require him to enable and encourage plan participants to violate the law, i.e., to sell their stock at artificially high prices to make a profit or avoid loss *before* disclosure of Enron's financial condition was made public. Nor would selective disclosure of that information by the fiduciary to plan participants protect any lawful financial interests of the plan participants and beneficiaries. Like any other investor, plan participants have no lawful right, before anyone else is informed of Enron's negative financial picture, to profit from fraudulently inflated stock prices or to avoid financial loss by selling early before public disclosure. If the material information about Enron's precarious financial status had been made public by Enron officials and plan fiduciaries in accordance with their legal obligations and the prices of the stock dropped before the plan participants could make a profit or reduce a substantial loss, the damage to the plan participants would not be the fault of the plan fiduciary but of the underlying alleged fraudulent Ponzi scheme and the corporate officials who participated in it concealed it, and against whom the plan would have a cause of action A trustee has no duty to violate the law to serve his beneficiaries. Restatement (Second) Trusts § 166, cmt. a. Nor is an ERISA fiduciary an insurer of the value of plan assets, even where that price is the result of fraud or manipulation; he has, instead, an ongoing obligation to satisfy the pru-

dent man rule, which, if he performs the necessary investigations and provides accurate information in accordance with it, relieves him of personal liability regardless of the financial success or failure of the purchased assets, even if he does not discover the fraud. If he does not meet the requirements of the prudent man standard, then the plan fiduciary is personally liable to the plan for monetary damages under ERISA. Similarly if Enron directors fail to meet their duties of disclosure but continue to conceal or materially misrepresent Enron's financial condition, they are subject to liability under the securities laws. Thus under either scenario the plan and/or plan participants and beneficiaries who invest in Enron stock because of material misrepresentations or omissions of corporate officers/fiduciaries have a remedy against those who violate the law and injure them.

"The Department of Labor, the agency responsible for interpreting and enforcing ERISA, flatly rejects the *McKesson* court's position on the interaction between ERISA and the securities laws." Secretary of Labor's Amended *Amicus Curiae* Brief (# 1024 at 7). The Court finds that the Secretary's brief appropriately addresses the issue and suggests practical ways to resolve the alleged tension between ERISA and the federal securities statutes so that both can be followed:

> Defendants' duty to "disclose or abstain" under the securities laws does not immunize them from a claim that they failed in their conduct as ERISA fiduciaries. To the contrary, while their Securities Act and ERISA duties may conflict in some respects, they are congruent in others, and there are certain steps that could have been taken that would have satisfied both duties to the benefit of the plans. First and foremost, nothing in the securities laws would have prohibited them from disclosing the information to other share-

holders and the public at large, or from forcing Enron to do so. *See MATTER OF CADY, ROBERTS*, 1961 WL 60638, at \*3 (1961). The duty to disclose the relevant information to the plan participants and beneficiaries, which the Plaintiffs assert these Defendants owed as ERISA fiduciaries, is entirely consistent with the premise of the insider trading rules: that corporate insiders owe a fiduciary duty to disclose material nonpublic information to the shareholders and trading public. *See id.* (incorporating common law rule that insiders should reveal material inside information before trading) . . . .

> Second it would have been consistent with the securities law for the Committee to have eliminated Enron stock as a participant option and as the employer match under the Savings Plan. . . . The securities rules do not require an individual never to make any decision based on insider information. To the contrary, the insider trading rules require corporate insiders to refrain from buying (or selling) stock if they have material, nonpublic information about the stock. Thus, the "disclose or abstain" securities law rule is entirely consistent with, and indeed contemplates a decision not to purchase a particular stock. See *Condus v. Howard Sav. Bank*, 781 F.Supp. 1052, 1056 (D.N.J.1992) (it is perfectly legal to retain stock based on inside information; violation of insider trading requires buying or selling of stock). It would have been entirely consistent with securities laws for the fiduciaries to have eliminated Enron stock as a participant option and the employer match. . . . Finally, another option would have been to alert the appropriate regulatory agencies, such as the SEC and the Department of Labor, to the misstatements.

*Id.,* # 1024 at 26–27.[67]

## f. Personal Liability of Corporate Employees

Courts are divided about if and under what circumstances the officers or employees of a corporation that is the named fiduciary in plan instruments may be personally liable for a breach of their fiduciary duty. In light of the traditional rule that the employees of a corporation acting within the course and scope of their employment cannot be personally liable for their actions, some courts have held that the individual corporate employee must have an individual discretionary role in the plan administration to be liable as a fiduciary under ERISA. To shield themselves from liability, Defendants rely heavily on *Confer v. Custom Engineering Co.,* 952 F.2d 34, 37 (3d Cir.1991), holding "that when an ERISA plan names a corporation as a fiduciary, the officers who exercise discretion on behalf of the corporation are not fiduciaries within the meaning of section 3(21)(A)(iii) unless it can be shown that these officers have *individual* discretionary roles as to plan administration." [68]

67. Plaintiffs in response to Defendants' argument based on the holding of *McKesson,* cite another unpublished opinion, *Vivien v. Worldcom, Inc.,* No. C 02–01329–WHA, 2002 WL 31640557 at *7–8 (N.D.Cal. July 26, 2002). Copy attached to Plaintiffs' Response, # 514. In *Vivien,* another California district court, reviewing a Rule 12(b)(6) motion and *Hull,* noted that the *Hull* judge "did not dismiss the complaint as a matter of law by concluding that the claim there was 'nothing more than an ineffective attempt to recast the securities action as an ERISA action.'" *Id.* at *7. Instead, the judge determined that the corporate defendants (the employer and the CEO) in that suit did not act in a fiduciary capacity with respect to the alleged breach of fiduciary duties owed to the pension plan because these defendants' fiduciary duties were expressly limited by the plan's governing written instrument and did not reach the asserted misconduct. Furthermore he concluded that the challenged duties to provide accurate information were "not based on the duties owed by an ERISA fiduciary to a plan and its participants, but the general duties of disclosure owed by a corporation and its officers to the corporation's shareholders." *Id.* at *8. The judge in *Vivien* distinguished the facts in its case because the plaintiff had alleged that the Plan administrator had the duty and responsibility "as one of its duties in administering the Plans," to distribute to the plan participants and beneficiaries information about the plans. *Id.* More important, the judge in *Vivien* decided, "It is impossible to rule out as a matter of law any and all ERISA recovery at the pleadings stage simply because federal securities law may provide overlapping relief." *Vivien* at *8; # 514 at 7.

Moreover, Plaintiffs in their Memorandum in Opposition, # 315 at 39 n. 18, also argue ways the tension between the two statutes can be resolved without violating either:

> The Complaint alleges that as a matter of fact there were any number of things that Olson could have done consistent with her fiduciary duties, without running afoul of the securities law, to protect the Plans, including but not limited to making or causing Enron to make immediate disclosure of the substance of Watkins' allegations to the market, and (along with other Committee Members) discontinuing further purchases of Enron stock by the Plans. ¶¶ 678–91, 780. Olson does *not* dispute that she had, and breached, the duty to disclose what she knew from Watkins and about Fastow's behavior to her fellow-fiduciaries on the Committee. *See, e.g., Glaziers v. Newbridge Securities, Inc.,* 93 F.3d 1171, 1180–82 (3d Cir.1996) (one fiduciary can be held liable for failing to make disclosure to another fiduciary to permit that second fiduciary to protect the plan and its beneficiaries even where the information to be disclosed is beyond the scope of fiduciary authority of the inappropriately silent fiduciary.) Exactly what she and the Plans' fiduciaries could and should have done, and how much they could and should have saved the Plans is an issue for another day.

68. The *Confer* panel explained,

> Although section 3(21)(A) by itself may give rise to fiduciary status when a designated fiduciary is not chargeable with a particular discretionary role, section 3(21)(A) does not extend the fiduciary status of a corporation to its officers. Where no designation

*See also Torre v. Federated Mutual Ins. Co.*, Civ. A. No. 91–425–DES, 1993 WL 545237, *3 (D.Kan. Dec. 3, 1993); *Eyler v. C.I.R.*, T.C. Memo 1995–123, No. 16247–92, 1995 WL 127907 (1995) [page references unavailable] (U.S. Tax Ct. Mar. 23, 1995) (following *Confer*), *aff'd*, 88 F.3d 445 (7th Cir.1996); *Professional Helicopter Pilots Ass'n v. Denison*, 804 F.Supp. 1447, 1451 (M.D.Ala.1992).

Other courts, stressing the functional definition of a fiduciary under ERISA, have held that the individuals within the corporations who actually exercised the fiduciary discretionary control or authority in their official capacity may also be personally liable, depending on the facts of the particular case. *See, e.g., Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1459–61 (9th Cir.1995) (Because fiduciary status under ERISA depends upon an individual's functional role rather than title, as exemplified by Department of Labor interpretations, and because of ERISA's underlying, broadly based liability policy, the Ninth Circuit "reject[s] the Third Circuit's interpretation in *Confer* that an officer who acts on behalf of a named fiduciary corporation cannot be a fiduciary if he acts within his official capacity and if no fiduciary duties are delegated to him individually."), *cert. denied*, 516 U.S. 914, 116 S.Ct. 301, 133 L.Ed.2d 206 (1995). Such a rule would allow a corporation to "shield its decision-makers from personal liability merely by stating in the plan documents that all their actions are taken on behalf of the company and not in a fiduciary capacity." [69] *Id.* at 1461. *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir.2000) ("where, as here, a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company"), *cert. denied*, 531 U.S. 1074, 121 S.Ct. 768, 148 L.Ed.2d 668 (2001); *Landry v. Air Line Pilots Ass'n Inter. AFL–CIO*, 901 F.2d 404, 418 (5th Cir.1990) (Members of the board of directors of an employer that maintains an employee benefit plan will be viewed as fiduciaries for the plan maintained by that employer only "to the ex-

is made or implied, the corporation remains the fiduciary. A Department of Labor bulletin makes clear that the officers of a corporation that sponsors an employee benefit plan are *not* fiduciaries solely by reason of holding office. 29 C.F.R. § 2509.75–8 at D–5 (1991). The bulletin further states that "persons who perform one or more of the functions described in section 3(21)(A) of the Act ... are fiduciaries." *Id.* at D–2. When a corporation is a "person" who performs the fiduciary functions, however, the officer who controls the corporate action is not *also* the person who performs the fiduciary function. Because a corporation always exercises discretionary authority, control, or responsibility through its employees, section 3(21)(A) must be read to impute to the corporation some decisions by its employees. Otherwise, the fictional "person" of a corporation could never be a fiduciary because a corporation could never meet the statute's requirement of "having discretion." We cannot read

section 3(21)(A) in a way that abrogates a use of corporate structure clearly permitted by ERISA.
952 F.2d at 37.

**69.** The Ninth Circuit also points to 29 U.S.C. § 1110, which states, "[A]ny provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty under this part shall be void against public policy." 51 F.3d at 1460. Moreover, that provision also permits insurance of fiduciaries for potential liability, but not a shield from liability. *Id.* Therefore, concluded the Ninth Circuit, the argument by a corporate party, which the Court finds functionally meets the definition of a fiduciary, that it relied on a statement in the Plan that its officers were not acting as fiduciaries, but only on behalf of the corporation, is void against public policy because it "purports to relieve the officers from fiduciary responsibility or liability, under § 1110." *Id.*

tent" that they have the responsibility for functions listed in § 3(21)(A) of ERISA, such as selection and retention of plan fiduciaries, over which they necessarily would exercise "discretionary authority or discretionary control respecting management of such plan."), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *Martin v. Schwab,* No. CIV. A. 91–5059–CVSW–1, 1992 WL 296531, at *5 (W.D.Mo. 1992) ("Defendants' contention they have no individual exposure as fiduciaries [because they were members of the Board of Directors] is clearly at odds with the language of the statute [70] .... Congress 'conferred fiduciary status on persons and entities by activity and not by label.' "); *Kay v. Thrift & Profit Sharing Plan for Employees of Boyertown Casket Co.,* 780 F.Supp. 1447, 1461 (E.D.Pa.1991) (holding liable the company and the company employees personally involved in a plan decision that was determined to be a breach of fiduciary duty); *Eaton v. D'Amato,* 581 F.Supp. 743, 747 (D.D.C.1980) (where a corporation's "key officials exercised far more than ministerial powers[,][t]heir status as administrator may well qualify them automatically as fiduciaries"); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 641 (W.D.Wis.1979) ("While it is indeed contemplated under ERISA that a corporation, as an entity, may be a plan fiduciary, the analysis does not end there. Individuals within the corporation who exercise the type of authority or control described in section 3(21)(A) of ERISA will themselves be fiduciaries with respect to the Plan.").

This year the Fifth Circuit emphasized that in last year's opinion in *Bannistor v. Ullman,* 287 F.3d 394, 403–06 (5th Cir. 2002) (holding that corporate officers were liable as fiduciaries since they exercised

control over plan assets, approved a new health plan, and had check-signing authority for their employer corporation), it had demonstrated that it has adopted the functional approach of the Ninth Circuit in *Kayes* and holds corporate officers personally responsible for the role they played in the management of plan assets, while it clearly rejected *Confer. Musmeci v. Schwegmann Giant Super Markets, Inc.,* 332 F.3d 339, 350 n. 7 (5th Cir.2003). One district court in the Fifth Circuit had previously held corporate officials personally liable when acting within the scope of their employment on behalf of the corporation. *Brock v. Self,* 632 F.Supp. 1509, 1523–24 (W.D.La.1986) ("While the ... Company, as an entity, is properly held to be a fiduciary, it cannot shield its officers and employees from liability for their fiduciary breaches under the express terms of ERISA, which provides that [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities imposed upon fiduciaries ... *shall be personally liable* to make good to such plan any losses to the plan resulting from each such breach ... [emphasis added by court]."), *quoting* 29 U.S.C. § 1109(a).

In view of the broad language, the functional and flexible definition of "fiduciary," and the expansive liability policy of the statute, as well as the holding in *Musmeci,* this Court agrees with those courts which reject a *per se* rule of nonliability for corporate officers acting on behalf of the corporation and instead make a functional, fact-specific inquiry to assess "the extent of responsibility and control exercised by the individual with respect to the Plan" to determine if a corporate employee, and thus also the corporation, has exercised sufficient discretionary authority and con-

70. Section 409(a) of ERISA, 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries ... shall be personally liable to make good to such plan.").

trol to be deemed an ERISA fiduciary and thus personally liable for a fiduciary breach. *Bell v. Executive Committee of United Food and Commercial Workers Pension Plan for Employees,* 191 F.Supp.2d 10, 15 (D.D.C.2002); *Musmeci,* 332 F.3d at 350 n. 7.

### g. Professional Liability

██ Even where a person exercises some control over the plan's operations or assets, if he is providing only traditional professional services to the plan, he is not a "fiduciary" for such services and is not subject to an ERISA suit for breach of fiduciary duties. "[A]n attorney rendering legal and consulting advice to a plan" will not be considered to be a fiduciary unless he exercises authority over the plan "in a manner other than by usual professional functions" and thus cannot be sued for breach of fiduciary duty under ERISA for pursuing a lawyer's traditional services. *Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson,* 201 F.3d 1212, 1220 (9th Cir.2000) (*quoting Yeseta v. Baima,* 837 F.2d 380, 385 (9th Cir.1988)), *amended and superseded on other grounds,* 208 F.3d 1170 (9th Cir.), *cert. denied,* 531 U.S. 992, 121 S.Ct. 482, 148 L.Ed.2d 456 (2000). The same is true for providers of other professional services, including accountants and banks. *Rutledge,* 201 F.3d at 1220; *Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse,* 879 F.2d 1146, 1150 (3d Cir.1989); *Anoka Orthopaedic Assocs., P.A. v. Lechner,* 910 F.2d 514, 517 (8th Cir.1990); *O'Toole v. Arlington Trust Co.,* 681 F.2d 94, 96 (1st Cir.1982). The Department of Labor's guidelines for interpreting ERISA's definition of "fiduciary" in 29 U.S.C. 1002(21)(A) note that "attorneys, accountants, actuaries, and consultants will ordinarily not be considered fiduciaries." Interpretive Bulletin 75-5, 29 C.F.R. § 2509.75-5 (1987).

██ ERISA does not permit a civil action for legal damages against a nonfiduciary charged with knowing participation in a fiduciary breach. *Reich v. Rowe,* 20 F.3d 25, 26, 28 (1st Cir.1994), *citing Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). As an alternative to fiduciary liability, a nonfiduciary may be liable as a "party in interest," but only for "appropriate equitable relief," including injunctions and equitable restitution, in civil actions brought by plan participants under 29 U.S.C. § 1132(a)(3).[71] *See also Useden v. Acker,* 947 F.2d 1563, 1581–82 (11th Cir. 1991), *cert. denied sub nom. Useden v. Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel,* 508 U.S. 959, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993). A party in interest of an employee benefit plan is defined in 29 U.S.C. § 1002(14) and includes *inter alia* any fiduciary (administrator, officer, trustee, custodian, etc.), a person that provides services to the plan (such as an accountant, attorney), an employer of any employees covered by the plan and an employee organization including any members covered by the plan. Such nonfiduciaries may be held liable for such "appropriate equitable relief" if they are "parties in interest" and, with actual or constructive knowledge, they participate in a fiduciary's breach of its duties in transactions between the plan and a party in interest that are expressly prohibited under § 406(a) of ERISA, 29 U.S.C. § 1106(a).

---

**71.** Section 502(a)(3), 29 U.S.C. § 1132(a)(3), which will be discussed in more detail under the section of this memorandum and order entitled "Standing and Remedies," allows suits by a plan participant, beneficiary or fiduciary "(A) to enjoin any act or practice which violates any provision of this subchapter or terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provisions of this subchapter or the terms of the plan."

Section 406(a) bars a plan fiduciary from entering into certain kinds of transactions that he "knows or should know" are transactions with a party in interest to the injury of the participants of the plan. These include purchases of assets, loans and extensions of credit, payments and transfers of assets to the party in interest, and payments for furnishing services. Section 406(b) bars a fiduciary from dealing with plan assets for his own interest. *See, e.g., Donovan v. Cunningham*, 716 F.2d at 1464–65 ("[T]he object of section 406 was to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse."). *See also Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241, 248, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (unanimous op.); *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 485–86 (6th Cir.2001); *Whitfield v. Lindemann*, 853 F.2d 1298, 1303 (5th Cir.) (holding attorney liable as a nonfiduciary), *cert. denied sub nom. Klepak v. Dole*, 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989).[72] When a plaintiff shows that a fiduciary "caused the plan to engage in an allegedly unlawful transaction" listed in § 406(a)(1), 29 U.S.C. § 1106(a)(1), the fiduciary, in contrast to the participating interested party, may be held personally responsible for monetary damages under § 409(a), 29 U.S.C. § 1109(a), "for any losses incurred by the plan, any ill-gotten profits, and other equitable and remedial relief deemed appropriate by the court." *Lockheed Corp. v. Spink*, 517 U.S. at 888, 116 S.Ct. 1783.

Although the claim against the party in interest in *Harris Trust* was brought under § 406 for participation in designated prohibited transactions, the Supreme Court's broad language indicated that ERISA § 502(a)(3) authorizes a private cause of action for "appropriate equitable relief" to redress any violations of ERISA's Title I, which would include violations of § 404's fiduciary duties. In its ruling, the high court stated that § 502(a)(3) "admits of no limit on the universe of possible defendants" and "the focus ... is on redressing the *fact or practice* which violates any provision of [ERISA Title I]." *Harris Trust*, 530 U.S. at 246–47, 120 S.Ct. 2180 (contrasting the fact that § 503(a) "makes no mention at all of which parties may be proper defendants" while other provisions "do expressly address who may be a defendant."). Thus it would appear that a party-in-interest's liability under *Harris Trust* applies beyond prohibited transactions with the plan under § 406 to a knowing participation in a fiduciary's breach of fiduciary duties under § 404(a). *See Rudowski v. Sheet Metal Workers Intern. Ass'n, Local Union Number 24*, 113 F.Supp.2d 1176 (S.D.Ohio 2000) (holding that a nonfiduciary union may be liable for participating in a fiduciary breach of § 404 in a suit brought under § 502(a)(3)); *L.I. Head Start Child Dev. Serv., Inc. v. Frank*, 165 F.Supp.2d 367 (E.D.N.Y.2001) (attorneys alleged to have knowingly participated in a breach of duty could be liable to return legal fees received in that improper transaction). Plaintiffs have alleged that Arthur Andersen, while not a plan fiduciary, was a knowing participant in the fiduciary breaches by other Defendants by actively

---

**72.** The Ninth Circuit has held that the prohibited transactions under §§ 406(a) and 408(b) include receipt of excessive compensation by a law firm for legal services provided to an ERISA plan. *Concha v. London*, 62 F.3d 1493, 1504 (9th Cir.1995), *cert. dismissed*, 517 U.S. 1183, 116 S.Ct. 1710, 134 L.Ed.2d 772 (1996); *Nieto v. Ecker*, 845 F.2d 868, 873 (9th Cir.1988). *But see Useden v. Acker*, 947 F.2d at 1578 (rejecting Ninth Circuit's rationale because it permits "anyone performing services for an ERISA plan-be it an attorney, a security guard or a janitor" to be deemed a fiduciary.)

concealing from the plans' fiduciaries and participants Enron's actual financial condition and the imprudence of investing in its stock.[73] Moreover, they assert that the accounting firm received large fees that included assets belonging to the plan for Arthur Andersen's provision of these services that purportedly constituted a knowing participation in the breach of fiduciary duty. Thus Plaintiffs seek to have the court impose a constructive trust on plan assets or proceeds traceable to such assets, and ultimately conveyance of those assets or profits derived from them to the plan, i.e., equitable restitution.

■ Even though generally a lawyer or accountant providing services to a plan is a party in interest and not a fiduciary, it has been recognized that at times a professional consultant or advisor may go beyond his normal, traditional advisory function and, because of his special expertise and influence, in effect exercise the discretionary authority or control over the management or administration of an ERISA plan to the point that he has assumed the fiduciary obligations and has transmuted into a fiduciary as defined under ERISA, 29 U.S.C. § 1102(21)(A). *Mertens,* 508 U.S. at 262, 113 S.Ct. 2063 ("professional ser-

vice providers ... become liable for damages only when they cross the line from advisor to fiduciary"). *See also Schloegel v. Boswell,* 994 F.2d 266, 271 (5th Cir. 1993), *cert. denied,* 510 U.S. 964, 114 S.Ct. 440, 126 L.Ed.2d 374 (1993); *Reich v. Lancaster,* 55 F.3d 1034, 1047–49 (5th Cir. 1995); *Martin v. Feilen,* 965 F.2d 660 (8th Cir.1992) (finding that two partners in an accounting firm who recommended a complex series of transactions, structured deals, provided advice, and had expertise not shared among other corporate insiders exercised effective control over the plan's assets and were ERISA fiduciaries), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); *Carpenters' Local Union No. 964 Pension Fund v. Silverman,* No. 93 CIV. 8787(RPP), 1995 WL 378539 (S.D.N.Y. June 26, 1995) (finding a law firm was a fiduciary under ERISA where plan trustees depended on lawyers' expertise for a real estate investment, lawyers played a role in investment decisions, and one partner was a plan trustee).. To meet the "authority or control" element under 29 U.S.C. § 1002(21)(A)(i), a plaintiff must show that the consultant or advisor did not merely influence the plan fiduciary, but "caused [the] trustee ... to relinquish his

73. Disagreeing with this expansive construction of the potential liability of a party in interest beyond violations of § 406 to reach breaches of fiduciary duty under § 404, the First Circuit, refusing to add to the remedies (including money damages and other forms of liability) expressly provided by ERISA's comprehensive regulatory scheme and acknowledging Congress' decision to balance the competing goals of protecting employees' interests and containing pension costs, explains that nonfiduciary participation in a fiduciary breach is most likely to involve ... service providers and other nonfiduciary professionals who provide advice or expertise to ERISA fiduciaries. The advice and expertise provided by these individuals—whether actuaries, lawyers, accountants, or consultants—is vital for the successful operation of ERISA plans which must function in a

highly complex and regulated environment.... We do not mean to countenance the action of someone who advises a fiduciary to break the law, but we are concerned that extending the threat of liability over the heads of those who only lend professional services to a plan without exercising any control over, or transacting with, plan assets will deter such individuals from helping fiduciaries navigate the intricate financial and legal thicket of ERISA. *Reich v. Rowe,* 20 F.3d 25, 26, 32 (1st Cir. 1994) (holding that ERISA does not authorize suits against nonfiduciaries charged solely with participating in a fiduciary breach). To impose liability on professionals that regularly offer advice to ERISA plans would result in high insurance costs to them and ultimately to the plans. *Id.*

independent discretion in investing the plan's funds and follow the course prescribed" by the consultant. *Schloegel*, 994 F.2d at 271–72, *citing Sommers Drug Stores Co. Employee Profit Sharing Trust*, 793 F.2d at 1460. Alternatively, the rendering of investment advice for a fee on a regular basis pursuant to an agreement or understanding between the consultant and the plan where the agreement indicates that the consultant's advice will be the primary basis for the plan's investment decisions and the consultant will provide individualized investment advice according to the plan's individual needs may also impose fiduciary liability on a professional consultant. *Schloegel*, 994 F.2d at 273.

■ There is no *per se* rule regarding the rendering of professional advice and the point at which a professional may become subject to fiduciary liability. *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 537–38 (7th Cir.1991) (the legislative history "seems to ... contemplate[ ] ... a fact intensive inquiry that looks at whether the professional transcended her 'ordinary functions' "); *Mertens*, 508 U.S. at 262, 113 S.Ct. 2063 ("professional service providers ... become liable for damages only when they cross the line from advisor to fiduciary"). A fact intensive examination of the extent of the discretion and control assumed by the administrator is required. *Pappas*, 923 F.2d at 538; *Reich*, 55 F.3d at 1047. For instance, where pre-existing

policies, practices and procedures sufficiently limit an entity that assumes discretionary authority or control over plan management and/or assets, that entity will not be viewed as a fiduciary. *Reich*, 55 F.3d at 1047. The performance of ministerial duties or mere processing of claims will not impose fiduciary liability; however, if the administrator has the authority to grant, deny or review claims or has the sole authority to determine the benefits to which the insured plan participant is entitled, the administrator may be a fiduciary under ERISA. *Id.* (and cases cited therein); *Arizona State Carpenters Pension Trust Fund*, 125 F.3d at 721–22 ("A person or entity who performs only ministerial services or administrative functions within a framework of policies, rules and procedures established by others is not an ERISA fiduciary. To become a fiduciary, the person or entity must have control respecting the management of the plan or its assets, give investment advice for a fee, or have discretionary responsibility in the administration of the plan."). The statute " 'defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties—and to damages—under § [1109(a) ].' " *Id.* at 1048, *quoting Kayes v. Pacific Lumber Co.*, 51 F.3d at 1459, and § 1002(21)(A). *See also* 29 C.F.R. § 2510.3–21(c).[74] Courts have analyzed the extent of authority and control exer-

---

**74.** Section 2510.3–21(c), which defines "fiduciary," states,

(1) A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of [ERISA] and this paragraph, only if

(i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and

(ii) Such person either directly or indirectly (e.g., through or together with any affiliate)-

(A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

(B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment ad-

cised by attorneys and accountants over plan investment decisions to determine whether they crossed the line and became fiduciaries of the plan. *See, e.g., Martin v. Feilen,* 965 F.2d 660, 669 (8th Cir.1992) (finding that accountants who provided professional accounting services to an ESOP and also recommended transactions, structured deals, and provided investment advice to the point that they exercised effective control over the plan's assets and utilized their positions of trust and confidence as corporate insiders to involve the plan in transactions in which they had a personal interest were fiduciaries of the ESOP), *cert. denied sub nom. Henss v. Martin,* 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); *Useden v. Acker,* 947 F.2d 1563, 1577–78 (11th Cir.1991) (finding that a law firm providing advice on a number of concerns but not beyond the usual professional function of attorneys and otherwise controlling the plan did not become a fiduciary), *cert. denied sub nom. Use-*den *v. Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel,* 508 U.S. 959, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993).

### h. Section 404(c) Plans

Generally ERISA imposes liability for resulting losses on fiduciaries who commit breaches of their duties. 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . ."). Section 404(c) of ERISA, 29 U.S.C. § 1104(c), however, provides that a plan fiduciary is not liable if (1) the plan is an "individual account plan", (2) the plan participants can exercise control over the assets allocated to their accounts, and (3) the plan participants actually do exercise control over their accounts in a manner proscribed under the regulations.[75] Under § 404(c), the

vice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.
(2) A person who is a fiduciary with respect to a plan by reason of rendering investment advice (as defined in paragraph (c)(1) of this section) for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or having any authority or responsibility to do so, shall not be deemed to be a fiduciary regarding any assets of the plan with respect to which such person does not have any discretionary authority, discretionary control or discretionary responsibility, does not exercise any authority or control, does not render investment advice (as defined in paragraph (c)(1) of this section) for a fee or other compensation, and does not have any authority or responsibility to render such investment advice . . . .

**75.** The Secretary of Labor has interpreted 29 U.S.C. § 1104(c) as inapplicable to ESOPs because it applies only to plans that give the participants a wide range of investments from which to select. 29 C.F.R. § 2550.404c–1.

Many 401(k) plans are established to qualify as § 404(c) plans. Plaintiffs argue that the Savings Plan does not qualify as a § 404(c) plan because under article XV.3, it imposes a duty to diversify on all Plan fiduciaries unless it would be prudent under the circumstances not to do so. Moreover the regulations require that the fiduciaries provide participants with "complete and accurate information" about investment alternatives, a range of investments, procedures to permit transfers and to deal with conflicts of interest, as well as notice that the plan qualifies under § 404(c), none of which were met according to Plaintiffs. Furthermore, as Plaintiffs point out, the employer's matching contributions went directly into Enron stock, where it remained until the employee reached fifty years of age; the employee never had the requisite independent control over this portion of his plan assets. Under 29 C.F.R. § 2550.404(c)–1(c)(2), a plan participant also lacks independent control where he "is subjected to improper influence by a plan fiduciary or plan sponsor with respect to the transaction or where a plan fiduciary has concealed material non-public facts regarding the investment from the participant or beneficiary . . . ."

plan participants that exercise such control over their accounts will not be treated as fiduciaries, and neither the plan participants nor the other plan fiduciaries will be liable for any loss or breach that results from the plan participants' exercise of control over the plan administration; in other words, no one is liable for the participants' loss that results from the participants' own informed investment choices. *See generally In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 443–46 (3d Cir.1996), *cert. denied sub nom. Unisys Corp. v. Meinhardt*, 519 U.S. 810, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996).

There is little case law regarding § 404(c) plans. The legislative history reveals that 29 U.S.C. § 1104(c) created "a special rule" for plans that permit the participant to have "independent control" over his individual account assets and provides that the participant who exercises that independent control, as well as other plan fiduciaries, is not liable for losses caused by the participant's control. *In re Unisys*, 74 F.3d at 445, *citing* H.R. Conf. Rep. No. 1280, *reprinted in* 1974 U.S.C.C.A.N. at 5085–86. A House Conference Report states,

> Therefore, if the participant instructs the plan trustee to invest the full balance of his account in, *e.g.*, a single stock, the trustee is not liable for any loss because of a failure to diversify or because the investment does not meet the prudent man standards. However, the investment must not contradict the terms of the plan, and if the plan on its face prohibits such investments, the trustee could not follow the instructions and avoid liability.

Plaintiffs have alleged such concealment occurred at Enron.

**76.** Because the appellate court in *In re Unisys* addressed matters that transpired before

*Id., quoting* H.R. Conf. Rep. No. 1280, *reprinted in* 1974 U.S.C.C.A.N. at 5086. The legislative history also indicates that the statute requires the plan to offer "a broad range of investments." *Id.* at 446 n. 24.

The Department of Labor issued final regulations regarding § 404(c) in 1992.[76] 29 C.F.R. § 2550.404c–1. The Court quotes below portions of the regulations that are relevant to the issues in this class action. It defines a § 404(c) plan as an individual account plan under § 3(34) of ERISA that

> (i) Provides an opportunity for a participant or beneficiary to exercise control over assets in his individual account ...; and
>
> (ii) Provides a participant or beneficiary an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested ....

29 C.F.R. § 2550.404c–1(b)(1).

Regarding the requirement that an opportunity be provided to a participant or beneficiary to exercise control over his account, to qualify as a § 404(c) plan, the regulation provides:

> (A) Under the terms of the plan, the participant or beneficiary has a reasonable opportunity to give investment instructions (in writing or otherwise, with opportunity to obtain written confirmation of such instructions) to an identified plan fiduciary who is obligated to comply with such instructions except as otherwise provided in paragraph (b)(2)(ii)(B) and (d)(2)(ii).
>
> (B) The participant or beneficiary is provided or has the opportunity to obtain sufficient information to make in-

these regulations were issued, it did not address them or apply them to the case before it.

formed decisions with regard to investment alternatives available under the plan, and incidents of ownership appurtenant to such investments. For purposes of the subparagraph, a participant or beneficiary will not be considered to have sufficient investment information unless-

(1) The participant or beneficiary is provided by an identified plan fiduciary (or a person or persons designated by the plan fiduciary to act on his behalf):

(i) An explanation that the plan is intended to constitute a plan described in section 404(c) of [ERISA], and title 29 of the Code of Federal Regulations Section 2550.440c–1, and the fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participant or beneficiary;

(ii) A description of the investment alternatives available under the plan and, with respect to each designated investment alternative, a general description of the investment objectives and risk and return characteristics of each such alternative, including information relating to the type and diversification of assets comprising the portfolio of the designed investment alternative.

29 C.F.R. § 2550.404c–1(b)(2)(i)(A)–(B)(ii).

The regulation allows a plan to "impose reasonable restrictions on the frequency with which participants and beneficiaries may give investment instructions." 29 C.F.R. 2550.404(c)–1(b)(i)(C). To be "reasonable," the plan must, with respect to each investment alternative, allow participants and beneficiaries to provide "investment instructions with a frequency which is appropriate in light of the market volatility to which the investment alternative may reasonably be expected to be subject." *Id.* Participants and beneficiaries must be permitted to give investment instructions at minimum at least once in any three-month period and to give transfer instructions as often as they are allowed to give investment instructions. *Id.*

The Department of Labor's regulation also prescribes the following guidelines for a "Broad range of investment alternatives":

(i) A plan offers a broad range of investment alternatives only if the available investment alternatives are sufficient to provide the participant or beneficiary with a reasonable opportunity to:

(A) Materially affect the potential return on amounts in his individual account with respect to which he is permitted to exercise control and the degree of risk to which such amounts are subject;

(B) Choose from at least three investment alternatives:

(1) Each of which is diversified;

(2) Each of which has materially different risk and return characteristics;

(3) Which in the aggregate enable the participant or beneficiary by choosing among them to achieve a portfolio with aggregate risk and return characteristics at any point within the range normally appropriate for the participant or beneficiary; and

(4) Each of which when combined with investments in the other alternatives tends to minimize through diversification the overall risk of large losses, taking into account the nature of the plan and the size of participants' or beneficiaries' accounts. In determining whether a plan provides the participant or beneficiary with a reasonable opportunity to diversify his investments, the nature of the investment alternatives offered by the plan and the size of the portion of the individual's account over which he is

permitted to exercise control must be considered.

29 C.F.R. § 2550.404c–1(b)(3).

The regulation also addresses "exercise of control." 29 C.F.R. § 2550.404c–1(c). *Inter alia* it states,

> Whether a participant or beneficiary has exercised independent control in fact with respect to a transaction depends on the facts and the circumstances of the case. However, a participant's or beneficiary's exercise of control is not independent in fact if:
>
> (i) The participant or beneficiary is subjected to improper influence by a plan fiduciary or the plan sponsor with respect to the transaction;
>
> (ii) A plan fiduciary has concealed material non-public facts regarding the investment from the participant or beneficiary, unless the disclosure of such information by the plan fiduciary to the participant or beneficiary would violate any provision of federal law or any provision of state law which is not preempted by the Act . . . .

29 C.F.R. § 2550.404c–1(c)(2)(i)–(ii). Plaintiffs here contend that the plan fiduciary concealed material non-public facts about Enron's financial condition from them so that under the regulation they did not, in fact, exercise independent control in making investment decisions for their individual accounts. As discussed *supra*, Defendants respond that to have provided such information only to the Savings Plan participants would have violated the federal securities laws. This Court has disagreed with Defendants and adopted the view of the Secretary of Labor.

In addition, "[a] fiduciary has no obligation . . . to provide investment advice to a participant or beneficiary under an ERISA section 404(c) plan." 29 C.F.R. § 2550.404c–1(c)(4).

Finally 29 C.F.R. § 2550.404c–1(d), in relevant part, explains

(d) Effect of independent exercise of control-

(1) Participant or beneficiary not a fiduciary. If a participant or beneficiary of an ERISA section 404(c) plan exercises independent control over assets in his individual account in the manner described in paragraph (c), then no other person who is a fiduciary with respect to such plan shall be liable for any loss . . . .

(2) Limitation on liability of plan fiduciaries.

(i) If a participant or beneficiary of an ERISA section 404(c) plan exercises independent control over assets in his individual account in the manner described in paragraph (c), then no other person who is a fiduciary with respect to such plan shall be liable for any loss, or with respect to any breach of part 4 of Title I of the Act, that is the direct and necessary result of that participant's or beneficiary's exercise of control.

(ii) Paragraph (d)(2)(i) does not apply with respect to any instruction, which if implemented-

(A) Would not be in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of Title I of ERISA.

. . . .

(D) Could result in a loss in excess of a participant's or beneficiary's account balance; or

(E) Would result in a direct or indirect:

. . . . .

(4) Acquisition or sale of any employer security except to the extent that:

(iii) Such securities are publicly traded on a national exchange or other generally recognized market;

(iv) Such securities are traded with sufficient frequency and in sufficient volume to assure that participant and

beneficiary directions to buy or sell the security may be acted on promptly and efficiently;

(v) Information provided to shareholders of such securities is provided to participants and beneficiaries with accounts holding such securities....

29 C.F.R. § 2550.404(c)–1(d).

Because § 404(c) in essence exempts a fiduciary from liability that he normally would have under 29 U.S.C. § 1109(a), the fiduciary seeking protection under § 404(c), and not the plaintiff, has the burden of demonstrating that it applies. *In re Unisys,* 74 F.3d at 446; *Allison v. Bank One–Denver,* 289 F.3d 1223, 1238 (10th Cir.2002)(as amended on denial of rehearing). The court must review evidence relating to whether a participant could remove his assets from one fund and place them in an acceptable alternative fund, whether the plan provided the participants with adequate information for an average participant to understand and evaluate his investments and the risks and financial consequences that might be associated with his taking control, information about the rights provided to participants and obligations imposed on fiduciaries by ERISA, the financial condition and performance of the investments, the alternative funds available, and developments which substantially affected that financial status. *Unisys,* 74 F.3d at 446–47.

If a plan does not qualify as a § 404(c), the fiduciaries retain liability for all investment decisions made, including decisions by the Plan participants. Plaintiffs contend that the Savings Plan did not qualify as a § 404(c) plan for all or most of the Class Period because it did not provide a broad range of diversified investment options, liberal opportunities to transfer assets among allocations, and sufficient information to make sound investment decisions, nor did the plan provide the requisite notice to participants that it

intended to qualify as such a plan. The Court has found that they have raised material fact issues as to whether the Savings Plan did qualify as a § 404(c) plan that cannot be resolved on a 12(b)(6) motion.

If the plan does qualify as a § 404(c) plan, and if the participants or beneficiaries exercised independent control over the assets in their individual accounts, "then no other person who is a fiduciary with respect to such plan shall be liable for any loss ... that is the direct and necessary result of that participant's or beneficiary's exercise of control." 29 C.F.R. § 2550.404c–1(4)(d)(2). Losses that do not "result from" the participant's exercise of control are still charged against the plan fiduciary, which retains the duty to prudently select investment options under the plan and to oversee their performance on a continuing basis. *See* Advisory Opinion No. 98–04(A)("... [T]he Department emphasized that the act of designating investment alternatives in an ERISA section 404(c) plan is a fiduciary function to which the limitation on liability provided by section 404(c) is not applicable"); Letter from the Pension and Welfare Benefits Administration, U.S. Dept. of Labor to Douglas O. Kant, 1997 WL 1824017, *2 (Nov. 26, 1997)("The responsible plan fiduciaries are also subject to ERISA's general fiduciary standards in initially choosing or continuing to designate investment alternatives offered by a 404(c) plan.").

Even if the Savings Plan were to qualify as a § 404(c) plan, relating to the Savings Plan and the ESOP in the Department of Labor's Final Regulation Regarding Participant Directed Individual Account Plans, Preamble, 57 Fed.Reg. 46,906, 924 n. 27 (1992), the agency emphasized,

[T]he act of designating investment alternatives ... is a fiduciary function ... [and][a]ll of the fiduciary provisions of ERISA **remain applicable to both the**

**initial designation of investment alternatives and investment managers and the ongoing determination that such alternatives and managers remain suitable and prudent investment alternatives for the plan** [emphasis added].

See also *Buccino v. Continental Assurance Co.*, 578 F.Supp. 1518, 1521 (S.D.N.Y. 1983)("as Fund fiduciaries [Defendants] were under a continuing obligation to advise the Fund to divest itself of unlawful or imprudent investments"); *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 955–56 (D.C.Cir.1985)("[T]he requirement of prudence in investment decisions and the requirement that all acquisitions be solely in the interests of plan participants continue to apply. The investment decisions of a profit sharing plan's fiduciary are subject to the closest scrutiny under the prudent person rule, in spite of the 'strong policy and preference in favor of investment in employer stock.' "); *Eaves v. Penn*, 587 F.2d 453, 458–60 (10th Cir.1978)(holding that the trustee of an ESOP is subject to the duty of loyalty and the prudent man requirements in deciding whether to invest plan assets in employer's securities).

### i. Causation

Defendants contend that Plaintiffs have failed to plead facts showing that the alleged breaches of fiduciary duty caused the loss to the plans. There is division of opinion about who bears the burden of proving the fiduciary caused the alleged losses to a plan.

The Sixth and Second Circuits have placed the burden of demonstrating causation on the plaintiff. *Kuper v. Iovenko*, 66 F.3d 1447, 1459–60 (6th Cir.1995)(To satisfy the causation link between a breach of fiduciary duty and an alleged plan loss, "a plaintiff must demonstrate that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident."); *Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 105–06 (2d Cir.)(placing the burden of proof of causation on the plaintiff), *cert. denied*, 525 U.S. 876, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998).

The Fifth and Eighth Circuits have held that the plaintiff initially must prove a breach of fiduciary duty and a prima facie case of loss by the plan under § 1109(a), and then the burden shifts to the defendant fiduciary to prove that the loss was not caused by the breach of the fiduciary duty.[77] *McDonald*, 60 F.3d at 237; *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir.1992), *cert. denied sub nom. Henss v. Martin*, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993).[78] *In accord,*

---

**77.** To prevail on a cause of action for breach of fiduciary duty, a plaintiff is only required to "prove a breach of fiduciary duty and a prima facie case of loss to the plan. 'Once the plaintiff has satisfied these burdens, 'the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by ... the breach of duty.' ' " *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir.1995)(*citing and quoting Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir.1994), *cert. denied*, 516 U.S. 1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996)).

**78.** In his concurrence to *Silverman*, Judge Jacobs pointed out that under the common law of trusts, the defaulting fiduciary has the burden of disproving causation. 138 F.3d at 106, *citing inter alia Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 278 (2d Cir.1992). Nevertheless, as discussed previously, because the common law of trusts informs but has often been modified when interpreting ERISA, the Second Circuit construed key provisions relating to co-fiduciary responsibilities to place the burden on the plaintiff, rather than on the fiduciary defendant, to prove that his losses resulted from the defendant's inaction or fraud. *Silverman*, 138 F.3d at 104, addressing 29 U.S.C. § 1109(a)("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this sub-

*Meyer v. Berkshire Life Ins. Co.,* 250 F.Supp.2d 544, 564, 571 (D.Md.2003); *McCurdy v. Wedgewood Capital Management Co.,* No. CIV. A. 97–4304, 1999 WL 391494, *4 (E.D.Pa. May 28, 1999); *Chao v. Moore,* No. CIV. A. AW–99–1283, 2001 WL 743204, *7–8 (D.Md. June 15, 2001). This Court is bound by *McDonald.* Thus Plaintiffs need not plead causation. *See Ehlmann v. Kaiser Foundation Health Plan,* 20 F.Supp.2d 1008, 1011 (N.D.Tex.1998)(plaintiff not required to plead causation under *McDonald*), *aff'd,* 198 F.3d 552 (5th Cir.2000), *cert. dismissed,* 530 U.S. 1291, 121 S.Ct. 12, 147 L.Ed.2d 1036 (2000). Moreover, because at this point Plaintiffs have pleaded under Counts II and III both fiduciary breach and injury, i.e., that Defendants' participation in the lockdowns and failure to diversify caused the plans, and indirectly the plaintiffs, to lose hundreds of millions of dollars, Plaintiffs have stated a claim and demonstrated standing to sue, even though they have not alleged that "but for the lockdown" or "but for the failure of the fiduciaries to diversify investments of the Plan," they, themselves, would have timely diversified their investments or sold the Enron stock in their individual accounts.

### 2. Co–Fiduciary Liability

■ A person must be a fiduciary before he can be liable as a co-fiduciary. *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.* ("*Sommers II*"), 883 F.2d 345, 352 (5th Cir.1989)(Because a person is a fiduciary

only to the extent that he exercises authority or control over that management of a plan or plan assets, in the absence of such authority and control a person cannot be liable as a co-fiduciary).

Under section 405(a) of ERISA, 29 U.S.C. § 1105(a),

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or undertakes knowingly to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1) [29 U.S.C. § 1104(a)(1) ] in the administration of his specific responsibilities, which give rise to his status as fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.[79]

A fiduciary that breaches § 1105(a) is "personally liable to make good to such plan any losses to the plan resulting from each such breach ..." under § 1109(a) of the statute.

■ Sections 405(a)(1) and (3) require a showing of actual knowledge of the other fiduciary's breach; there is no vicarious liability under these provisions. *Donovan*

---

chapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ....") and § 1105 ("[A] fiduciary with respect to the plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan ... if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.").

**79.** Where there was more than one trustee, the common law of trusts imposed a duty on each to use reasonable care to prevent his co-trustee(s) from committing a breach of duty. If he failed to take reasonable steps to prevent a breach of duty, the trustee would be liable for the co-trustee's breach of duty. Restatement (Second) of Trusts § 224(2)(d)(1959).

*v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Keach v. U.S. Trust Co.*, 240 F.Supp.2d 840, 844 (C.D.Ill.2002). *But see Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 283 (2d Cir.1992)(constructive knowledge sufficient).[80]

▮▮▮▮ The elements of a claim brought under § 405(a)(1), 29 U.S.C. § 1105(a)(1), are "(1) that a co-fiduciary breached a duty to the plan, (2) that the fiduciary knowingly participated in the breach or undertook to conceal it, and (3) damages resulting from the breach." *Silverman v. Mutual Ben. Life Ins. Co.*, 941 F.Supp. 1327, 1335 (E.D.N.Y.1996), *aff'd*, 138 F.3d 98 (2d Cir. 1998), *cert. denied*, 525 U.S. 876, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998). As noted, under Fifth Circuit law, the plaintiff does not have the burden of pleading or proving the third element, which falls instead on the defendant fiduciary. *McDonald*, 60 F.3d at 237.

Under § 405(a)(2), 29 U.S.C. § 1105(a)(2), providing the broadest type of co-fiduciary liability without any requirement of knowledge about what the co-fiduciary is doing, to impose liability a plaintiff must prove that the fiduciary "failed to comply with its duties under ERISA, and thereby enabled a co-fiduciary to commit a breach." *Silverman*, 941 F.Supp. at 1336. *In accord, Free v. Briody*, 732 F.2d 1331, 1335 (7th Cir.1984);

*Brock v. Self*, 632 F.Supp. 1509, 1524 (W.D.La.1986).

▮▮▮▮ For a cause of action under § 405(a)(3), 29 U.S.C. § 1105(a)(3), the elements are that the fiduciary had knowledge of the co-fiduciary's breach and that the losses "resulted from" the co-fiduciary defendant's failure to take reasonable steps to remedy the breach. *Id.* at 1337. Under Department of Labor Interpretive Bulletin, 29 C.F.R. § 2509.75–5FR–10, a fiduciary must take all legal and reasonable steps to prevent or remedy a breach by a co-fiduciary, including taking legal action against the co-fiduciary or informing the Department or the plan sponsor.

### 3. Directed Trustee Liability

▮▮▮▮ There is a factual dispute in *Tittle* as to whether Northern Trust was a "directed" or discretionary trustee. Plaintiffs argue that it was the latter. The complaint alleges that Northern Trust was the trustee of the Savings Plan and exercised discretionary authority and control over plan assets when it imposed the lockdown, in spite of the fact that it had the power to postpone the lockdown until the price of Enron stock stabilized to avoid injury to the participants, and that numerous red flags should have alerted Northern Trust to the dangers of proceeding with the scheduled lockdown. Furthermore, the complaint asserts, plan documents and the trust agreement[81] gave Northern Trust

---

80. *Diduck* has been abrogated on other grounds by recent Supreme Court decisions discussed elsewhere in this memorandum and order: *Mertens*, 508 U.S. at 255, 113 S.Ct. 2063; *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146–47, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 375–76, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002); *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).

81. Plaintiffs argue that the Savings Plan and ESOP plan documents identify Northern Trust as both the plans' trustee and as a "named fiduciary" of the plans responsible for investment of the plans' assets. # 322, Ex. B (Savings Plan Document), § XIV.1(a)("The Trustee shall be the 'named fiduciary' with respect to the investment of the Trust Fund's assets"); *id.*, § XV.3 (detailing the duties of "the Committee and the Trustee as 'named fiduciaries'" of the Savings Plan); Ex. C (ESOP Plan Document) § 16.1 ("The Trustee shall be the 'named fiduciary' with respect to investment of the Trust Fund's assets"); *id.*,

discretionary authority and control over plan assets and plan administration where there was no direction by the Administrative Committee.

Alternatively, the complaint asserts that if Northern Trust was a directed trustee and if the Administrative Committee gave written instructions to Northern Trust regarding the lockdown, Northern Trust breached its fiduciary duties in following the lockdown instructions because the directions were contrary to ERISA and Northern Trust knew or should have known that the lockdown instructions violated ERISA.

Northern Trust contends that it was a "directed" trustee, as opposed to a "discretionary" trustee, under provisions in the plan documents and trust agreement that subjected it to direction by the Administrative Committee, that the Administrative Committee exercised total authority and discretion over the plan assets and management, and that Northern Trust thus had no responsibility or liability for the lockdown.

While case law addressing the duties of a directed trustee is minimal, it is also in conflict with respect to the extent, if any, of the duty and potential liability of a directed trustee. The issue necessitates consideration of the relationship of several different provisions under ERISA.

As a starting point, under § 403(a)(1), 29 U.S.C. § 1103(a)(1),

> All assets of an employee benefit plan shall be held in trust by one or more trustees. Such trustee or trustees shall be either named in the trust instrument or in the plan instrument described in section 402(a) or appointed by a person who is a named fiduciary, and upon acceptance of being named or appointed, the trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan, except to the extent that-
>
> (1) the plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, in which case the trustee shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to [ERISA].

In other words, in contrast to the general rule, pursuant to which trustees hold the assets of every employee benefit plan in trust and have exclusive authority and discretion to manage and control the assets of the plans, an exception[82] may arise when

---

§ 17.3 (detailing the duties of "the Committee and the Trustee as 'named fiduciaries' " of the ESOP).

Furthermore, under parallel provisions in both plans, if the Committee, as a co-fiduciary, shall exercise its power given hereunder at any time, and from time to time, by written notice to the Trustee, to direct the Trustee in the management, investment and reinvestment of the Trust Fund, then in such event the Trustee shall be subject to all proper directions of the Committee that are made in accordance with the terms of the Plan and the Act. Ex. B, § XV.2; Ex. C, § 17.2. Plaintiffs maintain that Northern Trust has no evidence that the Committee directed Northern Trust by any written notice with respect to either the timing or the length of the lockdown under Count II or diversification under Count III. Such factual disputes are not properly resolved on a 12(b)(6) motion, but must await discovery.

**82.** Two other exceptions to the trustee's otherwise exclusive authority and discretion to manage the plan assets are permitted by the statute: the plan may delegate the trustee's authority to manage the plan assets to investment manager(s), an exception not at issue here; or a qualifying § 404(c) plan may establish individual participant accounts and give the participants control over the assets in their accounts and may subject the trustee to direction of a named fiduciary who is not a trustee. 29 U.S.C. § 1103(a)(2), § 1104(c). Thus employers have the option of four different ways to structure control of their plans (exclusive control in the trustee; appointment of investment manager; qualifying § 404(c) plan; and directed trustee).

the plan authorizes a named fiduciary (a fiduciary either named in the plan document or designated by an employer or an employee organization according to a procedure described in the plan), who is not a trustee, to direct the trustee, who in turn then becomes a "directed" trustee.

Under § 403(a)(1) of the statute, the directed trustee will escape liability for his actions performed pursuant to the named fiduciary's direction if the named fiduciary's directions are "proper" and "in accordance with the terms of the plan" and "not contrary to" ERISA. The underlying issue here can be rephrased as to what extent, if at all, is the directed trustee a fiduciary, as defined in § 3(21)(A), and thus subject to the standards, duties, and obligations of an ERISA fiduciary under § 404(a)(1)(the duty of loyalty, the prudent man rule, the duty of diversification of plan investments, and the duty of acting in accordance with the provisions of the statute)?

Difficulties in construing the scope of the directed trustee's fiduciary obligations pursuant to the statute are compounded by (1) the lack of a statutory definition of "proper" with respect to the named fiduciary's directions and (2) a lack of guidance about the nature and extent of a directed trustee's duty to determine whether the fiduciary's directions are "in accordance with the terms of the plan" and "not contrary to" ERISA under § 403(a)(1). For example, if the instruction on its face looks consistent with the plan and the statute, does a directed trustee have any duty to investigate further? What if the directed trustee knows or suspects that the directing fiduciary has breached his fiduciary duties?

Implicated by the directed fiduciary provision is § 409(a), which makes a fiduciary personally liable "to make good to such plan any losses to the plan resulting from such breach ...." Thus if the directed

trustee is a fiduciary, the plan may hold him personally liable for losses caused by any breach of his fiduciary duty. If he is not a fiduciary, a plan may not seek a remedy against him for any misconduct under § 409 and § 404 Moreover, § 502(a) does not provide an individual civil action for relief against a non-fiduciary, so plan participants may be without a remedy for a directed trustee's allegedly wrongful conduct.

Furthermore a directed trustee's potential fiduciary liability also implicates claims under § 405, 29 U.S.C. § 1105, a plan fiduciary's liability for breach of duty by a co-fiduciary, discussed *supra*. Section 405(b)(1)(A) provides that where assets are held by two or more trustees, "each shall use reasonable care to prevent a co-trustee from committing a breach." 29 U.S.C. § 1105(b)(1)(A). This provision incorporates the common law of trusts. Restatement (Second) of Trusts § 184 (1959); 2A Austin Wakeman Scott & William F. Fratcher, *Scott on Trusts* § 184 at p. 561 (4th ed.1987).

Section 405(b)(1) of ERISA, 29 U.S.C. § 1105(b)(1), begins, "except as otherwise provided in ... section 1103(a)(1) and (2)"; and § 405(b)(3)(B) states, "No trustee shall be liable under this subsection for following instructions referred to in section 1103(a)(1)." At the same time, § 405(b)(2) states, "Nothing in this subsection shall limit any liability that a fiduciary may have under subsection (a) or other provision of this part." "[T]his part clearly refers to § 405(b), which includes the requirement that the "directing" named fiduciary's instructions must be "proper" and in compliance with the terms of the plan and the statute. Section 405 has been criticized as "nearly impenetrable in its awkward structure and phrasing," while subsection 405(b)(3)(B) in particular has been characterized as "oddly placed," inexplicable by

the rule of statutory construction, and confusing because of phrases that appear to exempt the directed fiduciary from liability for following the instructions of a directing named fiduciary, yet a contrary provision that clearly does not." Patricia Wick Hatamyar, *See no Evil? The Role of the Directed Trustee under ERISA,* 64 Tenn. L.Rev. 1, 19–21 (1996).[83] As noted by Ms. Hatamyar, "To say that a trustee is not liable for following [an instruction that is "proper" and "made in accordance with" the plan and ERISA,] is to beg the question of when an instruction is improper enough for the trustee to ignore: in other words, if § 405(b)(3)("No trustee shall be liable under this subsection for following instructions referred to in section 403(a)(1)") "refers generally to the directed trustee's liability for following a named fiduciary's direction, it is redundant." *Id.* at 21.

In contrast, Ms. Hatamyar observes that in the other two statutory exceptions to a trustee's exclusive authority, i.e., when authority is granted to an investment manager under § 405 or to a plan participant over his own individual account under § 404(c), the statute is quite explicit about the resulting limitations on the directed trustee's liability. *Id.* at 17–18. With a properly appointed investment manager, under § 405(d)(1) the trustee has no liability for breaches of duty occurring under the investment manager's management and control unless the trustee knowingly participates in or conceals a breach of duty by that investment manager as a co-fiduciary under § 405(a). See § 405(d)(1) of ERISA, 29 U.S.C. § 1105(d)(1)("If an investment manager or managers have been appointed under section 1102(c)(3) of this title, then not withstanding subsections

(a)(2) and (3) and subsection (b) of this section, no trustees shall be liable for the acts or omissions of such investment manager or managers, or be under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager."). Similarly, when the plan participant is given control of his individual account, under § 404(c)(1) the participant does not become a "fiduciary" by exercising that control and thus the directed trustee cannot be liable as a co-fiduciary under § 405. Had Congress intended that the directed trustee be completely relieved of liability for following a named fiduciary's instructions, it could just as easily have stated so. 64 Tenn. L.Rev. at 21 ("If a trustee were free from liability for following a named fiduciary's directions, one would expect to see that stated unambiguously in section 405.").

This Court agrees with Ms. Hatamyar that in light of the common law history, Congress did not intend to release the directed trustee from all liability where the directed trustee follows the directions of a named fiduciary, and that if it had, it would have expressly stated so. 64 Tenn. L.Rev. at 21. After attempting to follow the rules of statutory construction to give meaning to each provision, Ms. Hatamyar concluded that § 405(b)(3)(B) does not provide a safe harbor from liability for the directed trustee, but is a nullity. *Id.* at 20.

Construction of the statute does require first a determination whether the directed trustee is a fiduciary. If so, and if the directed trustee follows "proper" directions of the named fiduciary with respect to that part of the plan management or control granted to the named fiduciary,

---

**83.** The Court has found Ms. Hatamyar's article to be the most extensive and authoritative source regarding construction of statutory provisions in ERISA relating to the directed trustee. The article is cited as persuasive authority by most of the few courts addressing the directed trustee issue.

and if those directions are "in accordance with the terms of the plan" and "not contrary to" ERISA under § 403(a)(1), the directed trustee is not liable for a co-fiduciary's [the named fiduciary's] breaches. Regardless, the same issue must initially be addressed under both § 403(a)(1) and § 405(b)(1)—the extent of a directed trustee's duty to determine whether the instructions are "proper" and consistent with the terms of the plan and of ERISA.

Defendants rely on the fact that a single sentence in the legislative history of § 403(a)(1) states that the trustee is only required to determine whether the directed action *facially* complies with the terms of the plan and of ERISA, a fairly minimal duty:

> If the plan provides that the trustees are subject to the direction of named fiduciaries, then the trustees are not to have the exclusive management and control over the plan assets, but generally are to follow the directions of the named fiduciary. Therefore, if the plan sponsor wants an investment committee to direct plan investments, he may provide for such an arrangement in the plan. In addition, since investment decisions are basic to plan operations, members of such an investment committee are to be named fiduciaries.... If the plan so provides, the trustee who is directed by an investment committee is to follow that committee's directions **unless it is clear on their face that the actions to be taken under those directions would be prohibited by the fiduciary responsibility rules of the bill or would be contrary to the terms of the plan or trust** [emphasis added].

H.R. Conf. Rep. No. 93–1280 (1973), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5079.

Furthermore Defendants argue that the legislative history implies that if the directed trustee meets the facial compliance requirement, his responsibility is less than that of a fiduciary and that he may be free of any liability:

> if the trustee properly follows the instructions of the named fiduciaries, the trustee generally is not to be liable for losses which arise out of following these instructions. (The named fiduciaries, however, would be subject to the usual fiduciary responsibilities rules and would be subject to liability on breach of these rules.)

*Id.* at 5082.

The American Bankers Association ("the Association"), the principal national trade association of the banking industry in the United States, whose members serve as trustees of numerous ERISA pension plans, has submitted an *amicus curiae* brief (# 464), arguing, based on the single sentence, quoted above, in the minimal legislative history available relating to § 403(a)(1), that the directed trustee's duty is merely to examine the named fiduciary's directions to determine whether it is "clear on their face" that following these directions would violate ERISA or the plan or trust document. According to the Association, the directed trustee is not required to examine the merits of the named fiduciary's direction.[84] The Association maintains that the banking and trust industry has relied on this facial compliance standard since ERISA was enacted in 1974. The Association insists that the directed trustee is not subject to a fiduciary's duty to act prudently and loyally nor required to exercise independent judgment nor subject to the Department of Labor's

---

84. In a reply brief (# 520) the Association, believing that Plaintiffs have mischaracterized its position, emphasizes that it assumes that a directed trustee is a fiduciary, but with severely restricted duties, as will be discussed. In essence the Association finds that a directed trustee is subject to co-fiduciary liability under § 405(a) of ERISA. # 464 at 18–19.

broader and more demanding standard that a directed trustee should not follow the named fiduciary's directions if he "knows or should know" that the directions violate ERISA's fiduciary duties of prudence. The Association further claims the Department of Labor's standard is not supported by its cited authority.[85]

For a number of reasons, including the rules of statutory construction, the common law roots of the directed trustee concept, the Department of Labor's interpretation, as well as some of the case law, all of which are discussed in detail in the remainder of this section, this Court is not persuaded by the Association's argument for a minimum standard that would shield its members from liability.

■ The first step in construing a statute is to decide whether the language in question has a plain and unambiguous meaning by examining the plain language, the specific context in which the language is used, and the broader context of the complete statute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "Plain" language does not always mean that it is always "indisputable" or "pellucid." *Aviall Services, Inc. v. Cooper Industries, Inc.*, 312 F.3d 677, 679 (5th Cir.2002), *petition for cert. filed*, 02–1192, 71 USLW 3552 (Feb. 12, 2001). Thus, as the proper way to interpret a provision, one should examine the contested passage in connection with other sections and the law as a whole, as well as the statute's purpose and policies, with the aim of reaching the most reasonable and harmonious result. *Id.* at 680–81 n. 3.

■ "Legislative history should be consulted gingerly, if at all, in aid of statutory construction." *Aviall Services*, 312 F.3d at

684. Use of legislative history is only appropriate where the language is "opaque," "translucent," or ambiguous. *Id.* at 680 n. 3, *citing Perrone v. General Motors Acceptance Corp.*, 232 F.3d 433, 440 (5th Cir.2000), *cert. denied*, 532 U.S. 971, 121 S.Ct. 1601, 149 L.Ed.2d 468 (2001). Even when reference to the legislative history is appropriate, there is disagreement about the reliability and persuasiveness of such evidence. *See, e.g., Shannon v. U.S.*, 512 U.S. 573, 583, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994), *citing County of Washington v. Gunther*, 452 U.S. 161, 182, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981)(Rehnquist, J., dissenting)("[I]t is well settled that the legislative history of a statute is a useful guide to the intent of Congress."), and *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 617, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991)(Scalia, J., concurring)(Legislative history is "unreliable ... as a genuine indicator of congressional intent.").

■ In interpreting § 403(a)(1), as a threshold matter the Court notes that nowhere in that provision relating to the directed trustee, nor in the statute as a whole, is the phrase "clear on their face" or any paraphrase of that facial compliance standard to be found. The Supreme Court has stated, "We are not aware of any case in which we have given an authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute." *Shannon v. U.S.*, 512 U.S. 573, 583, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994). Moreover, in terms of the statute as a whole, the Fifth Circuit has long held that given its remedial purposes, ERISA is "to be construed liberally to safeguard the interests of fund participants and beneficiaries, and to preserve

**85.** The Secretary of Labor relies upon *Koch v. Dwyer*, No. 98 CIV. 5519(RPP), 1999 WL 528181 (S.D.N.Y. July 22, 1999), *clarified on other grounds*, 2000 WL 174945 (S.D.N.Y. Feb. 15, 2000), and *Scott On Trusts* § 185. The Court will discuss both subsequently.

the integrity of fund assets." *Landry v. Air Line Pilots Ass'n Intern., AFL–CIO,* 901 F.2d 404, 417 and n. 38 (5th Cir.)(and cases cited therein), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). *Inter alia,* fiduciary status in particular under the statute is broadly construed in accordance with ERISA's policies and objectives. *John Hancock Mutual Life Ins. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 96, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993)("To help fulfill ERISA's broadly protective purposes, Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive."); *see also Mertens,* 508 U.S. at 262, 113 S.Ct. 2063 (ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, ... thus expanding the universe of persons subject to fiduciary duties—and damages-under § 409(a).").

With respect to the language of § 403(a)(1), the Court agrees that the phrase, "proper directions," is ambiguous because there is no definition of "proper" other than an implied relationship to the remainder of the provision requiring, also in vague language, compliance with the plan and with the statute, similarly undefined; indeed the meaning of the terms and the scope of the trustee's duty under the whole provision are uncertain.[86]

The underlying issue in construing § 403(a)(1) is the same question discussed *supra,* whether the directed trustee is a fiduciary to any degree, and therefore subject to the fiduciary duties embodied in § 404(a) of the statute. Of significance in this determination, "the underlying pur-

poses of ERISA" have been described by the Supreme Court as "enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries." *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 158, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)(Brennan, J., joined by Justices White, Marshall and Blackmun, concurring). Furthermore, "in enacting ERISA Congress made *more* exacting the requirements of the common law of trusts relating to employee trust funds." *Id.* at 158 n. 17, 105 S.Ct. 3085, *quoting Donovan v. Mazzola,* 716 F.2d 1226, 1231 (9th Cir. 1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). ERISA's expansive definition of fiduciary, its enhancement of the fiduciary's duty incorporated from trust law, and the statute's purpose and policy of heightened protection of plan assets and plan participants and beneficiaries, together, support the Court's conclusion that § 403(a) should be read to maintain some, rather than virtually eliminate, fiduciary obligations of a directed trustee to question and investigate where he has some reason to know the directions he has been given may conflict with the plan and/or the statute.

As an example of ERISA's emphasis on fiduciary protection of plan participants and beneficiaries, increased over that provided by common law beyond the statute's expansion of the definition of "fiduciary," "thus expanding the universe of persons subject to fiduciary duties—and damages—under § 409(a),"[87] section 410(a) of ERISA, 29 U.S.C. § 1110(a), seeks to bar a fiduciary's evasion of its responsibilities: "Any provision in an agreement or instru-

---

**86.** This Court cannot help but note that the legislative history sentence's "clear on their face" standard is vague and ambiguous, too, with no delineated guidelines defining what effort must be made to determine compliance.

**87.** *John Hancock,* 510 U.S. at 96, 114 S.Ct. 517.

ment which purports to relieve a fiduciary from responsibility, obligation, or duty under this part shall be void as against public policy." Unlike the single sentence in the legislative history for § 403(a), which states the "clear on their face" standard notably absent from the statutory provision, the legislative history of § 410 reflects the same purpose as the statutory provision: "[E]xculpatory provisions which relieve a fiduciary from liability shall be void as against public policy." H.R. Rep. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4639, 5038, 5101.

Moreover, the Association dismisses the origins of the directed trustee's liability in the common law of trusts by quoting the Supreme Court's statements, such as "trust law does not tell the entire story," but "often will inform but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties," or trust law may "offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements." *Varity Corp.*, 516 U.S. at 497, 116 S.Ct. 1065. Yet the Association fails to make such an analysis or to demonstrate that the statute was an intentional modification of the common law regarding a directed trustee, but instead basically ignores the question. Other than complaining about the burden that a "knew or should know" standard would impose on a directed trustee, the Association fails to identify reasons to carve out an exception here to the established concept that "rather than explicitly enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility." *Varity Corp.*, 516 U.S. at 496, 116 S.Ct. 1065; *Central States*, 472 U.S. at 570, 105 S.Ct. 2833 (same); *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct.

948, 103 L.Ed.2d 80 (1989)("ERISA's legislative history confirms the Act's fiduciary responsibility provisions ... 'codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.' ").

Moreover, the Association brushes off the Secretary's reliance on *Scott on Trusts* § 185 at 562–68, without a close reading, even though it corresponds to the Restatement (Second) of Trusts § 185 and deals expressly with the common-law roots of the statute's directed-trustee/directing-named-fiduciary relationship, although the common law uses different terminology than ERISA to describe that relationship. Apparently concluding that § 185 of the Restatement (Second) of Trusts is irrelevant to ERISA, the Association emphasizes that rather than dealing with what the statute terms a "named fiduciary," § 185 refers generally to a person holding a "power of control" over the trust and permits that person to be a "co-trustee, beneficiary, settlor or person otherwise unconnected with the trust" which would be subject to different rules for determining their level of responsibility, depending on which type of person is the holder of power. Comment a to Restatement (Second) of Trusts § 185 (1959).

Section 185, entitled "Duty With Respect to Person Holding Power of Control," provides,

If under the terms of the trust a person has power to control the action of the trustee in certain respects, the trustee is under a duty to act in accordance with the exercise of such power, unless the attempted exercise of the power violates the terms of the trust or is a violation of a fiduciary duty to which such person is subject in the exercise of the power.

Restatement (Second) of Trusts § 185 (1959). The Court acknowledges that the Restatement (Second) of Trusts § 185 is

far more inclusive than § 403(a)(1); it covers situations where persons, including fiduciaries and nonfiduciaries, are given power by the trust to direct the trustee, as well as situations where the holder of the power is acting for his own benefit or as a fiduciary for the benefit of a beneficiary.

Nevertheless Comment e to the Restatement (Second) § 185 specifically addresses the situation where a *fiduciary* is empowered by the trust document to direct a trustee and provides a guide to the directed trustee's obligations under common law that also informs and is codified in § 403(a)(1), as well as reveals the seeds for the "knew or should know" standard now advocated by the Secretary of Labor. Comment e to § 185 also reflects that a directed trustee's obligations derive from those at common law of co-trustees, who, if they have reason to suspect that a co-trustee was breaching his duty, must take reasonable steps to prevent a breach:

> *Duty of trustee where holder of power is subject to fiduciary obligations.* If the power is for the benefit of someone other than the holder of the power, the holder of the power is subject to a fiduciary duty in the exercise of the power. In such a case the trustee is under a duty similar to his duty with respect to the action of a co-trustee. See § 184. If the trustee has **reason to suspect** that the holder of a power is attempting to exercise it in violation of a fiduciary duty to which the holder is subject in the exercise of the power, the trustee *is under a duty not to comply* and may be

liable if he does comply. If the holder of the power insists upon compliance notwithstanding the objection of the trustee, it is the duty of the trustee to apply to the court for instructions.

Even though the person holding the power holds it as a fiduciary and in fact violates his duty as fiduciary in the exercise of the power, the trustee is **not liable** for acting in accordance with the exercise of the power **if he has no notice** that the holder of the power is violating his duty as fiduciary [emphasis added].... [emphasis added]

The Restatement (Second) of Trusts § 184 further stakes out a trustee's duty with respect to a co-trustee, while § 224[88] sets out the rule for one trustee's liability for a breach of trust by a co-trustee; these three section (§§ 185, 184 and 224), with their quoted comments, are the basis from which ERISA's co-fiduciary liability under § 405 is derived. Section 184 states, "If there are several trustees, each trustee is under a duty to the beneficiary to participate in the administration of the trust and to use reasonable care to prevent a co-trustee from committing a breach of trust or to compel a co-trustee to redress a breach of trust." *Id.* Comment a to § 184 states in relevant part, "if a trustee has **reason to suspect** that a co-trustee is committing or attempting to commit a breach of trust, he must take reasonable steps to prevent him from doing so [emphasis added]."

---

**88.** Section 224 provides,

(1) Except as stated in Subsection (2), a trustee is not liable to the beneficiary for a breach of trust committed by a co-trustee. (2) A trustee is liable to the beneficiary, if he
(a) participates in a breach of trust committed by his co-trustee; or
(b) improperly delegates the administration of the trust to his co-trustee; or

(c) approves or acquiesces in or conceals a breach of trust committed by his co-trustee; or
(d) by his failure to exercise reasonable care in the administration of the trust has enabled his co-trustee to commit a breach of trust;
(e) neglects to take proper steps to compel his co-trustee to redress a breach of trust.

Moreover the ERISA statute, itself, and the underlying common law of trusts also suggest a continuing responsibility on the part of the directed trustee. According to § 403(a) of ERISA, 29 U.S.C. § 1103(a), "[a]ll assets of an employee benefit plan shall be held in trust by one or more trustees." Furthermore, the trustee "shall have *exclusive* authority and discretion to manage and control the assets of the plan, *except to the extent that* ... the plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary *who is not a trustee* [emphasis added]." *Id.* The employment of a trust structure necessarily invests a trustee with common-law fiduciary duties. Restatement (Second) of Trusts § 2, comment h (stating that "a trust involves three elements, namely, (1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; (2) a beneficiary, to whom the trustee owes equitable duties to deal with the trust property for his benefit; (3) trust property, which is held by the trustee for the beneficiary."). At common law, a trust is defined as "a fiduciary relationship with respect to property, subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person ...." Restatement (Second) of Trusts § 2 (1959). According to comment f to § 2, a trustee holds a legal interest in trust property, while the beneficiary has an equitable interest. Under § 3(3) of the Restatement (Second) of Trusts, a "trustee" is "[t]he person holding property in trust." Thus if trust law is applied, as Congress indicated it should be where not inconsistent with ERISA's purpose and language, as long as the trust remains in existence, the trustee retains a legal interest in, and thus some ultimate authority, over the plan's assets, which would qualify a trustee to meet the definition of a "fiduciary" under § 3(21)(A)(i)("exercises any authority or

control respecting management or disposition of [plan] *assets* [emphasis added]," which, as noted in *FirsTier*, does not require the trustee to have discretion.)

Under the terminology employed in ERISA, when instructed by a named fiduciary, a "trustee" remains designated a "trustee," though his role is qualified by the adjective "directed." Moreover, under the statute, the named fiduciary ("who is not a trustee" according to the requirements of the statute) who directs the trustee does *not* then become a "directing trustee" nor does the named fiduciary replace the trustee. The statutory language appears to this Court to support a continuance of fiduciary responsibility, though modified, in the trustee, who retains a legal interest in the trust and some authority over the plan assets, the *res* in the trust. According to the statute, the named fiduciary must instruct the directed trustee to perform what actions the named fiduciary wants done, thus interposing the trustee (and any control he has) between the named fiduciary and the act. The trustee's function as the holder of the legal interest in the property of the trust also precludes direct action on the trust's *res* by the named fiduciary. Furthermore the express imposition by the statute of a duty, though its scope is uncertain, on the directed trustee to determine whether the instructions given to him by the directing named fiduciary were "proper," "made in accordance with the plan," and "not contrary to ERISA," also implies that the trustee retains certain supervising and investigative duties and that the directed trustee is still bound by the terms of the plan documents and of ERISA and cannot escape its fiduciary or statutory obligations to the plan participants and beneficiaries. As has been noted by many, the statute fails to define "proper." The directed trustee's undefined duty to supervise and question would be determined at

minimum by what was prudent under the particular circumstances at the time and, as under the common law, be heightened where the directed trustee knew or should have known of the named fiduciary's breach of its duties or of potential conflicts of an act or omission with ERISA or the plan, which threatens the interests of the plan participants and beneficiaries. Nevertheless the nature and scope of that higher standard remain unclear. This Court will accordingly apply a fact-specific approach to determining that duty here. In this context, in an ESOP there should be some duty on the part of a directed trustee to keep apprized of the company's financial condition to the extent that trustee can determine whether its stock is an appropriate, i.e., prudent, investment.

██ Thus in light of § 403(a)(1)'s vague language and Congress' failure to exclude expressly the directed trustee's heightened common law duty where he has notice, or knows or should know, of a breach by the directing named fiduciary, it appears to this Court that Congress deliberately chose not to hold a directed trustee jointly liable for a directing named fiduciary's breach of duty under § 405(a)(1) and (3) of ERISA except where the directed trustee has notice (knows or should know) of a directing fiduciary's breach of its fiduciary duties. Such a choice makes good business sense to keep the costs of administering such plans down and encouraging employers to establish them, but maintaining key protection for the plan participant or beneficiary where the directing trustee's failure to protect is more egregious. See IIA *Scott on Trusts* § 185 at 574–75 ("[W]here the holder of the power [to direct the trustee] holds it as a fiduciary, the trustee is not justified in complying with his directions if the trustee knows or ought to know that the holder of the power is violating his duty to the beneficiaries as fiduciary in giving the instructions"; moreover the directed trustee "is ordinarily under a duty to make a reasonable inquiry and investigation in order to determine whether the [directing fiduciary] is violating his duty."). Furthermore, under § 405(a)(2), where the directed trustee himself breaches his duty by "failing to comply with its duties under ERISA" (at minimum to insure that the directions comply with the plan and the statute) and "thereby enabled a co-fiduciary to commit a breach," the directed trustee's knowledge of that co-fiduciary's resulting breach is not a necessary element for imposition of liability.

In contrast, the American Bankers Association's proposed facial compliance standard, based on a single line in the legislative history that finds no reflection in the statute, would impose only a minimal duty on the trustee and place the plan participants and beneficiaries and the assets in their pension plans at much greater risk. The Association also argues that a knowledge standard is not needed under § 403(a)(1) because "a directed trustee is subject to co-fiduciary liability under § 405(a), imposing liability on a fiduciary that has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." The Court has indicated previously that the Fifth Circuit requires a more restrictive, actual knowledge standard for claims under § 405. *Donovan v. Cunningham,* 716 F.2d at 1475 (co-fiduciary must actually know that the other person is a fiduciary, that the other person participated in an act that constituted a breach of his fiduciary duties, and that the co-fiduciary knows that the act was a breach of fiduciary duty). Therefore § 405(a) alone, contrary to the Association's arguments, would not adequately protect plan participants and beneficiaries.

Moreover, the Association's argument that the banking and trust industry has relied on the "clear on its face" standard

since ERISA was enacted in 1974 is undermined by the judicial decisions that have ruled otherwise, as will be discussed. Plaintiffs furthermore cite a number of advisory opinion letters written by the Department of Labor since ERISA was enacted in response to requests from banks serving as directed trustees that reflect the Department's long-standing assumptions that these banks are fiduciaries with a duty of inquiry. # 501 at 16. They also point to Ms. Hatamyar's statement in *See No Evil*, 63 Tenn. L.Rev. at 31 & n. 203 (*citing* Committee on Fiduciary Responsibility (Employee Benefits Group), Directed Trusts under ERISA, 12 Real Prop. Prob. & Tr. J. 535, 546–48 (1977)): "Early industry commentators were quick to point out that section 403(a)(1) gave directed trustees no comfort in mechanically following a named fiduciary's directions." Ms. Hatamyar also discusses the Department of Labor's advisory opinions. *Id.* at 32–335 & nn. 210–230.

These opinion letters issued by the Department of Labor have some weight with respect to defining the obligations of directed trustees. The Supreme Court has held that when an agency, authorized by statute to interpret and enforce that statute, construes the statute that it administers, a court must defer to that interpretation if Congress has not spoken directly on the matter and if the agency's interpretation "is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron, U.S.A.*, the Supreme Court further held that a court must defer to a regulation issued after formal adjudication or notice-and-comment rulemaking pursuant to the Administrative Procedure Act by an agency, if the agency's interpretation of an ambiguous statute contains a reasonable (but not necessarily the most reasonable) interpretation of an ambiguous statute. *Id.* at 842–44, 104 S.Ct. 2778. *See also United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)("We hold that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law and that the agency interpretation claiming deference was promulgated in the exercise of that authority."). Where an agency offers an interpretation that is not the result of formal procedures such as adjudication or notice and comment rulemaking, however, as in opinion letters, policy statements, agency manuals, *amicus curiae* briefs, and enforcement guidelines, that interpretation lacks the force of law and does not warrant *Chevron*-style deference. *Christensen v. Harris County,* 529 U.S. 576, 586–87, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)(and cases cited therein). Instead the agency's interpretations are "entitled to respect," "but only to the extent that those interpretations have the power to persuade." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655. Indeed such interpretations merit some deference because of the "specialized experience and broader investigations and information," as well as the importance of uniformity in the agency's administrative and judicial understanding of what a federal law requires available to the agency. *Skidmore,* 323 U.S. at 139–40, 65 S.Ct. 161. In sum,

> The weight [given to an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.* at 140, 65 S.Ct. 161. *See also Samson v. Apollo Resources, Inc.,* 242 F.3d 629,

638 (5th Cir.)( "Opinion letters by the Department of Labor do not *per se* bind the court.... Such materials, however, do 'constitute a body of experienced and informed judgment' and the court will give these materials 'substantial weight.' [citations omitted]"), *cert. denied,* 534 U.S. 825, 122 S.Ct. 63, 151 L.Ed.2d 31 (2001).

The few advisory or opinion letters from representatives of the Department of Labor which, while not on point because they deal with the issue in different contexts than that involving Northern Trust, in dicta suggest that the Secretary and/or the Pension and Welfare Benefits Administration views a directed trustee as having some further duty under the § 403(a)(1) exception than merely determining that an instruction from the directing named fiduciary is facially in compliance with the terms of the plan and ERISA. While the letters merely state an opinion without indicating the underlying reasoning, and thus lack the force of law and do not carry great weight, they appear to reflect the determination of the agency with expertise in the application of the statute that the directed trustee has obligations requiring more than a superficial determination that the fiduciary's instructions are in compliance with the plan and the statute.

For example in an advisory opinion letter from the Secretary of Labor's Director of Regulations and Interpretations, Robert J. Doyle, to attorney John B. Brescher, Jr., Opinion No. 92–23A, 1992 WL 314117 (E.R.I.S.A.), *3 (Oct. 27, 1992), dealing with the applicability of section 406 (prohibited transaction provisions) to a bank acting as a directed trustee, the Director stated,

> It should be pointed out, however, that under section 403(a)(1) of ERISA, a trustee that is subject to proper directions from the plan's named fiduciary remains responsible for determining whether following a given direction would result in a violation of ERISA. The directed trustee also has responsibility to exercise discretion where the directed trustee has reason to believe that the named fiduciary's directions are not made in accordance with the terms of the plan or are contrary to ERISA. Furthermore, as with other fiduciary duties, the trustee must ascertain whether existing or potential conflicts of interest may interfere with the proper exercise of this responsibility. Whether, in light of all the facts and circumstances, a trustee is subject to a conflict-of-interest or has reason to believe that a particular direction is contrary to ERISA are inherently factual questions as to which the Department generally will not opine.

The phrase, "reason to believe," which was implied in the common law's notice standard, informs the standard urged by the Secretary, i.e., "knows or should know." [89]

---

89. On the other hand, the Department has issued some advisory opinions regarding situations where the plan participants have been granted the authority to manage and control their individual account assets that appear to contradict the express language of § 404(c)(1) stating that the plan participant does not become a "fiduciary" by exercising control over the assets in his individual account, and therefore the trustee cannot be liable as a cofiduciary under § 405. As Patricia Wick Hatamyar has commented,

> Thanks to the DOL, participant control under ERISA is at present a rather murky area of law. Through changing interpretations and new regulations, the DOL has fogged up one of ERISA's clearer provisions. Section 404(c), which allows participant control of individual accounts, used to be interpreted on its face as a straightforward exculpation of the trustee for losses directly resulting from a participant's exercise of control over the assets in her individual account. The legislative history and the DOL itself (in an early advisory opinion) confirmed this interpretation.... [S]ince at least 1984, the DOL's position has been that a participant acts as a limited "named fidu-

The Department of Labor's regulations, on the other hand, do warrant deference. Rather than quote the entire text of 29 C.F.R. § 2550.404c–1(b)(2), which places a long list of specific requirements that must be met before a plan participant or benefi-

ciary" under section 403(a)(1), at least with respect to stock allocated to her individual accounts. Accordingly the DOL now asserts that the trustee which is directed by participants in voting or tendering shares must determine "whether following participant directions would result in a violation of" ERISA's fiduciary obligations.

More generally, in 1992, following the authorization of section 404(c), the DOL finally promulgated regulations [29 C.F.R. § 2550.404c–1(b)(2)(i) ], to clarify when "a plan provides a participant or beneficiary an opportunity to exercise control over assets in his account." Those regulations cut back considerably on section 404(c)(2) by setting forth numerous detailed conditions that must be met before the trustee may enjoy relief from liability for following the participant's instructions.

Despite this added layer of complexity, the upshot of the DOL regulations is the same as the statute's. If the regulations' requirements are met, the trustee is not liable for any loss resulting from the participant's exercise of control.

64 Tenn. L.Rev. at 18–19 [footnotes omitted]. Ms. Hatamyar has decided, "Although the DOL's regulations arguably go beyond the statutory language of ERISA § 404(c), I will assume the regulations' validity in the remainder of the article." This Court does the same for purposes of reviewing the motions to dismiss.

Examples of the Department of Labor's obfuscation of the statute's originally clear release of a directed trustee from liability through its advisory letters are the following two pronouncements. In an opinion issued on August 19, 1994, by the Department of Labor, 1994 ERISA LEXIS 51, *9–10, in the context of a tender offer, when the plan grants a plan participant authority to direct trustees with regard to stock allocated to the participant's own account and the participant is thus considered to be a named fiduciary for the limited purpose of giving such instructions,

[u]nder section 403(a)(1) of ERISA, the trustee may follow such direction subject to the direction being both proper and made

ciary can be deemed to "exercise control over assets in his account," and thus "not be deemed a fiduciary by reason of his exercise of control" or expose the directed trustee to liability, the Court briefly gener-

in accordance with the plan terms, as well as not being contrary to the provisions of ERISA. However, even with regard to directions involving stock that has been allocated to an individual participant's account, the Department has taken the position that the trustee(s) remain(s) responsible for determining whether a violation of ERISA would occur if the participant's directions were followed.

More specific about the nature of that directed trustee's duty is the "Labor Department Guidance on Pass–Through Voting Provisions In Collectively Bargained Employee Stock Ownership Plans," 22 Pen. & Ben. Rep. (BNA) 2249, 2250–51 (Sept. 28, 1995). In it the Department dealt with a directed trustee's role where an ESOP plan granted plan participants the authority to direct the trustee regarding the tendering of stock or proxy voting of stock allocated to their own accounts, thus rendering the participants fiduciaries for the limited purpose of giving such directions. The letter states that the trustee can satisfy § 403(a)(1) and assure itself that a participant's instructions are proper and not contrary to ERISA and the plan if it follows procedures to insure that the eligible individual account plan's provisions are fairly implemented, that the directing participant has not been subject to coercion or undue pressure in its decision, that necessary information was provided to the participant, and that clearly false information or misleading information is not distributed to the participant, or that any false or misleading information that may have been distributed by other parties is corrected. *Id.* at 2250. Furthermore, the fact that the named fiduciary-participant issues such a direction with respect to a tender offer or proxy vote related to stock in its individual account "does not diminish the trustee's duty to diligently investigate and evaluate the merits of the course of action required by the plan document to determine that the instructions are consistent with titles I and IV [of ERISA]."

alizes the key category of restrictions: a broadly diversified range of investment options to reduce risk, sufficient information about the plan and about the investments for its participants and beneficiaries to make informed investment decisions, and a structure to allow participants to give directions regarding their securities investments with sufficient frequency "in light of the market volatility to which the investment alternative may reasonably be expected to be subject." 29 C.F.R. 2550.404(c)–1(b)(i)(C).

The case law on the issue of a directed trustee's obligations, although far from in agreement, also generally appears to place at least some burdens on the directed trustee beyond merely facial compliance with the terms of the plan and of ERISA suggested by the legislative history text. In the few published opinions available, courts have started from different assumptions and focused on different issues. Some, without considering the question, have assumed that a directed trustee, acting at the direction of a fiduciary authorized by the plan to exercise control over plan management or assets, is still a fiduciary, but is liable only where he knows of a breach of fiduciary obligations by the named fiduciaries under § 404,[90] while other courts analyze the issue of fiduciary duty based on the functional statutory definition, § 3(21)(A), 29 U.S.C. § 1002(21)(A), on the language of the plan and the trust agreement, and on the facts

in the particular case.[91] In both kinds of cases, what the directed trustee knew or should have known plays a significant role in deciding what duties and liability would be imposed on the directed trustee.

The Eighth Circuit has issued several, somewhat inconsistent opinions that have been influential in the few subsequent cases addressing the issue of the directed trustee's responsibility and liability. It has moved from a liberal to a very narrow construction of directed trustee liability.

In *FirsTier Bank, N.A. v. Zeller,* 16 F.3d 907, 911 (8th Cir.), *cert. denied sub nom. Vercoe v. Firstier Bank, N.A.,* 513 U.S. 871, 115 S.Ct. 194, 130 L.Ed.2d 126 (1994), the Eighth Circuit focused on the language (especially the use of the word, "discretionary") and the grammatical structure of § 3(21)(A)(i) of ERISA, 29 U.S.C. § 1002(21)(A)(i): "a person is a fiduciary ... to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such *plan* or exercises any authority or control respecting management or disposition of [plan] *assets* [emphasis added]." It distinguished the first half of the provision dealing with authority and control over management of the plan from the second portion concerning authority or control over the plan assets: "this [first] section imposes fiduciary duties only if one exercises *discretionary* authority or control over plan *management,* but imposes those

---

**90.** *See, e.g., Ershick v. United Missouri Bank of Kansas City, N.A.,* 948 F.2d 660 (10th Cir. 1991) (holding that trustee of an ESOP, acting at the specific direction of the plan administrator to purchase additional company stock despite its diminishing value, actions permitted by the plan documents and consistent with ERISA, was held to be not liable to plan participants for breach of fiduciary duty absent evidence that the trustee used its position for its personal benefit to the detriment of the participants); *Newton v. Van Otterloo,* 756 F.Supp. 1121 (N.D.Ind.1991) (concluding that

the directed trustee did not breach his fiduciary duties because he lacked actual knowledge that the ESOP committee, which had directed him to abstain from voting, had conflicts of interest and had not performed a proper investigation of their options in voting unallocated shares of stock in the plan and thus breached its fiduciary duties).

**91.** *See, e.g., Maniace v. Commerce Bank of Kansas City, N.A.,* 40 F.3d 264 (8th Cir.1994), *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1964, 131 L.Ed.2d 854 (1995).

duties *whenever one deals with plan assets*. This distinction is not accidental—it reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another." *Id.* at 911, 115 S.Ct. 194. *In accord IT Corp. v. Gen. American Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir.1997), *cert. denied*, 522 U.S. 1068, 118 S.Ct. 738, 139 L.Ed.2d 675 (1998); *Board of Trustees of Bricklayers and Allied Craftsmen Local 6 of New Jersey Welfare Fund v. Wettlin Assoc., Inc.*, 237 F.3d 270, 274–75 (3d Cir.2001).

In *FirsTier*, the trustee was authorized by a profit-sharing plan "to hold, manage, invest, and account for all Plan assets." *Id.* In *FirsTier*, the named fiduciary, who was the plan sponsor, directed the trustee to make loans to plan participants from the plan assets. After the company went bankrupt, plan participants sued the directed trustee for breach of fiduciary duty. On appeal, the appellate court held that § 1103(a), dealing with directed trustees, "no doubt modifies, . . . but does not eliminate, the trustee's fiduciary duty when handling assets. When the direction comes from another fiduciary, . . . the law of trusts does not excuse a compliant trustee from all fiduciary responsibility . . . ." 16 F.3d at 911. The panel quoted IIA *Scott on Trusts* § 185 at p. 574 (4th ed.1987) for a rule that the Eighth Circuit determined was adopted by Congress in ERISA:

> "[W]here the holder of the power [to direct the trustee] holds it as a fiduciary, the trustee is not justified in complying with his directions if the trustee knows or ought to know that the holder of the power is violating his duties to the beneficiaries as fiduciary in giving the directions."

16 F.3d at 911. From the same section of the treatise, the panel found support for imposing a duty to inquire even where the directed trustee does not know that the directing fiduciary is breaching his fiduciary duties:

> The trustee is not necessarily justified in complying with the directions of the holder of the power merely because he does not actually know that the latter is violating his duty as fiduciary . . . . [The trustee] is ordinarily under a duty to make a reasonable inquiry and investigation in order to determine whether the holder of the power is violating his duty.

16 F.3d at 912, *citing id.* at 575. The panel concluded that the directed trustee must make a reasonable inquiry and investigation to determine if the named fiduciary's order was "proper" and was "made in accordance with the terms of the plan and . . . not contrary to [ERISA]." *Id.* at 912. In sum the Eighth Circuit held, "[A]n ERISA trustee who deals with plan assets in accordance with proper directions of another fiduciary is not relieved of its fiduciary duties to conform to the prudent man standard of care, *see* 29 U.S.C. § 1104(a); to attempt to remedy known breaches of duty by other fiduciaries, *see* 29 U.S.C. § 1105(a); and to avoid prohibited transactions, *see* 29 U.S.C. § 1106." *Id.* at 911.[92]

Nevertheless, in *Maniace v. Commerce Bank of Kansas City, N.A.*, 40 F.3d 264 (8th Cir.1994), *cert. denied*, 514 U.S. 1111, 115 S.Ct. 1964, 131 L.Ed.2d 854 (1995), in dealing with a directed trustee of an ESOP, the appellate court reached a different result and attempted to distinguish the situation from that in *Firstier*.

**92.** In *FirsTier*, the trustee made the loans not only at the direction of the fiduciary, but also at the request of the plan participants. The appellate court held, "When acting at the direction of the ultimate beneficiary of a trust, the trustee's fiduciary duty is satisfied if it simply complies with a direction that does not violate the terms of the trust." *Id.* at 912.

This Court briefly summarizes the facts in *Maniace*. Over a ten-year period, Juvenile Shoe Company's ("JSC's") sales, profits and net worth diminished and the business fell apart, ultimately ending in bankruptcy, with the ESOP's JSC stock becoming worthless. During the company's gradual demise, Commerce Bank annually reviewed JSC's financial statements, but did not become involved in its business difficulties until JSC suffered a large loss in 1988. Commerce Bank then met with JSC officials and voiced its concerns. When the problems were not resolved, Commerce resigned as trustee. Shortly thereafter, JSC filed for bankruptcy. Plan participants then sued Commerce for breach of fiduciary obligations to prudently manage and protect plan assets, on the grounds that Commerce had held onto substantial amounts of JSC stock despite the fact that Commerce knew of the company's declining value. They also alleged that Commerce knew of, but failed to remedy, breaches of fiduciary duties by the Administrative Committee since Commerce did not involve itself in trying to remedy the company financial difficulties and management disputes.

In *Maniace* the named fiduciary, i.e., the Administrative Committee, was the plan administrator of the ESOP, which, by its nature, may invest only in the employer's (JSC's) stock. Commerce Bank was designated as its trustee in the trust agreement and granted general responsibilities, powers and authority, which allowed it "to invest in savings accounts, certificates of deposit, JSC stock, real estate, securities of companies other than JSC, bonds or mortgages." 40 F.3d at 265. Nevertheless, according to paragraph 5 of the Trust, which became critical to the decision, "*The Trustee's duties and responsi-*

*bilities with respect to the purchase sale, retention, distribution or other action with respect to Company stock ... shall be limited to effecting the direction of the [Administrative] Committee, discretionary, fiduciary responsibility with respect to such matters being hereby allocated to the Committee.*" *Id.* at 266. In contrast, the *Maniace* panel noted, in *Firstier* the trustee was given the authority to "hold, invest, and account for *all* plan assets." *Id.* at 268.[93] The *Maniace* panel ignored *Firstier's* distinction between the first half of 29 U.S.C. § 1002(21)(A) concerning a fiduciary's discretionary authority and control over management of the plan and the second portion concerning a fiduciary's authority or control over the *assets,* which did not require a grant of discretionary authority for the imposition of fiduciary duties on the trustee. 16 F.3d at 911. The *Maniace* panel focused on the language of the plan and concluded that the directed trustee Commerce "had no discretion nor control with respect to JSC stock, the central asset in the ESOP at issue" and thus "did not fit within the ERISA definition of a fiduciary," but was governed wholly by § 1103(a). 40 F.3d at 267–68. Furthermore, presumably because the plan at issue in *Maniace* was an ESOP, the *Maniace* panel stated that the directed trustee "was not required to weigh the merits of an investment in [the company's] stock against all other investment options every time it was directed to purchase said stock." 40 F.3d at 268. The panel further found that based on the summary judgment record, the plan participants had failed to establish that Commerce's conduct at the Committee's direction was not in accordance with the terms of the plan or was contrary to provisions of ERISA. *Id.* The panel did recognize that, depending

---

**93.** Plaintiffs in *Tittle* have alleged that Northern Trust, like the trustee in *FirsTier,* is charged with the authority to "hold, care for and protect the assets" of the Savings Plan and the ESOP.

upon the grant of control under the plan, a directed trustee may have some duty beyond merely following directions, but a substantially diminished one, that might subject it to the modified prudent man standard of care imposed on the directed trustee in FirsTier. Nevertheless, the *Maniace* panel distinguished the situation before it from that in *Firstier* on the grounds that in *Firstier* the trustee was invested with *general* control to hold manage, invest and account for *all* plan assets; in contrast, in *Maniace* Commerce was given a more limited grant of control with no discretion with respect to JSC stock. *Id.* The *Maniace* panel concluded that "imposing any 'residual' duties on Commerce would, in effect, abrogate the distinction between trustees and directed trustees clearly intended by ERISA." *Id.*

With respect to the JSC plan participants' second claim for co-fiduciary liability on the grounds that Commerce had breached its duty when it knew of but failed to remedy breaches of fiduciary duty by the Administrative Committee, the panel determined that it also involved action or inaction with respect to the JSC stock, for which Commerce had no fiduciary responsibility. The panel cited as the standard,

> Upon delegation of fiduciary duties, the fiduciary is not thereafter liable for the acts or omissions of the person carrying out fiduciary responsibility, except to the extent it participates knowingly in the breach, or fails to act reasonably in discharging it[s] own responsibilities and thereby enables the other fiduciary to commit the breach, or it has knowledge of a breach by such other fiduciary and makes no reasonable efforts under the circumstances to remedy the breach.

*Id.* at 268, *quoting Presley v. Blue Cross-Blue Shield of Alabama,* 744 F.Supp. 1051, 1058 (N.D.Ala.1990) (*citing* 29 U.S.C. § 1105(a),(c)). The panel found that Plain-

tiffs/Appellants had not shown that Commerce participated in any breaches of fiduciary duty with the Committee nor that it knew of any breaches and failed to remedy them. *Id.*

In *Herman v. NationsBank Trust Co. (Georgia),* 126 F.3d 1354, 1361, 1371 (11th Cir.1997), *cert. denied,* 525 U.S. 816, 119 S.Ct. 54, 142 L.Ed.2d 42 (1998), the Eighth Circuit noted the divergent holdings of *Firstier* and *Maniace* and made no attempt to reconcile or explain them; nevertheless the *Herman* panel followed *Maniace,* which it construed as holding that "insofar as a trustee acts at the direction of a named fiduciary in accordance with the terms of the plan and ERISA's requirements, he is not subject to the fiduciary requirement in § 1104(a) to act prudently," although the panel did require the directed trustee "to make sure the directing fiduciary's instructions 'were proper, in accordance with the terms of the plan, and not contrary to ERISA.'" *Id.* at 1361, 1371. The panel in *Trust,* using a relative, as opposed to an absolute, adjective, opined that when a plan falls within one of the three exceptions to exclusive trustee authority under § 1103(a) (provides an investment manager with the authority to control plan assets, gives plan participants control over their individual accounts, or makes the trustee subject to the direction of a named fiduciary that is not a trustee), "the responsibilities of the trustee are correspondingly *lessened* [emphasis added]"; yet in regard to each exception the panel concluded in absolute language that the trustee was "not liable" for the losses caused by the controlling person. *Id.* at 1361. *See also Grindstaff v. Green,* 133 F.3d 416, 426 (6th Cir.1998) ("First American is a *directed* trustee and is not a fiduciary to the extent it does not control the 'management or disposition' of the ESOP stock it holds in trust. . . . For these reasons we find that the District Court

correctly determined that Plaintiffs' claim that the Bank breached a fiduciary duty to investigate was without merit."). *But see FirsTier*, 16 F.3d at 911 ("[A]n ERISA trustee who deals with plan assets in accordance with proper directions of another fiduciary is not relieved of its fiduciary duties to conform to the prudent man standard of care, *see* 29 U.S.C. § 1104(a), to attempt to remedy known breaches of duty by other fiduciaries, *see* 29 U.S.C. § 1105(a) [94], and to avoid prohibited transactions, *see* 29 U.S.C. § 1106."); *Koch v. Dwyer*, No. 98 CIV. 5519(RPP), 1999 WL 528181 (S.D.N.Y. July 22, 1999), *clarified on other grounds*, 2000 WL 174945 (S.D.N.Y. Feb. 15, 2000) ("If [the directed trustee] were aware that the direction to invest in JWP common stock was imprudent or that the fiduciaries' direction to make that investment was based on an inadequate investigation, then [the directed trustee] would not be immune from liability because it would have knowingly carried out a direction that was contrary to ERISA. What [the directed trustee] knew about the prudence of the investment in question, about the bases on which the fiduciaries directed [the trustee] to make that investment, and about the alleged fraud and conflicts of interest on the part of [JWP's officers] and others are factual questions inappropriate for resolution on a motion to dismiss."), *clarified on other grounds on denial of reconsideration.* No. 00–20030RMW, 2000 WL 31431588 (N.D.Cal. Sept. 30, 2002).

At least where the facts alleged (and ultimately the evidence) provide reason for the directed trustee to have known or should have known of a breach of fiduciary duty, this Court finds that those cases which construe § 403(a)(1) to require something more than a duty to check superficial compliance, which in actuality would serve no purpose, effectuate ERISA's underlying policies and purposes far better.

For instance, in *Koch*, 1999 WL 528181, relied upon by the Secretary of Labor, participants in a defined contribution 401(k) plan, funded by a combination of employee contributions and employer matching contributions and earnings thereon, along with participants in an ESOP, sued the plans' fiduciaries for breach of fiduciary duties and co-fiduciary duties on the following grounds: that from 1991 until the company went into bankruptcy in December 1993 it was imprudent to retain the company's stock in the plan because the company was in a precarious financial situation; that the fiduciaries allegedly knew or should have known they were using inflated values for the employer stock because the company was on the verge of bankruptcy; that the stock was overvalued that they continued to invest in the stock for the plans and failed to sell it; that they failed to obtain an independent determination whether the plans should continue to hold the employer's securities; and that the fiduciaries acted to conceal their breaches of their fiduciary duty by misstating and inflating the value of the stock and the contributions made on various forms. The directed trustee, AET, made the same argument as the Association does in *Tittle*, i.e., that it was required to follow the fiduciaries' directions to invest in the employer company's common

---

**94.** If a trustee is determined to be not acting as a fiduciary, as in *NationsBank*, the trustee could be liable under § 1105(3) as party in interest who knew of a breach of fiduciary duty by a fiduciary and made no reasonable effort to remedy the problem. *Mertens*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161.

Nevertheless under such circumstances to be discussed *infra*, the "nonfiduciary" trustee would be liable only for equitable relief. *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241, 248, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000).

stock "unless 'it is clear on their face' that those directions constitute a breach of fiduciary duty." The district court rejected the argument. It opined, "if AET were aware that the direction to invest in JWP common stock was imprudent or that the fiduciaries' direction to make the investment was based on an inadequate investigation, then AET would not be immune from liability because it would have knowingly carried out a direction that was contrary to ERISA." 1999 WL 528181 at *10.

The Association dismisses *Koch*'s rejection of the Association's "clear on their face" standard by claiming that the district court failed to explain or analyze why, but simply stated that this standard was not used in the statute nor in case law that the court merely cited in passing, but did not discuss, and most of which dealt with discretionary trustees. This Court disagrees, has indicated that the "knows or should know" standard is rooted in the common law of trusts, and reemphasizes that the absence of that "clear on their face" standard in the statute is significant. Furthermore, in the alleged directed trustee situation, the *Koch* court found appropriate a fact-specific inquiry to determine what the directed trustee knew to determine whether he had any duty to inquire further: "What AET knew about the prudence of the investment in question, about the bases on which the fiduciaries directed AET to make that investment, and about the alleged fraud and conflicts of interest on the part of the 'individual fiduciaries' are factual questions inappropriate for resolution on a motion to dismiss." *Id.* at *10. Moreover, the *Koch* court determined that the participants had alleged a continuing decline in the value of the company's stock over the three years and its documentation in Deloitte & Touche's accounting report in October 1992, which resulted in a 45% drop in the price of that stock, reflected that the directed trustee had knowledge that the directing fiduciaries breached their duty of prudence by not ordering the sale of the stock before it became worthless, and that their investment instructions to retain the stock were not "proper," but in fact in violation of ERISA.

In *In re McKesson HBOC, Inc. ERISA Litigation*, No. C00–2003RMW, 2002 WL 31431588, *11 (N.D.Cal. Sept. 30, 2002), relied upon by Defendants, the district court compared the allegations before it with those in *Koch*, 1999 WL 528181. The *McKesson* court found no facts alleged in the complaint before it to demonstrate knowledge by the directed trustee of an ESOP that the directing fiduciary's instructions violated ERISA and dismissed the complaint with leave to amend. The judge did note, however, "If plaintiffs can demonstrate that [directed trustee] Chase knew that the investment directions it received violated ERISA, then Chase is not necessarily relieved of ERISA liability merely because it followed those improper directions." *Id.* at *12 n. 11.

In the only case to come before the Fifth Circuit, which made only a cursory examination of the statute, the Secretary of Labor sued a group of men on the board of directors and administrative committee (and thus fiduciaries) of Metropolitan Contract Services, Inc. for purchasing company stock from Defendant Cunningham, the company's CEO as well as a member of the administrative committee and board of directors, for more than the stock was worth. *Donovan v. Cunningham*, 541 F.Supp. 276 (S.D.Tex.1982), *aff'd in part, vacated in part, reversed in part*, 716 F.2d 1455 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). These fiduciary Defendants then filed a third-party complaint against the trustee, Allied Bank of Texas, for co-fiduciary liability, indemnity and contribution. The district court held that the committee members did not breach their fiduciary

duties. Nevertheless, the district court seemed to recognize that a directed trustee had a varying legal duty, not clearly defined by the appellate court but less than that of a "primary" fiduciary, and suggested that a directed trustee's obligations would depend on the specific facts of the case and his actual exercise of control or authority:

> The statutory construction of ERISA makes clear that the responsibility of Allied as directed trustee is not equal to that of primary fiduciaries. Section 403(a)(1) of ERISA, 29 U.S.C. § 1103(a)[,] provides that a trustee such as Allied is to follow the "proper directions" of a named fiduciary which directions are made in accordance with the terms of the plan and which are not contrary to ERISA. This court, while acknowledging differentiation in standards of care implied by section 1103, carried Allied's motion for summary judgment through the trial because the reach of ERISA to entities performing services for the ESOP is quite long. Notwithstanding the limited role prescribed by section 1103, the trustee['] s actual exercise of authority or control could raise the fiduciary responsibility required of such trustee. Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). However it became apparent upon hearing the evidence at trial and upon a review of the depositions of the various principals, that Allied at all times remained within the limited role of directed trustee.

541 F.Supp. at 290. Thus despite potential liability, in view of the evidence, the district court found that the claim against Allied lacked merit and ordered Cunningham to pay Allied's litigation expenses because he was the only fiduciary financially able to do so. *Id.* On appeal the Fifth Circuit reversed the ruling as to the fiduciary committee members, found them liable, and concluded that the independent appraisal of the stock's value on which they relied was not adequate to satisfy their duty to prudently manage and protect plan assets, but affirmed the district court's determination as to Allied. 716 F.2d at 1475, 1476.

■ After extensive research, this Court concludes for the reasons discussed *supra* that even where the named fiduciary appears to have been granted full control, authority and/or discretion over that portion of activity of plan management and/or plan assets at issue in a suit and the plan trustee is directed to perform certain actions within that area, the directed trustee still retains a degree of discretion, authority, and responsibility that may expose him to liability, as reflected in the structure and language of provisions of ERISA. At least some fiduciary status and duties of a directed trustee are preserved, even though the scope of its "exclusive authority and discretion to manage and control the assets of the plan" has been substantially constricted by the directing named fiduciary's correspondingly broadened role, and breach of those duties may result in liability.

In any ERISA retirement plan, where the plaintiffs, as in *Tittle*, allege with factual support that the directed trustee knew or should have known from a number of significant waving red flags and/or regular reviews of the company's financial statements that the employer company was in financial danger and its stock greatly diminished in value, yet the named fiduciary, to which the plan allocated all control over investments by the plan, directed the trustee to continue purchasing the employer's stock, there is factual question whether the evidence is sufficient to give rise to a fiduciary duty by the directed trustee to investigate the advisability of purchasing the company stock to insure that the ac-

tion is in compliance with ERISA as well as the plan.

Finally, even if the Court construed § 403(a) to require only that the trustee find that the directions he received from the named fiduciary are "proper" and facially in compliance with the terms of the plan and of ERISA, it finds that the *Tittle* Plaintiffs still state a claim: "Plaintiffs submit that any order to proceed with lockdowns on its face violated the duties of prudence and loyalty mandated by ERISA" because the alleged exigent circumstances, laid out in the complaint, made its timing highly suspect and clearly injurious to plan participants and beneficiaries. # 501 at 15 n. 9.

### 4. Standing and Remedies under ERISA

Section 502(a), 29 U.S.C. § 1132(a), sets out the types of civil enforcement actions recognized under ERISA. The Supreme Court has pronounced, "The six carefully integrated civil enforcement provisions found in § 502 of the statute as finally enacted, ... provide strong evidence that Congress did not intend to authorize other remedies ..." *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). *See also Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)("The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive."). Indeed, in addition to its preemption of state-law causes of action, to be discussed *infra*, "ERISA's interlocking, interrelated and interdependent scheme, which is in turn part of a 'comprehensive and reticulated statute,'" undermines any assertion that Congress inadvertently omitted other remedies. *Russell,* 473 U.S. at 146, 105 S.Ct. 3085.

Thus if a plaintiff cannot sue under one of the provisions for relief under § 502(a), he has no remedy under ERISA. *Bullock v. Equitable Life Ass. Soc. Of U.S.,* 259 F.3d 395, 400–01 (5th Cir.2001)("Because section 502(a) provides the exclusive enforcement mechanism for section 510 rights, it preempts any state cause of action seeking such relief, no matter how artfully pled.... 'The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.' ")(*quoting Pilot Life,* 481 U.S. at 54, 107 S.Ct. 1549).

Among the types of civil actions a beneficiary may bring and the kind of relief available under § 502(a), three are relevant here.

First, § 502(a)(1)(B) provides a cause of action "to recover benefits due ... under terms of [a] plan, to enforce ...rights under the terms of the plan, or to clarify ... rights to future benefits due ... under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

Second, § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a suit for breach of fiduciary duty to obtain "appropriate relief" under § 409, 29 U.S.C. § 1109(a). Section 409(a) of ERISA, 29 U.S.C. § 1109(a), which makes a fiduciary personally liable to the plan for a breach of fiduciary duty, provides,

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from such breach, and to restore to such plan any profits of such

fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Thus § 409(a) provides for monetary and equitable relief for the plan, but no recovery by an individual participant or beneficiary. The Supreme Court has held that § 502(a)(2) authorizes relief only for the benefit of a plan, and relief may not flow directly to individual plan participants; individual plan participants may therefore sue under § 502(a)(2), 29 U.S.C. § 1132(a)(3), and 29 U.S.C. § 1109(a), only on behalf of the plan as a whole. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140–42 n. 8–9, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)(plan fiduciary may not be held personally liable to individual plan participant or beneficiary for extracontractual, compensatory and/or punitive damages under § 502(a)), construing 29 U.S.C. § 1132(a)(2). *See also In re Occidental Petroleum Corp.*, 217 F.3d 293, 297 n. 14 (5th Cir.2000); *Matassarin v. Lynch*, 174 F.3d 549, 565–66 (5th Cir.1999), *cert. denied*, 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000); *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d at 992–93 (and cases cited therein).

Third, § 502(a)(3) allows a plan participant to bring a suit "to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or ... to obtain other such appropriate equitable relief ... to redress such violations or ... to enforce any provisions of [ERISA] or the terms of the plan." Sections 502(a)(3), 29 U.S.C. § 1132(a)(3). It is now established that plan participants individually, as well as on behalf of the plan as a whole, may sue a fiduciary for a breach of fiduciary duty to recover "appropriate equitable relief" under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a). *Varity Corp.*, 516 U.S. at 496, 116 S.Ct. 1065 (concluding that § 1132(a)(3), unlike § 1132(a)(2), does not require loss to the plan as a whole); *Matassarin*, 174 F.3d at 566.

The *Tittle* plaintiffs seek a judgment on behalf of the plans ordering that "each of the Enron ERISA Defendants, the Compensation Committee, Lay, Skilling [since dismissed], and Northern Trust, *are liable to the Savings Plan, the ESOP, and the Cash Balance Plan* for violating the duties and responsibilities and obligations imposed [sic] them as fiduciaries and cofiduciaries by ERISA [under § 502(a)(2)] with respect [sic], and that [nonfiduciary] Andersen is liable in equity [under § 502(a)(3)][95] for its knowing participation in the afore-mentioned violations of the ERISA fiduciaries [emphasis added]." Complaint, # 145 at page 295.

The *Tittle* Plaintiffs have also asked the Court to "enjoin the Enron ERISA Defendants and the Cash Balance Plan as the successor to the Enron Corp. Retirement Plan, from computing the value of each component of the ESOP offset according to the market value of the Enron shares on each January 1st of the three-year period 1998–2000, to order those defendants to redress all damages flowing from prior Cash Balance payments made pursuant to the offset arrangement," and to "enjoin the Enron Defendants and the Compensation Committee from further violating the duties, responsibilities, and obligations imposed upon them as fiduciaries by ERISA and the Plan documents with respect to the Savings Plan, the ESOP and the Cash

---

**95.** Only fiduciaries are liable under § 502(a)(2), which does not authorize suits for money damages against nonfiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty. *Mertens*, 508 U.S. at 253, 113 S.Ct. 2063. Plaintiffs do not allege that Andersen is a fiduciary.

Balance Plan." # 145 at 295. Thus they seek "other appropriate equitable relief" under § 503(a)(3).

In *Varity Corp.*, 516 U.S. at 512, 116 S.Ct. 1065, the Supreme Court stated that § 502(a)(3) acts as a " 'catchall' remedial section" by providing "a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere remedy." The high court has since qualified and clarified that remark. The view of the nature of the equitable relief available under the provision has been substantially constricted. Moreover, relief under § 502(a)(3) must be "appropriate" as well as "equitable." A plaintiff cannot sue for a breach of fiduciary duty for denial of benefits under § 502(a)(3) if he has a remedy expressly provided for his cause of action under § 502(a)(1)(B). *See, e.g., Musmeci v. Schwegmann Giant Super Markets, Inc.*, 332 F.3d 339, 349 n. 5 (5th Cir.2003), *citing Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002); *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir.1998)(concluding that claim for equitable relief for breach of fiduciary duty was precluded because plaintiff had an adequate claim for benefits due under the plan under § 1132(a)(1)); *Katz v. Comprehensive Plan of Group Ins.*, 197 F.3d 1084, 1088–89 (11th Cir. 1999); *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 615 (6th Cir.1998).

In *Mertens*, the Supreme Court rejected the argument that relief available under § 502(a)(3) would include all relief that a court of equity was empowered to grant, which would encompass legal remedies that would "render the modifier ['equitable'] superfluous." *Id.*, 534 U.S. at 257–58, 122 S.Ct. 726. The Supreme Court observed in dicta that remedies like injunction, mandamus, and restitution were typically available in equity, but that compensatory damages were not. *Id.* at 256, 122 S.Ct. 726. Up until recently, courts, including the Supreme Court, flexibly viewed restitution generally as an equitable remedy and allowed it to encompass all kinds of monetary recovery as long at the remedy was not termed "money damages." *See, e.g., Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)[96]; *Griggs v. E.I. Dupont de*

---

**96.** In *Bowen*, a six-justice majority of the Supreme Court held that the State of Maryland's suit for injunctive relief, declaratory judgment, and reimbursement from the Department of Health and Human Services regarding disallowed benefits under Medicaid was an equitable claim for restitution, not money damages. The majority observed,

> Our cases have long recognized the distinction between an action at law for damages-which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation, and an equitable action for specific relief-which may include an order providing for reinstatement of an employee with back pay or for "the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions." . . . The fact that a judicial remedy may require one party to pay money to another is not sufficient reason to

characterize the relief as "money damages." Thus we have recognized that relief that orders a town to reimburse parents for educational costs that Congress intended the town to pay is not "damages."

487 U.S. at 893–94, 108 S.Ct. 2722. Moreover, quoting from Judge Robert Bork in *Maryland Dept. of Human Resources v, Department of Health and Human Services*, 763 F.2d 1441 [1445–46] (D.C.Cir.1985), regarding the fact that payment of money is not necessarily money damages, the *Bowen* majority further stated,

> "The term 'money damages' . . . normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he is entitled.' D. Dobbs, *Handbook on the Law of Remedies*, 135 (1973). Thus, while in many

*Nemours & Co.,* 237 F.3d 371, 384 (4th Cir.2001)(comparing equitable remedies of reinstatement and back pay under Title VII with ERISA); *Bowerman v. Wal-Mart Stores, Inc.,* 226 F.3d 574, 592 (7th Cir.2000)(When restitution is sought as a remedy for a breach of fiduciary duty, it is properly viewed as an equitable remedy because the fiduciary concept is equitable).

In *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)(5–4 opinion), under § 502(a)(3) a medical insurance company sought specific performance of a reimbursement provision in an ERISA health insurance plan to compel a plan beneficiary to pay the proceeds the beneficiary recovered from a third-party tortfeasor in the settlement of a personal injury suit, as restitution for benefit payments previously made by the plan. The Supreme Court held that § 502(a)(3) did not authorize such relief, which in actuality was a legal remedy imposing personal liability on the beneficiary and his wife for a contractual obligation to pay past due money, relief not typically available in equity court.

Justice Scalia, this time writing for the majority of the high court (Justices Scalia, Rehnquist, O'Connor, Kennedy, and Thomas joining), construed § 502(a)(3)'s remedy of "other appropriate equitable relief" to redress violations or enforce provisions of ERISA and the plan. He examined remedies that, depending upon the circumstances, might be characterized as legal or equitable, such as restitution, and recognized what he conceded was, for the Supreme Court, a new "fine distinction between restitution at law and restitution in equity." *Id.* at 214–15, 122 S.Ct. 708. The majority's decision limited equitable restitution to remedies historically available in the courts of equity when they were separate from courts of law, substantially narrowing the availability of monetary relief under § 502(a)(3). Furthermore Justice Scalia reiterated the holding in *Mertens* that "the term 'equitable relief' in § 502(a)(3) must refer to those categories of relief that were *typically* available in equity.*" Great-West,* 534 U.S. at 219, 122 S.Ct. 708, *quoting Mertens,* 508 U.S. at 256, 113 S.Ct. 2063. He observed that where a plaintiff seeks to impose personal liability on a defendant for a contractual obligation, the relief sought is not that typically available in equity, but in an ac-

instances an award of money is an award of damages, '[o]ccasionally a money award is also a specific remedy.' *Id.* Courts frequently describe equitable actions for monetary relief under a contract in exactly such terms. Citing cases that allowed specific performance of a contract to borrow money, contrasting lump-sum damages for breach of promise to pay monthly support payments with an order decreeing specific performance as to future installments, and specific performance of a promise to pay a money bonus under a royalty contract." *Id.* at 895, 108 S.Ct. 2722.

Judge Scalia wrote a significant and predictive dissent to *Bowen,* and subsequently authored the majority opinion in *Great-West Life,* which narrowed the concept of restitution by returning to that "typically available in equity.*" Great-West,* 534 U.S. at 210, 122 S.Ct. 708. In his dissent in *Bowen,* which reveals the seeds of *Great-West Life,* he asserted that there was an historical distinction between money damages, which "compensate the plaintiff for a loss," and specific relief, which "prevents or undoes the loss—for example, by ordering return to the plaintiff of a precise property that has been wrongfully taken or by enjoining acts that would damage the plaintiff's person or property." 487 U.S. at 914, 108 S.Ct. 2722. He found that Maryland "sought money to compensate for the monetary loss it sustained by expending resources to provide services to the Government in reliance on the Government's contractual duty to pay," in other words, a "suit for money damages." *Id.* at 917, 108 S.Ct. 2722. He characterized it as "a suit seeking to recover a past due amount of money that does no more than compensate a plaintiff's loss," i.e., "a suit for damages, not specific relief." *Id.* at 918, 108 S.Ct. 2722.

tion at law, because money damages "are the classic form of *legal* relief." *Id.* at 205, 210, 122 S.Ct. 708, *quoting Mertens,* 508 U.S. at 255, 113 S.Ct. 2063. Expanding beyond contracts, he emphasized for the majority of the divided high court, "Almost invariably suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Id., citing* Scalia's dissent in *Bowen,* 487 U.S. at 918–19, 108 S.Ct. 2722.[97] Moreover, not all relief characterized as restitution or injunction was available in equity. *Id.* at 209–10, 122 S.Ct. 708, *quoting Mertens,* 508 U.S. at 258 n. 8, 113 S.Ct. 2063 (" '[e]quitable relief must mean *something* less than *all* relief' "). According to the majority, an action for restitution in equity, by means of an equitable lien or a security interest or a constructive trust, is appropriate in equity only where the plaintiff in good conscience is the true owner and the particular property being sought is identifiable and in the hands of the defendant; a court in equity could then order transfer of title (imposing a constructive trust) or of a security interest (enforcing an equitable lien) to the true owner. *Id.* at 213, 122 S.Ct. 708.[98] The defendant may have already disposed of the property at issue; the high court concluded that an action for disgorgement of proceeds is appropriate only where the defendant still holds those identifiable proceeds. The majority rea-

soned, "Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214–15, 122 S.Ct. 708. Furthermore, if the property that the plaintiff sought to recover or its proceeds has been dissipated, so that no property remains, the plaintiff's claim is only that of a general creditor and he cannot seek equitable remedies such as a constructive trust or a lien. *Id.* at 214, 122 S.Ct. 708.

A number of courts have applied the *Great–West Life* holding to dismiss claims under ERISA's § 502(a)(3). *See, e.g., Gerosa v. Savasta & Co.,* 329 F.3d 317 (2d Cir.2003)(money sought as reimbursement from a loss in the plan based on the alleged negligent advice of an actuary was held to be consequential money damages since the money was never within the actuary's possession and thus restitution was not "appropriate equitable relief"), *cert. denied,* —— U.S. ——, 124 S.Ct 435, —— L.Ed.2d —— (2003); *Rego v. Westvaco Corp.,* 319 F.3d 140, 145 (4th Cir.2003)(specific performance in the form of issuance of more company stock sought by terminated plan participant to make up the difference in valuation of his interest in his savings plan on the date he was initially entitled to a distribution and the date one month later when the distribution was actually made was held to not constitute "appropriate equitable relief" under ERISA because defendants possessed no particular fund or property clearly identifiable as belonging

---

97. For that reason, "an injunction to compel payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Id.* at 210, 122 S.Ct. 708.

98. In contrast to the situation where a plaintiff could claim title or right to possession of identifiable property, where the plaintiff demonstrated that he was entitled to recover mon-

ey for some benefit or service that a defendant had received from the plaintiff, the traditional right to restitution was at law through an action arising out of a common-law writ of assumpsit. *Id.* at 214–15, 122 S.Ct. 708. Thus the claim was legal rather than equitable because the plaintiff sought a judgment imposing personal liability on the defendant to pay money.

in good conscience to plaintiff and because defendants no longer possessed plaintiff's share in the savings plan); *Bauhaus USA, Inc. v. Copeland,* 292 F.3d 439 (5th Cir.2002)(affirming dismissal of an ERISA plan administrator's declaratory judgment suit to enforce a reimbursement clause of the plan in order to obtain part of the settlement funds recovered in a plan participant's tort suit against a third party because the funds were no longer in the defendant's possession, but in a court registry, and thus the claim was for legal relief); *Wellmark, Inc. v. Deguara,* 257 F.Supp.2d 1209, 1216 (S.D.Iowa 2003)("This Court finds the possession theory is the correct reading of *Great–West.* That is, attempts by an ERISA plan or insurer to recover settlement proceeds to which it is entitled under a subrogation or reimbursement provision are only prohibited under § 502(a)(3) if the insured is not in possession of clearly identifiable proceeds," i.e., to make him whole.)

With respect to Count IV,[99] Plaintiffs, apparently drawing on an *amicus curiae* brief filed by the Secretary of Labor in another suit, seek to escape the reach of *Great–West* by arguing that under the common law of trusts, where a beneficiary sues a fiduciary for breach of fiduciary duty, equity required the fiduciary to restore the beneficiary to "the position he would have been if the trustee had not committed the breach of trust." Restatement (Second) of Trusts § 205, cmt. a (1959). Section 205 provides,

If the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit that would have accrued to the trust estate if there had been no breach of trust.

Comment a, addressing "[a]lternative remedies for breach of trust," states,

If the trustee commits a breach of trust, the beneficiary may have the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust; or of pursuing a remedy which will give him any profit which the trustee has made by committing the breach of trust; or of pursuing a remedy which will put him in the position in which he would have been if the trustee had not committed the breach of trust. These three types of remedies are not always distinct and are not always all of them available. . . .

Comment c, which addresses § 205(a), provides in relevant part, "If as a result of his breach of trust, trust property is destroyed or lost, the trustee is chargeable with the value of the property so destroyed or lost." *See also* Restatement (Second) of Trusts § 199 (1959)(entitled "Equitable Remedies Of Beneficiary," which includes a suit "to compel the trustee to redress a breach of trust."); *Id.* § 197 ("Except as stated in § 198, the remedies of the beneficiary against the trustee are exclusively equitable."); *Id.,* § 198 (listing "Legal Remedies Of Beneficiary," cmt. a (stating that beneficiary has concurrent legal and equitable remedies against the trustee)). The *Tittle* Plaintiffs distinguish *Mertens* and *Great–West* on the grounds that those suits grounded in § 502(a)(3) were actions against non-fiduciaries; monetary relief in such circumstances was legal relief, even though a court of equity had the power to grant it.[100] They urge that if the Court

---

**99.** The other ERISA Counts for breach of fiduciary duty are brought on behalf of the plans and seek "appropriate relief" under § 502(a)(2), 29 U.S.C. 1132(a)(2).

**100.** Plaintiffs cite Scott & Fraher § 282, at 30 for the proposition that when a beneficiary sues both a trustee/fiduciary and a non-fiduciary for injuring the trust in the same transaction, the beneficiary may bring an equity action to enforce equitable rights against the

adopts the restrictive reading of equitable relief urged by Defendants' construction of *Great–West*, they and many other beneficiaries would be without remedy for serious breaches of duty by plan fiduciaries.[101]

Searching for further support in treatises for their contention that they seek an equitable remedy against fiduciary Defendants for breach of their obligations of loyalty and prudence, Plaintiffs quote G. Bogert, *The Law of Trusts and Trustees* § 861 at 3–4 (Rev.2d ed.1995):

> Equity is primarily responsible for the protection of rights arising under trusts and will provide the beneficiary with whatever remedy is necessary to protect

him and recompense him for the loss, in so far as this can be done without injustice to the trustee or third parties.

They also cite 3 A. Scott & W. Fraher, *The Law of Trusts* § 199 at 203–04, 206 (4th ed.1988), characterizing payment of money to redress a fiduciary's breach as an "equitable" remedy available to the beneficiary.

Plaintiffs also rely on a Fifth Circuit case, *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321 (5th Cir.1992), *cert. denied*, 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992),[102] which they claim demonstrates that a fiduciary's duty to a beneficiary is equitable and that the remedies for breach of that duty (monetary make-whole

---

> fiduciary and a legal action to enforce legal rights against the non-fiduciary, simultaneously in the same court. *See also* Restatement (Second of Trusts) § 282 cmt. e.

**101.** The argument that many beneficiaries will not have a remedy in a federal forum apparently holds little weight with the majority in *Great–West*. This Court observes that in their dissents to *Great–West*, Justice Stevens and Justice Ginsberg (joined by Justices Stevens, Souter, and Breyer) objected to the majority's interpretation of § 503(a)(3) as *limiting* the relief available rather than enlarging it. 534 U.S. at 222, 224, 122 S.Ct. 708. Justice Stevens complained that the effect of the majority's interpretation of "equitable" is to treat as dispositive an ancient classification unrelated to the substance of the relief sought; and to obstruct the general goals of ERISA by relegating to state court (or to no court at all) an array of suits involving the interpretation of employee health plan provisions. *Id.* at 224, 122 S.Ct. 708. Similarly Justice Ginsberg's dissent objected to what she regarded as "the conflict between the Court's holding and Congress' stated goals in enacting ERISA":

> After today, ERISA plans and fiduciaries unable to fit their suits within the confines the Court's opinion constructs are barred from a federal forum; they may seek enforcement of reimbursement provisions like the one here at issue only in state court. Many such suits may be precluded by anti-subrogation laws, ... others may be preempted by ERISA itself, and those that

survive may produce diverse and potentially contradictory interpretations of the disputed plan terms.

*Id.* at 227, 122 S.Ct. 708. The dissenters also detailed how in their view the majority opinion in *Great–West* was contrary to the high court's holdings in previous cases, including *Mertens*, *Varity Corp.*, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), and *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). *See generally* 534 U.S. at 227–34, 122 S.Ct. 708.

**102.** In *Corcoran*, originally filed in state court and removed to federal court on ERISA preemption grounds, the parents of a fetus, which died after an employee disability plan concluded that hospitalization of the expectant mother was unnecessary and thus not covered by the plan, brought a wrongful death suit against the provider of utilization review services to the plan based on its allegedly erroneous decision. The district court granted summary judgment to the defendant on the grounds that the medical malpractice claim was preempted by ERISA, which barred any recovery of emotional distress damages. On appeal, the Fifth Circuit affirmed, finding that ERISA preempted the state-law cause of action and that money damages for emotional distress were "extra-contractual damages" not available under ERISA. Although the original state court petition did not seek relief under § 503(a)(2), the parents filed a motion for reconsideration and requested damages under this provision.

relief under trust law principles) are not within the definition of "money damages" as defined by Justice Scalia in *Bowen*, 487 U.S. at 913, 108 S.Ct. 2722 ("[T]he term 'damages' refers to money awarded as reparation for injury resulting from breach of *legal* duty [emphasis added]."). In *Corcoran*, 965 F.2d at 1336, written ten years before *Great–West* was issued, the Fifth Circuit wrote about "other appropriate equitable relief" under § 502(a)(3)

> The characterization of equitable relief as encompassing damages necessary to make the plaintiff whole may well be consistent with the trust law principles that were incorporated into ERISA and which guide its interpretation.... Section 205 of the Restatement (Second) of Trusts allows for monetary damages as make whole relief, providing that a beneficiary has "the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust" or "of pursuing a remedy which will put him in the position in which he would have been if the trustee had not committed the breach of trust." In the context of the breach of a trustee's investment duties, "the general rule [is] that the object of damages is to make the injured party whole, that is, to put him in the same condition in which he would have been if the wrong had not been committed...."
> Both direct and consequential damages may be awarded.... [citations, some to the same sources as are relied upon by the *Tittle* Plaintiffs, omitted]

*Id.* at 1336. Moreover, in view of the preemption by ERISA of the plaintiffs' tort claim, the appellate court concluded that assuming that make-whole relief "is a proper construction of that section," it was not available to the plaintiffs because such extracontractual, make-whole damages for emotional distress and mental anguish are not available on a contract between a patient and a physician unless there is an express agreement to perform a particular service or achieve a particular cure, not present in the plan booklet, as well as the fact that it was "dubious" whether the relationship at issue constituted a fiduciary doctor-patient relationship that would support a contractual theory of recovery. *Corcoran*, 965 F.2d at 1336–38. It further wistfully noted that plaintiffs "have no remedy, state or federal, for what may have been a serious mistake." *Id.* at 1338.

In *Corcoran*, however, the Fifth Circuit did not conclude as a certainty that make-whole relief is available under § 502(a)(3), but entertained it as a possibility, as it indicated in a later opinion. *Rogers v. Hartford Life and Acc. Ins. Co.*, 167 F.3d 933, 944 (5th Cir.1999)("[I]n *Corcoran*, we assumed without deciding, that the 'other appropriate equitable relief' provided for in section 502(a)(3) encompassed 'damages necessary to make the plaintiff whole.' "). Five years after *Corcoran*, after the issuance of *Mertens* but still before *Great–West*, the Fifth Circuit concluded in *Rogers* that under *Mertens*, 508 U.S. at 255, 113 S.Ct. 2063, such "make whole" relief was actually compensatory, i.e., legal, relief not recoverable under § 502(a)(3). 167 F.3d at 944.

More to the point of Plaintiffs' argument that they are entitled to "make-whole" monetary relief under § 502(a)(3) in *Rogers*, 167 F.3d at 944, the Fifth Circuit opined that it was not typical equitable relief:

> Although our decision in *Corcoran* may have "left the door open" to the possibility of recovering certain extra-contractual damages necessary to make a plaintiff whole, the Supreme Court firmly closed this door in *Mertens* .... In *Mertens*, the Supreme Court rejected the petitioners' arguments that ERISA permitted a remedy calculated to make them whole, holding that ERISA does not

permit recovery of compensatory damages. As the Supreme Court stated,

> Petitioners maintain that the object of their suit is "appropriate equitable relief" under § 502(a)(3) .... They do not, however, seek a remedy traditionally viewed as "equitable," such as an injunction or restitution.... Although they often dance around the word, what petitioners seek is nothing more than compensatory damages for all losses their plan sustained as a result of the alleged breach of fiduciary duties. Money damages are, of course, the classic form of legal relief....

*Rogers,* 167 F.3d at 944, *quoting Mertens,* 508 U.S. at 255, 113 S.Ct. 2063. The Fifth Circuit concluded, "Thus compensatory damages, whether extra-contractual or not, are not recoverable under ERISA." *Id.* This conclusion came even before *Great–West's* restrictive definition of equitable restitution.

Furthermore *Tittle* Plaintiffs urge that *Mertens* and *Great–West* were not suits against an employer/fiduciary for an alleged breach of fiduciary duty, but only suits against a non-fiduciary for unjust enrichment, unlike *Tittle* Plaintiffs here The Court finds that *Tittle* Plaintiffs' distinction is without merit. In *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138 (2d Cir.1999)(holding that "equitable relief" or "make-whole" relief under § 502(a)(3) includes compensatory damages for breach of fiduciary duty), another *pre-Great–West* case, the Second Circuit reviewed an action and agreed with many of the same arguments put forth by *Tittle* Plaintiffs here. It concluded that under § 502(a)(3) a half a million dollars was recoverable as "equitable relief." The "make-whole" relief in *Strom* was money that a plaintiff/widow would have received in life insurance proceeds under the terms of an ERISA plan had her deceased husband's employer not breached its fiduciary duty by failing to send timely his application to the insurer, with the result that the husband's life insurance did not become effective before his death. The Second Circuit found that the monetary relief sought was like that traditionally sought in an equitable action to enforce duties of loyalty and prudence owed by a fiduciary to a trust. After a lengthy and detailed analysis based on the same basic argument as *Tittle* Plaintiffs make here, the Second Circuit described the action as follows:

> Here, the gravamen of the claim against Goldman is not that it holds property which in equity and good conscience belongs to the plaintiff and which must be surrendered to avoid unjust enrichment. Rather the claim is that Goldman was a fiduciary within the meaning of ERISA and that it breached its fiduciary duty. Its analog is the conventional action by a *cestui que trust* against a trustee for breach of trust.
>
> Claims of this sort do not depend upon the fiction of constructive trusts but on the positive duties of loyalty and prudence owed by fiduciaries to their beneficiaries. They have lain at the heart of equitable jurisdiction from time immemorial.

*Id.* at 144.

In the aftermath of *Great–West,* however, although the Second Circuit has not re-examined its holding in *Strom,* several of its district courts have and have concluded that it has been abrogated. For example, in *Kishter v. Principal Life Ins. Co.,* 186 F.Supp.2d 438, 444–45 (S.D.N.Y.2002)(granting summary judgment to defendants on a claim brought by an executor of an ERISA beneficiary's estate, who sued to recover money that the beneficiary would have received if the defendants had not allegedly breached their fiduciary duty by failing to provide information about a life insurance policy), the

district court concluded that "there is substantial reason to believe that *Great–West Life* has repudiated *Strom* and its reasoning" and documented how the majority of the Supreme Court in *Great–West* "expressly rejected" each of the arguments on which the *Strom* decision was founded.[103] In *De Pace v. Matsushita Elec. Corp. of America,* 257 F.Supp.2d 543, 561–63 (E.D.N.Y.2003), the court found that the monetary relief sought by former employees claiming that they were fraudulently induced by their employer to participate in a voluntary resignation program was a tort-related monetary remedy that did not constitute "equitable relief" under § 502(a)(3) as construed in *Great–West.* Furthermore, in *Bona v. Barasch,* No. 01 CIV. 2289(MBM), 2003 WL 1395932 (S.D.N.Y. Mar. 20, 2003), individual participants and beneficiaries of union employee benefit funds sued the funds' trustees, as well as the companies and officers involved in the management and investment services to those funds *inter alia,* claiming they had manipulated the services contracts to increase the fees and enrich themselves, i.e., failed to manage the funds prudently. The district court announced that *"Strom*'s holding cannot be reconciled with *Great–West,"* and addressed the specific distinction argued by *Tittle* Plaintiffs:

> On the surface *Strom* might be distinguished from *Great–West* because *Strom* involved an alleged breach of fiduciary duty, and "[a]n alleged breach of fiduciary duty always has been within the exclusive jurisdiction of equity." *Strom,* 202 F.3d at 145. However the broad

language in *Great–West* suggests otherwise.

*Id.* at \*11, *citing Kishter,* 186 F.Supp.2d at 444–45. The *Bona* judge concluded that the individual plaintiffs' request for monetary relief from the trustees was barred. *Id.*

The Fourth Circuit also has applied the holdings in *Mertens* and *Great–West* to a suit asserting breach of fiduciary duty and rejected the contention that "any remedy, when sought for breach of fiduciary duty, is always an equitable remedy." *Rego v. Westvaco Corp.,* 319 F.3d 140, 145 (4th Cir.2003). In *Rego* a plan participant sued his employer, two ERISA-governed employee benefit plans (a Savings Plan and a pension plan), and the administrator of the plans, alleging *inter alia* breach of fiduciary duty in that they had failed to provide him with complete and accurate information about his benefit plans after he requested it in breach of their fiduciary duties and had prevented him from withdrawing his share of one of the plans in time to take advantage of a high price for the stock in the plan. He sought specific performance under § 502(a)(3) in the form of an order from the court that defendants issue to him Westvaco stock equal in value to the difference in the amount of money the stock was valued at on October 21, 1997 and on March 2, 1999. *Id.* at 144–45. Rego argued that at common law a beneficiary could only bring actions for breach of fiduciary duty by a trustee in equity and thus any remedy for such a cause of action "is always an equitable remedy." *Id.* at 145.

---

**103.** These included *Great–West*'s rejection of (1) the contention that " 'the special equity-court powers applicable to trust define the reach of § 502(a)(3)' "; (2) that there is equitable restitution outside of restoration of money or property identified as belonging in good conscience to the plaintiff that can be traced to money or property still in the defendant' possession; (3) that equitable remedies include what were in actuality forced monetary payments (of insurance proceeds); (4) the analogy of such monetary relief to back-pay under Title VI; and the argument that under the statements in *Varity Corp.,* § 502(a)(3) had to be read broadly to provide catch-all remedies for ERISA violations that were not covered by the other provisions in § 502(a). *Id.* at 444–45.

The Fourth Circuit disagreed and quoted from *Mertens*, 508 U.S. at 256–57, 113 S.Ct. 2063 (rejecting this argument because it would render the adjective " 'equitable' " superfluous because " '*all* relief available for breach of trust could be obtained from a court of equity' "); Section 502(a)(3), 29 U.S.C. § 1132(a)(3), "authorizes only 'those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages.' "), and *Great–West*, 534 U.S. at 213–14, 122 S.Ct. 708 (generally a claim for equitable restitution may not seek " 'to impose *personal* liability on the defendant but to restore to the plaintiff particular funds or property in the defendant's possession,' " i.e., "money or property identified as belonging in good conscience to the plaintiff [that] could clearly be traced to particular funds or property in the defendant's possession.' "). 319 F.3d at 145. The Fourth Circuit found that the defendants possessed no particular fund or property that could clearly be identified as belonging in good conscience to Rego and that Rego's share of his Savings Plan had long ago been transferred to him and was no longer in defendants' possession. *Id.*

This Court is in full agreement with these cases. *Corcoran* and *Strom* are no longer good law. No matter how artfully pled, "make-whole" relief for a claim of breach of fiduciary duty by a trustee cannot cloak a claim for compensatory damages. Whether monetary relief is available under § 502(a)(3) under *Great West's* analysis depends upon whether it constitutes equitable restitution as defined by the majority, i.e., whether it is a type of relief that was *typically* available in equity and whether the suit seeks "to restore to the plaintiff particular funds or property in the defendant's possession." 534 U.S. at 214, 122 S.Ct. 708.[104]

As a general matter, the Fifth Circuit has held that as long as the plaintiff is entitled to some type of relief under the ERISA, pleading of an unavailable remedy or failure to specify a particular kind of equitable relief to which the plaintiff claims entitlement will not result in dismissal. *Heimann v. Nat'l Elevator Industry Pension Fund*, 187 F.3d 493, 511 (5th Cir.1999)[105] (holding that the plain-

**104.** Even before the *Great–West* decision was handed down, the Sixth Circuit had also rejected the *Strom* decision. *Helfrich v. PNC Bank, Kentucky, Inc.*, 267 F.3d 477, 482 n. 5 (6th Cir.2001), *cert. denied*, 535 U.S. 928, 122 S.Ct. 1298, 152 L.Ed.2d 210 (2002). In *Helfrich*, a plan participant sought monetary compensation for losses he suffered when the defendant plan administrator failed to follow the participant's instructions to transfer the assets in his 401(k) profit-sharing plan to better performing mutual funds. The Sixth Circuit, reversing the district court's denial of the defendant's motion to dismiss, concluded that such relief constituted money damages, not restitution. *Id.* at 482–83 ("ERISA does not permit plan beneficiaries to claim money damages from plan fiduciaries.... Helfrich denominated his requested relief as 'restitution' while measuring that relief with reference to his losses rather than [the defendant's] gains. That measure is the hallmark of money dam-

ages."). The appellate court further observed,

> Had [the plan administrator] invested [Helfrich's] money for its own benefit in a separate unauthorized, but better performing account, [the plan administrator] would be liable to Helfrich in restitution for the principal and its ill-begotten gain. Helfrich's principal has, however, been restored and there is no allegation that [the plan administrator] profited by its improper maneuver. As such, there is nothing to *restore* to Helfrich, and therefore there is no basis for restitutionary relief.

*Id.* at 481. *See also Ostler v. OCE–USA, Inc.*, No. 00 C 7753, 2001 WL 1191183, *2 (N.D.Ill. 2001) (rejecting *Strom*).

**105.** *Heimann* was overruled on other grounds in *Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir.2003).

tiffs' suit should not be dismissed even though they failed to specify that they were seeking equitable relief), *citing Doss v. South Central Bell Tel. Co.*, 834 F.2d 421, 423 n. 3 (5th Cir.1987)("The court stated that it dismissed those claims because the plaintiff had requested legal relief rather than the equitable relief authorized by Title VII. However, demand of an improper remedy is not fatal to a party's pleading if the statement of the claim is otherwise sufficient to show entitlement to a different form of relief."); and Fed. R.Civ.P. 54(c)("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.").

With respect to the lockdown claims under Count II, brought on behalf of the Savings Plan and the ESOP, Defendants have argued that Plaintiffs lack standing because they have not alleged that they, personally, complained about the lockdown at the time or that they would have ordered Northern Trust to sell their Enron stock had the lockdown not been imposed. The Court sees no reason, and Defendants provide no authority, for the proposition that Plaintiffs had to show that they, personally, complained in order to assert their claim that Defendants breached their fiduciary duty in proceeding with the lockdowns despite protests (notice, warning) from numerous plan participants. The general outcry, which has not been denied by Defendants, was sufficient to put

Northern Trust on notice of the threat posed by the lockdowns.

■ Furthermore, Plaintiffs provide authority for their insistence that they do not have the burden of proving loss to the plans here, citing *Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985). In *Bierwirth*, the Second Circuit held that under § 409 [and § 502(a)(2) [106]] the "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Id., citing* Restatement (Second) of Trusts § 205 (1959).[107] The Second Circuit explained,

In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.... [O]nce a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer.

*Id.* (if, but for the breach, the trust fund would have earned more than it actually

---

**106.** In contrast to § 502(a)(3)'s "appropriate equitable relief," § 502(a)(2) allows a plan participant to sue for "appropriate relief" for a breach of fiduciary duty under § 409, 29 U.S.C. § 1109, which in turn provides that a fiduciary breaching his fiduciary duty may be "personally liable to make good to such plan any losses to the plan resulting from each such breach."

**107.** Section 205 provides,

If the trustee commits a breach of trust, he is chargeable with
(a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or
(b) any profit made by him through the breach of trust; or
(c) any profit which would have accrued to the trust estate if there had been no breach of trust.

earned, there is a "loss" to the plan), *citing Leigh v. Engle,* 727 F.2d at 138 ("[W]e believe that the burden is on the defendants who are found to have breached their fiduciary duties to show which profits are attributable to their own investments apart from their control of the ... [t]rust assets. . . . [W]hile the court may be able to make only a rough approximation, it should resolve doubts in favor of the plaintiffs."). *See also Dardaganis v. Grace Capital Inc.,* 889 F.2d 1237, 1243–44 (2d Cir.1989)("uncertainties in fixing damages will generally be resolved against the defendant," except where "the defendant comes forward with particularly reliable evidence that, had the funds not been improperly invested, they would have been put into a particular alternate investments"); *Meyer v. Berkshire Life Ins. Co.,* 250 F.Supp.2d 544, 572 n. 36 (D.Md.2003).

 ERISA does not provide for recovery of extra contractual damages (e.g., punitive damages, damages for emotional distress). *Mass. Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Mertens,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161. An award of pre-judgment interest is discretionary with the court. *See, e.g., Di-*

*duck v. Kaszycki & Sons Contractors Inc.,* 974 F.2d 270, 286 (2d Cir.1992); *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 131–32 (3d Cir.2000).

**5. Service on and Liability of the Administrative Committees of the Plans as Unincorporated Associations**

Federal Rule of Civil Procedure 17(b), addressing "Capacity to Sue or to be Sued" for a federal statutory claim, indicates in relevant part that other than an individual or a corporation,

> [i]n all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or the laws of the United States . . . . [108]

Defendants Enron Corp. Savings Plan Administrative Committee, the Administrative Committee of the Enron Corp. Cash Balance Plan, and the Administrative Committee of the Enron Employee Stock Ownership Plan [109] identify themselves as

---

108. *See also* Fed. R. Civ. p. 23.2, in relevant part: "An action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will fairly and adequately protect the interests of the association and its members." Advisory Committee Notes to the rule make clear, "Although an action by or against representatives of the membership of an unincorporated association has often been viewed as a class action, the real or main purpose of this characterization has been to give 'entity treatment' to the association when for formal reasons it cannot sue or be sued as a jural person under Rule 17(b)."

109. The complaint designates twelve members of the Committees as "Enron ERISA Defendants" and fiduciaries with respect to the Savings Plan and ESOP Plan because they exercised control with respect to management of the assets of those plans, rendered investment advice for a fee or other compensation or had the authority to do so, and had discretionary authority or responsibility in the administration of one or more of all three plans, with respect to allegations in Counts I–IV. According to Plaintiffs, the membership of the three committees "was apparently at all times co-extensive and identical for each of the Plans." # 315 at 3. The complaint also identifies Blake, LeMaistre, Duncan and Jaedicke as "Compensation Committee Directors," and charges in Count V that they, along with Kenneth Lay, had and/or exercised the re-

"unincorporated associations," but not under Texas law, and move to dismiss on the grounds that (1) they are not legal entities capable of being sued under the law of Texas, (2) retaining the Committees as parties to this action is "impractical, unnecessary, and inappropriate" under ERISA, (3) they have not been properly served, and (4) they should be dismissed because their individual committee members should be dismissed.

Defendants argue that under the law of Texas "an unincorporated association is a voluntary group of persons without a charter formed by mutual consent for the purposes of promoting a common enterprise," which includes "churches, voters' groups, homeowners' associations, unions, and social groups such as the Independent Order of Odd Fellows." #231 at 2, *citing inter alia Cox v. Thee Evergreen Church*, 836 S.W.2d 167, 169 (Tex.1992); *Citizens for Fair Taxes v. Sweetwater Indep. School Dist. Bd. of Trustees*, 807 S.W.2d 451, 452 (Tex.App.—Eastland 1991), motion to file mandamus overruled; *Dutcher v. Owens*, 647 S.W.2d 948, 950 (Tex.1983).

 Committee Defendants argue that they do not fit the Texas definition of unincorporated associations because their service on the Plan Committees was not completely voluntary since the members are employees of Enron, appointed to the committee by Enron, removable by Enron, and their membership ceases if they cease employment by Enron. Thus membership is a function of their employment rather than a voluntary activity undertaken for their own purposes. Defendants further argue that they do not exhibit other characteristics of unincorporated associations, such as (i) a membership too large to join

feasibly all members as defendants; (ii) operation under a constitution, bylaws, or other detailed organizational documents; (iii) accumulation of funds by the association for its own use; (iv) the conduct of business or other activities under its own name and for its own benefit or in furtherance of its own interests. #231 at 3 (no authority cited).

Defendants also contend that under Plan documents, they act solely on behalf of the plans and their participants and beneficiaries and were never considered separate legal entities with the power to enter into contracts or conduct business for their own benefit. Nor have they registered as an association with Harris County. Tex. Bus. & Com.Code § 36.10 (2002)("Any person who regularly conducts business or renders professional services other than as a corporation, limited partnership, registered limited liability partnership, or limited liability company in this state under an assumed name shall file in the office of the county clerk in each county in which such person has or will maintain business or professional premises or, if no business or professional premises are or will be maintained in any county, in each county where such person conducts business or renders a professional service, a certificate ....").[110]

Plaintiffs respond that Defendants' argument is meritless because "a cursory search of the Westlaw or Lexis computer databases for cases involving ERISA claims of fiduciary breach in which a plan 'Admin. Committee' is named a defendant yields a score of cases ...." #315 at 21. Plaintiffs do not provide any legal authori-

---

sponsibility on behalf of Enron for appointing and monitoring the Plans' other Plan fiduciaries.

110. Defendants have failed to explain or cite any authority demonstrating that § 36.10 applies to an administrative committee of an employee benefit retirement plan of a corporation.

ty to support their claim that these committees are suable.

After reviewing the law related to the issue, the Court finds that Defendants' challenge is frivolous. First the Court points out that Defendants' list of typical unincorporated associations and their usual characteristics is not exclusive and that unincorporated associations have proved difficult to pigeonhole and have resulted in development of special and often flexible rules. *Cox*, 836 S.W.2d at 169 n. 3 ("Unincorporated associations long have been a problem for the law. They are analogous to partnerships and yet not partnerships; analogous to corporations, and yet not corporations . . . ."); *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1286 (5th Cir.1994)(analogically extending the law of unincorporated nonprofit associations to persons affiliated with and to unincorporated political campaign committees even though the latter are not organized with bylaws, membership rosters, or other instruments of governance or formalities characteristic of the unincorporated association). Although Defendants cite *Cox* as authority on the characteristics of an unincorporated association under Texas law, the Texas Supreme Court stated in that case. "[A]n issue regarding what constitutes an unincorporated association is not before this Court." 836 S.W.2d at 169 n. 1. Furthermore, issues such as whether the members' services were "voluntary" or whether or not the Administrative Committees are unincorporated associations under Texas law are questions which can only be answered after a factual record has been established. Moreover, assuming that the Administrative Committees are unincorporated associations, from the record before it, the Court cannot be sure whether they are nonprofit associations subject to the law of agency or they are associations organized for profit or to conduct a business, subject to the principles of partnership law. *Karl Rove*, 39 F.3d at 1284–85.

As for the merits of Defendants' argument, at common law an unincorporated association was not recognized as a legal entity, was not suable in its own name, but only in the name of its members, had no existence separate from that of its individual members, and one member's personal liability could not be enforced against any other members unless they also expressly or impliedly assented to, authorized or ratified the transaction on which liability was based. *Karl Rove*, 39 F.3d at 1285; *Cox v. Thee Evergreen Church*, 836 S.W.2d 167, 168–69 (Tex.1992); *Beta Beta Chapter of Beta Theta Pi Fraternity v. May*, 611 So.2d 889, 892 (Miss.1992). The reason for holding individual members personally liable was that since the unincorporated association was not recognized as a legal entity, no judgment could be rendered against it for contracts it entered into or torts that it may have perpetrated. *Karl Rove*, 39 F.3d at 1285 n. 14.

Since that time, many states and the federal government have passed statutes that expressly or impliedly authorize suits by and against unincorporated associations. *Id.* at 1285–86; *Beta Beta*, 611 So.2d at 891–92. It has become "well-established that the members of an unincorporated association may be sued, 'as to third parties, under the association's assumed name as a legal entity.'" *Gonzales v. American Postal Workers Union, AFL–CIO*, 948 S.W.2d 794, 798 (Tex.App.—San Antonio 1997, writ denied), *citing Cox*, 836 S.W.2d at 171. *See also Hutchins v. Grace Tabernacle United Pentecostal Church*, 804 S.W.2d 598, 600 (Tex.App.-Houston [1st Dist.] 1991, no writ)(Texas Rule of Civil Procedure 28 authorizes suit by or against an unincorporated association in the common name for purpose of defending or enforcing a substantive right, but

does not enlarge or diminish any substantive rights or obligations of parties.). The authorization by statute for an unincorporated association to act as a legal entity in its own name need not be express, but may rise by implication from a statute. *Beta Beta*, 611 So.2d at 893–94. ERISA, which provides the substantive law here, expressly contemplates that when an administrative committee acts in the denial of plan benefits or as a fiduciary in breach of its fiduciary duties, it may be sued. In Texas, a statute now authorizes suits against an unincorporated association; furthermore the recognition of such a group as a jural person with entity status expressly does not "affect nor impair ... the right of a plaintiff to sue in the individual names of ... members." Tex.Rev.Civ. Stat. Ann. arts. 6133 ("Any unincorporated ... association, whether foreign or domestic, doing business in this State, may sue or be sued in any court of this state having jurisdiction of the subject matter in its company or distinguishing name; and it shall not be necessary to make the individual ... members thereof parties to the suit.") and 6138 (Vernon 1970 and Supp.2003); *Kerney v. Fort Griffin Fandangle Ass'n, Inc.*, 624 F.2d 717, 719–20 (5th Cir.1980). Thus contrary to Defendants' arguments, it appears that Plaintiffs may sue both the unincorporated association and its members in Texas. Moreover, like Fed.R.Civ.P. 17(b), Texas Rule of Civil Procedure 28 ("Any ... unincorporated association ... may sue or be sued in its ... common name for the purpose of enforcing for or against it a substantive right") has been construed to permit such organizations a procedural right to sue or be sued as legal entities in their names. *Cox*, 836 S.W.2d at 171–73.

Although Defendants argue that Plaintiffs should not be allowed to sue the unincorporated association and them, individually, this contention also lacks merit. In *Karl Rove*, 39 F.3d at 1286, the Fifth Circuit addressed this issue:

One could argue, therefore, that it is no longer necessary or even appropriate for the laws of these jurisdictions to permit third parties to sue individually the members of an association for the contract debts incurred by the association in its own name. The argument would go as follows: The third party is no longer being misled or deceived about a nonexistent principal; such a party is contracting with a disclosed juridical entity, the assets of which can be reached to satisfy any debt that the association may owe.

As appealing and logical as that argument might appear, however, that is not the way the law has developed. The courts of the states that have adopted statutes permitting suit against unincorporated associations have not altered or supplanted the preexisting common law rule governing the personal liability of association members. The courts of both Pennsylvania and Texas have continued to hew this line. [footnotes omitted]

As for service, under Federal Rule of Civil Procedure 4(h)(1), in relevant part,

service upon ... a partnership or other unincorporated association that is subject to suit under a common name, and from which a waiver of service has not been obtained and filed, shall be effected ... in a judicial district of the United States in the manner prescribed for individuals by subdivision (e)(1), or by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or law to receive service of process ....

*See also,* for recognized connections between unincorporated associations and partnerships insofar as defending a lawsuit is concerned, *Penrod Drilling Co. v. Johnson*, 414 F.2d 1217, 1219–25 (5th Cir.1969),

*cert. denied,* 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 495 (1970). A plaintiff suing an unincorporated association may either serve the entity under its common name or serve authorized individuals who comprise the group. *See, e.g., Furek v. Univ. of Del.,* 594 A.2d 506, 513–14 (Del.Supr.1991).

Administrative Committee Defendants have argued that they were not personally served. Plaintiffs state in a footnote, # 315 at 22 n. 10, "The Admin. Committee's claim that as of the date of its filing it has not 'been properly served with *any* complaint' is surprising in light of its counsel's agreement to accept service of the *Kemperer* complaint, consolidated herewith. If counsel is now withdrawing his agreement to accept service on behalf of the Committee, that can and will be promptly remedied through the use of a process server...." If there is still a valid challenge that Defendants have not been properly served, the Court directs Defendants to file a specific motion to that effect.

Finally Defendants have contended that because the Enron bankruptcy court appointed State Street Bank and Trust Company to take over their duties, and because they no longer have any assets that could be used to satisfy a judgment nor any power to cause recalculation and redistribution of benefits, a suit against them has no purpose. Plaintiffs' response is sufficient to deny the motion to dismiss: they seek declaratory as well as legal and equitable relief and co-fiduciary liability of others. Moreover they are entitled to discovery to determine whether there are any assets now controlled by the independent fiduciary that would be available to satisfy a judgment, if one is obtained.

**B. RICO Amendment**

Section 107 ("the RICO Amendment") of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as amended, 18

U.S.C. § 1964(c), to eliminate securities fraud as a predicate act under § 1961(1) for a private cause of action under RICO:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date the conviction becomes final.*

18 U.S.C. § 1964(c)(emphasis added).

Before the RICO Amendment, a plaintiff could allege a private civil RICO claim for securities laws violations sounding in fraud because "fraud in the sale of securities" was listed as a predicate offense. *Bald Eagle Area School Dist. v. Keystone Financial, Inc.,* 189 F.3d 321, 327 (3d Cir. 1999) (*citing Sedima v. Imrex Company, Inc.,* 473 U.S. 479, 504–05, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (Marshall, J., dissenting)), *cert. denied,* 526 U.S. 1067 (1999).

The Conference Committee Report for § 107 makes clear that the RICO Amendment was intended by Congress "to eliminate securities fraud as a predicate offense in a civil RICO action" and to bar a plaintiff from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." *Bald Eagle,* 189 F.3d at 327, *quoting* H.R.

Conf. Rep. No. 104–369, at 47 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 746. *See also Mathews v. Kidder Peabody & Co., Inc.,* 161 F.3d 156, 157 (3d Cir.1998) (The PSLRA amended 18 U.S.C. § 1964 "to eliminate, as a predicate act for a private cause of action under [RICO], any conduct actionable as fraud in the purchase or sale of securities"), *cert. denied,* 526 U.S. 1067, 119 S.Ct. 1460, 143 L.Ed.2d 546 (1999); *Scott v. Boos,* 215 F.3d 940, 945 (9th Cir.2000); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 86 F.Supp.2d 481, 487 (E.D.Pa.2000) (Congressional intent behind the RICO Amendment "was substantive—to deprive plaintiffs of the right to bring securities fraud based RICO claims."); *Heffernan v. HSBC Bank USA,* No. 1:99CV07981, 2001 WL 803719, *1–2 (E.D.N.Y. Mar. 29, 2001); *Mezzonen, S.A. v. Wright,* No. 97 CIV 9380 LMM, 1999 WL 1037866, *3–4 (S.D.N.Y. Nov. 16, 1999); *Krear v. Malek,* 961 F.Supp. 1065, 1074–75 (E.D.Mich. Mar.31, 1997); *Ostler v. The Codman Research Group, Inc.,* No. CIV. 98–356–JD, 1999 WL 1059684, *6 (D.N.H. April 20, 1999); *ABF Capital Management v. Askin Capital Management, Inc.,* 957 F.Supp. 1308, 1319 (S.D.N.Y.1997).[111]

The RICO Amendment's "focus" was on "completely eliminating the so-called 'treble damage blunderbuss of RICO' in securities fraud cases." *Mathews v. Kidder, Peabody & Co., Inc.,* 161 F.3d at 157 (quoting 141 Cong. Rec. H2771). *See also Hemispherx Biopharma, Inc. v. Asensio,* No. CIV. A. 98–5204, 1999 WL 144109, *4 (E.D.Pa. Mar. 15, 1999) ("The legislative

history indicates that Congress intended that RICO, which provides treble damages and attorney's fees, not be used for securities fraud claims at all because there were, generally speaking, other statutes that more appropriately provided for recovery in such cases.").

Thus if Defendants' alleged misconduct to support a claim is characterized by the plaintiff as wire, mail, or bank fraud, but also "amounts to securities fraud," the court should not permit a "surgical presentation" of the cause of action to "undermine the congressional intent behind the RICO Amendment." *Bald Eagle,* 189 F.3d at 329–30; *Burton v. Ken–Crest Services, Inc.,* 127 F.Supp.2d 673, 677 (E.D.Pa.2001) (After Plaintiff recast as embezzlement and theft his claims that he was deprived of his legal right to select investments in his pension plan after plan officials with conflicts of interest chose low-yielding investments, the court opined, "[T]here is no question that the whole of Plaintiff's allegations concern a fraudulent transaction of securities. Plaintiff cannot magically revive his claim by picking out discrete details of his allegations and then claiming that they are not actionable as securities fraud."); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 86 F.Supp.2d 481, 486–87 (E.D.Pa.2000) (where plaintiff alleged as predicate acts accounting improprieties that were effected to provide certain individuals with large bonuses, but where they also inflated stock prices, the court found the acts actionable as securi-

---

**111.** Based on the language of the legislative history, the district court in *Krear,* 961 F.Supp. at 1074, asked "whether the amendment applies only to plaintiffs' predicate acts alleging securities fraud or to those alleging mail and wire fraud," and concluded, "It is abundantly clear that Congress intended that conduct constituting wire and mail fraud not form the basis of a predicate act under the

amendment if such conduct would also be actionable as securities fraud. Since plaintiffs herein have pleaded predicate acts of mail fraud [and] wire fraud based on conduct that also forms the basis of their claims of securities fraud, all of plaintiffs' RICO claims must be dismissed unless an exception applies."

ties fraud, the court dismissed "regardless of the injury alleged").

In *Bald Eagle*, a number of school districts sued a bank that was custodian of funds that they had collected from bonds, loans and other revenues and that acted according to investment directions from the plaintiffs' investment advisor. That bank in turn was a knowing and essential participant with the investment advisor in a Ponzi scheme involving numerous acts of what the plaintiffs characterized as bank, mail and wire fraud which defrauded the school districts of approximately $70 million. The bank used the funds in impermissible and risky investments in Collateralized Investment Agreements ("CIAs"), fraudulently reported market values as the value declined, failed to maintain the requisite 100% collateral on the assets in its custody, and paid out more money to withdrawing clients than their fair share so the bank could continue to conceal losses and entice new money for investments. Just before the plaintiffs filed their suit, the SEC contemporaneously brought a civil enforcement action based on the same scheme as a securities fraud action. The Third Circuit affirmed the district court's dismissal of the school districts suit as barred by the RICO Amendment.

■ The proper inquiry according to the Third Circuit is not whether the wrongful conduct is "connected to and dependent upon securities fraud," but whether the conduct is "actionable as securities fraud." *Bald Eagle*, 189 F.3d at 330. The Third Circuit rejected plaintiffs' "contention that the conduct alleged as predicate offenses was not in connection with the purchase or sale of securities" on the grounds that their argument

> completely ignores the hard reality that the conduct was an integral part of Black's securities fraud Ponzi scheme. A Ponzi scheme is ongoing, and it continues only as long as new investors can be lured into it so that early investors can be paid a return on their "investment." Consequently, conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities.

*Id.*

■ The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws. The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws; its wording ("no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962") does not make such a connection. *See Hemispherx Biopharma,* 1999 WL 144109 at *4 (agreeing with Defendants that "when Congress stated that 'no person' could bring a civil RICO action alleging conduct that would have been actionable as securities fraud, it meant just that. It did not mean 'no person except one who has no other actionable securities fraud claim.' It did not specify that the conduct had to be actionable as securities fraud by a particular person to serve as a bar to a RICO claim by that same person.").

Even if the provision were deemed unclear or ambiguous, the legislative history indicates a concern that securities fraud defendants not be exposed to multiple kinds of suits and especially the need to limit the "treble damage blunderbuss" of a RICO claim. Chairman of the SEC Arthur Levitt testified before the Telecommunications and Finance Subcommittee of the House Commerce Committee during hearings on the RICO Amendment on

February 10, 1995, *reprinted in* 1996 U.S.C.C.A.N. 679, 746,

> Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both unnecessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO.

*Quoted by Rowe v. Marietta Corp.*, 955 F.Supp. 836, 847 (W.D.Tenn.1997).

Statements, quoted in *Krear*, 961 F.Supp. at 1075–76 n. 16 *(citing* 141 Cong. Rec. H2771), by California Representative Cox, who introduced the bill, explain that the purpose of the RICO Amendment was to provide remedies for injured investors while "reduc[ing] the cost of capital" and limiting the "imposition of excessive penalties on all participants in our capital market", because of RICO's "treble damage blunderbuss" that results in exorbitant litigation costs and imposes the rising costs of raising capital on consumers and emerging innovative companies:

> [O]ur economy's health depends on the efficient operation of America's capital markets. We must continue to balance the provisions of adequate remedies for injured investors and the imposition of excessive penalties on all participants in our capital markets. The treble damage blunderbuss of RICO undermines the balance and imposes exorbitant litigation costs, impedes the raising of capital and ultimately puts these costs on the shoulders of consumers and emerging innovative companies.

*Krear*, 961 F.Supp. at 1075, *citing* 141 Cong. Rec. H2773. Cox also made clear that the amendment, as indicated *supra*, was intended to rein in what many perceived as the misapplication of RICO beyond racketeering and organized crime to matters never intended by Congress, including securities fraud lawsuits, which at the time of the amendment represented

forty percent of the cases brought under RICO. *Id.*, at 1075–76 n. 16. Representative Cox further stated,

> Because many claims that could be asserted as securities claims can also be characterized as mail or wire fraud and because mail and wire fraud are also predicates for civil RICO liability, Plaintiffs' attorneys have a devastating, potent, and readily available alternative for bringing actions under RICO instead of under our securities laws.

*Id.* at 1075 n. 16, *citing* 141 Cong. Rec. H2772. In contrast to the express limitation on actual damages available under federal securities statutes, the availability of treble damages under RICO was leading plaintiffs to craft their pleadings to obtain relief, contrary to Congressional intent. *Id.* at 1076. Representative Cox maintained that passage of the RICO Amendment was necessary to stop attorneys from "doing an end run" around all the reform [of the securities laws] by simply using the RICO statute instead and thereby obtaining "discovery going back 10 years to show a pattern which is part of RICO, not part of the securities laws," and in effect "gin up settlements where a settlement is not in order." *Id.* at 1076, *citing* 141 Cong. Rec. H2771, H27778.

Among the few courts addressing the issue, the Ninth Circuit has held that the RICO Amendment bar applies even if a plaintiff lacks standing to sue under the securities laws because he did not purchase or sell securities. *Howard v. America Online, Inc.*, 208 F.3d 741, 749 (9th Cir.2000) (claims that AOL misrepresented revenues, profits and number of subscribers, used improper accounting practices, and illegally sold stock at a profit were actionable as fraud in the purchase or sale of securities and are barred by the RICO Amendment even though Plaintiffs lack standing to sue for securities fraud), *cert.*

*denied,* 531 U.S. 828, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000). *See also Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.,* 165 F.Supp.2d 1345, 1356–58 (S.D.Fla.2001) ("the fact that Plaintiff–Growers are not DuPont shareholders and therefore cannot bring a securities fraud claim against DuPont does not preclude the use of Section 107 to bar their claim" when it could have been brought " 'by a [different] plaintiff with proper standing' "), *affirmed on other grounds sub nom. Green Leaf Nursery v. E.I. DuPont De Nemours and Co.,* 341 F.3d 1292 (11th Cir.2003); *Columbraria Ltd. v. Pimienta,* 110 F.Supp.2d 542, 548 (S.D.Tex.2000) (RICO Amendment bar applied where plaintiff was time-barred from suing under Rule 10b–5); *Hemispherx Biopharma,* 1999 WL 144109 at *4–5 (holding that the RICO Amendment barred suit even though plaintiffs had no cause of action under § 10(b) of the Securities Exchange Act).

 In an attempt to preserve their RICO claims, *Tittle* Plaintiffs have argued that unlike predicate acts of mail and wire fraud, their predicate acts of embezzlement (18 U.S.C. § 664), obstruction of justice (18 U.S.C. § 1512), and interstate transportation offenses (18 U.S.C. § 2314) do not sound in fraud and therefore cannot be barred by the RICO Amendment as a matter of law. This Court disagrees. Plaintiffs have clearly alleged five types of named predicate acts that are parts of an overarching scheme and conspiracy to defraud current and prospective shareholders of Enron stock in a Ponzi scheme, with all alleged acts and omissions intended to achieve the same goal, personal enrichment of Defendants at the expense of the corporation, its shareholders, and its ERISA plan participants and beneficiaries. A "scheme to defraud" necessarily embraces " '[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with prop-

erty or to surrender some legal right, and which accomplishes the designed end.' To allege intentional fraud there must be 'proof of misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension [citations omitted].' " *Kenty v. Bank One, Columbus, N.A.,* 92 F.3d 384, 389–90 (6th Cir.1996). While a "scheme to defraud" is an express element of mail and wire fraud, the complaint's allegations explicitly relate to all the other predicate acts charged, i.e., embezzlement, obstruction of justice and interstate transportation, to lure and keep Enron investors in an overarching Ponzi scheme to defraud. Any conduct that sustains a securities fraud Ponzi scheme is intrinsically conduct undertaken "in connection with the purchase or sale of securities" and is barred by the RICO Amendment. *Bald Eagle,* 189 F.3d at 330.

Similarly, *Tittle* Plaintiffs attempt to limit § 10(b) violations to statements of misrepresentation or omissions. The Court refers the parties to its memorandum and order of December 19, 2002, # 1194, in *Newby,* for its more inclusive determination that § 10(b) and Rule 10b–5 also reach a course of business, a deceptive device, and/or a scheme or artifice that operated as a fraud on sellers or purchasers of securities.

There is little case law addressing the application of the last sentence of § 107, 18 U.S.C. § 1964(c)("The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date the conviction becomes final"), dubbed the "criminal conviction exception." The exception was an issue of first impression in *Krear v. Malek,* 961 F.Supp. 1065 (E.D.Mich.1997), which noted that "the

Congressional record is devoid of any substantive discussion of the exception." 961 F.Supp. at 1074.

In a multi-defendant case, the *Krear* court dismissed all RICO claims against one defendant who had not been convicted, noting that if he were subsequently convicted, he could be sued again because the RICO Amendment explicitly provides that the statute of limitations does not start to run until the conviction becomes final. *Id.* at 1076 n. 17. The defendant who had pleaded guilty to an information, which also named other persons who had not pleaded guilty, argued that the conviction exception applied to them, too, because his conviction was based on a Ponzi scheme involving all the defendants. *Id.* at 1076. The court rejected this argument and found that in light of evidence that "Congress was weary of the susceptibility of civil RICO to litigation abuses in the securities fraud area," the court would "interpret the 'conviction exception' as narrowly as possible so that the exception is only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud.... [T]o find otherwise, plaintiffs who were not found to have been criminally defrauded would be allowed to 'bootstrap' their RICO claims to the claims of those plaintiffs who were found to have been criminally defrauded. This would necessarily cause the 'conviction exception' to swallow the rule which prohibits civil RICO claims for securities fraud." *Id.* "Simply put, those plaintiffs who were not found to have been criminally defrauded, cannot, by merely asserting that a Ponzi scheme existed, invoke the 'criminal exception.'" *Id.* at 1077. *See also Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.,* 165 F.Supp.2d 1345, 1356–57 (S.D.Fla.2001)("Section 107's

criminal conviction exception only applies to persons that have been criminally convicted in connection with the fraud ...."）(*citing Krear,* 961 F.Supp. at 1076, ("[T]he exception is only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud.")), *affirmed on other grounds sub nom. Green Leaf Nursery v. E.I. DuPont De Nemours and Co.,* 341 F.3d 1292 (11th Cir.2003).

Moreover, the legislative history also indicates that the conviction exception applies only to a defendant that has been criminally convicted. Senator Biden had offered a broader statement of the conviction exception than that ultimately enacted: "if any participant in the fraud is criminally convicted in connection therewith." 141 Cong. Rec. § 9150, § 9163 (amendment 1481). The Conference Committee rejected such language in favor the more restricted exception that was passed, with Senator Biden noting the distinction:

> Under an amendment I offered, the Senate bill allowed the RICO statute to be used in a securities fraud civil case if at least one person in the civil case has been criminally convicted. Under this bill, RICO could only be used in the civil case against the person who was actually criminally convicted.

141 Cong. Rec. S17991, S17992 (Dec. 5, 1995); *see also Krear,* 961 F.Supp. at 1075 n. 14.

Thus although Plaintiffs argue that because of the guilty plea of Michael Kopper to conspiracy to commit wire fraud and money laundering and Arthur Andersen's conviction for obstruction of justice,[112] all Defendants fall within the criminal exception. This Court disagrees. The language of the § 107's conviction exception is plain

---

**112.** The Court notes that David Duncan has also entered a guilty plea to obstruction of

justice.

and unambiguous; even if it were not, the legislative history reflects, and the available case law supports, the Court's conclusion that the securities-fraud-based RICO claims can be used only against the particular defendant that was criminally convicted of fraud.

■ Moreover, it is unclear at what point the "criminal conviction" exception is triggered; the statute does not state when the criminal exception claim accrues, but indicates that limitations does not begin to run until the conviction becomes *final*, not yet the case with Kopper and David Duncan, who have not been sentenced. Indeed Kopper recently filed a motion to stay discovery in the civil cases based on his indictment. Arthur Andersen's conviction and sentence are being appealed, and thus its conviction is not final. Others remain under indictment awaiting trial. In the absence of clarity in the statute or authority on the issue, the Court concludes that it is reasonable that the conviction must be final before the exception is triggered. To hold otherwise would undermine the core purpose of the statutory bar.[113]

## C. COMMON LAW CLAIMS

### 1. Preemption and the Federal Statutes at Issue

Preemption by ERISA and preemption by SLUSA, defined by the particular statutory language, are different. The Court addresses the law relating to each statute and then the issues of preemption of the Texas common law claims of civil conspiracy and negligent misrepresentation. RICO, of course, has no preemption provision.

### a. ERISA

Once viewed as a fairly straight forward doctrine, preemption under ERISA has recently become a somewhat complex, uncertain, and thorny issue.[114] The Court addresses the developing doctrine.

"State law" is broadly defined by ERISA as including "all laws, decisions, rule, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c)(1).

■ There are two conceptually distinct doctrines of preemption of state law under ERISA: (1) "ordinary" preemption (also called "express" or "conflict" preemption) under § 514, 29 U.S.C. § 1144(a), which occurs when a state law that conflicts with federal law is the basis of the petition, and preemption is asserted as an affirmative defense to the complaint; and (2) "complete" preemption under § 502(a), 29 U.S.C. § 1132(a), the civil enforcement section (constituting the exclusive remedy for rights guaranteed under ERISA, discussed earlier under the

---

**113.** Were Arthur Andersen's conviction final, another issue would be whether obstruction of justice is a crime "in connection with fraud" under the statute. Because in the trial of Arthur Andersen, the evidence demonstrated the alteration and the destruction of documents were motivated by Arthur Andersen's desire to conceal its role in the alleged Enron fraud on the investing public from the SEC investigators, the Court finds that the cause of action in this case is a crime in connection with fraud.

**114.** *See, e.g., Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 363, 122 S.Ct. 2151, 2158, 153 L.Ed.2d 375 (2002)("The 'unhelp-

ful' drafting of [the express preemption provisions under § 514] occupies a substantial share of this Court's time."); *California Division of Labor Standards v. Dillingham,* 519 U.S. 316, 335, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997)(Justice Scalia noted that despite fourteen attempts by the Supreme Court to resolve preemption issues in cases since 1974 enactment of ERISA, "our prior decisions have not succeeded in bringing clarity to the law"); *Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.,* 215 F.3d 136, 139 (1st Cir.2000)(the Supreme Court has "been at least mildly schizophrenic in mapping [the] contours of ERISA's preemption phrase, 'relate to any employee benefit plan.' ").

"Standing and Remedies Under ERISA" section in this memorandum and order). Both ordinary and complete preemption result in the displacement of state law by federal law, but only complete preemption under § 502(a) provides removal jurisdiction. *Haynes v. Prudential Health Care,* 313 F.3d 330, 333–34(5th Cir.2002). In other words, only state law claims that duplicate or seek relief falling within the scope of ERISA's § 502(a) are completely preempted. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 64–66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Roark v. Humana, Inc.,* 307 F.3d 298, 305 (5th Cir.2002), *petition for cert. filed,* No. 02–1845, 72 U.S.L.W. 3007 (June 20, 2003). The Court examines the preemption issue in greater detail below.

■ Of the two types of ordinary preemption, express preemption occurs by express statutory term, as reflected in § 514(a) of ERISA. *Heimann v. National Elevator Industry Pension Fund,* 187 F.3d 493, 500 (5th Cir.1999). "Conflict preemption," on the other hand, occurs (1) when there is a direct conflict between the operation of federal and state law so that it is impossible to comply with both, or (2) when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the federal statute. *Boggs v. Boggs,* 520 U.S. 833, 844, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997); *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372–73, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *Id.*

Ordinary preemption falls under § 514(a) of ERISA, 29 U.S.C. § 1144(a)

(" …[T]his provision … of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan …"), and preempts such laws unless that state law asserted "regulates insurance" under the savings clause in § 514(b)("nothing in this title shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or securities").[115] *McClelland v. Gronwaldt,* 155 F.3d 507, 517 (5th Cir.1998), *overruled on other grounds, Arana v. Ochsner Health Plan,* 338 F.3d 433 (5th Cir.2003) [116]; *Haynes,* 313 F.3d at 334.

■ Traditionally, under the "well pleaded complaint rule," the plaintiff is the master of his complaint, may choose whether to bring his claim under state or federal law, and must assert a federal cause of action on the face of a complaint before a defendant may remove the case from state court on federal question jurisdiction grounds. *Louisville & Nashville Ry. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). "The presence of a federal question … in a *defensive* argument does not overcome" the well pleaded complaint rule. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 398–99, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)(emphasis added). Thus "ordinary" federal preemption, which occurs where a federal law claim serves only as an affirmative defense, does not appear on the face of the complaint, and does not provide federal question jurisdiction for purposes of removal. *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern*

115. *See, e.g., Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47, 52–54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Christopher v. Mobil Oil Corp.,* 950 F.2d 1209, 1217 (5th Cir.1992), *cert. denied,* 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992).

116. The Fifth Circuit has recently overruled its previous holding that both kinds of preemption were required for removal to federal court, and now requires only complete preemption under § 502(a). *Arana v. Ochsner Health Plan,* 338 F.3d 433, 439–40 (5th Cir. 2003).

*Cal.,* 463 U.S. 1, 9–12, 25–27, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983).

■ Ordinary preemption under § 514(a), in contrast to the jurisdictional scope of complete preemption, "governs the law that will apply to state law claims, regardless of whether the case is brought in state or federal court." *Haynes,* 313 F.3d at 334. Thus if the case is brought in state court, without a basis for federal jurisdiction, ERISA would preempt or extinguish the state law claims, but the case would remain in state court.

An exception to the well pleaded complaint rule occurs where Congress intends that a federal statute have "extraordinary pre-emptive power" and so "completely preempts" a particular field of law that "a state common law complaint [is converted] into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *see also Rivet v. Regions Bank of Louisiana,* 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998); *McClelland v. Gronwaldt,* 155 F.3d at 516–17 (complete preemption not only displaces substantive state law, but also 'recharacterizes' preempted state law as 'arising under' federal law for the purposes of determining federal question jurisdiction, typically making removal available to the defendant. Thus 'complete preemption' is less a principle of substantive preemption than it is a rule of federal jurisdiction. In other words, complete preemption principally determines not whether state or federal law governs a particular claim, but rather whether that claim will, irrespective of how it is characterized by the complainant, be treated as 'arising under' federal law.). "Complete preemption" is sometimes called "implied preemption" or "field preemption." *See, e.g., Orson, Inc. v. Miramax Film Corp.,* 189 F.3d 377, 380–81 (3d Cir.1999), *cert. denied,* 529 U.S. 1012, 120 S.Ct. 1286, 146 L.Ed.2d 232 (2000).

■ The civil enforcement cause of action, § 502(a), 29 U.S.C. § 1132(a), constitutes the complete preemption provision under ERISA; it "functions as an exception to the well-pleaded complaint rule" and "completely preempts any state cause of action seeking the same relief, regardless of how artfully pleaded as a state action." *Haynes,* 313 F.3d at 334 (citations omitted). Whether a state-law claim is subject to complete preemption by ERISA is determined by whether it falls within the scope of the civil enforcement provision of § 502(a). *McClelland,* 155 F.3d at 517 nn. 30, 31. The Fifth Circuit has succinctly restated the rule for complete preemption: "States may not duplicate the causes of action listed in ERISA § 502(a)." *Roark v. Humana, Inc.,* 307 F.3d at 310–11.

■ The complete preemption doctrine is something of a misnomer because it does not completely preempt all state-law claims; only where a state law claim is found to fall "within the scope" of a statute's preemption provision is it considered to be converted to a federal cause of action. *Metropolitan Life,* 481 U.S. at 64–66, 107 S.Ct. 1542. In *Metropolitan Life* the Supreme Court examined the language and structure of ERISA and the legislative history to conclude that the statute completely preempted state law contract and tort claims because the plaintiff's claim for benefits was within the scope of § 502(a)(1)(B), 29 U.S.C. § 1132(a), and that the "ultimate touchstone" guiding that determination is Congressional intent. *Id.* at 65–66, 107 S.Ct. 1542. The Fifth Circuit interprets the scope of complete preemption as encompassing the whole § 502(a) provision, even though it acknowledges there is some uncertainty about whether its scope is limited to claims fall-

ing within § 502(a)(1)(B), which was the only section at issue in *Metropolitan Life. McClelland,* 155 F.3d at 517 n. 34.

■■■ It is important to note that a federal remedy need not be available under the federal statute for federal preemption of a state law cause of action. *Lister v. Stark,* 890 F.2d 941, 946 (7th Cir.1989), *cert. denied,* 498 U.S. 1011, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990). *See, e.g., Pilot Life,* 481 U.S. at 54, 107 S.Ct. 1549 ("The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."); *Agrawal v. Paul Revere Life Ins. Co.,* 205 F.3d 297, 302 (6th Cir.2000)("As a general rule, the absence of a remedy under ERISA does not mean that state-law remedies are preserved."); *Hubbard v. Blue Cross & Blue Shield Ass'n,* 42 F.3d 942 (5th Cir.1995)(summary judgment appropriate where preempted claim had no remedy under the statute), *cert. denied,* 515 U.S. 1122, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995).[117] See also *Caterpillar,* 482 U.S. at 391 n. 4, 107 S.Ct. 2425 (*rejecting* Court of Appeals' holding that "a case may not be removed on the ground that it is completely pre-empted unless federal cause of action relied upon provides the plaintiff with a remedy.").

After the enactment of ERISA, the Supreme Court initially read the ordinary preemption clause very broadly. It found that Congress intentionally drafted the provisions of ERISA to be expansive and to "establish pension plan regulation as exclusively a federal concern." *Alessi v.*

*Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981). *See also FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990)("[T]he ERISA preemption clause is conspicuous for its breadth. It establishes as an area of exclusive federal concern the subject of every state law that relates to an employee benefit plan governed by ERISA."). Thus the phrase, "relate to" in § 514(a) was construed in its "broad" common-sense meaning as "hav[ing] a connection with or reference to such plan" and as not limited to "state laws specifically designed to affect employee benefit plans." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Reliable Home Health Care, Inc. v. Union Central Ins. Co.,* 295 F.3d 505, 515 (5th Cir.2002). Courts have also held that state law causes of action were preempted by 29 U.S.C. § 1144(a) when two elements are present: 1) the state laws "address an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and 2) the claims directly affect the relationship [among] the traditional ERISA entities the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Hollis v. Provident Life and Acc. Ins. Co.,* 259 F.3d 410, 414 (5th Cir.2001); 29 C.F.R. § 2510.3-3(b)(2001); *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 245 (5th Cir.1990).

In recent years the Supreme Court has shown greater deference to state law in finding its early definition of "relates to" overly inclusive and in narrowing the

**117.** This Court notes that the Fifth Circuit has made an exception under ERISA, not applicable here, to the general rule that availability of a remedy under federal law is not a prerequisite where a claim is brought under ERISA by a third-party health care provider that has provided medical services to a plan participant. *Memorial Hospital Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 248 n. 16 (1990).

scope of and establishing a stricter standard for ERISA's § 514(a) preemption. *See, e.g., Arizona Carpenters,* 125 F.3d at 723 ("[T]he 'relates to' test may lead to an overly expansive view of preemption."), *citing New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).[118] Noting that even if the state law does not "refer to" ERISA plans, it may still be preempted if it has a "connection with" such plans, the Supreme Court realized that "an uncritical literalism" in applying the standard of a "connection with" ERISA plans was not very useful in determining Congress' intent regarding the scope of preemption under § 514(a). *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671. Acknowledging ERISA's "unhelpful text and the frustrating difficulty of defining its key terms," the Supreme Court began focusing instead on the "federal interest in uniformity" and the objectives of the statute "as a guide to the scope of the state law that Congress understood would survive." *Bullock v. Equitable Life Ass. Soc. Of U.S.,* 259 F.3d 395, 399 nn. 10, 11 (5th Cir.2001), *quoting inter alia De Buono v. NYSA–ILA Med. & Clinical Services Fund,* 520 U.S. 806, 813–15, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997). ERISA's primary objectives are to "protect ... the interests of participants ... and their beneficiaries, by requiring the disclosure and reporting ... of financial and other information ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, ... providing for appropriate

remedies, sanctions, and ready access to the Federal courts, and by improving the equitable character and soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and requiring plan termination insurance." 29 U.S.C. § 1001(b) and (c). In *California Labor Standards,* the Supreme Court added that the objectives of ERISA should be used to consider the "nature of the effect of the state law on ERISA plans." 519 U.S. at 325, 117 S.Ct. 832. Moreover, Congressional intent focused on the need for uniformity of law regulating ERISA employee benefit plans

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ..., [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

*Travelers Ins. Co.,* 514 U.S. at 656–57, 115 S.Ct. 1671, *quoting Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

As previously discussed, in *Shaw* the Supreme Court defined § 514(a)'s "relates to" an employee benefit plan as "hav[ing] a connection with or reference to" such a plan. 463 U.S. at 96–97, 103 S.Ct. 2890.

---

**118.** In *Travelers,* the Supreme Court noted that the literal language of § 514(a) is "clearly expansive," but emphasized that the text could not be read to "extend to the furthest stretch of its indeterminacy, [or] for all practical purposes preemption would never run its course for '[r]eally, universally, relations stop nowhere' ... [citations omitted]." 514 U.S. at 655, 115 S.Ct. 1671. *See also California*

*Div. of Labor Standards v. Dillingham,* 519 U.S. 316, 335, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (Scalia, J., joined by Ginsberg, J., concurring) ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.").

The Supreme Court subsequently has attempted to refine and to limit the meaning of the phrase, "reference to."

In *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), a collection agency obtained money judgments against some participants in an ERISA employee welfare benefit plan. The Supreme Court, reviewing two Georgia statutes, found there was no preemption by ERISA of a state garnishment statute of general applicability that was applied to collect the judgments against ERISA plan fiduciaries even though it might burden the administration of that plan. It reached this determination on the grounds that Congress did not intend ERISA to forbid garnishment of welfare benefit plans and because the statute made no reference to ERISA plans, did not require that a plan be established or maintained, and did not regulate the terms or conditions of the plan. In contrast the Supreme Court found that another statute that expressly singled out ERISA plans for protective treatment was preempted by § 514(a), i.e., because it was "related" by express reference to ERISA plans and was specifically designed to affect ERISA plans. Furthermore the preemption occurred even though the statute might have been enacted to effect ERISA's underlying objectives, because § 514(a) " 'displaces all state laws that fall within its sphere, even including those that are consistent with ERISA's substantive requirements.' " *Id.* at 829, 108 S.Ct. 2182, *quoting Metropolitan Life*, 471 U.S. at 739, 105 S.Ct. 2380.

While most of the cases dealing with the more restrictive preemption analysis concern statutes, in *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the Supreme Court addressed a wrongful discharge claim brought under state tort and contract theories and seeking compensatory and punitive damages. In that action the plaintiff-employee alleged that his employer wrongfully discharged him, mainly to avoid having to contribute to and pay him benefits under his ERISA pension fund plan. When the litigation had earlier reached the Texas Supreme Court, the state high court had recognized that an at-will employee can state a cause of action for wrongful discharge where the alleged motive was contrary to public policy, in this instance that the employee was fired by the employer to deprive the employee of pension benefits. *McClendon v. Ingersoll–Rand Co.*, 779 S.W.2d 69, 70–71 (Tex. 1989), *rev'd*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

On final appeal, the United States Supreme Court focused on Congressional intent behind ERISA by examining ERISA's language, structure, and purposes to determine if the common law claim was preempted. *McClendon*, 498 U.S. at 137–38, 111 S.Ct. 478. The Supreme Court held that there was express preemption by ERISA, under the language of § 514(a), of the common-law wrongful discharge claim, because the plaintiff had pleaded and the trial court ultimately found (1) as "the critical factor," the existence of an ERISA pension plan, and (2) a "pension-defeating motive" for the termination of plaintiff's employment, which thus "relates to" that plan. *Id.* at 139–40, 111 S.Ct. 478. The Court also emphasized that to allow state-law suits such as this wrongful discharge action to go forward would impose burdensome administrative and financial costs of complying with differing requirements among states or between a state and the federal government and potential conflicts in substantive law contrary to the purposes of § 514(a). *Id.* at 142, 111 S.Ct. 478. Moreover, the Supreme Court concluded that there was also conflict preemption in *McClendon* because the state common-law claim conflicts with ERISA § 510,

29 U.S.C. § 1140, which prohibits interference with rights provided to plan participants by the statute, including the termination of any plan participant in order to interfere with his attainment of any right ... under the plan, in combination with the limitations of the civil enforcement provision in § 502(a) with its explicit exclusive federal court jurisdiction and remedy for violation of participants' rights guaranteed by ERISA. *Id.* at 142–44, 111 S.Ct. 478.[119] The high court emphasized, " '[T]he mere existence of a federal regulatory or enforcement scheme' " by itself was not sufficient to imply preemption; the added "special feature" was § 514(a)'s exclusive jurisdiction and remedies for participants deprived of their rights under ERISA, which warranted preemption, even when state law authorized a remedy not available under ERISA. *Id.* at 143–44, 111 S.Ct. 478.

In *Travelers Ins. Co.*, the Supreme Court determined that a state statute that mandated surcharges on hospital rates for patients with commercial health plans, but not for patients from some HMOs, had too indirect an economic effect on the ERISA plan to "relate to" the plan. *Travelers Ins. Co.*, 514 U.S. at 668, 115 S.Ct. 1671. The high court approached the issue of preemption with the "starting presumption that Congress [did] not intend to supplant state law ... in fields of traditional state regulation." *Id.* at 654–55, 115 S.Ct. 1671. Moreover although the "relate to" language appears to be broad, the Supreme Court acknowledged that an expansive approach to it would "read the presumption against pre-emption out of the law." *Id.* at 655, 115 S.Ct. 1671. In addition, the high court "recognized that an 'uncritical literal-

ism' in applying [the "connection with"] standard offered scant utility in determining Congress' intent as to the extent of § 514(a)'s reach." *Id.* at 656, 115 S.Ct. 1671, cited by *California Division of Labor,* 519 U.S. at 325, 117 S.Ct. 832, another key case reflecting the shift in ERISA preemption jurisprudence.

The Supreme Court decided that to define what was a "forbidden connection" under § 514(a), it should examine " 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive' " and to the " 'nature of the effect of the state law on ERISA plans.' " *California Division of Labor,* 519 U.S. at 325, 117 S.Ct. 832, *citing Travelers,* 514 U.S. at 656, 658–59, 115 S.Ct. 1671. Furthermore, where " 'federal law is said to bar state action in fields of traditional state regulation,' " the Supreme Court has approached the issue with the " 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *California Division of Labor,* 519 U.S. at 325, 117 S.Ct. 832, *citing Travelers,* 514 U.S. at 655, 115 S.Ct. 1671. Nevertheless because "[t]he basic thrust of the ["relates to"] pre-emption clause was [a] nationally uniform administration of employee benefit plans," the high court has also concluded that ERISA "pre-empts state laws that mandated employee benefit structures or their administration" and "all state laws providing alternative enforcement mechanisms" because such requirements constituted "connections with" ERISA plans. *California Division of La-*

---

119. For another case alleging wrongful denial of benefits to an ERISA plan beneficiary where a statute was not at issue and the existence of an ERISA plan was essential to finding preemption, *see Pilot Life,* 481 U.S. at 48, 107 S.Ct. 1549 (holding that state com- mon-law tort and contract actions were preempted under § 514(a) because they were based on "alleged improper processing of a claim for benefits under an insured employee benefit plan").

*bor,* 519 U.S. at 328, 117 S.Ct. 832; *Travelers,* 514 U.S. at 657–58, 115 S.Ct. 1671.

In *California Division of Labor,* 519 U.S. at 325, 117 S.Ct. 832, the Supreme Court examined both the objectives of ERISA and the nature of the effect of a California prevailing wage statute on ERISA plans and stated that where a state law "acts immediately or exclusively upon ERISA plans ... or where the existence of ERISA plans is essential to the law's operation," the " 'reference' will result in preemption" of the state law. *Id.* at 325, 117 S.Ct. 832. The Court highlighted its established approach that where "federal law is said to bar state action in fields of traditional state regulation, ... we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress [citations omitted].' " *Id.* It then observed that "apprenticeship standards and the wages paid on state public works have long been regulated by the States," while they were also "quite remote from areas with which ERISA is expressly concerned— 'reporting, disclosure, fiduciary responsibility and the like.' " *Id.* at 330, 117 S.Ct. 832, *quoting Travelers,* 514 U.S. at 661, 115 S.Ct. 1671. The Supreme Court in *California Division of Laborers* found that California's prevailing wage law and the regulations promulgated pursuant to it did not make "reference to" ERISA plans, nor did they have a "connection with" the ERISA plans at issue, and therefore the wage law was not preempted.

In contrast, the Court has concluded that denial of benefits "is an area of core ERISA concern." *Egelhoff v. Egelhoff,* 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001) (state statute requiring plan administrators to pay beneficiaries chosen by state law rather than those identified in plan documents, as required by ERISA, "implicates an area of core

ERISA concern"). *See also Rush Prudential,* 122 S.Ct. at 2166 ("Congress ha[s] so completely preempted the field of benefits law that an ostensibly state cause of action for benefits was necessarily a 'creature of federal law' removable to federal court.").

The high court has also recognized that even where there may be a reference to an employee benefit plan, a narrow exception to the federal preemption doctrine under ERISA exists for state law claims that only tenuously, remotely or peripherally relate to an ERISA plan. *Bullock,* 259 F.3d at 399, *citing Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. 2890. *See, e.g., Mackey v. Lanier Collection Agency & Service,* 486 U.S. 825, 833, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (ERISA does not preempt "run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan," even though such claims "obviously affect[ ] and involv[e] ERISA plans and their trustees").

■ The Ninth Circuit summarizes that the United States Supreme Court has concluded that Congress intended to preempt state law claims in at least three areas: (1) state laws that control employee benefit structures or their administration; (2) state laws tying employers or plan administrators to particular choices or barring uniform administrative practice so as to regulate the plan; and (3) state laws that establish alternative enforcement mechanisms for a participant or beneficiary to obtain ERISA plan benefits. *Arizona Carpenters,* 125 F.3d at 723, *citing Travelers,* 514 U.S. at 655–61, 115 S.Ct. 1671, and *Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1468 (4th Cir.1996). In light of these determinations, the Ninth Circuit has held "that where state law claims fall outside the three areas of concern established in *Travelers,* arise from state laws of general application, do not depend upon

ERISA, and do not affect the relationships between the principal ERISA participants[,] the state law claims are not preempted." *Arizona Carpenters*, 125 F.3d at 724.

The Fifth Circuit has previously concluded that § 514(a) preempts state-law civil conspiracy claims that involve misuse of an ERISA plan's assets. *See, e.g., McDonald v. Provident Indemnity Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995), *cert. denied*, 516 U.S. 1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996). It has also determined that a state-law cause of action relating directly to the operation of an ERISA employee benefit plan is preempted even if it arises under a law of general application that has no connection to employee benefit plans. *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1218–19 (5th Cir.1992), *cert. denied*, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992). To determine whether there is preemption, a court must consider whether "the underlying conduct" that forms the basis of the claim could "be divorced from its connection to the employee benefit plan." *Id.* at 1220.

Moreover, any state law that does relate to an ERISA plan and that "provides a form of ultimate relief in a judicial forum that add[s] to the judicial remedies provided by ERISA ... patently violates ERISA's policy of inducing employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Rush Prudential HMO v. Moran*, 536 U.S. 355, 379, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002). As noted, even if ERISA provides only a lim-

ited remedy or even no remedy at all to a plaintiff whose state law claim is preempted, preemption may still occur. *Pilot Life*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39.

**b. The Securities Litigation Uniform Standards Act of 1998 (SLUSA)**

If those *Tittle* Plaintiffs who have standing under the federal securities statutes (and many do not, as will be explained) were to recharacterize and bring their claims under those statutes, or if they were to join the *Newby* class, or if they were to file their class action (meeting SLUSA's standards) under state law in state court asserting claims based on an alleged misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security and/or use by the defendants of a manipulative or deceptive device or contrivances in connection with the purchase or sale of Enron stock, their common law claims of conspiracy and negligence would be preempted by SLUSA for the reasons explained below.

SLUSA, which amended the Securities Act of 1933 and the Securities and Exchange Act of 1934, aimed to protect corporations from securities · fraud strike suits and "meritless class actions" and abusive discovery practices of litigious investors by making federal courts the exclusive venue for securities class actions [120] and establishing various procedural hoops and pleading requirements designed to screen out frivolous suits. *Spielman v. Merrill Lynch Pierce, Fenner & Smith*, 332 F.3d 116, 121–23 (2d Cir.2003). SLUSA does not completely preempt the field of securities regulation; instead its preemptive scope is limited by the sub-

---

**120.** SLUSA was enacted to cure a perceived "loophole" in the PSLRA, which permitted investors to avoid the requirements of the PSLRA by bringing claims against issuers in state court. When the numbers of such state-court filed suits increased dramatically, Congress passed SLUSA to close the loophole. *See, e.g., Dudek v. Prudential Securities, Inc.*, 295 F.3d 875, 877 (8th Cir.2002); *Gutierrez v. Deloitte & Touche*, 147 F.Supp.2d 584, 589 (W.D.Tex.2001).

stantive requirements of its removal provisions, its unique definition of class action, and its automatic dismissal of certain kinds of securities-related claims. *Id.* at 123, 125–26.

The statute provides in relevant part,

No covered class action based upon the statutory or common law of any state or subdivision thereof may be maintained in any State or Federal court by any private party alleging—

(A) A misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

Securities Act of 1933, 15 U.S.C. § 77p(b); Securities and Exchange Act of 1934, 15 U.S.C. § 78bb(f)(1).

Title 15 U.S.C. § 78bb(f)(5)(B) defines a "covered class action" as

(i) any single lawsuit in which—

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominated over any question affecting only individual persons or members or

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

A "covered security" is defined as "a security that satisfies the standards for covered security specified in paragraph (1) or (2) of section 77r(b) of this title, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred . . . ." 15 U.S.C. § 77p(f)(3). Section 77r(b), adopted by § 78bb(f)(5)(E), defines a "covered security" as one listed on the New York Stock Exchange, the American Stock Exchange, or the Nasdaq National Market, or a security issued by an investment company that is registered, or for which a registration statement has been filed under the Investment Company Act of 1940. Enron's stock was listed on the New York Stock Exchange throughout the relevant period.

SLUSA thus provides for mandatory removal and/or dismissal of a specific kind of class action:

(f) LIMITATIONS ON REMEDIES.— (1) CLASS ACTION LIMITATIONS.—No covered class action based upon the statutory or common law of any state or subdivision thereof may be maintained in any State or Federal court by any private party alleging—

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

(2) REMOVAL OF COVERED CLASS ACTIONS.—Any covered class action brought in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

15 U.S.C. § 78bb(f)(1)(A), (B) & (2). *See, e.g., Dudek v. Prudential Securities Inc.,* 295 F.3d 875, 877 (8th Cir.2002); *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1128 (9th Cir.2002), *amended on other grounds,* 320 F.3d 905 (9th Cir.2003); *Behlen v. Merrill Lynch,* 311 F.3d 1087, 1091–93 (11th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 2583, 156 L.Ed.2d 605 (2003).

▮ Thus a claim falls within the preemptive scope of SLUSA if it meets four requirements: (1) the suit is a "covered class action" as defined in the statute; (2) the action is brought under state law; (3) the plaintiffs allege that the defendants misrepresented a material fact or omitted a material fact or used or employed a manipulative or deceptive device or contrivance; and (4) the plaintiffs allege that defendants' wrongful conduct was "in connection with" the purchase or sale of a "covered security." *Green v. Ameritrade,* 279 F.3d 590, 596 (8th Cir.2002).

Not only SLUSA, but § 10(b) of the 1934 Act and Rule 10b–5 provide a cause of action based on practices prohibited therein, qualified *inter alia* by the phrase, "in connection with the purchase or sale" of a security. 15 U.S.C. § 78j(2)(b); 17 C.F.R. 240.10b–5. SLUSA preempts all state law class actions based upon alleged untrue statements or omissions of material fact, or use of manipulative or deceptive devices or contrivances, in connection with the purchase or sale of a covered security, as those terms are defined in the statute. 15 U.S.C. § 78bb(f). Although SLUSA does not define "in connection with the purchase or sale of a covered security," and the Supreme Court has only minimally addressed the issue,[121] most courts addressing the question have applied the judicial construction of the parallel phrase in § 10(b).[122] Most of these cases have dealt only with alleged material misrepresentations or omissions "in connection with the purchase or sale of a covered security." *See, e.g., Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 292 F.3d 1334, 1342 (11th Cir.), *cert. denied,* 537 U.S. 950, 123 S.Ct. 395, 154 L.Ed.2d 296 (2002); *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1129 (9th Cir.2002), *amended on other grounds,* 320 F.3d 905 (9th Cir.2003); *Behlen v. Merrill* Lynch, 311 F.3d 1087, 1093 (11th

121. *See SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), in which a unanimous Supreme Court read the "in connection with the purchase or sale of any security" very flexibly to reach the fraudulent practices of a broker with authorization to manage his client's investment accounts who wrote checks to himself from his clients' accountant that required the sale of securities for payment. The Supreme Court found that stock sales and the broker's fraudulent actions were interdependent and coincidental with the stock sales and that the sales furthered the broker's scheme to defraud his clients and misappropriate their assets.

122. *But see Shaw v. Charles Schwab & Co.,* 128 F.Supp.2d 1270, 1273–74 (C.D.Cal.2001)

("Although Sections 10(b) and 78bb(f) may be phraseologically homologous, the Court cannot simply assume that the two statutes produce meaning in the same way. Different congressional intents gird the two statutes."), *appeal dismissed for lack of appellate jur.,* 45 Fed.Appx. 651, 2002 WL 1929469 (9th Cir. 2002). In this case, the district court explained that while § 10(b)'s primary purpose is "to protect investors from false and misleading practices," SLUSA's is " 'to protect the interest of shareholders and employees of public companies that are the target of meritless 'strike' suits.' " *Id.* at 1273–74 Therefore the district court refused to construe "in connection with" as broadly in the SLUSA context as it would in a § 10(b) context. *Id.* at 1273–74.

Cir.2002), *petition for cert. filed, No. 02–1520,* 71 U.S.L.W. 3680 (Apr. 14, 2003); *Green v. Ameritrade, Inc.,* 279 F.3d 590, 597–98 (8th Cir.2002); *Gutierrez v. Deloitte & Touche, L.L.P.,* 147 F.Supp.2d 584, 595 (W.D.Tex.—San Antonio Div.2001); *Shaev v. Claflin,* No. C 01–0009, 2001 WL 548567, *4 (N.D.Cal. May 17, 2001); *Shen v. Bohan,* 2002 WL 31962136, *3 (C.D.Cal. Oct. 17, 2002); *Zoren v. Genesis Energy, L.P.,* 195 F.Supp.2d 598, 605 (D.Del.2002); *Gordon v. Buntrock,* No. 00 CV 303, 2000 WL 556763, *3 (N.D.Ill.2000). A few did address manipulative or deceptive devices or contrivances "in connection with the purchase or sale of a covered security." *See, e.g., Burns v. Prudential Securities,* 116 F.Supp.2d 917, 921–23 (N.D.Ohio 2000); *Denton v. H & R Block Financial Advisors, Inc.,* No. 01 C 4185, 2001 WL 1183292, *4 (N.D.Ill. Oct. 4, 2001) ("While it is true that allegations of breach of fiduciary duty alone will not sufficiently plead a securities fraud claim, a breach of fiduciary duty may give rise to a Rule 10b–5 claim where the alleged conduct 'can fairly be viewed as manipulative or deceptive conduct within the meaning of the [Securities Act].'") (*quoting Santa Fe Indus. Inc. v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)); *Shaw v. Charles Schwab & Co.,* 128 F.Supp.2d 1270, 1272 (C.D.Cal.2001), *appeal dismissed for lack of appellate jur.,* 45 Fed. Appx. 651, 2002 WL 1929469 (9th Cir. 2002).

In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (affirming the rule of *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.1952)), the Supreme Court held that claimants contending that they were defrauded into not purchasing stock or defrauded into continuing to hold stock, in other words claimants that did not actually sell or purchase stock because of the alleged misrepresentation, have no right of action under § 10(b). *Blue Chip Stamps,* 421 U.S. at 727, 95 S.Ct. 1917. The Supreme Court further observed, "Obviously, this disadvantage is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law." 421 U.S. at 739 n. 9, 95 S.Ct. 1917. Thus, as the Eleventh Circuit has commented, while the high court in *Blue Chip Stamps* "recognized that 'holding' claims are not actionable under federal securities laws, they may well be actionable under state laws that are more stringent than their federal counterparts." *Riley,* 292 F.3d at 1343. *See generally Ameritrade,* 279 F.3d 590 (absent allegations of the sale and purchase of a covered security, SLUSA did not preclude a state law claim for breach of contract); *Gutierrez v. Deloitte & Touche,* 147 F.Supp.2d at 592 (allegations that accounting misfeasance caused plaintiffs to hold securities that they otherwise would have sold are not barred by SLUSA); *Shen v. Bohan,* 2002 WL 31962136 at *3 (where plaintiffs alleged only that the defendants diluted their shareholder voting rights when stock was issued to acquire another company, their suit was not brought in connection with the purchase or sale of securities and may not be removed under SLUSA); *Shaev v. Claflin,* No. C 01–0009 MJJ, 2001 WL 548567 at *5 (N.D.Cal.2001) (where claims are not based on purchase or sale of stock but on dilution of a present shareholder's interests, "the complaint essentially claimed that the value of *existing* shareholder's ownership interests were reduced ... by the stock option adjustment" and does not meet the "in connection with" requirement for removal under SLUSA); *Gordon v. Buntrock,* No. 00 CV 303, 2000 WL 556763 at *3 (N.D.Ill. Apr. 28, 2001) (complaint alleging common law claims for breach of fiduciary duty, recognized under Delaware law, and seeking damages for lost value caused by holding onto securities, but not

purchase or sale, was not properly removable).

Thus the courts agree that "SLUSA does *not* apply to claims dealing *solely* with the retention of securities, rather than with purchase or sale." *Riley*, 292 F.3d at 1345. Where a plaintiff alleges that a misrepresentation caused him to purchase more stock as well as to hold a particular security, however, as is the case in the *Tittle* complaint, the Eleventh Circuit has concluded that the plaintiff "may not avoid SLUSA's restrictions," the complaint does fall within the ambit of SLUSA, and the rule that SLUSA does not apply to holding claims is not applicable *Id. In accord, In re WorldCom, Inc.*, 263 F.Supp.2d 745, 771 (S.D.N.Y.2003). Such a rule makes good sense to this Court, in light of the concerns that led Congress to enact the PSLRA. Typically plaintiffs will have both transactional and holding claims and could otherwise easily avoid the more stringent requirements of the federal statute by asserting both. Courts have reached the same decision about hybrid complaints based on both covered and non-covered securities or on securities and non-securities. *See Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F.Supp.2d 993, 1000 n. 21 (C.D.Cal.2002)("When a claim concerns a transaction that involves both covered and non-covered securities as alleged, the entire claim is subject to removal under SLUSA"), *citing Lasley v. New England Variable Life Ins. Co.*, 126 F.Supp.2d 1236, 1238–39 (N.D.Cal.1999) (holding that a complaint alleging fraud in connection with the purchase of a variable life insurance policy (a covered security) and ordinary life insurance (a non-security) was removable under SLUSA); *Kenneth Rothschild*

*Trust v. Morgan Stanley Dean Witter*, 199 F.Supp.2d 993, 1000 n. 21 (C.D.Cal.2002).

*Tittle* Plaintiffs argue that in the ESOP, all shares of Enron stock were distributed by the end of 1996, the Class Period did not begin until January 20, 1998, and thus all the participants' claims are solely holding claims because none of the participants or beneficiaries bring claims "in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1) Thus they maintain that the claims of the ESOP participants are not within the preemptive scope of SLUSA, and that any state law claim as to them, such as the civil conspiracy cause of action, is not preempted by that statute. Nor, Plaintiffs insist, has there been any purchase or sale of securities relating to Plaintiffs' phantom stock/compensation claims,[123] the Cash Balance Plan offset based on inflated price of Enron stock on specified dates, and the Savings Plan employer matching contributions. In sum, insist Plaintiffs, because these fail to fall under the securities laws, the civil conspiracy claim related to them is not preempted.

Nevertheless, the language of the complaint differs from Plaintiffs' current account and plainly states that Plaintiffs were deceived into both holding and/or purchasing Enron stock in the ERISA-governed plans. *See, e.g.*, Complaint at 4, ¶ 5 ("Andersen's actions also caused employees to invest in or hold their Enron stock in their ESOP and Savings accounts rather than to diversify or put their retirement funds in safer investments."); at 5, ¶ 8 ("Participants in the Savings Plan, the ESOP and the Cash Balance plans, having no knowledge of the accounting improprieties, and further encouraged by the statements of officers of Enron regarding the

123. As the Court explains in footnote 2 and on pages 231–37 and nn. 126–30 of this memorandum and order, the federal securities laws do not apply to bonus plans like the phantom stock program.

financial strength of the Company[,] continued to add more Enron stock to their accounts ... and/or continued to retain Enron shares instead of diversifying their holdings.").

There is no dispute that Savings Plan participants and beneficiaries bring both holding and purchasing claims, and therefore their interests in that portion of the Plan involving the purchase and/or sale of stock might constitute a "security" and be actionable under the securities laws. If Plaintiffs were to replead these claims under the federal securities laws, the related common law conspiracy and negligent misrepresentation claims would be preempted by SLUSA.

Plaintiffs have also argued that the misstatements made by Lay, Skilling, Fastow and other Enron insiders to Enron employees as part of the conspiracy to fraudulently induce them to retain and acquire Enron stock, as alleged in their complaint, are not actionable under the securities laws because they are not *public* statements intended to artificially inflate the stock's price (under a fraud on the market theory), but statements made inside inhouse publications or at employee meetings as part of a fraudulent scheme to convince the employees to keep their retirement assets in, or to accept compensation in the form of, over-valued Enron stock to free up cash for Defendants' personal enrichment. The Court concludes that such an arbitrary division between "non-public" statements made only to employees and statements of virtually identical import to the public at large, included in *Newby*, constitutes the kind of manipulative pleading to circumvent the PSLRA and SLUSA that has not been permitted by most courts.

Citing *Lemanik, S.A. v. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 607 (S.D.N.Y. 1989), as authority, Defendants have argued that because the plan itself held the Enron stock in the plan and owned the legal interest in those assets, the plan record holder is the real party in interest and the plan participants and beneficiaries, who hold only the equitable interest, cannot bring securities law claims.[124]

This Court disagrees. Federal Rule of Civil Procedure 17(a) provides in relevant part, "Every action shall be prosecuted in the name of the real party in interest. An ... administrator, ... trustee of an express trust, ... or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the actions is brought." Defendants' authority, *Lemanik*, merely held that the record keeper of a plan is a party-in-interest, but not the only one, who could bring suit for securities violations. The established rule is that "nothing in the real party in interest rule precludes a beneficial owner from commencing an action or joining an action with the legal title holder, if the beneficial owner has a right which can be enforced in a court action." 25 Federal Procedure, Lawyers Ed. § 59:54 (Database updated May 2003), *citing Beascoechea v. Sverdrup & Parcel and Associates, Inc.*, 486 F.Supp. 169, 173 (E.D.Pa.1980) ("The permissive language of [Rule 17(a) ] does not preclude the beneficial owner from suing or joining with the legal title holder if the beneficial owner has the right sought to be enforced.").

Furthermore it is not the procedural rule alone, but the substantive law that determines whether the plaintiff is actually the real party in interest. *See Lubbock*

---

**124.** The Court distinguishes the issue of beneficial versus legal ownership from the issue of whether the participants' interest in each of the plans or phantom stock constitutes a "security" within the meaning of the federal securities laws, to be discussed later. See pages 231–37 of this memorandum and order.

*Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 256–57 (5th Cir.1980) ("the mere fact that a plaintiff falls within one class of persons enumerated in Rule 17(a) is not dispositive of the real party in interest question, for the rule assumes that the enumerated persons are granted the right to sue by the applicable substantive law."); *HB General Corp. v. Manchester Partners L.P.*, 95 F.3d 1185, 1196–97 (3d Cir.1996); *Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39, 43 (6th Cir.1994). The civil enforcement provisions of ERISA, embodied in § 502(a), 29 U.S.C. 1132(a), expressly give plan participants the right to bring suit. *See also Isola v. Hutchinson*, 780 F.Supp. 1299 (N.D.Cal.1991) (sole remaining participant in plan with "a beneficial interest in recovering assets that may have been fraudulently removed from the Plan" held to be an appropriate plaintiff under § 502(a)(3)). The same is true of beneficial interest holders under RICO. Title 18 U.S.C. § 1964(c) grants standing to "[any] person injured in his business or property by reason of a violation of section 1962 . . . ." In turn, under 18 U.S.C. § 1961(3), "person" is defined as "includ[ing] any individual or entity capable of holding a legal or beneficial interest in property." *See, e.g., Joseph v. Algemene Bank Nederland, N.V.*, 592 F.Supp. 141, 148 (W.D.Pa.1984).

In construing § 10(b)'s use of the term "device," the Supreme Court, relying on *Webster's International Dictionary* (2d ed.1934), found that the term involved "knowing and intentional conduct" and equated the word, *inter alia*, with a "scheme; often a scheme to deceive . . . ." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 n. 20, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Moreover, Rule 10b–5 makes it unlawful for any person "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." There are a number of state-law claims, such as breach of contract, breach of fiduciary duty, conversion or negligence, which by themselves, would not fall within the proscriptions of § 10(b), but when they become part of a larger deception, a scheme to defraud, would constitute a violation of the federal statute. For example a number of courts faced with the question of whether unauthorized trading by a broker states a claim for violation of the Securities Act have concluded that unauthorized trading alone does not establish scienter and does not state a claim under the Securities Act. *Burns*, 116 F.Supp.2d at 923–25 (and cases cited therein). Nevertheless, when such misconduct is alleged to be part of a larger deception, a scheme to defraud, coupled with scienter (specific facts giving rise to a strong inference of severe recklessness or intent to deceive, manipulate or defraud), the allegations are sufficient to trigger the preemptive effect of *SLUSA*. *Id.* at 925. *See also SEC v. Zandford*, 535 U.S. 813, 818, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002) (although the "statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b), neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act"; the high court found that securities sales and a broker's unauthorized fraudulent acts were not independent events, but coincided because each sale was made to further broker's fraudulent scheme for his own benefit) [125]; *Prager v. Knight/Tri-*

---

125. In *Zandford*, the SEC's complaint alleged "a fraudulent scheme in which the securities transactions and the breaches of fiduciary duty coincide." 122 S.Ct. at 1906. Thus the connection or nexus requirement of "in connection with" need not be causation: the fraud may be "in connection with" the securi-

*mark Group, Inc.*, 124 F.Supp.2d 229, 234–35 (D.N.J.2000) ("It must be concluded, therefore, that plaintiff has pleaded what are, in essence, securities fraud claims [for breach of contract, violation of the implied covenant of good faith, breach of fiduciary duty, unjust enrichment, and violation of New Jersey's Consumer Fraud Act], even though they were framed as state law claims, and that SLUSA governs."); *Behlen*, 311 F.3d at 1093–95.

A misrepresentation by a person, whose position made it reasonable for a plaintiff to rely upon that misrepresentation, about the value of a security, which was subsequently bought or sold by the plaintiff in reliance upon that statement, will satisfy the requisite "in connection with" a security for a § 10(b) claim. *See, e.g., In re Ames Dept. Stores, Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir.1993).

 Only a purchaser or seller of "securities" may bring a private action for damages under § 10(b) and Rule 10b–5.

ties purchases or sales if the fraud "coincides" with those transactions. Nevertheless, even with such an expansive and flexible construction of the phrase, some kind of "nexus between the alleged fraud and a securities transaction" must be alleged to satisfy the "in connection with" element. *French v. First Union Securities, Inc.*, 209 F.Supp.2d 818, 827 (M.D.Tenn.2002).

**126.** Section 2 of the 1933 Act, as amended, 15 U.S.C. § 77b(a)(1), defines a "security" as any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchases, any of the foregoing.

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–33, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Many of the *Tittle* Plaintiffs lack an interest in a "security" or a connection with the purchase or sale of a "security," and thus lack standing to bring a claim under § 10(b) and Rule 10b–5. Whether an employee's interest in an employee benefit retirement (pension) plan constitutes a "security" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934[126] does not depend upon whether it is a defined benefit or defined contribution plan; instead it depends on whether the plan is "voluntary or involuntary, and contributory or noncontributory." The S.E.C. defined a " 'voluntary' plan [as] 'one in which the employees may elect whether or not to participate,' " while a "contributory" plan is "one in which employees make direct payments, usually in the form of cash or payroll deductions, to the plan." *Employee Benefit Plans*, SEC Release No. 33–

The definition in § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is nearly identical, and coverage under the two Acts is regarded as the same. *International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551, 557 n. 7, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). Neither statutory provision refers to any kind of pension plan. *Id.* at 558, 99 S.Ct. 790. Section 2(3) of the 1933 Act provides that "[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security for value." Similarly, Section 3(a)(14) states, "[t]he terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." *See, e.g., Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555, 556 (2d Cir.1985) (concluding that an individual, who accepted an employment contract from a corporation in return for that corporation's stock or promise of stock was an "investor" and the issuance or transfer of stock was a "sale" (disposition of a security for value) under the federal securities laws).

6188, 1980 WL 29482, at *33 nn. 19, 20 (Feb. 1, 1980). In other words, a "noncontributory" plan would be one where the employer makes all the contributions. The interests of employees in an employee benefit plan "are securities only when the employees voluntarily participate in the plan and individually contribute thereto." *Id.* at *2, 7. On the other hand, "... the Securities Acts do not apply to a noncontributory, compulsory plan." *Id.* at *8, citing *International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel,* 439 U.S. 551, 570, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). The SEC has long taken the position that interests in voluntary contribution pension and profit-sharing plans are "securities" because "such interests constitute investment contracts, although it has also been suggested that they may be 'certificates of interest or participation in a profit-sharing agreement' as well." 1980 WL 29482, at *9. The SEC's Chairman stated before the Senate Committee on Human Resources on the antifraud provisions of the proposed ERISA Improvements Act of 1979 (S.209),

> ... An employee who is given a choice whether to participate in a voluntary pension plan, and decides to contribute a portion of his earnings or savings to such plan, has clearly made an investment decision, particularly when his con-

tribution is invested in securities issued by his employer. Employees making such decisions should continue to be afforded the protections of the antifraud provisions of the federal securities laws.

*Id.* (noting that the reasoning in *Daniel* supports the view that the employee's interest in a voluntary, contributory plan is an investment contract).

The Supreme Court in *Daniel* looked to an "economic realities" test (substance over form) in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), to determine whether a particular financial relationship constitutes an investment contract: " 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' " 439 U.S. at 558, 99 S.Ct. 790.[127] The Supreme Court explained in *Daniel,*

> An employee who participates in a noncontributory, compulsory pension plan by definition makes no payment into the pension fund. He only accepts employment, one of the conditions of which is eligibility for a possible benefit on retirement.... In every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial inter-

---

127. In contrast, in a noncontributory, compulsory pension plan, the investment is a minor part of the employee's compensation package and the employee can only in the most abstract sense be viewed as exchanging part of his labor for the possible benefits of the plan; "[h]e surrenders his labor as a whole, and in return receives a compensation package that is substantially devoid of aspects resembling a security .... [A]n employee is selling his labor primarily to obtain a livelihood, not making an investment." *Daniel,* 439 U.S. at 560, 99 S.Ct. 790. The pension fund is largely derived from employer contributions, not earnings from its assets, and does not depend on the efforts of its managers. *Id.* at 562, 99 S.Ct. 790. The employee's expectations of participating in earnings from the plan's assets is only a small part of the total compensation package and is " 'far too speculative and insubstantial to bring the entire transaction within the Securities Acts'." *Id.* at 562, 99 S.Ct. 790. The high court further emphasized, "unlike the Securities Acts, ERISA deals expressly and in detail with pension plans," and thus ERISA's comprehensive legislative scheme for such plan "undercuts all arguments for extending the Securities Act to noncontributory, compulsory pension plans." *Id.* at 569–70, 99 S.Ct. 790.

est with the characteristics of a security. . . . Even in those cases where the interest acquired had intermingled security and nonsecurity aspects, the interest obtained had "to a very substantial degree the elements of investment contracts . . . ." In every case the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security. [citations omitted]

439 U.S. at 559–560, 99 S.Ct. 790 (concluding that an employee's participation in a noncontributory, compulsory pension plan does not constitute a "security" or an "investment contract").

In contrast to a noncontributory, involuntary pension plan like that in *Daniel*, a voluntary, contributory plan, such as that portion of the Savings Plan other than the employer match contributions [128] in *Tittle*, has been found to be a "security" for purposes of securities fraud claims under the federal securities statutes. *See Dubin v. E.F. Hutton Group, Inc.*, 695 F.Supp. 138, 144–47 (S.D.N.Y.1988); *Hood v. Smith's Transfer Corp.*, 762 F.Supp. 1274, 1284 (W.D.Ky.1991). Thus any state-law claim relating to it might fall within the preemptive scope of SLUSA if the statute's other requirements are met. The intermingling of the employer matching contributions portion to the Savings Plan with the voluntary contributions on which the employer match depends appears to fall within *Daniel's* "cases where the interest acquired had intermingled security and nonsecurity aspects" and thus "to a very substantial degree the elements of investment contracts," making it a "security." 439 U.S. at 560, 99 S.Ct. 790.

The ESOP at issue in *Tittle* is an involuntary, noncontributory plan,[129] but a plan in which employee participation is compulsory, and the shares distributed represent a mandatory portion of the employees' compensation, not securities that are purchased or sold. *See* discussion *infra; International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *Bauman v. Bish*, 571 F.Supp. 1054, 1064 (N.D.W.Va.1983) (ESOP plan more "a method of deferring income" than an investment in securities.[130]). "[A] grant of stock under an Employee Stock Ownership Plan or similar stock bonus program is generally not a 'sale' under the 1933 Act." *Falkowski v. Imation Corp.*, 309 F.3d at 1130, *citing Int'l Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) (holding that an interest in a compulsory, noncontributory pension plan is not a 'security.'), and SEC Release No. 33–6188, 1980 SEC LEXIS

---

**128.** The employer match contributions, furthermore, were made in Enron stock, but not "in connection with the purchase or sale" of these securities.

**129.** The ESOP plan at § 5.1 states, "Members shall neither be required nor permitted to contribute to the Plan." In contrast, Enron "shall contribute to the Trustee . . . the amount, if any, authorized by its Board of Directors."

**130.** As the *Bauman* court, in concluding that an ESOP created when employees bought a corporation did not fall within the scope of the Securities Acts, explained,

> Participation in the ESOP for employees of the proposed company is not voluntary and is, in a sense, compulsory. Each participant who meets certain minimum hours of service will have stock allocated to his or her account. Thus there is no affirmative investment decision. More importantly, there is no furnishing of "value" by participating employees. Instead of giving up some tangible and definable consideration, participants earn stock through labor for the employer.

571 F.Supp. at 1064.

2141, at *52–53 (Feb. 1, 1980). Moreover, according to the complaint at 51, ¶¶ 170–171, Enron closed the ESOP to new employees at the end of 1994 and all the shares in the ESOP were distributed by the end of 1996; therefore any claims by ESOP participants arising during the Class Period appear to be holding claims,[131] another reason why the federal securities laws do not apply, because there was no "connection with the purchase and sale of a covered security." 15 U.S.C. § 78bb(f)(1).

The Court lacks sufficient information about the program for compensating employees with phantom stock, but given the nature of the program, presumably the recipients are participating in a compulsory, noncontributory program and would not be subject to the Securities Act. *See* footnote 2 of the memorandum and order.

Although the Court again cannot be certain from the record before it, the Cash Balance Plan, in which the defined benefit is a mixture of an employee's averaged pay benefit offset by the value of one fifth of the Enron stock allocated to his individual ESOP account, calculated at market price on the first day of each of five years, also does not appear to be a security under *Daniel.* As noted, an employee's ESOP account does not appear to qualify as a security under *Daniel,* nor, under the Cash Balance Plan, is there any "connection with the purchase or sale" of Enron securities, but merely a reference to the market price of the stock on five days in five years. The averaged pay calculation is not a voluntary "contribution." Thus the Cash Balance Plan would also appear not to be a "security" and not to be subject to the federal securities laws.

In addition to that law, the Court notes that the *Newby* class description restricts the number of *Tittle* plaintiffs that would be eligible to join the *Newby* class. In the first consolidated complaint the class action was brought by Plaintiffs "on behalf of all persons who purchased Enron securities including … Enron employees who purchased Enron stock individually or for their *401(k) retirement plans* during the Class Period." # 441 at ¶ 986 in H–01–3624 [emphasis added]. The recent first amended consolidated complaint, which supersedes the former, has modified that definition and brings suit "on behalf of purchasers of Enron Corporation's publicly traded equity and debt securities between 10/19/98 and 11/27/01." # 1388 at 3. The definition implicitly incorporates the bar against pure holding claims to limit that group.

■■■ The fact that plaintiffs may plead state law claims that do not meet the pleading of scienter required by the federal law, i.e., § 10(b) and Rule 10b–5's severe recklessness, does not prevent preemption by SLUSA, which does not mention scienter. This Court agrees with the reasoning in *Feitelberg v. Merrill Lynch & Co., Inc.,* 234 F.Supp.2d 1043, 1051 (N.D.Cal.2002), where the district court explained,

[I]f by merely omitting scienter allegations plaintiff can avoid SLUSA's preemption effect, SLUSA would be totally eviscerated. If in fact the claims allege misrepresentations or omissions or use of manipulative or deceptive devices in connection with the purchase or sale of securities and otherwise come within the purview of SLUSA, artful avoidance of those terms or scienter language will not save them from preemption. In other words, if it looks like a securities fraud claim, sounds like a securities fraud claim and acts like a securities fraud

---

**131.** The Court has pointed out contrary statements in the complaint. Since, as explained, neither the ESOP nor the Cash Balance Plan qualifies as a security, the federal securities laws do not apply.

claim, it is a securities fraud claim, no matter how you dress it up.

*Id.* at 1051.[132]

■■■■ The Court observes that negligence is not actionable under § 10(b), which requires that scienter at minimum reach the level of "severe recklessness," which is "properly defined and adequately distinguished from mere negligence," i.e., as "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 408 (5th Cir.2001), *citing inter alia Broad v. Rockwell Intern. Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

If those *Tittle* Plaintiffs with claims that are cognizable under the federal securities laws were to replead to assert securities violations or to join the class in *Newby,* or to bring suit in state court alleging the same facts under state law, the common law claims of conspiracy and negligent misrepresentation would also be preempted by SLUSA. The *Tittle* Plaintiffs' suit, with more than fifty plaintiffs, meets the definition of "covered class action" under SLUSA; shares of Enron stock are a "covered security" within the meaning of SLUSA; the complaint alleges that Defendants have misrepresented or omitted material facts and have used manipulative or deceptive devices and contrivances in connection with the purchase or sale of Enron securities; and Plaintiffs' civil conspiracy and negligent misrepresentation claims relat-

ing to what are actually securities violations are common-law causes of action that fall within the preemptive reach of SLUSA.

■■■■ Even though there may be no remedy under the federal securities statutes, were Plaintiffs to assert violation of the securities laws, Plaintiffs' state-law negligent misrepresentation claim against Arthur Andersen LLP in Count VIII would be preempted by SLUSA because SLUSA expressly preempts all state law class action claims based on alleged false statements or omissions of material fact or the use of a manipulative device or contrivance in connection with the purchase or sale of a covered security. 15 U.S.C. § 77p(b) (Securities Act of 1933); 15 U.S.C. § 78bb(f)(1) (Securities Exchange Act of 1934). This Court finds that under the facts alleged here, as part of a scheme by Defendants for personal enrichment, Arthur Andersen's alleged fraudulent accounting practices purportedly served to persuade the plan participants to retain and to purchase Enron stock for their retirement funds and thus "were in connection with the purchase or sale of securities," the fraud coincides with the Savings Plan participants' purchase of Enron stock during the Class Period. Furthermore, as noted in the Court's discussion of the RICO Amendment, the scheme encompassed far more that plan participants; Arthur Andersen's accounting misrepresentations were embodied in public records and relied on by investors in the public at large just as they were by plan participants and beneficiaries. The ERISA plan participants constitute only one slice in the pie in the Ponzi scheme set out in the *Newby* securities class action.

---

**132.** *But see Burns v. Prudential Sec.,* 116 F.Supp.2d 917 (N.D.Ohio 2000) (holding that SLUSA does not preempt state law claims for conversion, breach of contract, breach of fi-

duciary duty and negligent supervision where the federal securities law standards for scienter are not satisfied by the pleadings).

Similarly the facts supporting the state-law conspiracy claim in Count IX duplicate many of those constituting the Ponzi scheme actionable under § 10(b) and Rule 10b–5. SLUSA preempts all state law class actions based upon alleged untrue statements or omissions of material fact, or use of manipulative or deceptive devices or contrivances in connection with the purchase or sale of a covered security, as those terms are defined in the statute. 15 U.S.C. § 78bb(f).

In sum, as indicated, for those *Tittle* Plaintiffs who have standing to sue under the federal securities laws, or who join the *Newby* class, or who attempt to file claims in state court based on the same facts and alleging under state law that they purchased Enron stock based on alleged misrepresentation, omissions, deceptive devices and contrivances, their common law claims of conspiracy and negligent misrepresentation are preempted by SLUSA.

## 2. ERISA Preemption and Plaintiffs' Common–Law Civil Conspiracy Claim

A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex.2001); *Operation Rescue–Nat'l v. Planned Parenthood of Houston & S.E. Tex., Inc.*, 975 S.W.2d 546, 553 (Tex.1998).[133] A plaintiff must prove (1) two or more persons are involved, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages. *Id.* The plaintiff must prove specific intent to cause injury, "to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by an unlawful means"; moreover the conspirators must be aware of the harm or

wrongful conduct when they commence the combination or agreement. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex.1996); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex.1995).

More important for our analysis, conspiracy is a derivative tort, so a plaintiff must prove the elements of an underlying tort in which the defendant participated in order to prevail on a civil conspiracy claim. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996).

Here by the specific factual allegations regarding the scheme of the conspirators, the underlying tort would be fraud, which would embrace both fraudulent misrepresentation and fraudulent inducement. Under Texas law to prevail on such a claim, a plaintiff must prove (1) a material misrepresentation (2) that was false, (3) that was known to be false when made or made without knowledge of the truth, (4) that was intended to be acted upon, (5) that was relied upon, and (6) that caused the plaintiff injury. *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). Texas law requires actual reliance; the presumption of reliance under the theory of fraud on the market does not apply. *Steiner v. Southmark Corp.*, 734 F.Supp. 269, 279, *clarified on other grounds*, 739 F.Supp. 1087 (N.D.Tex.1990); *Griffin v. GK Intelligent Sys., Inc.*, 87 F.Supp.2d 684, 690 (S.D.Tex.1999); *McNamara v. Bre–X Minerals Ltd.*, 197 F.Supp.2d 622, 697–98 (E.D.Tex.2001).

Furthermore tort damages, including exemplary damages, are available for a common-law fraud claim. *Formosa Plastics*, 960 S.W.2d at 46–47 (tort dam-

---

**133.** The Court presumes this cause of action is brought under Texas law.

ages, including exemplary damages, are recoverable for fraud claims sounding in tort, such as fraudulent inducement by misrepresentation, "irrespective of whether the fraudulent misrepresentations are later subsumed in a contract or whether the plaintiff only suffers economic loss related to the subject matter of the contract"). " 'Exemplary damages' means any damages awarded as a penalty or by way of punishment. 'Exemplary damages' includes punitive damages." Tex. Civ. Prac. & Rem.Code Ann. § 41.001(5) (Vernon's 2003).

■■■■ As noted, the Texas state-law cause of action for civil conspiracy is not an independent cause of action, but is based on an underlying substantive wrong, a tort committed by the alleged conspirators. Therefore liability is not based on the conspiracy, but on the underlying tort. *See Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 551 (8th Cir.1996) (" 'the gist of the action is not the conspiracy charged, but the tort working the damage to the plaintiff' "; the real purpose of a conspiracy claim is " 'to show facts for vicarious liability of defendants or for the acts committed by others, joinder of joint tortfeasors, and aggravation of damages' ") (*citing and quoting Harding v. Ohio Casualty Ins. Co.*, 230 Minn. 327, 338, 41 N.W.2d 818, 825 (1950)); *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C.Cir.1983) ("Since liability for civil conspiracy depends on the performance of some underlying tortious act, the conspiracy is not

independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort."); *In re Orthopedic Bone Screw Products Liability Litig.*, 193 F.3d 781, 789–90 n. 7 (3d Cir.1999) (and cases cited therein).

■■■■ If the alleged underlying tort of the conspiracy, here fraud, falls within the scope of a federal statute's "complete" preemption,[134] the conspiracy claim is deemed to arise under the federal law; the conspiracy allegations do not change the nature of the cause of action since liability is based on the underlying tort. *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d at 551 ("claims that fall within the preemptive scope of the particular statute . . . are considered to make out a federal question") (*citing Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 64–66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (extending doctrine of complete preemption to ERISA)).[135] In such a case, to allow the civil conspiracy cause to go forward under state law would allow litigants to "avoid federal question jurisdiction and create causes of action where Congress intended there to be none." *Id.* at 551.

### 3. ERISA Preemption and Claim of Negligent Misrepresentation against the Andersen Defendants

Plaintiffs assert that the Andersen Defendants performed improper accounting and negligently certified the accuracy of financial statements that they knew or

134. See pages 201–06 of this memorandum and order.

135. *Gaming Corp.* dealt with the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, which completely preempts state law relating to the governance of gaming activities, including management of casinos on Indian lands. The case alleged that a law firm representing a Native American tribe during a process for licensing tribal casino management violated

the Indian Civil Rights Act. A concurrent cause of action under Michigan law alleging a civil conspiracy to violate the Indian Civil Rights Act was dismissed because (1) it was determined that the conspiracy's underlying tort was completely preempted by the IGRA and (2) because the conspiracy claim arose under the Indian Civil Rights Act, which did not provide for a private cause of action, it had to be dismissed.

should have known to be false and misleading for Enron and the Savings Plan, reiterated these false statements in Andersen's capacity as auditor of the Savings Plan during part of the Class Period, and helped structure and conceal improper transactions of Enron Defendants, all in order to mislead Plaintiffs, persuade them to retain and add Enron stock to their retirement savings, and thereby enable Defendants to enrich themselves.

In dealing with a duty to use reasonable care in providing information to customers or potential customers, the elements of negligent misrepresentation under Texas law are (1) a false representation is made by a defendant in the course of its business or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant fails to exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers financial loss by justifiably relying on the representation. *Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (agreeing with the definition of Restatement (Second) of Torts § 552 (1977), which *inter alia* restricts damages to "those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is legal cause"). Reliance may not be presumed under Texas law. *McManus v. Fleetwood Enterprises, Inc.,* 320 F.3d 545, 549 (5th Cir.2003).

The *Tittle* consolidated complaint has alleged the elements and supporting facts to state a claim for negligent misrepresentation under Texas common law. It identifies a number of misrepresented transactions and examples of false information in certified financial statements and audit reports that the Andersen Defendants provided as auditor of both Enron and of the Savings Plan and

as an Enron consultant, allegedly without the degree of care, skill and competence exercised by a competent member of the accounting profession. The complaint asserts that Andersen issued such information, which it purportedly knew or should have known was materially false and misleading and would be used, and was used and relied upon, by Plaintiffs in their decision whether to acquire and/or retain Enron stock in the plans, and it demonstrates Andersen's pecuniary interest in substantial fees for its services in providing that information. The complaint further describes the plan's resulting loss.

Under the Restatement (Second) of Torts § 552, which has been adopted by Texas courts, an accountant may be liable for negligent misrepresentations in financial statements to a third party whom the maker of the misrepresentation intends to benefit or to a limited group of persons for whose benefit the maker of the misrepresentation intends to provide the information or knows that the recipient intends to provide the information. *Steiner v. Southmark Corp.,* 739 F.Supp. 1087, 1088 (N.D.Tex.1990). Texas courts have expanded the parameters of the tort of negligent misrepresentation in § 552 to include not only those that the defendant actually knows will receive the misrepresentation, but to those the accountant should know will receive it. *Blue Bell, Inc. v. Peat Marwick, Mitchell & Co.,* 715 S.W.2d 408, 411–13 (Tex.App.—Dallas 1986, writ ref'd); *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,* 81 F.3d 606, 614 & n. 35 (5th Cir.1996), *cert. denied,* 519 U.S. 869, 117 S.Ct. 182, 136 L.Ed.2d 121 (1996). *See generally* # 1194 at 90–98 in *Newby.* Whether a person falls within the class is a fact question related to the risk to which a particular victim is exposed and depends on such factors as "(1) the extent to which the

transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the closeness of the connection between the defendant's conduct and the injury suffered; and (4) the potential liability." *Steiner,* 739 F.Supp. at 1088, *citing Cook Consultants, Inc. v. Larson,* 700 S.W.2d 231, 235 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The complaint's allegations address each of these elements.

■■■ In essence, with respect to issues of preemption by ERISA, *Tittle* Plaintiffs' state-law claims against Arthur Andersen for negligent misrepresentation are claims of professional negligence, or malpractice, for providing substandard accounting services to the Plans and Enron. As previously discussed, providing regular professional services to a plan does not make the professional a fiduciary of the plan and relates to the ERISA plan only in a peripheral manner. Nearly every court addressing the issue has held that ERISA does not preempt state-law professional negligence or malpractice claims relating to the provision of services to the plan. *See, e.g., Gerosa,* 329 F.3d at 324 ("[C]ourts routinely find that garden-variety state-law malpractice or negligence claims against non-fiduciary plan advisors, such as accountants, attorneys, and consultants, are not preempted" by ERISA); *Dudley Supermarket, Inc. v. Transamerica Life Ins. and Annuity Co.,* 302 F.3d 1, 4–5 (1st Cir.2002); *Arizona State Carpenters Pension Trust Fund,* 125 F.3d at 723–24. *citing Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1467–72 (4th Cir. 1996) (holding that professional malpractice claims are not preempted by ERISA); *Custer v. Sweeney,* 89 F.3d 1156, 1162, 1166–67 (4th Cir.1996) (attorney representing ERISA plan)(and cases cited therein); *Airparts Co. v. Custom Benefit Services of Austin, Inc.,* 28 F.3d 1062, 1065–66 (10th Cir.1994)(plan consultant); *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse,* 879 F.2d 1146,

1152–53 n. 7 (3d Cir.1989)(auditor); *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 540 (7th Cir.1991)(refusing to imply cause of action under ERISA for malpractice by an actuary); *Bourns, Inc. v. KPMG Peat Marwick,* 876 F.Supp. 1116, 1122 (C.D.Cal.1994)(auditor); *Pension Plan of Public Serv. Co. of New Hampshire v. KPMG Peat Marwick,* 815 F.Supp. 52, 57–58 (D.N.H.1993) (auditor); *Carl Colteryahn Dairy, Inc. v. Western Pa. Teamsters & Employers Pension Fund,* 785 F.Supp. 536, 543 (W.D.Pa.1992)(accountants and actuaries); *Richards v. Union Labor Life Ins. Co.,* 804 F.Supp. 1101, 1105–06 (D.Minn.1992) (actuary); *Framingham Union Hospital, Inc. v. Travelers Ins. Co.,* 721 F.Supp. 1478, 1490 (D.Mass.1989).

## III. APPLICATION OF THE LAW TO COMPLAINT'S ALLEGATIONS

### A. Procedural Objections

A number of Defendants have argued that *Tittle* Plaintiffs have violated Judge Rosenthal's December 13, 2001 order, which consolidated all securities violation cases into *Newby* and all ERISA-controlled employee benefit plan cases into *Tittle,* by amending their complaint to add RICO claims. Defendants maintain that the RICO claims were asserted to reach the "deep pocket" Defendants that *Newby*'s Lead Plaintiff sued under the federal securities statutes, but that could not be sued by the *Tittle* Plaintiffs under ERISA because these newly named Defendants have no relationship to, nor involvement in, the ERISA retirement plans. For example, *Tittle* Plaintiffs have no claim for mishandling the plans' assets or for breach of fiduciary duty in connection with the retirement plans under ERISA against the investment banks or Vinson & Elkins lawyers. By extension, urge Defendants, the

*Tittle* Plaintiffs have also disregarded the appointment of Lead Plaintiff and Lead Counsel in *Newby* specifically to prosecute under the PSLRA the securities fraud claims common to all shareholders of the corporation. Such circumvention also results in the inapplicability of the PSLRA, which requires the Court to select as Lead Plaintiff the party with "the largest financial interest in the relief sought by the class" with interests strongly aligned with the prospective class of shareholders to prosecute the action and to retain control over the litigation. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

The Court is not perturbed by the fact that the complaint was amended to assert causes of action in addition to ERISA claims. The Court did not expressly restrict the complaint to its original causes of action, and it has allowed new claims to be asserted in the *Newby* class action. Thus the Court addresses each to determine whether the *Tittle* Plaintiffs have pleaded a viable cause of action for which relief may be provided.

## B. RICO Amendment

After a careful examination of the *Tittle* and *Newby* complaints and a review of the applicable law, the Court concludes that the RICO claims asserted here are barred by § 107 of the PSLRA, 18 U.S.C. § 1964(c). The alleged enterprises acting to conceal Enron's financial condition and defraud current and future shareholders are based on virtually the same conduct by Defendants that is the basis for, or relates to similar conduct that could have been alleged as further evidence of, the securities fraud Ponzi scheme alleged in *Newby* under the federal securities statutes. As will be discussed, the alleged predicate acts are an integral part of and/or support the securities fraud Ponzi scheme asserted in *Newby*. Plaintiffs attempt to bring RICO claims to sue deep-pocket parties that they cannot reach under ERISA because these Defendants have no fiduciary relationship to the employee benefit pension plans at issue.

As a side note, the *Tittle* Plaintiffs, both named and putative class members, who have 401(k) Savings Plans individual accounts with mixed holding and purchasing claims or that purchased Enron securities during the Class Period, are expressly included in the definition of the *Newby* class. Other *Tittle* Plaintiffs cannot sue under the federal securities laws. Nevertheless as emphasized in the earlier discussion of the RICO Amendment, the fact that a particular plaintiff may not have a cognizable claim under the securities law is not the issue under the RICO Amendment bar; the focus is on whether the alleged wrongful conduct could be challenged as a violation of the securities laws.

The *Tittle* complaint expressly alleges that Defendants participated "in a far-ranging multilayered scheme designed to conceal Enron's financial condition" while they personally profited and maintained "the illusion of Enron's profitability and financial strength, and the illusion that Enron was a legitimate enterprise and profitable company, and thereby induced Enron's 24,000 employees to invest in and retain Enron stock in their retirement plans." Complaint at ¶ 3.

Although draped in the language of RICO,[136] the *Tittle* Plaintiffs' allegations of wrongdoing in carrying out a scheme to defraud through various combinations of Defendants, characterized as "RICO

---

136. *Bald Eagle,* 189 F.3d at 329–30 ("[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud.").

enterprises," by means of "predicate acts" of embezzlement, mail and wire fraud, obstruction of justice, and interstate transportation offenses, are substantively virtually identical to the Ponzi-scheme allegations brought in *Newby*, against nearly the same Defendants.[137] The alleged acts are all offenses constituting misrepresentations or concealment of Enron's real financial condition to inflate the value of Enron stock and to keep investor money flowing into the alleged lucrative pyramid scheme that permitted Defendants to loot the corporation, and are actionable as parts of the *Newby* Ponzi scheme *Bald Eagle*, 189 F.3d at 330 (Where alleged RICO predicate offenses are an integral part of and sustain an alleged securities fraud Ponzi scheme, they are intrinsically conduct undertaken "in connection with the purchase or sale of securities" and are barred by the RICO Amendment; allowing a surgical presentation of parts of that scheme would "undermine the congressional intent behind the RICO Amendment"). The RICO and state-law civil conspiracy and accountant negligent misrepresentation claims of *Tittle* are also actionable as securities fraud claims and have been so characterized in *Newby*.

Defendants allegedly conspired to commit a pattern of racketeering activity that equates to the Ponzi scheme of *Newby* and engaged in many of the same transactions that support the conspiracies alleged under ERISA and the federal securities statutes to create the same illusion of financial strength by means of (1) the same or same kinds of "extensive 'off-book' transactions to hide and shift debt from its balance sheets," (2) making, certifying, and issuing false financial statements that violated GAAP and GAAS and filing misleading reports with the SEC with the knowledge or reckless disregard that they were false, (3) painting false financial pictures of Enron for the public, investors, and the plan participants, as well as the analysts, credit raters, and lenders and (4) concealing material conflicts of interest, all in connection with the purchase of Enron securities. *See, e.g., id.* at ¶¶ 3, 5, 203–41, 242–43. Both suits challenge the same allegedly false financial statements, SEC reports, and oral and written misrepresentations to the securities market, the public, and Enron employees, and the involvement of the investment banks, Vinson & Elkins lawyers, and Arthur Andersen accountants in creating parts of and perpetuating the scheme.

Furthermore, the plan participants' actual losses in essence are the same financial losses suffered by all Enron shareholders: the artificial and fraudulent inflation of value of Enron stock followed by a precipitous decline in price after revelations of Enron's actual financial condition. The fraud was perpetrated on all Enron securities holders, not only on ERISA retirement plan participants and phantom stock recipients. Thus in the larger picture, the RICO claims brought by *Tittle* Plaintiffs are in essence brought in their capacity as Enron shareholders, directly or indirectly, and not merely as plan participants. The fact that the participants' loss was in a retirement plan "pot," stock which the plans purchased and/or held on their behalf, as opposed to in an individual shareholder's portfolio, does not change the fact that in actuality they suffered the same injury, i.e., loss in value of Enron securities, purportedly caused by the same alleged wrongdoing of parties named in both *Newby* and *Tittle*.

---

**137.** The RICO claims in *Tittle* target the same kinds of groups, other than Enron directors and employees, as the securities violation claims in *Newby:* investment banks, Arthur Andersen and accountants, and Vinson & Elkins, L.L.P. and lawyers.

Although Plaintiffs have argued that Defendants' conduct caused them merely to hold onto Enron stock, thus having no connection with the purchase or sale of securities, the Court agrees with what Vinson & Elkins has argued,

> [T]he conduct that allegedly caused some investors to hold stock would, on the facts pleaded, be the same conduct that allegedly caused others to purchase or sell. The fact that the conduct pleaded could have caused some of Enron's employee-investors to continue purchasing Enron stock is sufficient for purposes of the PSLRA bar, even if other employee-investors suffered harm only by holding stock. *Ikon*, 86 F.Supp.2d at 487 (finding that the fact that the plaintiff was harmed by actions other than securities fraud does not negate the applicability of the PSLRA bar when the conduct pleaded is actionable securities fraud); *see Bald Eagle*, 189 F.3d at 330 (holding that "surgical presentation of the cause of action ... would undermine the congressional intent behind the RICO Amendment"); *Burton v. Ken-Crest Servs., Inc.*, 127 F.Supp.2d 673, 677 (E.D.Pa.2001) ("Plaintiff cannot magically revive his claim by picking out discreet [*sic*] details of his allegations and then claiming that they are not actionable as securities fraud.").

# 232 at 10–11.

The *Tittle* Plaintiffs attempt to argue that their claims are not actionable under securities law by narrowly focusing on the effects of the extensive fraud on the plan participants only, rather than viewing them in their broader context. For instance Plaintiffs argue that the securities laws do not apply because the misrepresentations and omissions made by Lay and Olson to them were not public, but instead occurred during employee meetings or were made in in-house publications. Nevertheless, the alleged misrepresentations were precisely the same kind being made by Enron officials and other Defendants to the public at large to entice more investors to purchase more stock and to retain what they already owned to keep the Ponzi scheme fed. Were Lay, Olson, or any Enron official to paint a different, inconsistent picture to the many thousands of plan participants than the one presented by these and other Defendants to the public at large, the SEC, and the market, they would not only violate insider trading laws, but the Ponzi scheme would have quickly been exposed and undermined.

*Tittle* Plaintiffs have construed § 10(b) and Rule 10b–5 narrowly and attempt to limit their reach merely to material misrepresentations and omissions. Even if the reach of § 10(b) were so restricted, the content of the alleged misinformation and misrepresentation to plan participants and beneficiaries was parallel to and redundant of that made publicly by the same or other Defendants at other times and has been challenged in *Newby*. Plaintiffs also claim that the conduct of most of the Defendants cannot be reached under the federal acts. This Court has ruled otherwise. *See* # 1194 in *Newby*.[138]

The alleged "predicate acts," a RICO term manipulated by Plaintiffs to cordon off acts that by another name would be "course of business," a "deceptive device,"

**138.** Even if this Court has read *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), and the statute too expansively in concluding that Defendants may be primarily liable under § 10(b) and Rule 10b–5, under a narrow construction the SEC would still have standing to pursue claims against the various Defendants who are not plan fiduciaries for aiding and abetting a securities law violation under § 10(b) and Rule 10b–5 in a civil enforcement action. *See, e.g., SEC v. Fehn*, 97 F.3d 1276, 1284 (9th Cir.1996), *cert. denied*, 522 U.S. 813, 118 S.Ct. 59, 139 L.Ed.2d 22 (1997).

and/or a "scheme or artifice that operated as a fraud on sellers or purchasers of securities" under the securities laws, all relate to, are part of, and are the direct or indirect effects of the alleged Ponzi scheme to defraud investors in connection with the purchase or sale of securities in *Newby*. The nature of the RICO predicate offenses of embezzlement, mail fraud, wire fraud, interstate transportation, and obstruction of justice arise from the same nucleus of facts and serve the identical scheme alleged in *Newby* for concealing Enron's actual financial condition from investors and creditors, for identical purposes, i.e., ensuring a successful public image and high credit ratings that induced continuing investment in and retention of Enron securities, ultimately for Defendants' personal enrichment.

The *Tittle* Plaintiffs' asserted predicate acts are integral parts of the Ponzi securities fraud scheme alleged in *Newby*. For example, *Tittle* Plaintiffs identify as an alleged embezzlement predicate act, "Enron Insider Defendants embezzled Plan assets within the meaning of Section 664 by intentionally investing and continuously reinvesting Plan assets in Enron stock, and by diverting Plan assets away from other available investment vehicles ...." Complaint at 273, ¶ 791.[139] The embezzlement of plan funds included Defendants' making matching contributions in artificially inflated Enron stock in lieu of actual compensation value in cash. That substitution of Enron stock for actual cash value, buttressed by the alleged fraudulent induce-

ment of plan participants to request the trustee to purchase more Enron stock at excessive prices for their individual accounts, ultimately functioned to line Defendants' own pockets in the form of increased salaries and bonuses, according to Plaintiffs.

The acts of alleged wire and mail fraud include numerous allegations parallel to those in *Newby*, such as the following: (1) "Merrill Lynch used the wires and mails on dozens of occasions between 1998 and 2001 to promote Enron stock to clients ..." (complaint at 277, ¶ 795(vii)); "Fastow, Kopper and Merrill used the mails and wires to obtain investors in LJM2." (*id.* at ¶ 795(ix)); and "CFSB used the wires and mails to help Enron Defendants create approximately 3,500 off balance sheet partnerships whose major purpose was to hide Enron debt and in so doing used the mails and wires on thousands of assets." (*id.* at ¶ 795 (xi)). *Tittle* Plaintiffs have alleged that Defendants used the mails and wire facilities "in furtherance of the unlawful scheme in order to (i) encourage employees to invest money in the Savings Plan; (ii) encourage Enron employees to accept over-valued Enron stock as compensation in the Savings Plan." *Id.* at ¶¶ 798; 826; 830.

The interstate transportation predicate acts involve allegations that Enron Insider Defendants, Arthur Andersen Defendants, and some Investment Banking Defendants conspired to induce Enron employees "to travel ... in the execution of the wrongful scheme alleged herein, ... to Houston,

---

**139.** The purported substitution of the deceptively over-valued stock for cash compensation, effectively cheating pension plan participants of the true value of compensation, is integral to the *Newby* Ponzi scheme to fraudulently enhance Enron's financial condition to obtain analysts' "buy" recommendations and more credit, to lure more and more investors to purchase Enron securities and to feed the frenzied Ponzi beast. Not only were plan participants subjected to the same alleged misrepresentations about Enron and investment in it, but that fraud on plan participants provided an added avenue of revenue for the Ponzi scheme when the overpriced Enron stock was substituted for cash for the retirement pensions, so that Defendants could allocate the undistributed funds to their own pockets as increased salaries and bonuses.

Texas, to attend meetings conducted by the Enron Insider Defendants at which ECSP participants were reassured that their 401(k) funds were safely invested and that they should hold and maintain their investments in Enron stock." (*Id.* at 281–82, ¶ 796). The interstate transportation of monies into the plans for fraudulent purposes and for convincing plan participants at meetings in Houston that their Enron investments were safe again were substantively part and parcel of the same kind of wrongful conduct directed at the public at large and challenged in *Newby*. Like the *Newby* Lead Plaintiff alleging that Defendants employed all kinds of deceptive devices, contrivances, and misrepresentations in a constant struggle for more funds through the sale of more overpriced Enron securities, the *Tittle* Plaintiffs claim that all these racketeering acts fraudulently induced plan participants to accept as part of their retirement benefits and/or to direct the trustee to acquire, and/or to hold Enron securities.

Finally, the obstruction of justice charge against Arthur Andersen LLP, while not a securities violation in itself, was part of the alleged Ponzi scheme's concealment of its earlier accounting misrepresentations in audits and SEC filings and ultimately of Enron's real worth and financial condition, and serves as evidence of scienter.

Furthermore the SEC has filed a number of civil enforcement actions under the securities statutes against parties that are defendants in the *Tittle* RICO claims. Moreover Joseph Hirko and Kenneth Rice, Defendants in *Tittle*, have been indicted for securities violations related to their roles in Enron's broadband business.

Thus the Court finds that the RICO claims are based on conduct actionable as securities fraud, indeed the same or similar conduct that has been or could have been alleged in *Newby* under the federal securities laws, and are therefore barred by the RICO Amendment. Because the RICO Defendants' alleged wrongful conduct is actionable as securities fraud, the *Tittle* Plaintiffs' RICO claims (Counts VI and VII), including the claim under § 1962(d) for conspiracy to violate § 1962(a) and (c),[140] must be dismissed. The dismissal is proper even though many of the *Tittle* plaintiffs may not have a remedy under the 1933 and 1934 Acts because the *Tittle* plan participants' interests in the ERISA plans and phantom stock compensation are not deemed securities under, and their pure holding claims are not reached by, the securities laws.

Finally, because no Defendant's criminal conviction is final, the Court concludes that the criminal exception to the RICO Amendment is at this point inapplicable.

## C. ERISA BREACH OF FIDUCIARY AND CO–FIDUCIARY DUTY

ERISA does not have heightened pleading requirements, but is subject to the notice pleading standard of Fed. R. of Civ. Procedure 8, i.e., "a short and plain statement of the claim showing that the pleader is entitled to relief" and that provides a defendant with fair notice of the claim against him. *Heimann v. National Elevator Industry Pension Fund,* 187 F.3d 493, 509, 511 (5th Cir., 1999)("technical forms of pleading are not required"), *overruled on other grounds, Arana v. Ochsner Health Plan,* 338 F.3d 433 (5th

**140.** *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir.1993)("Any claim under section 1962(d) based on conspiracy to violate the other subsections of 1962 necessarily must fail if the substantive claims are themselves deficient."); *In re Ikon,* 86 F.Supp.2d at 487 (where predicate acts are dismissed because they are actionable as securities fraud, a § 1962(d) conspiracy claim to violate the other subsections of § 1962 must fail because the substantive claims are deficient).

Cir.2003). " 'The complaint must be liberally construed in favor of the plaintiff, and all the facts pleaded must be taken as true,' " with dismissal proper only if " 'it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. [citations omitted]' " *Haynes v. Prudential Health Care*, 313 F.3d 330, 333 (5th Cir.2002).

**1. Count I (Plaintiffs on behalf of the Savings Plan and the ESOP sue Enron and the Enron ERISA Defendants for inducing and mandating the acquisition and retention of Enron stock in the Savings Plan and the ESOP); AND**

Count V (Plaintiffs, on behalf of the Savings Plan, the ESOP, and the Cash Balance Plan sue Enron, Lay,[141] and the Compensation Committee Defendants for failure to monitor the Plans' investment fiduciaries and/or disclose to the investing fiduciaries (not limited to the Administrative Committee) material facts regarding Enron's financial condition)

With respect to Counts I–V generally, the provisions of the Enron Corporation Savings Plan (Ex. A to #322) set out the fiduciary obligations of the various players and echo the law established under ERISA, discussed previously.

Under § XIII.1, Enron Corporation has the duty to appoint the members of a Committee which will serve as the Plan administrator and is designated a named fiduciary with respect to general administration of the Plan, except for investment of the assets in the trust fund. Moreover under § XIII.8, Enron must provide the Administrative Committee with "any information that the Committee determines is necessary for the proper administration of the Plan" and to the Trustee any such "facts as are deemed necessary for the Trustee to carry out the Trustee's duties under the Plan."

Under §§ XIV.1 and XV.2, Enron has sole discretion in appointing, removing and replacing the Trustee.[142] Enron, although a Plan sponsor, is also a fiduciary to the Plan to the extent it exercises discretionary control and authority over these specific matters.[143]

The duties of the Administrative Committee appointed by Enron are laid out in

**141.** Lay has argued that Count I does not allege a claim for failure to monitor against him and that Count V does not mention him at all. The amended complaint at 235–36, ¶ 674 asserts,

Under the terms of the [Savings] Plan, the Committee members were selected and monitored by "Enron Corp." Plan § XIII.1. On information and belief, selection and monitoring of the Committee members was performed by the Compensation and Management Development Committee of the Board of Directors ("Compensation Committee"), Lay and others. Enron itself acted as a fiduciary in selecting, monitoring, and removing other plan fiduciaries, such as the members of the Administrative Committee, and overseeing their investment of Plan assets.

The Court finds these allegations are sufficient to assert a claim against Lay for breach of his fiduciary duty to select and monitor, encompassed within Count V. It appears that Plaintiffs' reference to Count I was a clerical error.

**142.** In contrast, under § 16.1 of the ESOP Plan (Ex. C to #322) Enron's Board of Directors, specifically, has the power to appoint, remove and replace the trustee. Under § 16.8 of the ESOP Plan the trustee is authorized to invest the trust fund up to 100% in Enron stock, but the Administrative Committee "shall determine the extent to which the Trust Fund shall be invested in Company Stock and shall determine the price at which Company Stock will be purchased or sold. The Trustee shall act on the Committee's directions . . . ."

**143.** Section XV.2 expressly states, "Each fiduciary with respect to the Plan shall have only those specific powers, duties, responsibilities, and obligations as are specifically given him under the Plan."

§ XIII.7 of the Savings Plan and include directing the Trustee "as to the investment of the Trust Fund in Enron Stock or EO & G Stock," "appoint[ing] investment managers pursuant to Section 15.5," and "direct[ing] the Trustee as to the exercise of rights or privileges to acquire, convert, or exchange Enron Stock or EO & G Stock." In § XV.2, the Savings Plan provides that the Administrative Committee, "as a co-fiduciary" to the Trustee, may "exercise its power given hereunder at any time, and from time to time, by written notice to the Trustee, to direct the Trustee in the management, investment, and reinvestment of the Trust Fund . . . ."

The Savings Plan Trust Agreement (Ex. B to # 322) invests the Administrative Committee with additional obligations, some ministerial and some fiduciary. Article 1.1 expressly designates the Administrative Committee as "the named fiduciary for Plan administration" with "the responsibility for allocating the assets of the Fund among the Separate Accounts for monitoring the diversification of the investments of the Fund, for assuring that the Plan does not violate any provision of ERISA limiting acquisition or holding of securities or other property of the Company, and for the appointment and removal of Investment Advisors . . . ." Under Article Four ("Investment Funds") of the Savings Plan Trust Agreement, the Administrative Committee is to designate Investment Funds, such as a Company Stock Investment Fund, and "is authorized to terminate the existing Investment Funds" by written notice to the Trustee and "to direct the Trustee with respect to the allocation of assets to Investment Funds and with respect to transfers among such Investment Funds."

The Trustee, which is designated by § XIV.1 as *the 'named fiduciary' with respect to investment of the Trust Fund's assets*," is invested by § XV.2 with "*the sole responsibility for the administration, investment, and management of the assets held under the Plan*," which makes it a fiduciary under ERISA, subject to the Administrative Committee's authority to direct it, as described in the above paragraph. The Plan qualifies that responsibility in § XIV.2, however: when the Administrative Committee, as a co-fiduciary, directs by a written notice "the Trustee in the management, investment, and reinvestment of the Trust Fund, then in such event *the Trustee shall be subject to all proper directions of the Committee that are made in accordance with the terms of the Plan and the Act. It is intended under the Plan that each fiduciary shall be responsible for the proper exercise of his own duties, responsibilities and obligations hereunder* and shall not be responsible for any act or failure to act of another fiduciary except to the extent provided by law or as specifically provided herein." (Parallel provision in ESOP Plan § 17.2.) Plaintiffs have alleged that Northern Trust was the Trustee of the Savings Plan and of the ESOP, in accordance with the express terms of both, and a fiduciary with respect to powers allocated to it under the terms of those plans.

Section 1.24 of the Enron Corp. Savings Plan Trust agreement (Ex. B to # 322) names the Northern Trust and any successor to it as the trustee for the Savings Plan. Article V, which identifies the powers of the trustee, charges Northern Trust, except as otherwise provided in the Savings Plan Trust agreement, with holding, managing, caring for and protecting the assets of the Plan, including investing and reinvesting those assets, to sue or defend claims against the Trust Fund.[144]

---

144. Section 5.12 of the trust agreement gives the trustee the right "[t]o compromise, con-test, prosecute or abandon claims in favor of or against the Fund."

Article VI of the Savings Plan, addressing limitations on the trustee's power, sets out its fiduciary obligations and provides,

Notwithstanding Article Five:

6.1 The powers of the Trustee shall be exercisable for the exclusive purpose of providing benefits to the Participants and Beneficiaries under the Plan and in accordance with the standards of a prudent person under ERISA;

6.2 Subject to 6.1 and 6.3, the Trustee shall diversify the investments of that portion of the fund of which it has investment responsibility so as to minimize the risk of large losses;

6.3 Subject to 6.1, the Trustee shall, with respect to that portion of the Fund for which it has investment responsibility, follow the investment guidelines established by the Administrative Committee and shall act in accordance with the direction of the Administrative Committee.

. . . . .

6.7 No provisions of Sections 6.5 or 6.6 [addressing direction of the trustee by plan participants] shall prevent the Trustee from taking any action relating to its duties under Sections 6.5 or 6.6 if the Trustee determines in its sole discretion that such action is necessary in order for the Trustee to fulfill its fiduciary responsibilities.

Parallel provisions charging the Trustee and the Committee among others with the same fiduciary duties delineated in 6.1 and 6.2 of the Savings Plan are found in § 17.3 of the ESOP Plan and §§ 1.6, 4.1, and 4.4 of the ESOP Trust Agreement (Ex. D to # 322).

■ As a threshold matter, the Court finds that Plaintiffs' pleadings have raised material issues as to whether the Savings Plan qualifies as a § 404(c) plan, entitling Defendants to immunity from liability for investment decisions controlled by plan participants, by allegations that the plan did not provide the requisite broad range of diversified investment options, liberal opportunities to transfer assets among allocations, and sufficient information to make sound investment decisions, nor notice to plan participants that it intended to qualify as such a plan. These issues and any defense under § 404(c) asserted by Defendants, on a 12(b)(6) motion review, must be construed in Plaintiffs' favor and cannot properly be resolved prior to discovery.

■ With respect to the claims in Count I, the Court finds that Plaintiffs have stated a claim, which is intertwined with Plaintiffs' contention that the fiduciaries failed to meet the requirements for a § 404(c) plan, against those Defendants who were authorized by the Plans to invest the Plan assets and who allegedly induced their uninformed Savings Plan participants to direct the fiduciaries to buy more or maintain Enron stock for their individual accounts, in breach of their duties of loyalty and prudence.

Second, some of the allegations under Court I relate to plan design, a settlor function, and do not trigger fiduciary duties: "allowing Savings Plan participants the ability to direct the Plan's fiduciaries to purchase" Enron stock; and "imposing age and other restrictions on the ability of the participants to direct the Savings Plan's fiduciaries to transfer Savings Plan and ESOP assets" out of Enron stock. *See Lockheed Corp. v. Spink,* 517 U.S. 882, 887, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996)("Nothing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan."); *Smith v. Contini,* 205 F.3d 597, 602 (3d Cir. 2000)("ERISA neither mandates the creation of pension plans nor in general dic-

tates the benefits to be afforded once a plan is created. . . . Thus ordinarily only the plan can create an entitlement to a benefit."), *cert. denied,* 531 U.S. 875, 121 S.Ct. 180, 148 L.Ed.2d 124 (2000); *Goldstein v. Johnson & Johnson,* 251 F.3d 433, 441 (3d Cir.2001)("ERISA was enacted to ensure that employer-provided benefit plans are safeguarded and maintained so as to be available to employees when they are due. The Act does not mandate that an employer provide benefits and has nothing to say about how these plans are designed."); *McGann v. H & H Music Co.,* 946 F.2d 401, 407 (5th Cir.1991), *cert. denied sub nom. Greenberg v. H & H Music Co.,* 506 U.S. 981, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992)(approving Sixth Circuit's comments in *Musto v. American General Corp.,* 861 F.2d 897, 912 (6th Cir.1988)("rejecting challenge to an employer's freedom to choose the terms of its employee pension plan"), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989): "In enacting ERISA, Congress continued its reliance on voluntary action by employers by granting substantial tax advantages for the creation of qualified retirement programs. Neither Congress nor the courts are involved in either the decision to establish a plan or in the decision concerning which benefits a plan should provide. In particular, courts have no authority to decide which benefits employers must confer upon their employees . . . .")[145]; *Dzinglski v. Weirton Steel Corp.,* 875 F.2d 1075, 1078–79 (4th Cir.)(" Congress left employers much discretion in designing their plans under ERISA and in determining the level and conditions of benefits. The judicial role is not to rewrite plan provisions, but to assure that they are fairly administered. . . . [U]nder ERISA the institution of plans is largely voluntary and the fashioning of plan elements has been largely left in the hands of individual employers"), *cert. denied,* 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). Moreover, "The specific payout detail of the [ERISA] plan was, of course a feature that the employer as plan sponsor was free to adopt without breach of any fiduciary duty under ERISA since an employer's decisions about the content of a plan are not themselves fiduciary acts." *Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

Nevertheless, outside of challenging the establishment of these terms by the employer in its settlor, not fiduciary, capacity, the application of which terms Plaintiffs do not object until sometime in 1998 when the alleged scheme began, Plaintiffs have stated a claim for breach of their fiduciary duties of loyalty and prudence based on Defendants' alleged *inducement* of the plan participants to direct the trustee to invest in Enron stock for their individual Savings Plan accounts and inducing Savings Plan and ESOP participants to direct or allow the fiduciaries of both Plans to maintain such investments, under the circumstances from 1998–2000 set forth in the complaint. They also state a claim for breach of fiduciary duty in causing and allowing the Savings Plan to purchase or accept Enron's matching contributions in the form of Enron stock once the fiduciaries allegedly knew or should have known of the inherent risk of such stock in light

---

**145.** The Fifth Circuit in *McGann,* 946 F.2d at 407 n. 9, pointed out:

*Musto* involved an ERISA claim by retirees that their former employer violated contractual and fiduciary duties by changing the terms of their medical coverage. The court rejected plaintiffs' claim that they had a vested interest in the terms of their medical coverage. *Musto* . . . noted that "[t]here is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second."

of the circumstances alleged in the complaint.

 A claim has also been stated in Count I against Enron and the Compensation Committee for breach of their fiduciary duty of providing information necessary for Plan Administration because they allegedly withheld from the Administrative Committee (which in turn purportedly failed in its fiduciary duty to investigate) material information regarding the actual financial condition of Enron. Despite alleged red flags and warnings, Olson[146] and Prentice were among the members of the Administrative Committee who purportedly did nothing to protect plan participants and beneficiaries until November 2001, when Enron was near bankruptcy. The complaint asserts that Lay and Olson were not only forewarned by Enron vice president Sherron Watkins, formerly an Arthur Andersen accountant and thus highly knowledgeable about corporate accounting, of significant accounting malfeasance at Enron,[147] but as a result of Watkins' contentions, Lay became involved in setting up an "investigation" of the allegation by Vinson & Elkins, even though Watkins had voiced concern about the law firm's blatant conflict of interest in performing it. Furthermore, after Watkins' warning, Lay sold substantial amounts of his Enron stock holdings while contemporaneously and repeatedly exhorting plan participants and beneficiaries at meetings and by e-mail to buy more, touted Enron's financial strength, and made no disclosure of the material concerns, much of which Olson personally observed. He also purportedly misrepresented that the accounting for Enron's off-balance sheet partnerships and SPVs was approved by "all of our internal officers as well as our external auditor and counsel," while failing to mention Watkins' vocalized concerns. *See generally* Com-

---

**146.** Plaintiffs have alleged that Olson had read an article in the March 5, 2001 *Fortune* magazine that discussed Wall Street worries about Enron's increasing secrecy, growing debt, bullish expectations, "opaque accounting and dubious rationalizations" for its high stock price (then $76 per share), all of which constitute a "red flag" that "may increase the chance of a nasty surprise," but did not share that information even with other members of the Administrative Committee. Complaint at 237, ¶¶ 679–80. Olson purportedly sold over $2 million worth of Enron stock in January and February 2001 and another $350,000 worth of Enron stock at $71 per share on March 8, 2001. The complaint, at 238, ¶¶ 685–86 and 703, alleges that Olson also concedes that in August 2001 she was warned orally and in writing by Sherron Watkins about Watkins' concerns that the company "would implode in a wave of accounting scandals," and that Olson also learned that Fastow wanted Watkins fired for her warnings. Nevertheless, according to the complaint, Olson, in breach of her fiduciary duties did nothing, even while personally witnessing Lay repeatedly urge employees to invest in Enron stock. Olson purportedly admitted that only in November 2001 did the Commit-

tee seek legal and investment advice about the prudence of Enron stock as a Plan investment option. Prentice, who conceded that neither he nor the Committee members had ever questioned the prudence of Enron Stock as a Plan investment until November of 2001 and that he was not competent to evaluate the issue, is alleged to have sold $900,000 worth of company stock in June 2001. Complaint at 240, ¶ 693.

**147.** The complaint, at 238, ¶ 687, asserts,

Any prudent, disinterested fiduciary would at that point, among other things, have immediately convened an emergency meeting of the Plan Administrative Committee, made full disclosure of Watkins' allegations to the Committee, the Plan's counsel, the Plan's investment consultant and the Plan's participants; and taken actions to promptly suspend any further use of Enron stock as a Plan investment (based either on employee or employer contributions) pending a Committee investigation conducted independent of Enron, Andersen, and Vinson & Elkins and, upon receiving the result of such independent investigation, liquidate the Plan's Enron stock holdings.

plaint at 242–43 ¶¶ 705–709. The complaint also charges the Administrative Committee with an ongoing conflict of interest:

In considering the use and continued use of Enron stock as an investment option in the Plan for participant contributions (deducted from participants' paychecks), and in monitoring the prudence of continuing to implement Enron's decision to match employee contributions in Company stock (the employer matching contribution), the Administrative Committee members as employees and executives of Enron, and Enron itself who oversaw the Committee members, faced a direct, ongoing conflict of interest given the manifold business reasons they had for wanting to see employees heavily invested in Company stock.

Complaint at 240, ¶ 694.

Members of both the Administrative and the Compensation Committees, Enron, and Olson, when they spoke about plan investments, had a fiduciary obligation not to materially mislead plan participants and beneficiaries about Defendants' concealment of Enron's precarious financial condition by means of erroneous accounting and about the risk involved in investing their assets in and retaining its stock. *Varity Corp. v. Howe*, 516 U.S. at 506, 116 S.Ct. 1065 ("Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA"); *Schlumberger*, 338 F.3d at 424–25 ("The Supreme Court's words in *Varity* instruct that when an employer chooses, in its discretion, to communicate about future plan benefits, it does so as an ERISA fiduciary. In speaking it is exercising discretionary authority in the administration of the plan .... Thus it has a duty to refrain from 'knowingly and significantly deceiving a plan's beneficiaries 'in order to save the employer money at the beneficiaries' expense' ...."); *Mullins v. Pfizer, Inc.*, 23 F.3d at 668 ("when a plan administrator speaks, it must speak truthfully"). Communication with plan participants about employee benefit plans is an exercise of "discretionary authority" regarding the management or administration of the plans, under 29 U.S.C. § 1001(21)(A)(i) and (iii), and is a fiduciary act. *Varity Corp. v. Howe*, 516 U.S. at 502, 116 S.Ct. 1065. These Defendants allegedly breached their fiduciary duty to protect the plan participants and beneficiaries through failure to disclose to them and to other Committee Members that what they knew or should have known, through prudent investigation, was a threat to the pension plans or to correct any material misinformation. Lay and Olson in particular are described in the complaint as explicitly encouraging plan participants to direct the Savings Plan and ESOP fiduciaries to purchase and hold Enron stock when they knew or should have known that it was an imprudent investment option. In *Varity Corp.*, 516 U.S. at 502–03, 116 S.Ct. 1065, the Supreme Court found that "conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation," was part of a plan administrator's duty "to offer beneficiaries detailed plan information" and, that misinformation about such provided in conjunction with misrepresentations about the business health of the company, constituted an act of plan administration subject to fiduciary standards. Moreover Olson allegedly failed to correct what she knew were material misstatements of fact made by Lay, i.e., statements substantially likely to mislead plan participants in making informed decisions about investing in Enron stock, in the fall of 2001 that affected the interests of the plan participants and beneficiaries and which plan participants and beneficiaries, to protect their interests, should but did not know were untruthful. Administrative Committee Member Defen-

dants also allegedly failed not only to conduct, but even to consider conducting, a prudent investigation of Enron's financial situation and of Enron stock as an investment option for retirement assets until Enron was on the very edge of bankruptcy.

In sum Plaintiffs have stated claims against Enron, Lay, Olson, other Enron ERISA Defendants (including the Compensation Committee and the Administrative Committees) for breaching duties of undivided loyalty to the interests of the Savings Plan and ESOP plan participants and beneficiaries and duty of care to act with the skill, prudence and diligence under the circumstances to the extent that they were authorized to perform fiduciary duties: these Defendants allegedly exercised, but in specified cases not well,[148] their explicit duty to select and appoint fiduciaries, but, despite knowledge of the threat to the plan participants' retirement assets, failed to investigate adequately, failed to provide material information or correct misleading information essential to prudent administration of the plans, failed to direct the trustee regarding prudent investment of plan assets in both the Savings Plan, including employer matching contributions, and the ESOP, and failed to monitor or remove their appointees for incompetence. Instead the complaint charges that they permitted, encouraged, or induced uninformed plan participants to invest in or retain Enron stock in their Savings Plan individual accounts. The fact that the Savings Plan is asserted not to be a § 404(c) plan makes the Plan fiduciaries potentially liable for all investment decisions taken by the plan participants.

 Count V addresses breach of the fiduciary duty to appoint, monitor and remove. As indicated earlier, as a matter of

law, because Enron (i.e., a corporation acting through employees who perform functions on behalf of the corporation) has authority and control over appointments of fiduciaries to administer the plan and control its investments, it also has a fiduciary duty to monitor its appointees.

The ESOP (Ex. C to #322) at § 14.10 designates Enron as the Plan administrator, which is authorized under § 14.1 to appoint a Committee for Administration of the Plan. "For purposes of [ERISA], the Committee shall be the 'named fiduciary' with respect to the general administration of the Plan (except as to the investment of the assets of the Trust Fund)." *Id.* at § 14.1. Among the duties assigned by the ESOP to the Administrative Committee is "to direct the Trustee as to the purchase and sale of Company Stock" and "to instruct the Trustee as to the management, investment and reinvestment of the Trust Fund generally." *Id.* at § 14.7(*l*) and (n).

In a supplement (#619), Outside Director Defendants have argued that the Compensation Committee Defendants are not "named fiduciaries" under the 1994 amendment to the ESOP (Ex. C to #619), which superseded the 1989 version of the ESOP and deleted any express reference to the Board of Directors' having powers of appointment of investing fiduciaries and thus the ESOP ERISA claim against them should be dismissed.

Plaintiffs have responded (#623) that the Board of Directors were not "named" fiduciaries in the 1994 amendment, but "functional fiduciaries" who in exercising the duty to appoint, failed to monitor the fiduciaries of all three Plans. *Landry v. Air Line Pilots Ass'n Intern., AFL–CIO,* 901 F.2d 404, 418 (5th Cir.)("[W]e must emphasize that fiduciary status is to be

---

**148.** See, for example, Prentice's alleged admission that he was incompetent to fill his fiduciary duties on the Committee.

determined by looking at the actual authority or power demonstrated, as well as the formal title and duties of the party at issue"), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990).

The Secretary of Labor, however, has pointed out that the controlling version of the ESOP for all conduct following the date it became effective here is the January 1, 1999 document (Ex. B to # 625), which was approved by the same Board of Directors now challenging the complaint under the earlier 1994 amendment to the plan. The 1999 version explicitly restated the ESOP "in its entirety . . . except as otherwise indicated herein" according to Ex. A, p. ii, to # 625. Section 1.1(14) of that plan defines "Directors" as "The Board of Directors of Enron Corp." *Id.* at I–3. Section 16.1 ("The Trustee shall be appointed, removed, and replaced by and in the sole discretion of the Directors") of that document expressly states that the Directors had that authority. Moreover, argues the Secretary, that provision is consistent with Section 17.2's authorization, "The Company shall have the sole authority to appoint and remove the Trustee or members of the Committee," because, as made clear by § 16.1 and as a matter of established law, a corporation acts through its board of directors to effectuate its corporate duties. *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 80–81, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)(because only natural persons can make decisions and because principles of corporate law provide ready-made rules for determining who has the authority to make decisions on behalf of a corporation, an ERISA plan need not specify individuals or bodies within the "Company" to show who has the authority to perform the action on behalf of the corporation). This Court agrees. In part for the same reason, the Court agrees with the Secretary and disagrees with Outside Directors' reply, which contends that Sections 16.1 and

17.2 of the 1999 ESOP are inconsistent and ambiguous. Under federal common law, drawing on analogous state law, to the extent that it is consistent with congressional policy concerns, pertaining to the rules of contract construction (applicable because the ERISA plan is administered by a federal agency), one part of a writing should not be construed to nullify another; a contract should be interpreted as a whole, and its provisions should be read to give effect to and harmonize all where possible. *See, e.g., Transitional Learning Community at Galveston, Inc. v. U.S. Office of Personnel Management,* 220 F.3d 427, 431 (5th Cir.2000); *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1451–52 (5th Cir. 1995). After reviewing the documents, the Court concurs with the Secretary's view that the controlling plan is clear and unambiguous. Should there be a dispute whether the Outside Directors were actually the Company officials involved in the appointments, it can be raised on summary judgment after discovery.

Similarly Outside Directors argue that the Savings Plan did not invest them with any power of appointment. As indicated in the summary of the relevant terms of the Savings Plan, Enron had and exercised the power of appointment, which, as a corporation, it necessarily did through its Board of Directors. Under the holding of *Curtiss–Wright Corp.,* 514 U.S. at 80–81, 115 S.Ct. 1223, an ERISA plan need not specify individuals or bodies within the "Company" to show who has the authority to perform the action on behalf of the corporation.

The Court finds that Plaintiffs on behalf of the Savings Plan and the ESOP have stated claims in Count V for breach of fiduciary duties of loyalty and prudence under ERISA against Enron, Enron ERISA Defendants, including Members of the Compensation and Management Development Committee ("Compensation

Committee" made up of Blake, Duncan, Jaedicke and LeMaistre), and Ken Lay,[149] because they were given the power to appoint, retain and remove plan fiduciaries (Enron to appoint members of the Administrative Committee of both plans, and all three Defendants to select, appoint and remove fiduciaries of the Savings Plan and the ESOP) and because they allegedly exercised that discretionary authority of appointment over the management or administration of a plan under § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).[150] They were expressly charged by the plans to perform the selection, and therefore the monitoring, of the Administrative Committee with respect to its control over Plan investment and the prudence of investing in Enron stock as one of the Savings Plan's investment options. *See, e.g., Coyne & Delany Co.,* 98 F.3d at 1464–65 ("the power ... to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)"); *Hickman,* 840 F.2d 564("Tosco is a fiduciary within the meaning of ERISA ... because it appoints and removes the members of the administrative committee that administers the pension plan."); *Sommers Drug Stores,* 793 F.2d at 1459–60; *Leigh v. Engle,* 727 F.2d at 133–35; *Martin v. Feilen,* 965 F.2d at 668–70; *Detroit Terrazzo Contractors Ass'n v. Board of Trustees of B.A.C. Local 32 Ins. Fund,* 176 F.Supp.2d 733, 739–40 (E.D.Mich.2001); ERISA Interpretative

Bulletin 75–8, 29 C.F.R. § 2509.75–78(D–4)(members of a board of directors "responsible for the selection and retention of plan fiduciaries" have "'discretionary authority or discretionary control respecting the management of such plan' and are, therefore, fiduciaries with respect to the plan."). As such, they had a duty to insure that the selected fiduciaries in turn complied with their fiduciary duties. *Leigh v. Engle,* 727 F.2d at 134–35; *Mehling v. New York Life Ins. Co.,* 163 F.Supp.2d at 509–10; *Liss v. Smith,* 991 F.Supp. at 310, 311.

▮▮▮ The complaint has also stated a claim in Counts I and V against these Defendants for co-fiduciary liability under § 502(a)(3), 29 U.S.C. § 1132(a)(3), for knowingly participating in or concealing their knowledge of and/or failing to make reasonable efforts to remedy their co-fiduciaries' breach of fiduciary duties in violation of § 404(a), 29 U.S.C. § 1104(a). Section 405(a), 29 U.S.C. § 1105(a); *Landry,* 901 F.2d at 422–23; *American Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y,* 841 F.2d 658, 665 (5th Cir.1988)(failure to monitor and remove fiduciaries for misconduct may result in § 405 liability). The complaint further asserts that Enron, Lay, and the Compensation Committee are liable as co-fiduciaries for their failure to inform the Administrative Committees about Enron's actual financial status and/or failure to monitor their appointees and to supervise

149. Enron may be liable not only as a fiduciary to both the Savings Plan and the ESOP under § 3(21)(A), 29 U.S.C. § 1002(21)(A), but also as a party in interest under § 3(14), 29 U.S.C. § 1002(14), because it provided services to the Plans and was an employer with some employees covered by the Plans.

150. Although Outside Directors have argued that the Savings Plan's only express allocation of authority and control to the Compensation Committee was to review and approve plan

amendments, a task which does not trigger a fiduciary duty, Plaintiffs' complaint does allege that the Compensation Committee had and exercised the authority to select, monitor and remove fiduciaries to the Plan and that the Plans do explicitly allocate fiduciary duties to Enron, a corporate entity on whose behalf its officers and directors, including the Compensation Committee members, necessarily acted. Discovery will be required to determine precisely what role the Compensation Committee members played.

the Administrative Committees of the plans regarding the prudence of their decision to invest assets of the Savings Plan and the ESOP in Enron stock. Plaintiffs also claim that the Committees failed in their duty to investigate whether the investment options were prudent [151] and that the Committee Members were not competent, had no process in place for fulfilling their duty to make prudent investment decisions, and had corporate conflicts of interest that undermined their duties of loyalty to the plan participants and beneficiaries. *Brock*, 632 F.Supp. at 1524 (holding plan trustees that blindly follow the recommendations of another plan trustee or *de facto* fiduciaries liable for the others' breaches); *Sandoval v. Simmons*, 622 F.Supp. 1174, 1214–15 (C.D.Ill.1985)(fiduciaries failing to perform independent investigation of plan's investment options because of conflicting loyalties to another plan fiduciary and his corporate interests were liable for that fiduciary's breaches under § 405).

■■■ The Court additionally finds that the complaint states a claim under Count I against Arthur Andersen as a party in interest under § 3(14), 29 U.S.C. § 1002(14), as a provider of professional services to Enron and the Savings Plan, based on Plaintiffs' allegations that Arthur Andersen knowingly participated in the Enron Defendants' fiduciary breaches under § 404(a) by actively concealing from Plan fiduciaries and Plan participants and beneficiaries the truth about Enron's financial condition and the imprudence of investing in the company's stock, a prohibited transaction violation under ERISA's § 406(a). Under § 502(a)(3) and *Great–West*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635, if they prevail Plaintiffs may recover restitution in equity, disgorgement or other types of equitable relief. Plaintiffs assert that the enormous fees, over $100 million, for aiding Enron and other Defendants to breach their fiduciary duties, are traceable to Andersen's knowing participation in such breaches and are subject to such equitable remedies.

### 2. Count II: Lockdowns

■■■ Defendants to Count II have argued that they are not "fiduciaries" with respect to the transition between service providers. Some Defendants have argued that under § XV.6 (relating to "Third–Party Administrator") of the Savings Plan, Enron "may, in its sole discretion, engage any service provider which is not an employee or a subsidiary of the Company to perform identified administrative services with respect to the Plan," and that if it does engage such a "service provider," "Enron shall be fully responsible and accountable for selecting, credentialling, overseeing and monitoring such service provider, including without limitation, evaluating the quality of performance, determining whether the fees charged are reasonable, and removing or replacing such service provider as the Company deems to be necessary or appropriate in its discretion," and "[t]hereafter the Committee shall have no power, duty, or responsibility to monitor the performance of such service provider." The ESOP Plan has a parallel provision, § 14.7. Defendants argue that Northern Trust fits into this category of Third–Party Administrator and therefore the Administrative Committee has no liability relating to it. Here the Plans have specific provisions directly addressing the responsibilities of the named Trustee and the Administrative Committee, as distin-

---

**151.** Although Enron Committee members cite several cases for the proposition that Plaintiffs must show that an adequate investigation would have revealed information proving that the trustee's investment decision was objectively imprudent, all of them were decided after discovery at the summary judgment stage of the litigation. # 439 at 7.

guished from the general provision for an Enron-selected Third–Party Administrator.

Section XV.6 of the Savings Plan (Ex. A to # 322) provides that only if Enron chooses to hire an independent service provider to perform specific services for the plan and does so, and only if it informs the Administrative Committee in writing, identifying the service provider and the services to be performed by it, is Enron subsequently fully responsible for that selection and supervision of the service provider. Otherwise it appears that under the Plan's terms, the Administrative Committee, which was given "sole responsibility for the administration of the Plan" (§§ XIII.1, XV.2), is responsible wholly or in part (along with co-fiduciary Enron) for hiring, monitoring and removing third-party service providers under § XIII.7(d)(giving the Administrative Committee "the right, power, authority, and duty ... [t]o employ and compensate such accountants, attorneys, investment advisors, and other agents, employees, and independent contractors as the Committee may deem necessary or advisable for the proper and efficient administration of the Plan ...."). Parallel ESOP provision ¶ 14.7(d)(but without the written notice requirement).

The consolidated complaint alleges that the two Administrative Committees' members exercised that authority to appoint with respect to Northern Trust and recordkeeper Northern Trust Retirement Consulting, LLC. Defendants have not alleged nor demonstrated with documentary attachments that Enron invoked its discretionary authority to select the trustee, and the standard of review for Rule 12(b) motions requires the Court to accept Plaintiffs' factual allegations as true. Moreover at issue in the lockdown count is not the transfer of power from Northern Trust to a new service provider, but the Administrative Committees' discretionary control over the assets of the Plan, cutting off the plan participants' access to their individual accounts when circumstances make clear that the Committees knew or should have known that a lockdown was imprudent. Investment of Plan assets was solely within the control of the Committees and the mutual Trustee.

Olson has also challenged the assertion that she functioned as a fiduciary with respect to the lockdown decision. The complaint asserts that she, not only as a Committee Member, but also as a corporate officer for Enron, performed fiduciary functions on behalf of Enron relating to the transition in service providers and that the decision to lockdown the plans despite extraordinary circumstances that allegedly made the choice imprudent and disloyal to plan participants and beneficiaries. Lay, Enron's CEO, also is alleged to have exercised supervisory authority over the Committees and over Northern Trust and to have breached his fiduciary and co-fiduciary duty; thus he purportedly had some authority relating to the lockdowns.

According to the complaint, the lockdowns prevented both plan participants from directing the transfer and plan fiduciaries from fulfilling their duties of prudence and loyalty by disregarding, contrary ERISA provisions, and by transferring the participants' assets at a critical time. As a result, the Enron stock in the Savings Plan purportedly lost more than one-third of its value, and in the ESOP, more than two-thirds of its value.

Plaintiffs have stated a claim for breach of fiduciary and co-fiduciary duties to the ESOP and Savings Plan participants and beneficiaries against Enron, the Enron ERISA Defendants (see footnote 4 of this memorandum and order), and the named fiduciary and trustee Northern Trust, whether deemed a directed trustee or not, for proceeding with a previously scheduled

lockdown of the Savings Plan and the ESOP on October 26, 2001 and October 20, 2001, respectively, in spite of the extraordinary circumstances, enumerated below,[152] that obviously made the lockdowns an extreme threat to the participants' interests in their employee benefit plans. Plaintiffs have stated a claim that these exigent circumstances should have triggered the trustee's fiduciary duties to its plan participants and beneficiaries to postpone or at least to limit the duration of the scheduled lockdowns,[153] as Defendants had the ability to do.

First, the complaint asserts that Enron shocked Wall Street with the announcement on October 16, 2001 that it had lost $618 million in the quarter and was writing down $1.2 billion of its net worth. The media were filled with stories raising questions about the corporation's financial stability. Concerned employees urged Northern Trust and Enron to postpone the lockdowns. Their questions may have triggered the fiduciaries' duties to respond with truthful and complete information that would apply to the plans as a whole. Even without questions from the plan participants and beneficiaries, the fiduciaries had a duty to disclose to the participants and beneficiaries material facts affecting their interests in the plans' assets of which they were unaware and which threatened their retirement funds. With Enron's report to Wall Street, if not before, according to the complaint, Olson should have

known that Watkins' warnings in August had substance and that Lay had misled plan participants with his representations that Enron's financial picture that quarter was "great." Yet allegedly she continued to do nothing.

Second, on October 22, 2001, Enron announced that the SEC was informally investigating the company.

Third, two days later Fastow was forced to leave his position of Chief Financial Officer, which was taken over by McMahon, who had earlier voiced many of the same concerns about Enron's purportedly massive accounting improprieties as Watkins.

Furthermore, the complaint asserts that in the face of a swell of complaints and demands from panicked Plan participants, Enron actually did inquire about possible postponement of the lockdown and was told by Northern Trust and Hewitt Associates that a postponement was physically possible. Nevertheless, according to the complaint, although they knew or should have known the likely harm that would result for plan participants and although they had the discretion and power to delay the lockdowns, Enron decided that a postponement would be "inconvenient"; Olson, purportedly without even consulting other members of the Administrative Committee, refused the Plan participants' requests for a postponement; and Northern Trust, the named trustee and a fiduciary for the Savings Plan and the ESOP,[154] recom-

---

**152.** Other courts have also found a duty to disclose based on unique circumstances. *See, e.g., Glaziers and Glassworkers,* 93 F.3d 1171 (holding that plaintiffs, a group of benefit pension plans, stated a claim for breach of fiduciary duty against a former brokerage firm for failure to disclose that one of its brokers had been forced to resign on suspicion that he had committed fraud, after which the pension funds followed that broker to his new employer and the broker embezzled more than $2 million from the funds).

**153.** In the face of the outcry from plan participants, the Committee Members purportedly shortened the original month-long lockdown to twelve business days. Plaintiffs claim even that amount of time was a breach of fiduciary duty under the circumstances. Clearly fact questions exist that may not be resolved at this stage of the litigation.

**154.** *See* §§ 1.24. 3.6; Articles V and VI of the Savings Plan Trust Agreement (Ex. B to # 322).

mended that the lockdowns proceed even though it had the power to stop them and despite the extreme circumstances and participants' outcry. In addition, allege Plaintiffs, the objections made to Northern Trust by the participants about their plight triggered a duty in the fiduciary to communicate all material facts in connection with the transaction that the trustee knew or should have known, a duty which it did not fulfill.

This Court emphasizes that the Fifth Circuit's approach to issues of fiduciary duties has generally been a case- and fact-specific inquiry and a rejection of bright-line rules and "easy formula[s]." *See, e.g., Schlumberger,* 338 F.3d at 427; *Ehlmann,* 198 F.3d at 556. Such an evaluation requires a record developed through discovery; thus dismissal is not appropriate based on a 12(b)(6) motion.

Plaintiffs have further complained that these Defendants had a duty to provide timely and informative notice of the lockdown to Savings Plan participants so they had an opportunity to safeguard their rights and direct Northern Trust to sell the Enron stock allocated to their individual accounts; instead Enron sent notice to participants by e-mail on October 25, 2001 at 11:44 p.m., the day before the lockdown, and employees did not receive it until they came to work on the day of the lockdown.[155] The complaint asserts they had no reasonable time to "review [their] overall strategy and carefully weigh the potential earnings of each investment choice against its risk before making investment decisions that are aligned with [their] long-term financial plans and [their] risk tolerance," as directed by the e-mail. Consoli-

dated complaint at 244–47, ¶¶ 710–25. Given the timing of the e-mail and the lack of opportunity for this kind of detailed portfolio review, the fiduciaries knew or should have known that the notice was clearly inadequate, maintain Plaintiffs.

According to Plaintiffs, the lockdowns denying Plaintiffs access to their retirement investments were an exercise of control over the assets of the plans by Northern Trust. As noted *supra,* exercise of control over the assets of a plan does not require the person exercising control to have discretionary authority to do so in order to be a fiduciary; only the exercise over the management of a plan requires discretionary authority. *FirsTier,* 16 F.3d at 911; *IT Corp.,* 107 F.3d at 1421; *Wettlin,* 237 F.3d at 272–74. Thus Northern Trust was a fiduciary in imposing the lockdowns. Even if it was acting as a directed trustee with lessened discretion or control over imposing lockdowns, Northern Trust was still required to determine whether its directions complied with ERISA and thus disregard allegedly improper instructions of the Administrative Committee.

Finally, Plaintiffs have stated a claim for co-fiduciary liability against the Enron ERISA Defendants, Northern Trust, Olson, and the Administrative Committee relating to their action or inaction in knowingly participating in the lockdowns and failing to make reasonable efforts to remedy the breaches of their co-fiduciaries.

### 3. Count III: Failure to diversify Savings Plan assets

 Plaintiffs have also stated a claim against the Enron ERISA Defendants, in-

---

**155.** An initial notice was sent on October 8, 2001, before any of the "extraordinary circumstances" materialized, providing ESOP participants with the routine notice that unless they filed distribution request forms with Northern Trust by October 20th, their ESOP assets would remain in Enron stock until No-

vember 20. Once Enron made its shocking announcement on October 16, plan participants sent "a slew of complaints ... to Northern Trust urging Northern Trust to postpone the lockdowns." Complaint at 244, 246, ¶¶ 710, 718.

cluding the Administrative Committee, and against Northern Trust for failure to diversify Savings Plan assets in accordance with the plan's provisions and ERISA.[156]

Section XV.2 of the Savings Plan provides with respect to allocation of fiduciary duties:

Each fiduciary with respect to the Plan shall have only those specific powers, duties, responsibilities and obligations as are specifically given him under the Plan. Enron Corp. shall have the sole authority to appoint and remove the Trustee and members of the Committee. Except as otherwise specifically provided herein, the Committee shall have the sole responsibility for the administration of the Plan, which responsibility is specifically described herein. Except as otherwise specifically provided herein and in the Trust Agreement, *the Trustee shall have the sole responsibility for the administration, investment, and management of the assets held under the Plan.* However, if the Committee, as a co-fiduciary, shall exercise its power given hereunder at any time, and from time to time, by written notice to the Trustee, to direct the Trustee in the management, investment, and reinvestment of the Trust Fund, then in such event *the Trustee shall be subject to all proper directions of the Committee that are made in accordance with the terms of the Plan and the Act. It is intended under the Plan that each fiduciary shall be responsible for the proper exercise of his own powers, duties, responsibilities, and obligations hereunder* and shall not

be responsible for any act or failure to act of another fiduciary except to the extent provided by law or as specifically provided herein.

Section XV.1 makes clear that Article XV, titled "Fiduciary Provisions," "shall control over any contrary, inconsistent or ambiguous provisions contained in the Plan." A critical provision under Article XV for purposes of this suit, § XV.3(c) of the Savings Plan states, "Each fiduciary under the Plan, including, but not limited to, the Committee and the Trustee ... shall discharge his duties and responsibilities with respect to the Plan" *inter alia* by "diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly not prudent to do so."[157] In addition, § XV.3(d) requires each fiduciary to act "[i]n accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with applicable law."

Moreover, while § 1.1 of the Savings Plan Trust agreement (Ex. B to # 322) states that the Administrative Committee "has the responsibility ... for monitoring the diversification of the investments of the Funds," § 6.2 mandates that, subject to its duty of loyalty and the prudent man standard, "the Trustee shall diversify the investments of that portion of the Fund of which it has investment responsibility so as to minimize the risk of large losses ...." Furthermore § 6.3 recites that subject to its duty of loyalty and the prudent man standard, "the Trustee shall, with re-

---

**156.** Plaintiffs indicate in their memorandum in opposition to Northern Trust's motion to dismiss, # 316 at 38 n. 19, that although Count III currently refers only to the Savings Plan, because the ESOP Plan has parallel language requiring the trustee to prudently diversify, it will request leave of Court to amend to add the ESOP to Count III.

**157.** Therefore under §§ XV.1, XV.3 and XIX.5 (authorizing but not mandating investment of Plan assets in Enron stock), only if investment of Plan assets in Enron stock were prudent would nondiversification have been appropriate. Plaintiffs contend that not only was the decision to invest the assets in Enron stock imprudent, but that Defendants failed to investigate whether it was prudent.

spect to that portion of the Fund of which it has investment responsibility, follow the investment guidelines established by the Administrative Committee and shall act in accordance with the direction of the Administrative Committee ...." Thus the Savings Plan mandates that the Administrative Committee and the Trustee share a fiduciary responsibility to diversify plan assets where prudent. The trustee furthermore has a duty to plan participants not to follow the Administrative Committee's directions where they are contrary to ERISA, i.e., where they would lead to an imprudent result harmful to the plan participants and beneficiaries.

An exception to the diversification requirement is established by § 404(a)(2) of ERISA, 29 U.S.C. § 1104(a): an "eligible individual account plan" may acquire and hold qualifying employer securities (as defined in § 1107(d)(4) and (5)) without regard to the diversification requirements or the diversification element of the prudent man rule. Section 3(34) of ERISA, 29 U.S.C. § 1002(34), defines an "individual account plan" as one that

> provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains, and losses, and forfeitures of accounts of other participants which may be allocated to such participant's accounts.

*In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 425 n. 1 (3d Cir.), *cert. denied*, 519 U.S. 810, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996). A 401(k) plan is a type of individual account plan.

Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary has a duty to "diversif[y] the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Since no statute or regulation has defined that duty, the Fifth Circuit has turned to the legislative history for guidance:

> The degree of investment concentration that would violate this requirement to diversify cannot be stated as a fixed percentage, because a fiduciary must consider the facts and circumstances of each case. The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; (7) the dates of maturity.

*Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir.1997), *citing* H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5084–85 (Conference report at 304). The appellate court admonished, "It is clearly imprudent to evaluate diversification solely in hindsight—plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time the investment was made." *Id.* Thus, "[p]rudence is evaluated at the time of investment without the benefit of hindsight." *Id.* As to the question of who bears the burden of proof, to demonstrate a breach of the duty to diversify the plaintiff must show that the portfolio was not diversified "on its face"; the burden then shifts to the defendant fiduciary to show why under the circumstances it was prudent not to diversify the investments of the plan. *Id.*

As noted, the Savings Plan states, "Each fiduciary under the Plan, including, but not limited to, the Committee and the Trustee ... shall discharge his duties and responsibilities with respect to the Plan" by, *inter alia*, "diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstance it is

clearly not prudent to do so." Enron Corp. Savings Plan § XV.3(c). The Plan provision's language is nearly identical to the language of § 404(a)(1)(C) of ERISA, 29 U.S.C. § 1104(a)(1)(C)("[A] fiduciary shall discharge his duties with respect to a plan solely in the interests of participants and beneficiaries and ... by diversifying the investment of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so . . . .").

Plaintiffs concede in their complaint at ¶ 696 that ERISA explicitly exempts defined contribution plans (a/k/a "individual account plans") from the diversification requirement to the extent that the employee benefit plan invests in the employer's own stock. Section 404(a)(2), 29 U.S.C. § 1104(a)(2), provides, "In the case of an eligible individual account plan (as defined in section 407(d)(3) of this title"), the diversification requirement of (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is [sic] not violated by [158] acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 407(d)(4) and (5)). Section 407(d)(5)(A) defines "qualifying employer security" as "an employer security which is ... stock." 29 U.S.C. § 1107(d)(5)(A). Plaintiffs also admit that the Savings Plan at issue here was an eligible individual account plan within the meaning of § 407 of ERISA, 29 U.S.C. § 1107. Complaint at ¶ 158. Nevertheless, since an employer may establish the conditions and terms of its plan as long as these conditions and terms do not violate ERISA, and because neither the statute nor the plan mandates non-diversification in the individual account plan, Plaintiffs argue that § XV.3 of the Savings Plan, charging the Administrative Committee and Northern Trust with the duty of "diversifying the investments of the Plan so as to minimize the risk of large losses," controls over § 404(a)(2), 29 U.S.C. § 1104(a)(2).

Urging that Plaintiffs cannot state a claim for failure of the fiduciaries to diversify the Savings Plan, Defendants highlight a different provision in the Plan, which they claim is contrary to § XV.3, i.e., § XIX.5, which provides, "The Plan is specifically authorized to acquire and hold up to 100% of its assets in 'qualifying employer securities' as such term is defined in Section 407(d) of [ERISA]." Moreover, Section V.16 of the Savings Plan (Joint Appendix In Support of Defendants' Motions to Dismiss Amended and Consolidated Complaint, # 271, at Ex. A) provides that Enron's 50% match of employees' contributions would be made "primarily" in Enron stock and remain in such stock until participants reach the age of 50. Complaint at ¶¶ 677, 161.

After examining the text of the Savings Plan, the Court concludes the provisions are not in conflict and that Plaintiffs can state a claim under the key "clearly prudent under the circumstances" standard established in § XV.3(c): "[e]ach fiduciary ... **shall discharge his duties and responsibilities** with respect to the Plan **by** *inter alia* **diversifying the investments of the Plan** so as to minimize the risk of large losses, **unless under the circumstances it is clearly not prudent** to do so [emphasis added]." While the plan authorizes the trustee to hold "up to 100% of its assets" in Enron stock, it does not mandate that the trustee hold 100%, or even 30% or 20%, of its assets in Enron stock, and, in fact, seemingly allows com-

---

**158.** Note the statute does not mandate that the plan utilize the exception and not diversi-

fy.

plete discretion in how much may be invested in Enron stock where the circumstances make such investment imprudent. There also is substantial discretion permitted in § V.16's requirement that employer matching contributions be "primarily," but not wholly, in Enron stock. The language and grammatical structure of the Savings Plan's § XV.3 indicate that diversification is the general rule, not the exception, and where diversification is not effected, there is a burden to justify that the absence of diversification was clearly prudent under the circumstances. As most investment advisors inform their clients, putting all of one's eggs in a single basket is clearly a risky investment strategy; it is the rare case where diversification "is clearly not prudent." According to the parallel provision to § XV.3(c) in ERISA (§ 404(a)(1)(C)) and, as noted earlier, to case law construing it, if the fiduciary trustee decides not to diversify and is subsequently sued for breach of fiduciary duty, once a plaintiff meets the minimal burden of showing that the portfolio is not diversified on its face, the trustee then bears the much heavier burden to show that the choice was **clearly** prudent under the circumstances. *Metzler*, 112 F.3d at 209.

The complaint meets its light burden by alleging as facts that immediately before the lockdown, and in light of the red lights and rapidly deteriorating circumstances described in the pleadings, the Plan assets were dangerously overweighted in Enron stock, which constituted 60% of its investments, as Olson conceded during her testimony before Congress. It charges that Defendants breached their responsibility to protect the investments and to diversify.

The complaint states a claim specifically against the Administrative Committee [and its members], which, despite the express Savings Plan provision mandating diversification where prudent, allegedly did not question or investigate the prudence of investing Plan assets in Enron stock and did nothing to direct Trustee Northern Trust to diversify, nor did it supervise to insure that Northern Trust did diversify, the Savings Plan's assets.[159] As further factual support for breach of their fiduciary duty, Plaintiffs have asserted that the Administrative Committee had no process for monitoring the prudence of Enron stock as an investment option nor for discontinuing that option for the Plan if it became imprudent, as evidenced by the Congressional testimony of Prentice and Olson, both members of the Administrative Committee. The complaint asserts that Prentice and Olson admitted that only in November 2001, just prior to Enron's bankruptcy, did the Committee seek legal and investment advice about the prudence of using Enron stock as an investment option. The Court has previously noted allegations in the complaint regarding prior warnings to Olson about Enron's financial condition. The complaint also asserts that Olson missed most of the Committee meetings in breach of her fiduciary duties. The Court finds that the complaint has stated a claim that Olson failed to act solely in the interest of the Savings Plan participants and beneficiaries with the care skill prudence and diligence under the circumstances that a prudent person in similar circumstances would use.

Furthermore, although Enron's matching contributions under § V.16 of the Savings Plan were to be made "primarily in Enron stock," Plaintiffs have stated a claim in alleging that the Administrative Committee had an overriding fiduciary

---

159. The complaint at 241, ¶ 699, states, "Olson agreed with Senator Lieberman that the Savings Plan, which had 60% or more of its total assets invested in Enron stock as of last year, was not in fact 'diversified.' "

duty to monitor the prudence of allowing Enron to continue to match employee contributions with Enron stock if the stock became an imprudent investment, as they assert it had. ERISA § 404(a)(1)(D), 29 U.S.C. § 1004(a)91(D)(a fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . . in accordance with the documents and instruments governing the plan insofar as such documents are consistent with the provisions of this title and title IV."). Plaintiffs have further pointed out that "primarily" means "for the most part," not "all," and that the leeway provides the plan fiduciaries with considerable discretion, which they allegedly did not exercise prudently or loyally. Moreover, an investment fiduciary must disregard plan documents if following their terms would be imprudent. *Laborers National Pension Fund*, 173 F.3d at 322; *Cunningham*, 716 F.2d at 1467 (ESOP fiduciaries breached duty of prudent in purchasing company stock); *Eaves*, 587 F.2d at 459 (ERISA "requires that in making investment decision whether to invest in company stock, an ESOP fiduciary, like a fiduciary from other ERISA plans, is subject to the "solely in the interest" and "prudence" tests of § 404).

Because the complaint states a claim that the Administrative Committee and the Trustee were fiduciaries that breached their duties, Plaintiffs also state a claim against each for co-fiduciary liability relating to the failure to diversify under 29 U.S.C. § 1105(a)(2).

**4. Count IV (Plaintiffs on behalf of certain retirement plan participants and beneficiaries sue Enron and the Enron ERISA Defendants for breach of fiduciary duties to the Cash Balance Plan participants and beneficiaries from 1998–2000 [160] relating to offsets based on the inflated value of Enron stock)**

Section XVII.1 of the Cash Balance Plan provides in part,

The general administration of the Plan shall be vested in the Committee, which shall be appointed by the Company and shall consist of one or more persons. . . . For purposes of the Act, the Committee shall be the Plan "administrator" and shall be the "named fiduciary" with respect to the general administration of the Plan (except as to the investment of the assets of the Trust Fund).

Ex. A.3 to # 271. The "Company" denotes Enron Corp. *Id.* at (i). The Committee's duties are set out in § XVII.7. Section XVIII.1, dealing with the Trustee, states that "[t]he Trustee shall be appointed, removed and replaced by and in the sole discretion of the Company. The Trustee shall be the 'named fiduciary' with respect to investment of the Trust Fund's assets." Moreover, under Section XVIII.5, "The Committee shall issue directions to the Trustee concerning all benefits which are to be paid from the Trust Fund pursuant to the provisions of the Plan." Section XVIII.7, entitled *"No Benefits to the Employer,"* states, "No part of the corpus or income of the Trust Fund shall be used for any purpose other than the exclusive purpose of providing benefits for the Members and their beneficiaries and of defray-

---

**160.** Cindy Olson, whom the complaint identifies as one of the ERISA Defendants, insists, and points to ¶ 679 of the complaint to demonstrate that she did not join the Administrative Committee, which is charged with making the offset calculations, until January 2001 and thus this claim as to her should be dismissed. Because Plaintiffs have asserted that Olson is liable as a fiduciary in her capacity both as a Committee Member and as a corporate officer for Enron, with a duty to monitor, the fact that she did not become a Committee Member until January 2001 will not relieve her of potential responsibility.

ing reasonable expenses of administering the Plan." The Cash Balance Plan expressly limits "[t]he power to appoint or otherwise affect the Committee or the Trustee and the power to amend the Plan and Trust Agreement" to the "Company, alone [emphasis added]." § XX.3, Ex. A–3 to # 271. Section XXI.1 provides ... "the Company may from time to time amend, in whole or in part, any or all provisions of the Plan ...." Nevertheless, § XXI.2 makes clear, "No amendment of the Plan may be made that would vest in the Employer, directly or indirectly any interest in or control of the Trust Fund."

 With respect to the amendment of the Cash Balance Plan effective in 1996, and its computation of the offset to a plan participant's average pay for retirement benefits under § 5.2(g) of the amended Cash Balance Plan, Plaintiffs have asserted that Enron and the ERISA Defendants, because they knew or should have known that the market price of Enron stock did not reflect its actual value, breached their fiduciary duty by (1) failing to use the true value of Enron stock, which Defendants knew or should have known, rather than the artificially inflated market price, to compute the offset; (2) failing to fix permanently the market value component of the offset because it did not reflect the stock's real value at the close of the market on the first day of each year from 1996 to 2000; and/or (3) failing to disclose to participants and beneficiaries that the value of the stock used for the offset was artificially inflated or not the actual value of the stock on the relevant dates.

In opposition, Defendants have argued that the offset is part of the design of a plan, for which Enron was wearing its settlor hat and not its fiduciary hat, and thus they are not subject to fiduciary duties.[161]

Plaintiffs, in turn, insist that their claim is based not on the design of Enron's plan, but on implementation of the plan because Enron undermined the plan when it artificially and fraudulently manipulated the plan's components, specifically the market price of Enron stock. Plaintiffs also contend that Defendants had a fiduciary duty to provide plan participants with the information that the value of the stock was inflated. # 315 at 72.

Plaintiffs have not argued that Enron did not have the right as settlor to amend its earlier plan to create the Cash Balance Plan without triggering fiduciary duties. Nor have Plaintiffs alleged that the Cash Balance Plan was not amended in accordance with the procedures laid out in the plan document nor that use of a stock price on a fixed date (January 1st for five years) is, on its face, an impermissible offset of accrued pension benefits. Nor is their challenge to a decrease in accrued benefits, based on § 204(g), 29 U.S.C. § 1054(g). They also do not challenge the use of the amended formula during at least its first couple of years, since "[b]etween 1993 and 1997, Enron's stock did not appreciate significantly," prior to the Class Period. Complaint at ¶ 196.

According to the complaint, beginning in 1998, the company diversified, acquired

---

**161.** Plaintiffs have not challenged the amendment of the plan that put the new computation formula into effect. Even if they had, it is black letter law that ERISA's fiduciary standards do not apply when an employer amends an ERISA benefit plan; the amendment relates to "the composition or design of the plan itself and does not implicate the employer's fiduciary duties .... ERISA's fiduciary duty requirement simply is not implicated where [the employer], acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan, such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Hughes Aircraft Co.,* 525 U.S. at 444, 119 S.Ct. 755. *See also Izzarelli v. Rexene Products Co.,* 24 F.3d 1506, 1522–25 (5th Cir.1994).

more and new businesses, and the price of Enron stock increased substantially through 2000; at some point, not clearly pinpointed, the price became fraudulently inflated. While the amount of the offset under the Cash Balance Plan also increased, thereby reducing the participants' and beneficiaries' accrued pension benefits, had that rise in value of Enron reflected Enron's actual worth, the larger offset amount would not have injured Plaintiffs because their ESOP account holdings would also have increased substantially. Thus in essence the target of Plaintiffs' claim is not the new pension benefit plan formula established by the amendment. The cause of the injury is not the structure of the plan itself, but the purported fraud that allegedly began to occur a couple of years after the 1995 amendment became effective and which caused the market value of the stock to rise when the actual financial condition of the company was deteriorating, thereby making the application of the plan's formula injurious to plan participants and beneficiaries.

Plaintiffs have characterized their claim as a breach of fiduciary duty on the grounds that once Defendants knew or should have known that Enron's precarious financial condition and fraudulent accounting made evident that Enron stock was overpriced (identified by the complaint at 53, ¶ 189, as "the three-year period 1998–2000"), the plan fiduciaries should have disregarded the terms of the plan for those three years, determined what the true value of the stock should have been, and computed each component of the offset with that true value, or refused to fix the component permanently at the artificially inflated closing price as the plan mandated, or disclosed to plan participants and beneficiaries that the values of the stock were artificially inflated. Instead Defendants proceeded according to the plan amendment's formula even though they knew that the new formula would unfairly reduce the plan participants' pension benefits. Moreover, in the context of the larger scheme to defraud, Plaintiffs have also charged Defendants with a conflict of interest because at least some of the savings to Enron in paying Plaintiffs with, and reducing the amount of their benefits by use of, artificially inflated stock in their ESOP accounts allegedly went into higher bonuses and salaries for Defendants' personal gain, another breach of fiduciary duty because Defendants had the authority to amend the pension benefits and the discretion to exercise it.

According to Plaintiffs, Defendants had a fiduciary duty during the last three years of the phase-out "to effectively *disregard* the formula (or at a minimum, not to use the publicly traded share price on the days in question to calculate the offset) in order to avoid an imprudent, disloyal result." *Id.* at 74. Plaintiffs cite § 404(a)(1)(D)(A trustee must act prudently and "in accordance with the documents and instruments governing the plan *insofar as such documents are consistent with ERISA* [emphasis added] )", 29 U.S.C. § 1104(a)(1)(D), and, in support of their argument, two cases, *Central States,* 472 U.S. at 569, 105 S.Ct. 2833 ("[T]rust documents cannot excuse trustees from their duties under ERISA, and . . . trust documents must generally be construed in light of ERISA's policies."); *NationsBank,* 126 F.3d at 1369 (ESOP trustees are required to follow plan documents only to the extent they are consistent with ERISA; if the mirror voting provision was imprudent, NationsBank must ignore the provision and vote the unallocated shares prudently).[162]

---

**162.** The facts, focus, and the contexts in these cases are easily distinguishable from those in *Tittle.* More importantly, while the cases in *dicta* support "disregarding" provisions in a

plan that would require a trustee to breach its fiduciary duties of loyalty to the participants and prudence, the cases do not stand for the kind of specific affirmative duty to rewrite or amend the plan with the kind of particular plan provisions advocated here by Plaintiffs, i.e., to determine for themselves the real value of Enron stock for each of the last three years and/or not fix the price of the artificially inflated stock as a permanent component of the offset. Instead trustees, not the court, must examine available prudent options, described by the Eleventh Circuit in *NationsBank* as a "fact-laden issue" which is not appropriate for determination before discovery. 126 F.3d at 1369.

*Central States*, 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447, dealt with two ERISA-governed multiemployer welfare and pension benefit plans for employees performing work covered by collective bargaining agreements between a labor union and sixteen trucking companies. Under the collective bargaining agreements, each trucking company employer was required to make weekly contributions to the plans for each covered employee and, because of the size of the plans, to self-report the amount of its contribution liability and relate fluctuations in the employment status (e.g., terminations, new hires) of employees covered by the collective bargaining agreement so that the funds could adjust the weekly invoice. The funds would check on this self-reporting process by conducting random audits of the participating trucking company employers' records. Furthermore, the trust agreements of the plans contained a number of provisions to protect the trust, including one giving the trustees the power to demand and review relevant employer records, which the trustees construed as authorizing the audits. The trucking company employers refused to permit the funds to audit their payroll, tax, and personnel records, including records of employees that the employers maintained were not plan participants. The funds filed suit seeking an order to permit them to do the audits.

The case does not address a plan provision that would cause conflict with a trustee's fiduciary obligations to the participants. The Supreme Court concluded that the trustees' interpretations of the trust agreements as authorizing the audits, including those of non-covered employees to verify the accuracy of the employer's determination of the class of covered employees, was consistent with ERISA and entirely reasonable in light of ERISA's policies. The Supreme Court drew on the traditional common law of trusts to fill in the powers of the trustees not specifically enumerated in ERISA. At common law trustees had all the powers necessary or appropriate for effectuating the purposes of the trusts, which would include the goals of the audit, i.e., to inform plan participants fully of their rights and to check the financial integrity of the plans by determining the group of potential benefit claimants, while simultaneously insuring that the employers made full and prompt contributions. Significantly, as noted, in *Central States* the Supreme Court concluded that there was no inconsistency between the trustees' interpretation of the plan and ERISA. The high court observed that typically an employer is motivated to underreport the number of covered employees to reduce its own liability to the plans. Unlike the *Tittle* Plaintiffs, the court in *Central States* did not impose an affirmative duty on the trustees not merely to ignore the trust agreement, but to create new terms in order to fulfill duties of loyalty and prudence to plan participants and beneficiaries. Instead it determined that the right to monitor the employers' records to insure the financial stability and continuance of the plans was entirely reasonable and consistent with the policies behind the statute to preserve the funds' financial soundness to ensure that workers would receive vested benefits.

The Eleventh Circuit's opinion in *NationsBank* concerned an ESOP, not a Cash Balance Plan, and focused largely on ESOP shares allocated to the participants' individual accounts, regarding which the appellate court determined the trustee was a directed trustee and was relieved of liability in part because it was protected by § 404(c) when informed participants directed the management of those assets. This Court questions whether and how an ESOP would qualify as a § 404(c) plan. The trustee was held to be a fiduciary, however, with respect to ESOP shares not allocated to the participants individual accounts, not at issue here, which required the trustee to satisfy fiduciary standards under § 404(a)(1)(D).

In *NationsBank*, in 1988 Polaroid created an ESOP in part to thwart the threat of a hostile takeover by Shamrock Acquisitions, III, Inc. It allocated some common stock to participants' individual accounts in proportion to that participant's compensation and held other, unallocated stock in a separate account. The ESOP provided for "pass-through voting," which permitted participants to vote their allocated shares as if they

were shareholders. The plan also stated that in the event of a tender offer, the plan participants may direct the trustee, which was NationsBank, to tender or not tender their allocated shares. In addition the ESOP had a mirror voting provision, instructing the trustee to tender the unallocated shares in the same proportion as it tendered the allocated shares. Pass-through voting and mirror voting provisions are common in ERISA-governed ESOPS. The focus of *NationsBank,* unlike the issues before this Court, was on the trustee's responsibilities with respect to these two types of provisions and on evaluating the Department of Labor's stance regarding them.

When Shamrock made its tender offer, followed by one from Polaroid, NationsBank mailed the plan participants a description of the tender offers and informed them that by a specified date they had to direct NationsBank to tender or not tender their allocated shares to Polaroid or Shamrock, and that if they did not return the direction form, NationsBank would consider them to have chosen not to tender their shares. Significantly, the letter did not inform the participants that the unallocated shares would be voted in the same proportions as the allocated shares. Thus NationsBank was a directed trustee under § 403(a) for the plan participants with shares allocated to their individual ESOP.

After considering the prudence of the three options (directing tender to Polaroid, directing tender to Shamrock, and not tendering the ESOP shares in the individual accounts), the bank's Committee decided each was prudent because the post-tender price of Polaroid stock was uncertain; it chose to follow the plan provision for "pass-through voting" and the mirror voting provision.

The Secretary of the Department of Labor sued NationsBank on two causes of action, only one of which is relevant here: that the trustee violated § 404(a)(1)(A) and (B) because it failed to tender all of the unallocated shares and the allocated non-voted shares to Polaroid.

Both parties filed motions for summary judgment. The district court held that NationsBank could not rely on the plan's pass-through and mirror voting provisions, but had to exercise its independent judgment and follow the plan provisions only if they led to a prudent result. It also held that NationsBank had the exclusive responsibility for deciding whether to tender allocated non-voted shares and that ERISA precluded it from construing plan participants' failures to respond to its

notice as directions not to tender. It further found that genuine issues of material fact existed regarding whether NationsBank acted prudently in withholding the shares it did and whether NationsBank acted solely in the interest of plan participants. The district court pursuant to a request from NationsBank certified the decision on Count One for interlocutory appeal.

The Eleventh Circuit, whose opinion is not binding on this Court, focused on the directed trustee exception (29 U.S.C. § 1103(a)(1)) to the general rule that trustees have exclusive authority and control over plan assets. It pronounced, "[I]nsofar as a trustee acts at the direction of a named fiduciary in accordance with the terms of the plan and ERISA's requirements, *he is not subject to the fiduciary requirement in § 1104(a) to act prudently* [emphasis added]." *NationsBank,* 126 F.3d at 1361, *citing Maniace,* 40 F.3d at 267 (holding that a directed trustee is not acting as a fiduciary when he follows a named fiduciary's directions). This Court has previously discussed its disagreement with such a general rule. Thus the issue in *NationsBank* became whether the ESOP participants were "named fiduciaries" who can direct NationsBank's decisions regarding specific plan assets, i.e., unallocated and the allocated but non-voted shares.

The Secretary of Labor argued *inter alia* that plan participants cannot ever be named fiduciaries for the purpose of directing the trustee under 29 U.S.C. § 1103(a)(1) with respect to unallocated shares or allocated non-voted shares and therefore the trustee's decisions regarding those kinds of shares are subject to fiduciary duties, including the prudent man standard of 29 U.S.C. § 1104(a)(1). She insisted that the trustee always has the fiduciary responsibility for managing such unallocated shares, as well as allocated non-voted shares; thus the trustee may choose to follow plan participants' directions regarding those unallocated shares only to the extent that the participants' directions are prudent, consistent with the plan, and not contrary to ERISA. She also argued more narrowly that even if the plan participants were fiduciaries with respect to unallocated shares in some circumstances, because the tender notice sent to the participants did not explain to them the effect on the unallocated shares of their action or inaction in responding to the trustee's notice, they were not properly informed of their power and control over these unallocated shares. In addition, the Secretary maintained that the only prudent course for Nati-

As was the case in *Central States*, this Court finds that the Cash Balance Plan amendment, itself, is consistent with ERISA. In fact, the use of the closing market price on the designated day of each of five years is consistent with ERISA's own provision, § 3(1), 29 U.S.C. § 1002(18), that "adequate consideration" for purposes "of a security for which there is a generally recognized market" is "the price of the security prevailing on a national securities exchange which is registered under section 6 of the Securities Exchange Act of 1934." Moreover, although the inflated value of Enron stock had the effect of severely reducing the plan participants and beneficiaries' pension benefits, "[t]he Internal Revenue Code does not require that the defined benefit be fixed, but only that it be determinable according to criteria specified in advance that do not permit the plan to play favorites." *Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 241 F.3d 609, 612 (7th Cir.2001), *citing* 26 U.S.C. § 401(a)(25); 26 C.F.R. § 1.401–1(b)(1)(i). There are no allegations here of discrimination in the administration of the plan in order to interfere with benefits under § 510 of ERISA. Furthermore, an offset is a permissible method of controlling employer costs; "[b]enefits provided by one plan may be offset by benefits received under other plans provided by the same employer." *Lunn v. Montgomery Ward & Co.*, No. 97 C 3026, 1998 WL 102751, *6 (N.D.Ill. Feb. 26, 1998) (*citing Pritchard v. Rainfair*, 945 F.2d 185, 189–90 (7th Cir.1991), and *Holliday v. Xerox Corp.*, 732 F.2d 548, 550–52 (6th Cir.1984)), *aff'd*, 166 F.3d 880 (7th Cir.1999). In sum Plaintiffs have failed to point out any specific provisions showing that the plan is inconsistent with the provisions of ERISA or of the Internal Revenue Code.

onsBank would have been to tender all of the ESOP's shares to Polaroid.

The Eleventh Circuit, noting that under ERISA to be a fiduciary a party must have "discretion to decide the disposition of plan assets or must exercise authority or control over plan assets," reasoned that "[a] person cannot exercise the power of choice or individual judgment unless he is aware of his ability to do so." 126 F.3d at 1366. Because the participants did not receive notice that their action or inaction in voting their allocated shares would also control the disposition of the unallocated shares, they were not fiduciaries. Furthermore, "[i]f ERISA did not limit the definition of fiduciaries to those with knowledge of their authority and discretion, then person or entities could become subject to fiduciary liability without notice. Such a result would not only be unfair, but it would also disserve a core purpose of ERISA, which is to create a system whereby accountable fiduciaries are motivated by their accountability to protect the interests of participants in ERISA plans." *Id.* The Eleventh Circuit emphasized that § 404(c)(1) of ERISA allows individual account plans to give participants control over the assets allocated to their own individual accounts and thus relieve the trustee from being deemed fiduciaries and free the trustee from liability, while simultaneously not saddling the participants with fiduciary responsibilities and liability for what happens when they exercise control over their own accounts. But ERISA does not address unallocated shares nor participant control over unallocated assets, especially where participants are not adequately informed of the power and effect of their decisions. Imprudent decisions by plan participants would then affect not only their own assets, but the interests of other participants, and the participant decision-makers would be subject to suit by co-participants. Moreover, plan participants do not lose control over the assets allocated to their individual accounts merely because they fail to respond with directions for a tender offer after they have been informed that a failure to respond will be treated as a direction not to tender because that failure to respond with directions is an exercise of control or discretion. Thus the plan participants can be named fiduciaries with respect to the allocated, non-voted shares also. The appellate court remanded the case for determinations of fact issues.

What Plaintiffs have alleged is that various Defendants' purported fraud made the implementation of the plan, even though it was facially consistent with and permissible under the statute, imprudent for the last three years of a five-year phase-out period and that those circumstances made continued implementation of the plan a violation of their fiduciary duty of loyalty and prudence. It is necessary here to distinguish the breach of fiduciary duty alleged by Plaintiffs and the remedies they claim the trustee should have followed rather than breach his fiduciary duty. The Court agrees that Plaintiffs have stated a claim for breach of fiduciary duty; it is two of their particular remedies with which this Court takes issue because they offend policies behind ERISA. It addresses the Plaintiffs' proposed remedies first.

Plaintiffs plead that the plan administrators should have not only "disregarded" terms of the amended plan established by the employer in his settlor capacity, even though they facially complied with the statute, but also that the administrators should affirmatively have determined for themselves the real value of Enron stock for each of the last three years and used that amount and/or not fixed the price of the artificially inflated stock as a permanent component of the offset. Plaintiffs cannot mandate to the plan administrators what they should have done; and a court can only determine after the fact whether the path the administrators took was prudent in light of the circumstances and available options. A fiduciary must independently investigate and examine the prudence of possible options and determine which to follow, with an eye to the

policies underlying ERISA. There is a substantial difference between "disregarding" a plan term and mandating a specific new one that offends the employer/settlor's authority.

■■■ The two proposed remedies appear not merely to restrict the administrators' options, but are contrary to ERISA's policies. These proposed remedial actions in essence would constitute a plan amendment without reference to plan procedures.[163] The Court finds no authority for and is not willing to impose as a fiduciary duty on the trustee or plan administrators, as a matter of law, writing such specific terms into the plan; plan amendment is a settlor function, and in the case *sub judicia*, is reserved by the Cash Balance Plan's express terms solely to the Company. *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 511 (5th Cir.2000) ("An employer who adopts, amends or terminates an employee benefit plan is not acting as a fiduciary.") (*citing Lockheed Corp. v. Spink*, 517 U.S. 882, 889–90, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996).), *cert. denied*, 534 U.S. 822, 122 S.Ct. 57, 151 L.Ed.2d 26 (2001). The settlor function protection was created to encourage employers to establish plans. There are other options open to the trustee to "disregard" the plan's terms under the circumstances.

Second, the proposed task (of determining the true worth of Enron stock) would have been complex, costly, and unlikely to yield certain or verifiable figures in light of the alleged fraud ERISA was enacted not only to provide plan participants and beneficiaries with a vested right to receive ben-

---

**163.** The Court points out that § 402(a) of ERISA, 29 U.S.C. § 1102(a) requires, "Every employee benefit plan shall be established and maintained pursuant to a written instrument." Thus the statute "mandates that [a] plan itself and any changes made to it are to be in writing." *Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir.1989). Indeed, "a written employee benefit plan may not be modified or superceded by oral undertakings on the part of the employer." *Musto v. American General Corp.*, 861 F.2d 897, 910 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989).

efits when they reach normal retirement age, but also, as a balance, to hold down the impact of cost increases and burdens on employers, again to induce them to create such plans.

Alternatively Plaintiffs assert that Defendants had a fiduciary duty to disclose the artificially inflated price of the stock to protect the plan participants and beneficiaries. Here Plaintiffs have stated a more appropriate option under the circumstances: affirmative disclosure of the artificially high price of the stock, which, as noted previously, would, because of the securities laws' insider trading provisions, also necessitate a duty to find a means to disclose to all investors and the public at large the fraudulent acts and concealment that inflated the value of Enron stock. As indicated *supra*, the Fifth Circuit has recognized that "Section 404(a) imposes on a fiduciary the duty of undivided loyalty to plan participants and beneficiaries, as well as a duty to exercise care, skill, prudence and diligence. An obvious component of those responsibilities is the duty to disclose material information" to protect plan participants and beneficiaries where the impact of undisclosed information could cause plan participants and beneficiaries substantial injury. In *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d at 237; *Ehlmann v. Kaiser Foundation Health Plan of Texas*, 198 F.3d at 556 (describing

the imposition of a duty to disclose in *McDonald* as based on the "extreme impact" that the change in rate schedules would have on small employers, including the plaintiffs). Plaintiffs have alleged circumstances supporting the extreme impact that implementation of the new formula would have on plan participants and beneficiaries from 1998–2000.

▮▮▮▮▮▮ Some Defendants have argued that rather than a cause of action for breach of fiduciary duty, Count IV is actually an improperly framed challenge of and claim for plan benefits that can only be brought under § 502(a)(1)(B), 29 U.S.C. § 1132,[164] authorizing a participant civil suit "to recover benefits due ... under the terms of [the] plan, to enforce ... rights under the terms of the plan, or to clarify ... rights to future benefits under the terms of the plan" and with remedies limited to "accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits".[165] "When a beneficiary wants what was supposed to have been distributed under a plan, the appropriate remedy is a claim for denial of benefits under § 502(a)(1)(B) of ERISA rather than a fiduciary duty claim brought pursuant to § 502(a)(3)." *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 512 (5th Cir.2000), *cert. denied*, 534 U.S. 822, 122 S.Ct. 57, 151 L.Ed.2d 26 (2001).[166] Moreover, as noted earlier, a

164. *See* discussion in this memorandum and order addressing Standing and Remedies under ERISA.

165. *Pilot Life*, 481 U.S. at 53, 107 S.Ct. 1549. Furthermore, the Fifth Circuit has held that "an ERISA plaintiff may bring a private action for breach of fiduciary duty only when no other remedy is available under [§ 501(a)(3)], 29 U.S.C. § 1132." *Rhorer v. Raytheon Eng'rs and Constructors, Inc.*, 181 F.3d 634, 639 (5th Cir.1999), *citing Varity Corp.*, 516 U.S. at 510–16, 116 S.Ct. 1065.

166. *McCall*, 237 F.3d at 512, sets out the Fifth Circuit's two-step analysis for determin-

ing if a plan administrator abused its discretion in denying a participant benefits under the plan. First, the Court must decide whether the administrator's interpretation of the plan's terms was the legally correct interpretation. If it was, the inquiry ends. If the court determines the administrator's decision was not legally sound, it must then decide if the administrator's decision constituted an abuse of discretion. *Id.* "A decision is not an abuse of discretion if a reasonable person could have reached a similar decision given the evidence before him." *Id.* Elsewhere the Fifth Circuit has elaborated to explain that in deciding if the administrator's interpretation was an abuse of discretion, the court should

§ 502(a)(1) claim can only be brought on behalf of the plan, and not by "certain" plan participants and beneficiaries.

On the other hand, Section 502(a)(3) permits a plan participant to bring a suit "to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or ... to obtain other such appropriate equitable relief ... to redress such violations or ... to enforce any provisions of [ERISA] or the terms of the plan."

Plaintiffs insist they do not assert a § 502(a)(1) claim for denied plan benefits, which would require the Court to determine (1) whether the plan administrator made the correct legal interpretation of the plan and (2) whether the administrator interpreted the plan uniformly. *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604, 608 (5th Cir.1998). Plaintiffs emphasize that their claim does not fall under § 502(a)(1) because they agree that the plan is clear and unambiguous, they are not contending that Defendants did not interpret it properly, and they are not seeking to recover benefits under the terms of the plan. The Court agrees. They seek not to recover benefits, enforce rights, or clarify rights to future benefits under the plan; they seek to nullify the provision in dispute as it applies to certain plan participants from 1998–2000. *See, e.g., Ross v. Rail Car America Group Disability Income Plan*, 285 F.3d 735, 740, 741 (8th Cir.2002)(section 502(a)(1)(B) does not authorize a claim to reform a plan by obtaining a declaration that certain amendments are void; suits "which seek to invalidate [plan provisions] can only be characterized as arising under 29 U.S.C. § 1132(a)(3), section 502(a)(3) of ERISA.") (and cases cited therein), *cert. denied*, 537 U.S. 885, 123 S.Ct. 118, 154 L.Ed.2d 144

(2002). Normally the defendant in a suit for payable benefits under the terms of a plan is the plan. *Ross*, 285 F.3d at 740, *citing Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1490 (7th Cir. 1996) ("The appropriate defendant for a denial of benefits claim would be the Plan ...."), and *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1324 (9th Cir. 1985)("ERISA permits suits to recover benefits only against the Plan as an entity...."). Here Plaintiffs have dismissed the Cash Balance Plan. Because Plaintiffs have consciously framed their claim under § 502(a)(3) as a breach of fiduciary duty, they therefore must meet the burdens of proving a claim for which relief is provided under that statute.

In their complaint, Plaintiffs are vague about the equitable remedy prayer with respect to the Cash Balance Plan. According to the complaint they seek to enjoin Defendants from computing the value of each component of the ESOP offset according to the market value of the Enron shares on each January 1st of the three-year period 1998–2000 and order those defendants to redress all damages flowing from prior Cash Balance payments made pursuant to the offset arrangement. Complaint at 295. In their memorandum in opposition (# 315 at 76), they assert that they seek "injunctive and declaratory relief from those now in charge of the plan" and from each Committee Member "monetary make-whole relief that was 'typically available in equity.'" They cite as authority *Great–West*, 122 S.Ct. at 712, which ironically may be their undoing.

 "In determining the propriety of a remedy, we must look to the real nature of the relief sought, not its label." *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 321

---

examine whether the administrator gave the plan a uniform construction, made a fair reading of the plan, and any other unantic-

ipated costs resulting from different interpretations of the plan. *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604, 608 (5th Cir.1998).

(2d Cir.2003), *cert. denied* —— U.S. ——, 124 S.Ct 435, —— L.Ed.2d —— (2003), *citing Great–West,* 534 U.S. at 210, 122 S.Ct. 708.

The remedy of an injunction to maintain the status quo in *Tittle* would be to enjoin a three-year practice of offsetting pension benefits with the inflated value of Enron stock; that practice ended in 2000 and thus injunctive relief "to preserve the status quo" is a moot issue. Moreover it would not be an injunction under the language of § 502(a)(3) "to enjoin any act or practice which violates the terms of the plan" since implementation of that offset was in compliance with the terms of the plan.

 Moreover declaratory relief is not necessarily equitable relief. *Bauhaus USA, Inc. v. Copeland,* 292 F.3d 439 (5th Cir.2002) (Section 502(a)(3) of ERISA does not authorize Bauhaus' suit, because Defendants were not in possession or control of the funds). As noted by Judge Weiner in his dissent to *Bauhaus,* the Declaratory Judgment Act is a procedural statute and does not provide an independent basis for federal jurisdiction. *Id.* at 447. Instead "although declaratory judgment, in and of itself, is neither legal nor equitable, it takes on the character of the underlying right or relation it declares." *Id.* at 448 nn. 17, 19.

Under § 503(a) a prayer for equitable relief such as disgorgement or restitution to redress violations such as breaches of fiduciary duty must refer to "those categories of relief that were *typically* available in equity" under *Great–West.* Remedies of equitable restitution and disgorgement would have to meet the standard set out in *Great–West,* i.e., remedies that were *typically* available in a court of equity and that are not compensatory damages punishing Defendants for Plaintiffs' loss, but restoration of property subject to imposition of a constructive trust or equitable lien in which money belonging in good conscience to Plaintiffs can clearly be traced to particular funds in the Defendants' possession.

Plaintiffs' complaint alleges that they are seeking "monetary make-whole relief" from Committee Members' personal assets, in essence a claim for the difference in value between what their pensions would have been if calculated by a formula using the true worth of Enron stock and what they were allocated under the inflated value calculation from 1998–2000. As discussed earlier, under *Great–West* such monetary relief is actually compensatory relief for their loss, the imposition of personal liability on these Defendants' individual resources, unless Plaintiffs can trace some or all of the sum of money to which they claim entitlement, but which was never received by them or by the plan, through Enron's enormous business into the bonuses and increased salaries that went into these particular Defendants' personal pockets and which remains within their possession and control. Plaintiffs have set themselves a daunting task. At this stage of the litigation the Court cannot state that there is no possibility that Plaintiffs can satisfy their burden of proof, but their relief is limited to that defined as typical equitable restitution in *Great–West.*

#### D. Texas Common Law Causes of Action

#### 1. Count IX: Civil Conspiracy

 Plaintiffs' civil conspiracy claim (Count IX, complaint at 292–95, brought against Andersen, Enron Insiders, Attorney Defendants, and Investment Banking Defendants, asserts that "non-Enron Defendants ... conspired with Enron and Enron Insider Defendants for the unlawful purpose of masking the true financial condition of Enron, thereby deceiving Enron employees into (i) accepting over-valued Enron stock and phantom stock" as compensation; (ii) keeping their retirement as-

sets in artificially inflated Enron stock; and (iii) continuing to work a[t] Enron based on their false belief that it was a strong company.) *Id.* at 293, ¶ 823. It also states that the Defendants knew that "the falsified financial picture generated by the conspiracy" would *inter alia* cause the plan participants to "accept an offset to their Cash Balance Plan payments based on the artificially inflated price of Enron stock held by the ESOP," "continue to direct that their retirement plans be heavily concentrated in Enron stock which provided further benefits to Enron and, indirectly, to its co-conspirators," and "continue to offer Enron securities to the market." *Id.*, ¶ 827.

The Court finds that Plaintiffs have stated a claim for civil conspiracy to defraud under Texas common law. The issue becomes whether it is preempted by ERISA.

In a preemption analysis, the Court finds that some factors weigh against preemption of the civil conspiracy claim by ERISA. Texas common-law fraud or fraudulent misrepresentation as the cause of action underlying Plaintiffs' conspiracy claim does not "relate to" ERISA in the sense that it does not refer to ERISA or ERISA plans generally; indeed it is a law of general applicability. Moreover the states have traditionally regulated the area of common law fraud. Nevertheless these factors alone are not sufficient to determine the preemptive effect of the statute. *See Christopher*, 950 F.2d at 1218–19 (where a state law fraud claim "relates to the operations of an ERISA plan," "preempted state law includes any state law cause of action as it relates to an employee benefit plan, event if it arises under general law which in and of itself has no connection to employee benefits plans").

To determine whether there is a forbidden "connection" between the alleged wrongful fraudulent conduct and the plans at issue here, that would directly impact the administration and operation of those plans, rather than have merely a tenuous, remote or peripheral connection with the plans, this Court starts with the presumption that Congress does not intend to supplant state law. *Travelers*, 514 U.S. at 654, 115 S.Ct. 1671. It looks to the objectives of ERISA to determine the scope of the state law that Congress intended would survive and finds a number of them relevant here: protecting the interests of participants and their beneficiaries by requiring the disclosure and reporting of financial and other information, establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and providing appropriate and uniform remedies.

The specific nature of the allegations of fraud here shows that the employee benefit plans at issue were an essential part of Defendants' alleged conspiracy for personal gain. According to the complaint, by paying compensation to plan participants in the form of highly inflated Enron stock rather than cash, Enron was able to save substantial money which it then used for enormous bonuses and fees that purportedly went to the conspiring Defendants. The complaint also states that the block of shares owned by the Savings Plan was "likely to be voted in accordance with Enron management's wishes" and that the participants' purchases of the stock "created extra demand for Enron stock and thus helped increase the market price for Enron stock which was another objective of the Enron Insider Defendants." Complaint at 70, ¶ 241. Furthermore, with the participants' shares tied up in the plans where they could not easily be traded, fewer shares of Enron stock could be sold by worried investors, allowing defendants to sell theirs at higher prices.

The complaint asserts that the conspirators simultaneously engaged in self-dealing

and knowingly, fraudulently, and substantially diminished at the outset of the conspiracy (not by decline over the years) the value of the assets contributed by Enron to the plan that would fund benefits to the plan participants and beneficiaries, thus immediately and directly impacting an area of exclusive federal concern, i.e., the plan participants' and beneficiaries' right to receive benefits. The alleged fraudulent conduct falls within the sphere of a "pension-defeating motive" and was central to the conspiracy claim. *Bullock*, 259 F.3d at 400. Moreover, denial of plan benefits "is an area of core ERISA concern." *Egelhoff*, 532 U.S. at 147, 121 S.Ct. 1322. Plaintiffs' alleged wrongful conduct in the civil conspiracy/fraud claim directly impacted the administration of the ERISA plans and interfered with the responsibilities of the plans' administrators and fiduciaries with the authority and the duty to invest prudently in appropriate securities to protect participants and beneficiaries' retirement funds. The conspiracy allegedly directly and substantially looted the assets that should have been placed in trust in the plans to be available as future benefits to the participants and beneficiaries.

Which of the alleged conspirators might qualify as a plan fiduciary is a factual issue not appropriate for resolution on a 12(b)(6) motion; nevertheless that issue in turn also specifically implicates core ERISA issues of fiduciary, co-fiduciary, and interested-party breach of duties. The conspiracy claim also involves and materially affects the relationships among the traditional ERISA entities—the plans' employer, the plans' administrators and fiduciaries, the plans themselves, and the plans' participants and beneficiaries. ERISA was intended to deter mismanagement of ERISA plan benefits:

> In enacting ERISA, Congress' primary concern was the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds. To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator.

*California Division of Labor*, 519 U.S. at 326–27, 117 S.Ct. 832, *quoting Massachusetts v. Morash*, 490 U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989).

Moreover the conspiracy to defraud claim triggers both conflict preemption and complete preemption. First it interferes with the rights guaranteed to plan participants by the plans and by ERISA's fiduciary duty standards. Second, the carefully crafted, exclusive enforcement provisions in 29 U.S.C. § 1132(a) demonstrate that Congress did not intend to authorize other remedies. The compensatory and punitive damages that would be available under the Texas common-law tort constitute an alternative enforcement mechanism to that relief available in § 502(a) of ERISA. Against any Enron fiduciary compensatory and punitive monetary damages would not constitute "other appropriate equitable relief" within the meaning of § 1132(a)(3). While ERISA does not permit a civil action by plan participants for money damages against a nonfiduciary, it does permit a claim for "appropriate equitable relief" under section 502(a)(3), 29 U.S.C. § 1132(a)(3), by plan participants against a nonfiduciary "party in interest," which would include a provider of services under 29 U.S.C. § 1002(14)(B), such as Arthur Andersen, Vinson & Elkins, and the investment Bank Defendants, who purportedly knowingly participated with plan fiduciaries in a breach of fiduciary duties, i.e., violations of § 406(a) (including payment for furnishing services) and § 404. *See, e.g., Harris Trust*, 530 U.S. 238, 120 S.Ct. 2180, 147

L.Ed.2d 187; *Diduck*, 974 F.2d at 281; *Whitfield*, 853 F.2d at 1303; *Rudowski*, 113 F.Supp.2d at 1180. Thus the conspiracy claim falls within the scope of ERISA preemption and is preempted by ERISA.[167]

In sum, in so far as the civil conspiracy allegations relate to Plaintiffs' ERISA claims, they were directed against ERISA plan assets and affect the relationship of the plan fiduciaries and the employer to the *Tittle* Plaintiffs in ERISA covered retirement plans. They accordingly are completely preempted by ERISA. *See McDonald*, 60 F.3d at 238 (civil conspiracy claim that ERISA fiduciary failed to disclose material information about health insurance premiums preempted by ERISA); *Christopher*, 950 F.2d at 1219 (ERISA preempted civil conspiracy claim relating to alleged misrepresentations regarding tax consequences of an ERISA plan amendment affecting early retirement benefit). The relief available for civil conspiracy claims would also comprise the kind of alternative enforcement mechanism that is precluded by ERISA's civil enforcement provisions. *Pilot Life*, 481 U.S. at 54, 107 S.Ct. 1549; *Arizona Carpenters*, 125 F.3d at 723.

The sole exception to dismissal of the conspiracy claim here might be as it relates to the phantom stock recipients. See footnote 2 of the Memorandum and Order. The phantom stock recipients' claims do not fall under ERISA and thus a conspiracy claim relating to them is not preempted by that statute.[168] Nevertheless, the Court finds that the phantom stock claims are so vaguely pled by the *Tittle* complaint that they fail to give sufficient notice to Defendants of the conspiracy claim against them; as noted in footnote 2 of this memorandum and order, the particular stock involved is not even identified. Therefore the Court finds that the conspiracy claim relating to the phantom stock recipients, too, should be dismissed, but grants leave, to Plaintiffs to amend their pleading to reassert it, if they obtain sufficient information to replead their claim adequately.

### 2. Count VIII: Negligent Misrepresentation

As indicated previously, pursuant to black letter law, Plaintiffs' negligent misrepresentation claim against Arthur Andersen under Texas common law, which in essence is a professional malpractice claim, is not preempted by ERISA.

Pursuant to reasons indicated throughout this memorandum and order, the Court

ORDERS the following:

(1) As requested by Plaintiff, all claims against the Cash Balance Plan are DIS-

---

**167.** In arguing against preemption, Plaintiffs rely heavily on *Corporate Health Ins., Inc. v. Texas Dept. of Ins.*, 215 F.3d 526 (5th Cir. 2000), but seem unaware that judgment was vacated *sub nom. Montemayor v. Corp. Health Ins.*, 536 U.S. 935, 122 S.Ct. 2617, 153 L.Ed.2d 800 (2002), and remanded for the Fifth Circuit to reconsider in light of *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002) (holding *inter alia* that an Illinois statute requiring HMOs to provide independent reviews of disputes between the HMO and the primary care physician and to cover services found to be "medically necessary" by the independent reviewer did not conflict with ERISA by supplementing or supplanting ERISA's civil enforcement scheme, but was within the ultimate relief authorized by ERISA). The issues in *Rush Prudential* are not on point with those in *Tittle*, which deal with retirement plan assets.

**168.** Indeed, the Court observes that the phantom stock claims are part of the conduct charged in the alleged Ponzi scheme actionable under the securities laws and thus not are cognizable under RICO either. Moreover phantom stock does not qualify as a "security" and thus the recipients cannot sue under the federal securities statutes. Even if they could, their conspiracy claim would be barred by SLUSA.

MISSED without prejudice; all claims under Counts I–IV against Barnhart and Causey are DISMISSED without prejudice; all claims under Counts I and II against Skilling are DISMISSED without prejudice (See # 314 at 10–11); the claim against Lay under Count I for fraudulent promotion of Enron stock, but not for breach of fiduciary duty to monitor appointment and conduct of the savings Plan and ESOP Committee Members [which actually belongs under Count V], is DISMISSED without prejudice;

OTHERWISE IN ALL RESPECTS, OR IN ACCORDANCE WITH THE ABOVE,

(2) Kopper's motion to dismiss (# 207) the RICO and common-law conspiracy claims against him is GRANTED;

(3) Arthur Andersen LLP and Andersen Individual Defendants' motion to dismiss (# 208) is DENIED as to Count I (ERISA) and Count VIII (negligence), but otherwise GRANTED.

(4) Mark–Jusbasche's motion to dismiss (# 209) the RICO and common-law conspiracy claims against her is GRANTED;

(5) Odom's motion to dismiss (# 210) is GRANTED as to the RICO claims, but DENIED as the Texas common-law negligent misrepresentation claim;

(6) Harrison's motion to dismiss (# 216) the RICO and common-law conspiracy claims against him is GRANTED;

(7) Pai's motion to dismiss (# 222) the RICO and common-law conspiracy claims against him is GRANTED;

(8) Citigroup, Inc. and Salomon Smith Barney, Inc.'s motion to dismiss (# 227) the RICO and common-law conspiracy claims against them is GRANTED;

(9) J.P. Morgan Chase & Co.'s motion and corrected motion to dismiss (# 229, # 351) the RICO and common-law conspiracy claims against it are GRANTED;

(10) Enron Corporation Savings Plan Administrative Committee's and the Administrative Committee of the ESOP's motion to dismiss (# 231) is DENIED;

(11) Vinson & Elkins Defendants' motion to dismiss (# 232) the RICO and common-law conspiracy claims against them is GRANTED; (12) Derrick, Jr.'s motion to dismiss (# 233) the RICO and common-law conspiracy claims against him is GRANTED;

(12) Derrick, Jr.'s motion to (#234) and RICO and common–law Conspiacy claims against him is GRANTED;

(13) Olson's motion to dismiss (# 234) ERISA claims against her is DENIED;

(14) Causey's motion to dismiss (# 235) all claims against him is GRANTED;

(15) Credit Suisse First Boston Corporation's motion to dismiss (# 236) the RICO and common-law conspiracy claims against it is GRANTED;

(16) Merrill Lynch & Co.'s motion to dismiss (# 238) the RICO and common-law conspiracy claims against it is GRANTED;

(17) Outside Director Defendants' motion to dismiss (# 240) is DENIED as to the ERISA Counts IV and V against the Compensation Committee members (i.e., Blake, Duncan, Jaedicke and LeMaistre) and is GRANTED in all other respects;

(18) Northern Trust Company's motion to dismiss (# 241) is DENIED;

(19) Fastow's motion to dismiss (# 244) the RICO and conspiracy claims against him is GRANTED;

(20) Sutton's motion to dismiss (# 251) the RICO and conspiracy claims against him is GRANTED;

(21) Skilling's motion to dismiss (# 262) is GRANTED [169];

---

**169.** Although Count III, asserting failure to diversify the assets of the Savings Plan

(22) Lay's motion to dismiss (# 264) is DENIED as to the ERISA claim of breach of fiduciary and co-fiduciary duty to appoint, monitor, and remove and to make material disclosures necessary to protect the plan and its participants and beneficiaries, but it is GRANTED as to the RICO and common-law conspiracy claims against him;

(23) Certain Officer Defendants' motion to dismiss (# 265) the RICO and common law conspiracy claims against them is GRANTED

(24) Certain Administrative Committee Members' motion to dismiss (# 269) is DENIED;

(25) Enron Corp.'s motion to dismiss (# 370) ERISA claims against it is DENIED.

As a housekeeping matter, Plaintiffs' motion for leave to file notice of supplemental authority regarding *In re Worldcom ERISA Litigation* (# 598), the Secretary of Labor's request for leave to file response to supplement Outside Directors' motion to dismiss ERISA claims (# 624), and Plaintiffs' motion for leave to file notice of supplemental authority regarding *Kmart ERISA Litigation* (# 628) are GRANTED.

As a final matter, in light of this ruling, should the *Tittle* Plaintiffs wish to amend their motion for class certification, they shall notify the Court as soon as possible, with an indication of how much time they will need to file a superseding motion.

against the Administrative Committee and its members, conclusorily names Skilling, it does not state that he was a member of the Administrative Committee. Moreover the complaint

provides no details to support Skilling's liability, and Plaintiffs do not address Skilling's role in their opposition brief.